## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BAYOU STEEL BD HOLDINGS, L.L.C., *et al.*,[1] | Case No. 19-12153 (KBO) |
| Debtors. | (Joint Administration Pending) |

## DECLARATION OF ALTON DAVIS, PRESIDENT AND CHIEF OPERATING OFFICER OF BAYOU STEEL BD HOLDINGS, L.L.C., IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Alton Davis, hereby declare under penalty of perjury and to the best of my knowledge, information and belief:

1.      I am the President and Chief  Operating Officer ("**COO**") of Bayou Steel BD Holdings, L.L.C. and its subsidiaries (collectively, the "**Debtors**" or the "**Company**") in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**"). I have served as President and COO of the Debtors since April 4, 2016.

2.      In my capacity as COO of the Debtors, I have personal knowledge of, and am familiar with, the business affairs, day-to-day operations, books and records, and financial condition of the Debtors. I am authorized to make this declaration (this "**Declaration**") on behalf of the Debtors. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' employees, agents, attorneys, and advisors, the accuracy and completeness of which information I relied upon to provide this Declaration. References to the Bankruptcy Code (as hereafter defined), the chapter

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Bayou Steel BD Holdings, L.L.C., a Delaware limited liability company (1984), BD Bayou Steel Investment, LLC, a Delaware limited liability company (1222), and BD LaPlace, LLC, a Delaware limited liability company (5783). The location of the Debtors' mailing address is 138 Highway 3217, LaPlace, Louisiana 70068.

11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel. If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

3.      On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition in the United States Bankruptcy Court for the District of Delaware (the "**Court**") commencing a case for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors will continue to operate their business and manage their properties as debtors in possession.

4.      I submit this First Day Declaration on behalf of the Debtors in support of the Debtors' (a) voluntary petitions for relief that were filed under chapter 11 of the Bankruptcy Code and (b) "first-day" pleadings, which are being filed concurrently herewith (collectively, the "**First Day Pleadings**").[2]

5.      Contemporaneously herewith, the Debtors have filed the following First Day Pleadings:

   a.     Motion of Debtors for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases (the "**Joint Administration Motion**");

   b.     Motion of the Debtors for Entry of an Order Pursuant to Bankruptcy Rule 1007 Extending the Deadline to File Schedules of Assets and Liabilities and Statements of Financial Affairs (the "**Schedules Extension Motion**");

   c.     Application of Debtors for Authorization to Employ and Retain Kurtzman Carson Consultants LLC as Claims and Noticing Agent Effective *Nunc Pro Tunc* to the Petition Date (the "**Claims Agent Application**");

   d.     Motion of Debtors for Entry of an Order (I) Authorizing Continuation of, and Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection With, Various Insurance Policies, (II) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto, (III) Preventing Insurance Companies From Giving Any

---

[2]  Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the applicable First Day Pleadings.

70548148.10

Notice of Termination or Otherwise Modifying Any Insurance Policy Without Obtaining Relief from the Automatic Stay, and (IV) Authorizing the Debtors to Continue to Honor Premium Financing Obligations (the "**Insurance Motion**");

e.  Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors, Shippers, and Freight Forwarders, and (II) Granting Related Relief (the "**Critical Vendors Motion**");

f.  Motion of Debtors for Entry of Interim and Final Orders Authorizing Payment of (I) Certain Prepetition Workforce Claims, Including Wages, Salaries, and Other Compensation, (II) Certain Employee Benefits and Confirming Right to Continue Employee Benefits on a Postpetition Basis, (III) Reimbursement to Employees for Prepetition Expenses, (IV) Withholding and Payroll-Related Taxes, (V) Workers' Compensation Obligations, and (VI) Prepetition Claims Owing to Administrators and Third-Party Providers (the "**Wages Motion**");

g.  Motion of Debtors for an Order Authorizing Payment of Prepetition Taxes and Fees (the "**Taxes Motion**");

h.  Motion of Debtors for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service, (II) Approving the Debtors' Proposed Adequate Assurance of Payment for Postpetition Services, and (III) Establishing Procedures for Resolving Requests for Additional Adequate Assurance of Payment (the "**Utilities Motion**");

i.  Motion of Debtors for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service, (II) Approving the Debtors' Proposed Adequate Assurance of Payment for Postpetition Services, and (III) Establishing Procedures for Resolving Requests for Additional Adequate Assurance of Payment (the "**Cash Management Motion**");

j.  Motion of Debtors for Interim and Final Orders Authorizing the Debtors to Maintain and Administer Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto (the "**Customer Programs Motion**");

k.  Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Use of Cash Collateral, (II), Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV) Setting a Final Hearing, and (V) Granting Related Relief (the "**Cash Collateral Motion**").

70548148.10

6.      The Debtors seek the relief set forth in the First Day Pleadings to minimize the disruption to and adverse effects of the commencement of the Chapter 11 Cases on business operations and to maximize the value of their assets. I have reviewed the Debtors' petitions and the First Day Pleadings, or have otherwise had their contents explained to me by the Debtors' advisors, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' business and to successfully maximize the value of the Debtors' estates.

7.      References to the Bankruptcy Code, the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel or from my personal experience in other restructurings. If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

8.      To familiarize the Court with the Debtors and the relief the Debtors seek early in these Chapter 11 Cases, this Declaration is organized into four sections. <u>Section I</u> provides an introduction to the Debtors and detailed information on the Debtors' corporate history, business operations, and organizational structure. <u>Section II</u> provides an overview of the Debtors' prepetition capital structure. <u>Section III</u> describes the circumstances leading to the commencement of these Chapter 11 Cases, the Debtors' efforts to negotiate agreements with key constituents, and the objectives of these Chapter 11 Cases. <u>Section IV</u> sets forth the relevant facts in support of each of the First Day Pleadings filed in connection with these Chapter 11 Cases, which the Debtors believe are critical to administering these Chapter 11 Cases and preserving and maximizing the value of the Debtors' estates.

4

I.    **OVERVIEW OF CORPORATE HISTORY, BUSINESS OPERATIONS, AND ORGANIZATIONAL STRUCTURE**

A.    **Corporate History and Business Operations**

9.    The Company was founded in 1979 under the name Bayou Steel Corporation ("**BSC**"). The Company is a mini-mill with electric arc furnace steelmaking, continuous billet casting, and a medium section rolling mill.  It operates a bar product rolling mill in Harriman, Tennessee.

10.    The Company is headquartered in LaPlace, Louisiana (the "**Headquarters**"). Headquarters is located alongside the Mississippi River and near several rail providers. This allows the Company to distribute domestically and internationally.

11.    As detailed in the map below, Headquarters and a location in Harriman, Tennessee are the Company's operating facilities (the "**Facilities**"). The Facilities include a melt shop and rolling mills. At Headquarters and a location in Harvey, Louisiana, the Company conducts recycling operations which include the recycling of automobiles and appliances. Scrap is either processed at the Facilities or sold.

12.    Operations also include three distribution depots in strategic markets (the "**Distribution Depots**"). Each Distribution Depot includes water and rail access. The Distribution Depots are located in the following cities:

  a.    Tulsa, Oklahoma: services north and central United States. The Company owns the buildings and leases the land.

  b.    Chicago, Illinois: services the Ohio Valley and north and central United States. The Company owns the buildings and land.

  c.    Pittsburgh, Pennsylvania: services the Ohio Valley and northeastern United States. The Company leases the buildings and land.

70548148.10



13.    Typical steelmaking production flow includes processing scrap at Headquarters where it is then sent to steel making operations and then to rolling mills where it is converted into rolled products that are sold from the LaPlace or Harriman facility or shipped to distribution depots from where they are sold. Finished goods are shipped to customers via truck, rail, barge, or internationally via ocean vessel. Given the location of the Facilities and Distribution Depots, the Company has a geographic reach across the United States and North America.

14.    Across the Facilities and Distribution Depots, the Company employed 462 employees. As of the Petition Date, the Debtors employ approximately 161 employees across their Facilities and Distribution Depots.

**B.    Organizational Structure**

15.    In January 2003, BSC and its subsidiaries filed voluntary petitions for relief pursuant to chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Northern District of Texas (the "**2003 Bankruptcy Case**"). The 2003 Bankruptcy Case concluded with a plan of reorganization (the "**2003 Bankruptcy Plan**"). The 2003 Bankruptcy Plan went effective in February 2004. As part of the 2003 Bankruptcy Plan, BSC was dissolved.

16.    After emerging from the 2003 Bankruptcy Case, the Company experienced several years of growth and productivity, which culminated in a 2016 acquisition by Black

Diamond Capital Management ("**Black Diamond**"). As part of that transaction, Bayou Steel BD Holdings, L.L.C. ("**Bayou Steel Parent**") was formed as a Delaware LLC. Bayou Steel Parent is 100% owned by Black Diamond and in turn, owns 100% of each of the subsidiary Debtors.

## II.     PREPETITION CAPITAL STRUCTURE AND FINANCIAL OVERVIEW

### A.     Secured Debt

17.     In April 2016, BD LaPlace, LLC ("**LaPlace**" or the "**Borrower**") as borrower and Bayou Steel Parent and BD Bayou Steel Investment, LLC ("**Bayou Steel Investment**" and together with Bayou Steel Parent, the "**Guarantors**") as guarantors are party to that certain Loan and Security Agreement dated as of April 4, 2016 (as amended, supplemented, or otherwise modified from time to time, the "**Credit Agreement**" or the "**ABL Credit Agreement**") with Bank of America, N.A., in its capacity as agent and lender (the "**Pre-Petition Agent**" or the "**ABL Agent**") and Suntrust Bank (together with the Senior Agent, the "**Pre-Petition Lenders**" or the "**ABL Lenders**").

18.     Pursuant to the ABL Credit Agreement, the ABL Lenders agreed to extend the Company revolving loans in an aggregate principal amount not to exceed $75 million (the "**ABL Facility**" or the "**Revolver**"). As of the Petition Date, the maximum revolver commitment under the ABL Facility was $72.5 million.

19.     The ABL Agent has also extended letters of credit in the principal amount of $2.67 million.

20.     The ABL Facility is secured by first priority liens over substantially all of the Debtors' assets, including the Debtors' accounts receivable, inventory, and cash collateral, but excluding real estate (the "**ABL Collateral**"), all as set forth in greater detail in the ABL Credit Agreement and related documents (collectively, the "**ABL Facility Documents**").

7

21.     As of the Petition Date, the aggregate principal amount outstanding under the ABL Facility is approximately $41.25 million (the "**ABL Obligations**").

22.     The Borrower and Guarantors are also party to that certain Subordinated Loan and Security Agreement dated as of December 21, 2017 (as amended, supplemented, or otherwise modified from time to time, the "**Subordinated Loan Agreement**" or the "**Term Loan Agreement**") with Black Diamond Commercial Finance, LLC as lender and agent (the "**Subordinated Agent**" or the "**Term Loan Agent**", and together with the ABL Lenders, the "**Prepetition Secured Parties**").

23.     Pursuant to the Prepetition Term Loan Agreement, the Term Loan Agent agreed to extend the Company term loans in the aggregate principal amount of $15 million (the "**Term Loan Facility**"). As of the Petition Date, the maximum commitment under the Term Loan Facility was $40 million.

24.     The Term Loan Facility is secured by a second priority lien over the ABL Collateral and a first priority lien on the real estate owned by the Company (the "**Real Estate Collateral**," and together with the ABL Collateral, the "**Prepetition Collateral**"), all as set forth in greater detail in the Term Loan Agreement and related documents (the "**Term Loan Documents**").

25.     As of the Petition Date, the aggregate principal amount outstanding under the Term Loan Facility is approximately $36.5 million (the "**Term Loan Obligations**", and together with the ABL Obligations, the "**Prepetition Secured Obligations**").

26.     The ABL Agent and the Term Loan Agent are parties to that certain Subordination and Intercreditor Agreement dated as of December 21, 2017 (the "**Intercreditor**

Agreement").[3] The Intercreditor Agreement contains customary provisions governing the relationship between the ABL Agent and the Term Loan Agent, namely, to confirm the relative priority of their respective liens in the Prepetition Collateral. The Intercreditor Agreement also sets forth the parties rights with regard to postpetition financing and other bankruptcy-related rights.

### B.   Unsecured Debt

27.    In addition to the Prepetition Secured Obligations, as of the Petition Date, the Debtors estimate that they have approximately $30 million of outstanding unsecured debt, which is comprised mostly of trade debt.

## III.   EVENTS LEADING TO THE CHAPTER 11 FILINGS

28.    The Company has suffered under its debt load, which eventually led to severe liquidity issues, and eventually default under the ABL Facility Documents. The Company brought in an initial restructuring financial advisor to assist in an evaluation and hopeful turnaround of the Company. In addition, the Company began negotiating with the ABL Lenders and Black Diamond regarding forbearance. Unfortunately, no agreement on forbearance could be reached. Accordingly, and as a result of the default under the ABL Facility Documents, the Lenders began a daily sweep of the Company's bank accounts, which left the Company with no liquidity to purchase raw materials. The Company also had no credit terms remaining with its vendors given that most of the Company's accounts payable have grown over time given the lack of liquidity.

29.    Left with no liquidity, and little hope of turnaround, the Company determined not to purchase any further raw materials and, as it has done in the ordinary course of business in the

---

[3]  The Debtors are not parties to the Intercreditor Agreement, but received and executed an acknowledgement of the Intercreditor Agreement.

70548148.10

past when faced with excess inventory or liquidity concerns, the Company began selling off its finished goods inventory in order to pay down its secured debt.

30.    The Company also commenced discussions with its Lenders and Black Diamond regarding an orderly liquidation of the remaining inventory and assets through a chapter 11 bankruptcy filing. Accordingly, on September 30, 2019, the Debtors conducted a reduction in force and idled most of its operations before filing for protection under chapter 11 of the Bankruptcy Code on the Petition Date. The Company will continue to engage in limited production to finalize finished goods over the next few weeks and will use the bankruptcy process to sell off the remainder of its inventory and attempt to sell substantially all of its remaining assets via section 363 of the Bankruptcy Code to a strategic or financial buyer that will hopefully re-start operations.

31.    Given the competitive labor market, in order to incentive certain employees to remain employed during the liquidation and sales process, the Debtors will be filing a motion to approve a key employee incentive plan and key employee retention plan in the near future to assist in maximizing the value of the inventory and going concern business. The Company is hopeful that the ordinary course sale of inventory will pay off its Lenders and provide value to the Term Loan Agent, as well as other creditor constituencies. The remainder of the relief requested in the First Day Pleadings is absolutely critical to maximizing value through these Chapter 11 Cases.

## IV.    **FIRST DAY PLEADINGS**

32.    Contemporaneously with the filing of their chapter 11 petitions, the Debtors seek approval of the First Day Pleadings and related orders (the "**Proposed Orders**"). The Debtors respectfully request that the Court enter each of the Proposed Orders as they are critical to the Debtors' successful reorganization in these Chapter 11 Cases.

70548148.10

33.    I have reviewed each of the First Day Pleadings, Proposed Orders, and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief. Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enabling the Debtors to make the transition to, and operate in, chapter 11 with minimum interruptions and disruptions to their business or loss of productivity or value; and (b) constitutes a critical element in the Debtors' ability to successfully maximize value for the benefit of their estates. Below is a summary of my understanding of the First Day Pleadings and the general basis for why the relief requested in the First Day Pleadings is integral for the Debtors' estates.  To the extent there is a discrepancy between the summary below and the actual First Day Pleading, the language of the First Day Pleading governs.  I have reviewed all of the First Day Pleadings and incorporate all such First Day Pleadings by reference as if they were set forth in full herein.

### A.    Joint Administration Motion

34.    Pursuant to the Joint Administration Motion, the Debtors seek the joint administration of their three (3) Chapter 11 Cases for procedural purposes only. Many of the motions, hearings and other matters involved in the Chapter 11 Cases will affect all of the Debtors. Therefore, I believe the joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications and orders, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates. Accordingly, I believe the Court should approve the joint administration of these Chapter 11 Cases.

### B.    Schedules Extension Motion

35.    Pursuant to the Schedules Extension Motion, the Debtors seek entry of an order extending the deadline to file their (a) schedules of assets and liabilities, (b) schedules of

70548148.10

executory contracts and unexpired leases, and (c) statements of financial affairs (collectively, the "**Schedules and Statements**") by an additional fourteen (14) days, from the date such Schedules and Statements are otherwise required to be filed, to forty-two (42) total days from the Petition Date, without prejudice to the Debtors' ability to request additional time to file the Schedules and Statements should it become necessary.

36.     I believe cause exists for the following reasons: (a) the size and complexity of the Debtors' business; (b) the number of creditors; (c) the number of Debtors; and (d) the burden which would be imposed on the Debtors to file schedules and statements within the next twenty-eight days. To completely and accurately file Schedules and Statements, the Debtors must collect, review, and analyze a substantial amount of information.

37.     Prior to the Petition Date, the Debtors, their advisors, counsel, and other parties in interest focused extensively on preparing for the filing and transitioning the business into the chapter 11 process. This included extensive negotiations among the multiple tranches of creditors and other creditor constituencies. The Debtors are working expeditiously to prepare and file their Schedules and Statements, however, given the size of the Debtors' business and the amount of information required to adequately prepare such Schedules and Statements, the Debtors respectfully request an extension of fourteen (14) days, without prejudice to the Debtors' right to request further extensions, for cause shown.

38.     Given the exigent circumstances of these Chapter 11 Cases, I do not think the Debtors will be able to timely finalize the Schedules and Statements absent the requested extension.

### C.     Claims Agent Application

39.     Pursuant to the Claims Agent Application, the Debtors seek entry of an order appointing Kurtzman Carson Consultants LLC ("**KCC**") as claims and noticing agent (the

70548148.10

"**Claim and Noticing Agent**") in the Debtors' Chapter 11 Cases effective *nunc pro tunc* to the Petition Date. KCC is a bankruptcy administrator that specializes in providing comprehensive chapter 11 administrative services, including noticing, claims processing, balloting and other related administrative aspects of chapter 11 cases. Given the complexity of these cases and the number of creditors and other parties in interest involved, I believe appointing KCC as the claims and noticing agent in these Chapter 11 Cases will maximize the value of the Debtors' estates for all their stakeholders.

       **D.**      **Insurance Motion**

       40.      Pursuant to the Insurance Motion and as described in greater detail therein, the Debtors seek entry of an order: (1) authorizing, but not directing, the Debtors to continue and, to the extent necessary, renew prepetition insurance policies in the ordinary course of business and pay prepetition obligations in respect thereof; (2) authorizing banks and other financial institutions at which the Debtors hold accounts to honor and process check and electronic transfer requests related to the foregoing; (3) preventing insurance companies from giving any notice of termination or otherwise modifying or cancelling any insurance policies without first obtaining relief from the automatic stay imposed by Bankruptcy Code section 362; and (4) authorizing, but not directing, the Debtors to continue to honor premium financing agreements, installment plans, and brokerage obligations.

       41.      In the ordinary course of business, the Debtors maintain comprehensive insurance coverage through various policies in order both to mitigate risks associated with operating the Debtors' businesses and to comply with applicable regulations, laws, and contractual obligations. The Debtors regularly contract with an insurance broker to assist with the procurement and negotiation of insurance policies. To preserve liquidity, the Debtors pay for some insurance policy premiums through an installment plan and for others through premium financing

13

agreements. The Debtors plan to maintain such insurance coverage and honor their insurance broker and payment obligations during the bankruptcy process because it is necessary to preserve the value of the Debtors' estates and to abide by certain guidelines established by the U.S. Trustee (as defined in the Insurance Motion). I believe that authorizing the Debtors to continue with their pre-petition insurance practices and preventing insurers from terminating, modifying, or canceling any policies without obtaining stay relief will maximize the value of the Debtors estates for all their stakeholders.

### E.    Critical Vendors Motion

42.    Pursuant to the Critical Vendors Motion and as described in greater detail therein, the Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to pay prepetition claims (the "**Critical Vendor Claims**") of certain vendors, shippers, and freight forwarders, and other similar parties that are essential to maintaining the going concern value of the Debtors' business (the "**Critical Vendors**") [4] in an amount not to exceed $1,500,000 on an interim basis and $2,100,000 on a final basis (with respect each of the interim and final periods, as applicable, the "**Critical Vendor Cap**").

43.    In the ordinary course of business, the Debtors depend on the uninterrupted flow of material, inventory and other goods through their supply and distribution network.  To that end, the Debtors purchase essential goods and utilize services from certain vendors and suppliers that are unaffiliated with the Debtors without whom the Debtors could not operate. The Critical Vendors are essential to maintaining business continuity, delivering essential services to customers in a timely manner and, ultimately, maintaining customer satisfaction.

44.    Because the Debtors will benefit from maintaining services during the postpetition period and avoiding the severe disruption to the Debtors' operations that would

---

[4]  As used herein, the definition of "Critical Vendors" shall include "Shippers" (as defined below).

occur if the Debtors were to lose certain vendors, I believe it is prudent for the Debtors, at their discretion, to pay selected Critical Vendors some or all of their prepetition claims. Consistent with these needs, and to ensure that the Debtors' liquidity is preserved as they transition their business into chapter 11, the Debtors seek authority to implement procedures that will assist them in securing favorable terms and to deal with any vendors that may repudiate or otherwise refuse to honor existing obligations to the Debtors.

45.     The Debtors are mindful of their fiduciary obligations to seek to preserve and maximize the value of their estates. Toward that end, the Debtors have carefully estimated all potential vendor claims as of the Petition Date, including the Critical Vendor Claims, and have determined that the ability to satisfy Critical Vendor Claims is absolutely necessary to maximize enterprise value and avoid immediate and irreparable harm to the Debtors. To be clear, the Debtors are aware of the need to seek relief only for those vendors truly critical to the Debtors' ongoing operations.

46.     The Debtors carefully reviewed over 100 vendors to determine, among other things, (i) which vendors were sole source or limited source vendors, without whom the Debtors could not continue to operate without disruption, (ii) the Debtors' ability to find alternative sources for services and the potential disruption or lost revenues while a new service provider was resourced, (iii) which vendors would be prohibitively expensive to replace, and (iv) which vendors would present an unacceptable risk to the Debtors' operations given the volume of essential services provided. Additionally, the Debtors accounted for common carriers, movers, shippers, and freight forwarders currently in possession of goods and inventory that are vital to the Debtors' business operations. After compiling this information, the Debtors estimated the amount they believe they would be required to pay to ensure the continued supply of services.

47.     The vendors ultimately designated as Critical Vendors are critical to the Debtors' operations where the lack of, or even delay, of services (even for a short duration), would severely disrupt the Debtors' operations and irreparably harm business as the Debtors move sell substantially all of their inventory through these Chapter 11 Cases.

48.     The relief requested in the Critical Vendors Motion is specifically designed to accomplish the Debtors' sale efforts. In contrast, the Debtors will suffer irreparable harm if essential goods and services are not provided by the Critical Vendors. The Debtors cannot take the material risk that the Critical Vendors will refuse to perform postpetition if their prepetition claims are not paid.

49.     While the Debtors have historically enjoyed productive working relationships with many vendors, the Debtors' recent liquidity crisis has substantially limited the number of vendors who are willing to supply services that meet the Debtors' operational needs. This provides such vendors with considerable bargaining power. At this critical time following the filing of these Chapter 11 Cases, the loss of more vendors will significantly impair the Debtors' ability to maximize value for the benefit of all stakeholders.

50.     I believe the Critical Vendors are so essential to the Debtors' business that the absence of any of their particular goods or services, even for a short duration, could disrupt the Debtors' operations and cause irreparable harm to the Debtors' business, goodwill, and client satisfaction. I believe this irreparable harm to the Debtors and to the recovery of all of the Debtors' creditors will far outweigh the cost of payment of the Critical Vendor Claims.

**F.     Wages Motion**

51.     Pursuant to the Wages Motion and as described in greater detail therein, the Debtors seek entry of an order authorizing, but not directing, the Debtors to (1) pay accrued prepetition wages, salaries, and other compensation to their workforce; (2) honor any prepetition

16

70548148.10

obligations in respect of, and continue in the ordinary course of business until further notice (but not assume), certain of the Debtors' paid time off policies, and employee benefit plans and programs; (3) reimburse employees for prepetition expenses that employees incurred on behalf of the Debtors in the ordinary course of business on a prepetition basis; (4) pay all related prepetition payroll taxes and other deductions, including union benefits; (5) honor workers' compensation obligations; and (6) pay any prepetition claims of administrators and providers in the ordinary course of business to the extent that any of the foregoing programs are administered, insured, or paid through a third-party administrator or provider.

52.     The Debtors need to fund payroll on Thursday, October 3, 2019 for the payroll periods covering the periods from September 16, 2019 through and including September 30, 2019 when the Debtors employed approximately 462 hourly and salaried full-time employees. The Debtors also incurred various related obligations, including compensation, benefits, taxes, workers' compensation, expense reimbursements, and administrative costs. In addition, the Debtors' incurred various obligations with respect to their union member employees, including liability to union entities for collected but unpaid dues and responsibility for the retroactive pay increase to union employees under a recently approved collective bargaining agreement.

53.     To ensure the successful operation of the Debtors' business and to maximize the value of the Debtors' estates, it is imperative that the Debtors honor pre and postpetition obligations to the employees and continue to maintain benefit plans in the ordinary course of business through these Chapter 11 cases. I believe that failure to promptly do so would create concern and discontent among the employees and could lead to resignations. I believe the loss of even a few key personnel would immediately and irreparably harm the Debtors' ability to maintain operations to the detriment of all interested parties.

G.      **Taxes Motion**

54.      By way of the Tax Motion and further detailed therein, the Debtors respectfully request entry of an order authorizing them to pay any prepetition tax and fee obligations including, without limitation, income and franchise taxes, property taxes, sales and use taxes, business license fees, annual report taxes, and other taxes and fees (collectively, the "**Taxes and Fees**") owing to those federal, state, provincial, and local governmental entities in the United States listed in the Taxes Motion (the "**Taxing Authorities**"). The Debtors propose to limit the aggregate amount of payments to be made on account of prepetition Taxes and Fees under this Motion to $1,271,718.66 unless further authorization is obtained from this Court.

55.      For the avoidance of doubt, the requested authorization (i) would be discretionary, allowing the Debtors, among other things, to elect to pay Taxes and Fees as to which their officers and directors may have personal liability in the event of nonpayment by the Debtors, before other Taxes and Fees, (ii) would be without prejudice to the Debtors' rights to contest the amounts of any Taxes and Fees on any grounds they deem appropriate, and (iii) would extend to the payment of Taxes and Fees relating to tax audits that have been completed, are in progress, or arise from prepetition periods.

56.      In addition, the Debtors request that the Court authorize the Debtors' banks to receive, process, honor, and pay all prepetition and postpetition checks and fund transfers on account of the Taxes and Fees that had not been honored and paid as of the Petition Date, and authorize the Debtors' banks and financial institutions to rely on the representations of the Debtors as to which checks and fund transfers should be honored and paid in respect of Taxes and Fees, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

57.     I believe that the Taxes and Fees at issue are appropriate for payment to the extent that they are priority or secured claims that are payable in full or, alternatively, under the personal liability theory or the doctrine of necessity. By paying the Taxes and Fees in the ordinary course of business, as and when due, the Debtors will avoid unnecessary disputes with the Taxing Authorities—and expenditures of time and money resulting from such disputes—over myriad issues that are typically raised by such units as they attempt to enforce their rights to collect Taxes and Fees.

**H.    Utilities Motion**

58.     Pursuant to the Utilities Motion, the Debtors seek entry of an order (1) prohibiting Utility Providers (as defined in the Utilities Motion) from (a) altering, refusing, or discontinuing utility services to, or discriminating against, the Debtors on account of any outstanding amounts for services rendered prepetition, or (b) drawing upon any existing security deposit, surety bond, or other form of security to secure future payment for utility services; (2) determining that adequate assurance of payment for postpetition utility services has been furnished to the Utility Providers providing services to the Debtors; and (3) establishing procedures for resolving future requests by any Utility Provider for additional adequate assurance of payment.

59.     In the ordinary course of business and in conjunction with their day-to-day operations, the Debtors receive utility services from various Utility Providers for, among other things, water, sewer, electricity, gas, telecommunications, waste disposal, and similar utility products and services. In the Utilities Motion, the Debtors propose to make an adequate assurance deposit equal to a two week proration of their projected utility service usage for the month of October 2019 based on the anticipated reduction in output. The proposed adequate assurance deposits account for only those utility providers and amounts that the Debtor anticipates utilizing during the reduced operation of its business for the month of October 2019.

19

60.     I believe uninterrupted Utility Services are essential to the Debtors' business operations during the pendency of these Chapter 11 Cases. Should any Utility Provider alter, refuse, or discontinue service, even for a brief period, the Debtors' business operations could be disrupted, and such disruption could jeopardize the Debtors' ability to maximize value of the estates and consummate a sale through chapter 11. Therefore, the Debtors seek to establish an orderly process for providing adequate assurance to their Utility Providers without hindering the Debtors' ability to maintain operations. I am informed and believe the proposed Adequate Assurance Procedures (as defined in the Utilities Motion) are consistent with procedures that are typically approved in chapter 11 cases in this District. Accordingly, based on the foregoing and those additional reasons set forth in the Utilities Motion, I believe the relief requested in such motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

## I.      Cash Management Motion

61.     Pursuant to the Cash Management Motion, the Debtors seek entry of an order: (1) authorizing, but not directing, the Debtors to continue to maintain and use their existing cash management system, including maintenance of existing bank accounts, checks, and business forms; (2) granting the Debtors a temporary suspension of certain bank account and related requirements of the U.S. Trustee (as defined in the Cash Management Motion) to the extent that such requirements are inconsistent with the Debtors' practices under their existing cash management system or other actions described herein; and (3) authorizing, but not directing, the Debtors to continue to maintain and use their existing deposit practices.

62.     In the ordinary course of business, the Debtors maintain a Cash Management System (as defined in the Cash Management Motion) that is integral to the operation and administration of their business. The Cash Management System allows the Debtors to (i) monitor

and control all of the Debtors' cash receipts and disbursements, (ii) identify the cash requirements of the Debtors, and (iii) transfer and disburse cash as needed to respond to the cash requirements of the Debtors. The Cash Management System is comprised of seven bank accounts and is specifically designed for administering the Debtors' businesses, and cannot be altered without significant disruption to the Debtors' business operations and material distraction to the Debtors' management.

63.     For the aforementioned reasons, I believe that maintaining the existing Cash Management System without disruption is in the best interests of the Debtors, their estates, and all interested parties. Accordingly, the Debtors request they be allowed to maintain and continue to use the Cash Management System, including maintenance of their existing bank accounts.

## J.     Customer Program Motion

64.     Prior to the Petition Date and in the ordinary course of their business, the Debtors engage in certain practices to maximize sales, engender customer loyalty, and develop and sustain brand loyalty and a positive reputation in the marketplace.

65.     As detailed herein, historically, the Debtors manufactured and distributed long carbon steel products throughout North America. Immediately prior to the Petition Date, the Debtors idled operations at some facilities, but are still operating a bar product mill and have thousands of tons of finished materials ready for immediate sale. In the ordinary course of their business, the Debtors engage in a variety of marketing and sales practices designed to develop and sustain customer satisfaction and loyalty (the "**Customer Programs**"). On account of the Customer Programs, the Debtors incur various obligations to customers and distributors, including but not limited to, discounts, incentives, and allowances (collectively, the "**Customer Obligations**") in order to attract and maintain positive relationships. The Customer Programs

70548148.10

seek to encourage customers to increase purchasing frequency and volume, which, in turn, results in larger net revenues for the Debtors.

66.     Specifically, the Debtors maintain deductions and allowances for the benefit of certain customers.  For example, if a customer purchases a certain amount of product within a designated time period, the Debtors issue a credit to such customer. The Debtors settle these credits via rebates, deductions and allowances against the outstanding invoices on an annual basis.

67.     At their core, these Customer Programs aimed to meet competitive pressure, enhance customer satisfaction, generate goodwill for the Debtors, and, ultimately, allow the Debtors to retain current customers, attract new customers, and increase revenue and profitability. To effectuate a smooth transition into and out of chapter 11, the Debtors must maintain and honor the Customer Programs and fulfill the Customer Obligations as the Debtors deem appropriate.

68.     Given the ongoing nature of the Debtors' sales, it is difficult to calculate the exact amount of deductions and allowances accrued prior to the Petition Date. Notwithstanding, the Debtors estimate that the aggregate value of accrued prepetition Customer Obligations is approximately $2,910,000 for accrued rebates, deductions and allowances. I believe that paying or otherwise honoring the Debtors' these prepetition obligations, and continuing the Customer Programs postpetition, is imperative to the Debtors' sales prospects.

### K.     Cash Collateral Motion

69.     All as more fully set forth in the Cash Collateral Motion, the Debtors seek authority to, among other things, use the Cash Collateral of the ABL Agent, provide adequate protection to the ABL Lenders and Term Loan Agent; modify the automatic stay; and grant the ABL Lender certain liens upon property of the Debtors' estate.

70.    Given that the Debtors have no liquidity, the Debtors have an immediate and critical need for the use of Cash Collateral. Access to the use of Cash Collateral will allow the Debtors to retain employees to sell off inventory, which the Debtors believe will preserve and maximize the value of the estate, as well as attempt to sell substantially all of the Debtors' remaining assets and re-start plant operations. The Debtors have determined that absent the use of Cash Collateral, the Debtors will not be unable to undertake the limited operations of their businesses during the Chapter 11 Cases and sell of the remainder of its inventory, which will irreparably harm the Debtors' estates and creditors. Other than Cash Collateral, the Debtors do not have access to funds. The Debtors hope to continue to sell inventory and create new inventory from raw materials on hand, but any revenue generated will constitute collateral under the ABL Credit Agreement and Term Loan Credit Agreement. The Debtors' ongoing obligations include obligations to pay wages to employees and amounts due and owing to critical vendors.

71.    In exchange for the consensual use of Cash Collateral, the Debtors have agreed, and the Interim Order provides, adequate protection in the form of, among other things, adequate protection liens, superpriority claims, and adequate protection payments to protect the Prepetition Secured Parties against any diminution in the value of their interests in the Cash Collateral resulting from the use, sale, or lease of the Cash Collateral, the subordination of the Prepetition Secured Parties' liens to the Carve-Out (as defined in the Interim Order), and the imposition of the automatic stay.

72.    At this time, the Debtors do not contemplate the need for postpetition financing. Instead, the Debtors intend to operate their businesses solely on the use of the existing Cash Collateral generated from selling off existing inventory. Access to existing Cash Collateral on an interim basis will provide the Debtors with the liquidity necessary to ensure that the Debtors

have sufficient working capital and liquidity to begin the process of liquidating inventory and

beginning a sales process. Without access to such liquidity, the Debtors will face irreparable

harm.

Executed this 1st day of October, 2019.
LaPlace, Louisiana

**Bayou Steel BD Holdings, L.L.C.**
Debtors and Debtors in Possession


*/s/ Alton Davis*
Alton Davis
President and Chief Operating Officer

70548148.10