## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BAYOU STEEL BD HOLDINGS, L.L.C., *et al.*,[1] | Case No. 19-12153 (KBO) |
| Debtors. | (Jointly Administered) |

**MOTION OF DEBTORS FOR ENTRY OF (I) AN ORDER (A) APPROVING BID PROCEDURES IN CONNECTION WITH THE POTENTIAL SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) SCHEDULING AN AUCTION AND A SALE HEARING, (C) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (D) AUTHORIZING THE DEBTORS TO ENTER INTO A STALKING HORSE AGREEMENT, (E) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, AND (F) GRANTING RELATED RELIEF; AND (II) AN ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, AND (C) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "**Debtors**") hereby move (the "**Motion**") pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"); Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (as amended from time to time, the "**Bankruptcy Rules**"); and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedures of the Bankruptcy Court for the District of Delaware (the "**Local Rules**"), for the entry of:

> (i) an order, substantially in the form attached hereto as <u>Exhibit C</u> (the "**Bid Procedures Order**"), (a) approving procedures in connection with the potential sale of substantially all of the Debtors' assets, (b) scheduling the related auction and hearing to consider approval of the Sale (as defined below), (c) approving the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Bayou Steel BD Holdings, L.L.C., a Delaware limited liability company (1984), BD Bayou Steel Investment, LLC, a Delaware limited liability company (1222), and BD LaPlace, LLC, a Delaware limited liability company (5783). The location of the Debtors' mailing address is 138 Highway 3217, LaPlace, Louisiana 70068.

form and manner of notice thereof, (d) authorizing the Debtors to enter into a Stalking Horse Agreement (as defined below), (e) approving procedures related to the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases, and (F) granting related relief; and

(ii) an order (the "**Sale Order**"), (a) approving the Sale of the Assets (as defined below) free and clear of liens, claims, encumbrances, and other interests, (b) approving the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases related thereto, and (c) granting related relief.

In support of the Motion, the Debtors rely upon the *Declaration of Alton Davis, President and Chief Operating Officer of Bayou Steel BD Holdings, L.L.C., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 14] (the "**First Day Declaration**"). In further support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b). Under Local Rule 9013-1(f), the Debtors consent to entry of a final order under Article III of the United States Constitution. Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are Bankruptcy Code sections 105, 363, 365, 503, and 507, Bankruptcy Rules 2002, 6004, 6006, 9007, 9014 and Local Rules 2002-1, 6004-1, and 9013-1(m).

## BACKGROUND

3.      On October 1, 2019 (the "**Petition Date**"), each of the Debtors filed a voluntary petition in this Court commencing a case for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**"). The factual background regarding the Debtors, including their business

2

operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the First Day Declaration and fully incorporated herein by reference.

4. The Debtors continue to manage and operate their business as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108. No trustee or examiner has been requested in the Chapter 11 Cases.

5. On October 10, 2019, the Office of the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors in these Chapter 11 Cases (the "**Committee**").

6. Subject to their right to determine an alternative course of action is preferable, the Debtors intend to sell the Assets in the Chapter 11 Cases and the Prepetition Lenders and the Subordinated Term Loan Lenders have, subject to certain conditions, agreed to allow their cash collateral to be used to fund the Chapter 11 Cases pursuant to an agreed upon budget. *See Agreed Interim Order (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV) Setting a Final Hearing, and (V) Granting Related Relief* [Docket No. 42] (the "**Interim Cash Collateral Order**"). However, given the Debtors' are operating solely on the use of cash collateral and have very limited operations after the Petition Date, the Debtors need to complete the sale process as expeditiously as possible. The Debtors firmly believe that a sale of substantially all of their assets to a financial or strategic party that may re-start operations and potentially re-employee the laid off employees is in the best interests of the Debtors, their respective estates, all creditors, and the local community.

<u>**RELIEF REQUESTED**</u>

7. By this Motion, first, the Debtors seek entry of the Bid Procedures Order in substantially the form attached hereto as <u>Exhibit A</u>:

3

a.    authorizing and approving the Bid Procedures attached to the Bid Procedures Order as <u>Exhibit 1</u> in connection with the sale (the "**Sale**") of substantially all of the Debtors' assets (the "**Assets**");

b.    scheduling an auction (the "**Auction**") and sale hearing (the "**Sale Hearing**") with respect to the Sale of the Assets;

c.    approving the form and manner of notice of the Auction and the Sale Hearing, a copy of which is attached to the Bid Procedures Order as <u>Exhibit 2</u> (the "**Sale Notice**");

d.    authorizing, but not directing the Debtors to enter into an Asset Purchase Agreement (the "**Stalking Horse Agreement**") with any party identified (the "**Stalking Horse Bidder**") prior to November 22, 2019 (the "**Stalking Horse Deadline**"); and

e.    granting related relief.

8.    Second, the Debtors may seek entry of the Sale Order at the conclusion of the Sale Hearing:

a.    authorizing and approving the Sale of the Assets to the Successful Bidder (as defined in the Bid Procedures) on the terms substantially set forth in the Successful Bid free and clear of liens, claims, encumbrances, and other interests other than Permitted Encumbrances and Assumed Liabilities;

b.    authorizing the assumption and assignment of the Contracts; and

c.    granting any related relief.

9.    The Debtors reserve the right to file and serve any supplemental pleading or declaration that the Debtors deem appropriate or necessary in their reasonable business judgment, including any pleading summarizing the competitive bidding and sale process and the results thereof, in support of their request for entry of the Sale Order before the Sale Hearing.[2]

## POSTPETITION MARKETING AND SALE PROCESS

10.    As part of the proposed postpetition sale process, the Debtors, through Candlewood and their other professionals, will continue to engage in the robust marketing effort

---

[2]  A proposed form of Purchase Agreement and Sale Order will be made available to Potential Bidders in the Data Room.

70690192.5

for the Debtors' assets, which started on the Petition Date, continuing to contact both financial and strategic investors regarding a potential sale. All interested parties have been given an opportunity to execute a confidentiality agreement (a "**Confidentiality Agreement**") and be given access to the data room maintained by the Debtors. Those parties that execute a Confidentiality Agreement will be provided with substantial due diligence information concerning, and access to, the Debtors, including, without limitation, presentations by the Debtors and their advisors, and access to financial, operational, and other detailed information.

## STALKING HORSE PROCEDURES

11.    By this Motion and in connection with the Bidding Procedures, the Debtors request additional authority, but not direction, to enter into a Stalking Horse Agreement with an interested buyer to serve as the Staling Horse Bidder on or before November 22, 2019.

12.    Stalking Horse Agreement Content. A Stalking Horse Agreement may include, among other things:

   a.    offers, memorialized in a reasonably-detailed and supported term sheet(s), from strategic or alternative investors interested in acquiring an equity stake in the Debtors on terms acceptable to the Debtors;

   b.    going concern buyers interested in acquiring substantially all of the Assets, or a subset(s) thereof, including, but not limited to inventory, real property, plants, and equipment held by the Debtors; and

   c.    liquidators (or joint ventures thereof) interested in putting forth an equity bid for substantially all of the Assets or a subset thereof.

13.    Stalking Horse Bid Protections. As a condition to providing a Stalking Horse Bid, the Stalking Horse Bidder requests reasonable bid protections, including either or both of a "**Break-Up Fee**" and an "**Expense Reimbursement**" (together, the "**Bid Protections**"). The Debtors seek authority to designate a party as a Stalking Horse Bidder without further order of the Court, so long as the following parameters are satisfied: (a) the Break-Up Fee does not

5

exceed three percent (3%) of the aggregate cash purchase price; (b) the Expense Reimbursement does not exceed $250,000; and (c) the Consultation Parties consent, which shall not be unreasonably withheld, to the designation of such party as a Stalking Horse Bidder on or prior to the Stalking Horse Deadline of November 22, 2019.

14.     <u>Stalking Horse Agreement Notice</u>. In the event that the Debtors enter into any Stalking Horse Agreement that the Debtors determine is in the best interests of the Debtors and their estates, the Debtors will file with the Court a notice (a "**Stalking Horse Notice**") that shall include the following: (a) the identification of the Stalking Horse Bidder; (b) a copy of the Stalking Horse Agreement(s); (c) the purchase price provided for in the Stalking Horse Agreement (the "**Stalking Horse Purchase Price**"); (d) the deposit paid by the Stalking Horse Bidder; and (e) any proposed Bid Protections. The Debtors shall also serve the Stalking Horse Notice on (a) counsel to the Committee; (b) counsel to the Prepetition Agent; and (c) counsel to the Subordinated Term Loan Agent (collectively, the "**Consultation Parties**").

## THE PROPOSED SALE

15.     The Debtors believe a prompt sale of the Assets may represent the best option available to maximize value for all stakeholders in these Chapter 11 Cases. Moreover, it is critical for the Debtors to execute on any sale transaction as expeditiously as possible, as the Debtors are utilizing the Prepetition Lenders' and the Subordinated Term Loan Lenders' cash collateral to explore this sale process. Therefore, time is of the essence.

16.     By this Motion, the Debtors request the Court approve the following general timeline, with the assumption the Bankruptcy Court will enter an order granting this motion on shortened notice. These dates are subject to change in the event the Bankruptcy Court does not enter an order at that hearing:

70690192.5

a.     <u>Contract Cure Objection Deadline</u>: Objections to the potential assumption and assignment of any Contract, including proposed cure amounts, will be filed and served no later than **November 27, 2019 at 4:00 p.m. (prevailing Eastern Time)** (the "**Cure or Assignment Objection**").

b.     <u>Bid Deadline</u>: Bids for the Assets, as well as the deposit and the other requirements for a bid to be considered a Qualified Bid (as defined in the Bid Procedures) must be received by no later than **December 4, 2019 at 4:00 p.m. (prevailing Eastern Time)** or such later date as may be agreed to by the Debtors (the "**Bid Deadline**").

c.     <u>Auction</u>: The Auction, if necessary, will be held at the offices of Polsinelli PC, 222 Delaware Avenue, Suite 1101, Wilmington, Delaware 19801 on **December 10, 2019 at 10:00 a.m. (prevailing Eastern Time)**, or such other location as identified by the Debtors after notice to all Qualified Bidders.

d.     <u>Sale Objection Deadline</u>: Objections to the Sale will be filed and served no later than **4:00 p.m. (prevailing Eastern Time) on December 5, 2019**.

e.     <u>Sale Hearing</u>: Consistent with the Court's availability and schedule, the Sale Hearing will commence on or before **December 11, 2019**.

17.     The Debtors believe this timeline maximizes the prospect of receiving the highest and best offer without unduly prejudicing their estates. The Debtors' have given all due deference to the fact that a fulsome sale process must be run to maximize value for the Debtors' estates vis-à-vis the cost of efficiencies of running such a process. The proposed timeline is more than sufficient to complete a fair, open, and expedited sale process that will maximize the value received for the Assets. To further ensure the Debtors' proposed Auction and Sale process maximizes value for the benefit of the Debtors' estates, the Debtors and their professionals will use the time following the Petition Date to continue to actively market the Assets in an attempt to solicit the highest or otherwise best bids available. The Debtors believe the relief requested by this Motion is in the best interests of their creditors, their other stakeholders, and all other parties in interest, and should be approved.

18.     The Debtors believe an expedited sale process will minimize any further deterioration of the Assets and is in the best interests of all stakeholders. Thus, the Debtors have determined that pursuing the potential Sale in the manner and within the time periods prescribed in the Bid Procedures is in the best interest of the Debtors' estates and will provide interested parties with sufficient opportunity to participate.

## THE BID PROCEDURES ORDER

### I.     The Bid Procedures

19.     To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner, the Debtors have developed and proposed the Bid Procedures, attached as Exhibit 1 to the Bid Procedures Order. The Bid Procedures were developed to permit an expedited sale process, to promote participation and active bidding, and to ensure the Debtors receive the highest or otherwise best offer for the Assets. As such, the Debtors believe the timeline for consummating the sale process established pursuant to the Bid Procedures is in the best interest of their estates and all parties in interest.

20.     The Bid Procedures describe, among other things, the requirements for prospective purchasers to participate in the bidding process, the availability and conduct of due diligence, the deadline for submitting a competing bid, the method and factors for determining qualifying bids, and the criteria for selecting a successful bidder.

21.     The following summary describes the salient points of the Bid Procedures and discloses certain information required pursuant to Local Rule 6004-1(c)(i):[3]

---

[3] This summary of the Bid Procedures is qualified in its entirety by the Bid Procedures attached as Exhibit 1 to the Bid Procedures Order. All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings set forth in the Bid Procedures. To the extent there are any conflicts between this summary and the Bid Procedures, the terms of the Bid Procedures shall govern.

70690192.5

| | |
|---|---|
| Assets to be Sold. | The Debtors are offering for sale any and all of the Assets. Potential Bidders (as defined below) may bid on all or any number or combination of the Assets. Potential Bidders may also submit a Restructuring Term Sheet (as defined below) that provides for the reorganization of one or more of the Debtors. |
| Provisions Governing Qualification of Bidders. <br><br>Local Rule 6004-1(c)(i)(A) | Any person or entity that wishes to participate in the bidding process for the Assets (each, a "**Potential Bidder**") must first become a "**Qualifying Bidder.**" To become a Qualifying Bidder (and thus being able to conduct due diligence and gain access to the Debtors' confidential electronic data room concerning the Assets (the "**Data Room**")), a Potential Bidder must submit to the Debtors and their advisors: <br><br>(a) documentation identifying the interested party, its principals, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated Transaction; <br><br>(b) an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors, which by its terms will inure to the benefit of the Successful Bidder(s); <br><br>(c) a statement and other factual support demonstrating to the Debtors' reasonable satisfaction that the interested party has a bona fide interest in consummating a Transaction; and <br><br>(d) sufficient information, as determined by the Debtors, to allow the Debtors to determine that the interested party (i) has, or can obtain, the financial wherewithal and any required internal corporate, legal or other authorizations to close a Transaction, including, but not limited to, current audited financial statements of the interested party (or such other form of financial disclosure acceptable to the Debtors in their discretion) and (ii) can provide adequate assurance of future performance under any executory contracts and unexpired leases to be assumed by the Debtors and assigned to such bidder, pursuant to Bankruptcy Code section 365, in connection with a Transaction. <br><br>Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Debtors, each of the Consultation Parties (as defined below), or their advisors regarding the ability of such Potential Bidder, as applicable, to consummate its contemplated Transaction. |

70690192.5

| | Notwithstanding anything to the contrary herein, and for the avoidance of doubt, for all purposes under the Bidding Procedures: (i) any designated Stalking Horse Purchaser shall be considered a Qualifying Bidder, and a Stalking Horse Agreement shall be considered a Qualifying Bid (as defined below); and (ii) in determining whether the Potential Bidders constitute Qualifying Bidders, the Debtors may, in consultation and with consent of the Consultation Parties, consider a combination of bids for the Assets. |
|---|---|
| Due Diligence. | The Debtors will provide any Qualifying Bidder with reasonable access to the Data Room and any other additional information that the Debtors believe to be reasonable and appropriate under the circumstances. All additional due diligence requests shall be directed to: Candlewood Partners, LLC Grant Pollack (gyp@candlewoodpartners.com) and Rishi Agarwal (ra@candlewoodpartners.com).<br><br>The due diligence period shall extend through and including the Bid Deadline. The Debtors may, but shall not be obligated to, in their sole discretion, furnish any due diligence information after the Bid Deadline.<br><br>The Debtors reserve the right, in their reasonable discretion, to withhold or limit access to any due diligence information that the Debtors determine is business-sensitive or otherwise not appropriate for disclosure to a Qualifying Bidder. Notwithstanding any prepetition limitations, including, without limitation, any non-disclosure, confidentiality or similar provisions relating to any due diligence information, the Debtors and their estates shall be authorized to provide due diligence information to Qualifying Bidders provided that such Qualifying Bidders have delivered an executed confidentiality agreement in form and substance acceptable to the Debtors. The Debtors and their estates are not responsible for, and shall have no liability with respect to, any information obtained by, or provided to, any Qualifying Bidders in connection with the Bidding Procedures and a contemplated Transaction. |
| Right to Credit Bid. | Any Qualified Bidder who has a valid and perfected lien on any Assets of the Debtors' estates that is not subject to an objection by the commencement of the Auction (a "**Secured Creditor**") shall have the right to credit bid all or a portion of the value of such Secured Creditor's claim within the meaning of Bankruptcy Code section 363(k) and to the extent demonstrated by the Secured Claim Documentation; *provided* that a Secured Creditor shall have the right to credit bid its claim only with respect to the |

| | |
|---|---|
| | collateral by which such Secured Creditor is secured. For the avoidance of doubt, the Prepetition Lenders and the Term Lender reserve all of their rights with respect to a Credit Bid and the Debtors believe are entitled to Credit Bid. |
| Bid Deadline. | A Qualifying Bidder, other than any Stalking Horse Purchaser, that desires to make a bid shall deliver a written and electronic copy of its bid in both PDF and MS-WORD format to the Notice Parties so as to be received on or before **December 4, 2019 at 4:00 p.m. (ET)** (the "**Bid Deadline**"); *provided* that the Debtors may extend the Bid Deadline without further order of the Court, subject to providing notice to the Consultation Parties. To the extent that the Bid Deadline is extended for all parties, the Debtors shall file a notice on the docket of these chapter 11 cases indicating the same. **Any party that does not submit a bid by the Bid Deadline (including as extended in accordance with the prior two sentences) will not be allowed to (a) submit any offer after the Bid Deadline, or (b) participate in the Auction.** |
| Provisions Governing Qualified Bids.<br><br>Local Rule 6004-1(c)(i)(B) | As set forth below, Potential Bidders intending to submit bids must include with their bids:<br><br>(a) If the Transaction is a sale, an asset purchase agreement (a "**Purchase Agreement**"). The Purchase Agreement shall be (i) if a Stalking Horse Purchaser has been designated for the applicable Assets, be upon substantially the same terms as, or terms more favorable to the Debtors and their estates than, the terms set forth in a Stalking Horse Agreement, if applicable and include a redline marked against the Stalking Horse Agreement; and (ii) otherwise, in the form of the Purchase Agreement include in the Data Room and include a redline marked against the form Purchase Agreement; or<br><br>(b) If the Transaction is for a restructuring, a term sheet that reflects all of the material terms of a proposed restructuring including the consideration to be provided under the proposed restructuring to the Debtors' existing creditors and the sources and uses of any cash needed to fund the restructuring, including bridge financing for the Debtors' operations and administrative expenses from the date of the Auction to the anticipated effective date of the restructuring (a "**Restructuring Term Sheet**").<br><br>Other than in the case of a bid submitted by the Stalking Horse Purchaser, to be deemed a "**Qualifying Bid**," a bid must be received from a Qualifying Bidder on or before the Bid Deadline and satisfy each of the following requirements, as determined by |

70690192.5

the Debtors in consultation with the Consultation Parties (each, a "**Bid Requirement**"):

(a)  be in writing;

(b)  fully disclose the identity of the Qualifying Bidder (and any other party participating in the bid) and provide the contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors have any questions or wish to discuss the bid submitted by the Qualifying Bidder;

(c)  set forth the purchase price to be paid by such Qualifying Bidder or the material terms of a Restructuring Term Sheet;

(d)  if a bid includes a credit bid under Bankruptcy Code section 363(k), other than a credit bid by the Prepetition Lenders or Subordinated Term Loan Lenders, evidence of the amount of the claim, the Assets constituting the collateral securing the claim, and evidence of the grant, perfection, priority, and validity of the lien (the "Secured Claim Documentation");4

(e)  in the case of a proposed purchase of the Assets, not propose payment in any form other than cash (except as otherwise expressly set forth in these Bidding Procedures and the Bidding Procedures Order);

(f)  include an allocation of cash to each of the Assets proposed to be purchased;

(g)  state the liabilities proposed to be paid or assumed by such Qualifying Bidder or, if in the form of a plan, the treatment of each class of claims or equity interest under the plan;

(h)  specify the Assets that are included in the bid and, to the extent a Stalking Horse Purchaser is designated, state that such Qualifying Bidder offers to purchase the Assets, or a number or combination of the Assets, upon substantially the same terms as, or terms more favorable to the Debtors and their estates than, the terms set forth in the Stalking Horse Agreement, as applicable;

(i)  state that such Qualifying Bidder's offer is formal, binding and unconditional and is irrevocable until two (2) business days after the closing of the sale of the Assets (as applicable

---

4  Parties intending to submit a credit bid are encouraged to provide their Secured Claim Documentation to the Debtors' counsel prior to the Bid Deadline to ensure that their Secured Claim Documentation is validated.

to sales, only);

(j)  state that such Qualifying Bidder is financially capable of consummating the Transaction contemplated by the bid and provide written evidence in support thereof (including evidence of bridge financing in the case of a restructuring proposal);

(k)  contain such financial and other information to allow the Debtors to make a reasonable determination as to the Qualifying Bidder's financial and other capabilities to close the transactions contemplated by the proposal, including, without limitation, such financial and other information supporting the Qualifying Bidder's (or reorganized Debtors') ability to comply with the requirements of adequate assurance of future performance under Bankruptcy Code section 365(f)(2)(B) and, if applicable, Bankruptcy Code section 365(b)(3), including the Qualifying Bidder's financial wherewithal and willingness to perform under any contracts and leases that are assumed and assigned to the Qualifying Bidder, in a form that allows the Debtors to serve, within one (1) business day after such receipt, such information on any counterparties to any contracts or leases being assumed and assigned (or assumed) in connection with the Transaction that have requested, in writing, such information;

(l)  identify with particularity each and every executory contract and unexpired lease the assumption and assignment of which is a condition to close the contemplated transaction(s);

(m) specify whether the Qualifying Bidder intends to operate all or a portion of the Debtors' business as a going concern;

(n)  if the Transaction contemplated by the proposal is a sale, a commitment to close the Transaction by December 31, 2019;

(o)  not request or entitle such Qualifying Bidder to any break-up fee, termination fee, expense reimbursement or similar type of fee or payment;

(p)  in the event that there is a Stalking Horse Purchaser, the aggregate consideration proposed by the Qualifying Bidder must equal or exceed the sum of the amount of (A) the purchase price under the Stalking Horse Agreement, (B) any Break-Up Fee, (C) any Expense Reimbursement, and (D) $250,000.

70690192.5

(q) not contain any contingencies of any kind, including, without limitation, contingencies related to financing, internal approval or due diligence;

(r) contain a written acknowledgement and representation that the Qualifying Bidder (i) has had an opportunity to conduct any and all due diligence regarding the Assets, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and other information in making its Qualifying Bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any documents or other information provided in connection with the Bidding Procedures and the proposed Transaction;

(s) sets forth (i) a statement or evidence that the Qualifying Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable, and pay the fees associated with such filings and (ii) any regulatory and third-party approval required for the Qualifying Bidder to close the contemplated transactions, and the time period within which the Qualifying Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than five (5) days following execution and delivery of such Qualifying Bidder's Purchase Agreement, those actions the bidder will take to ensure receipt of such approval(s) as promptly as possible); provided that a Qualifying Bidder agrees that its legal counsel will coordinate in good faith with Debtors' legal counsel to discuss and explain Qualifying Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable; provided, further that the offer contains a covenant to cooperate with the Debtors to provide pertinent factual information regarding the bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements;

(t) provides for the Qualifying Bidder to serve as a backup bidder (the "Back-Up Bidder") if the Qualifying Bidder's bid is the next highest and best bid (the "Back-Up Bid") after the Successful Bid (as defined below);

14

|  | (u) includes written evidence of authorization and approval from the Qualifying Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of the subject term sheet;<br><br>(v) provides a good faith cash deposit (the "Deposit") in an amount equal to ten percent (10%) of the purchase price provided for in the proposal (or such additional amount as may be determined by the Debtors in their reasonable discretion and in consultation with the Consultation Parties) to be deposited, prior to the Bid Deadline, with an escrow agent selected by the Debtors (the "Escrow Agent") pursuant to the escrow agreement to be provided by the Debtors to the Qualifying Bidders (the "Escrow Agreement"); and<br><br>(w) provides for liquidated damages in the event of the Qualifying Bidder's breach of, or failure to perform under, the modified Purchase Agreement equal to the amount of the Deposit.<br><br>The Debtors reserve the right, in consultation with the Consultation Parties, to negotiate with any Qualifying Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualifying Bid.<br><br>Each Qualifying Bidder submitting a bid shall be deemed to: (a) acknowledge and represent that it is bound by all of the terms and conditions of the Bidding Procedures; and (b) have waived the right to pursue a substantial contribution claim under Bankruptcy Code section 503 related in any way to the submission of its bid, the Bidding Procedures, and the Sale. |
| No Qualifying Bids. | If no timely Qualifying Bids other than any Stalking Horse Purchaser's Qualifying Bid are submitted on or before the Bid Deadline, the Debtors shall not hold an Auction and may request at the Sale Hearing that the Stalking Horse Purchaser (if any) be deemed the Successful Bidder (as defined herein) and that the Court approve the Stalking Horse Agreement (if any) and the transactions contemplated thereunder. |
| Evaluation of Qualifying Bids. | The Debtors will deliver by no later than 9:00 a.m. (ET) on the day following the Bid Deadline, copies of all bids from Qualifying Bidders to each of the Consultation Parties.<br><br>The Debtors, in consultation with the Consultation Parties, shall make a determination regarding whether a timely submitted bid from a Qualifying Bidder is a Qualifying Bid, and shall notify all |

| | |
|---|---|
| | Qualifying Bidders whether their bids have been determined to be a Qualifying Bid by no later than 4:00 p.m. (ET) on the day before the commencement of the Auction. In the event that a bid is determined not to be a Qualifying Bid, including with respect to any proposed credit bid amount, the Qualifying Bidder shall be notified by the Debtors and shall have until the commencement of the Auction to modify its bid to increase the purchase price or otherwise improve the terms of the Qualifying Bid for the Debtors and to provide additional Secured Claim Documentation; *provided* that any Qualifying Bid may be improved at the Auction as set forth herein.<br><br>Prior to commencing the Auction, the Debtors shall determine, in consultation with the Consultation Parties, which of the Qualifying Bids, at such time, is the highest or best bid for purposes of constituting the opening bid of the Auction (the "**Baseline Bid**" and the Qualifying Bidder submitting the Baseline Bid, the "**Baseline Bidder**"), and shall notify any Stalking Horse Purchaser and all Qualifying Bidders with Qualifying Bids of the Baseline Bid no later than the opening of the Auction. |
| Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder.<br><br>Local Rule 6004-1(c)(i)(C) | On or before November 22, 2019 (the "**Stalking Horse Deadline**"), the Debtors may, in consultation and with consent of the Consultation Parties, select a party to serve as a "**Stalking Horse Purchaser**" to acquire substantially all of the Debtors' Assets pursuant to a "**Stalking Horse Agreement**," without the need for further notice and hearing; provided, however, that any break-up fee (a "**Break-Up Fee**") shall be limited to an amount no greater than 3% of the cash portion of any Qualifying Bid, any expense reimbursement (an "**Expense Reimbursement**" and together with any associated Break-Up Fee, the "**Bid Protections**") shall be limited to an amount not to exceed $250,000. If the Debtors designate a Stalking Horse Purchaser and Stalking Horse Agreement, including any Bid Protections, in accordance with the proviso at the end of the prior sentence, they shall file a Stalking Horse Notice in accordance with the Bidding Procedures Order and submit an order approving the same under certification of counsel. The Debtors, however, reserve the right to file a Stalking Horse Notice, on or before the Stalking Horse Deadline, to designate a Stalking Horse Purchaser and Stalking Horse Agreement, including any Bid Protections, that do not meet the foregoing qualifications and seek a hearing before the Court on, or as soon as the Court is available after, November 22, 2019 to consider approval of the same. |

16

| | |
|---|---|
| Auction. | If the Debtors timely receive one or more Qualifying Bids for any of the Assets (inclusive of any Stalking Horse Purchaser's Qualifying Bid), then the Debtors shall conduct an auction (the "**Auction**"). Following the Auction, the Debtors will determine, in consultation with the Consultation Parties, which Qualifying Bid is the highest or best bid for the Assets, which will be determined by considering, among other things, the following non-binding factors: (a) the terms of the Purchase Agreement or Restructuring Term Sheet requested by each bidder; (b) the extent to which such terms are likely to delay closing of the Sale, the cost to the Debtors and their estates of such modifications or delay, and any incremental financing being offered to accommodate any delay; (c) the total consideration to be received by the Debtors and their estates; (d) the Transaction structure and execution risk, including conditions to, timing of and certainty of closing, termination provisions, availability of financing and financial wherewithal to meet all commitments, and required governmental or other approval; (e) the net benefit to the Debtors' estates, taking into account any Break-Up Fee and any Expense Reimbursement provided for in any applicable Stalking Horse Agreement; (f) the impact on employees, trade creditors and lease and contract counterparties; and (g) any other factors the Debtors or the Consultation Parties may reasonably deem relevant. |

The Auction shall be governed by the following procedures:

(a)  the Auction shall commence on December 10, 2019 at 10:00 a.m. (ET) (the "Auction Date"), at Polsinelli PC, 222 Delaware Avenue, Suite 1100, Wilmington, Delaware 19801.

(b)  only a Stalking Horse Purchaser and the other Qualifying Bidders with Qualifying Bids (collectively, the "Auction Bidders") shall be entitled to make any subsequent bids at the Auction;

(c)  the Auction Bidders shall appear in person at the Auction, or through a duly authorized representative;

(d)  only the Debtors, the Auction Bidders, the Consultation Parties, and the Debtors' creditors and equity holders, together with the professional advisors to each of the foregoing parties, may attend the Auction; provided that any creditors and equity holders desiring to attend the Auction must provide counsel for the Debtors one (1) business day's written notice of their intent to attend the Auction;

17

(e)  the Debtors and their professional advisors shall direct and preside over the Auction, which shall be transcribed;

(f)  the Auction Bidders shall confirm that they have not engaged in any collusion with respect to the Bidding Procedures, the Auction or the Sale;

(g)  bidding shall commence at the amount of the Baseline Bid, and the Auction Bidders may submit successive bids in increments of $250,000 of the current highest and best bid (or Baseline Bid for the first round) (the "Bid Increment"); provided that: (i) each such successive bid must be a Qualifying Bid; (ii) if the then-highest and best bid was made by any Stalking Horse Purchaser, such bid shall be deemed to include the sum of the amount of, if applicable, (A) any Break-Up Fee and (B) any Expense Reimbursement; (iii) any successive bid made by any Stalking Horse Purchaser shall only be required to equal the sum of the amount of (A) the Baseline Bid or the then-highest and best bid, as applicable, plus (B) the Bid Increment, less (C) the sum of the amount of, if applicable, (X) any Break-Up Fee and (Y) any Expense Reimbursement; and (iv) the Debtors shall retain the right to modify the bid increment requirements at the Auction; provided, further, that the Debtors, in consultation with the Consultation Parties, reserve the right to modify the Bid Increment during the course of the Auction and shall do so on the record at the Auction;

(h)  the Auction may include individual negotiations with any of the Auction Bidders, but all bids shall be made on the record and in the presence of all of the Auction Bidders;

(i)  all material terms of the bid that is deemed to be the highest and best bid for each round of bidding shall be fully disclosed to the Auction Bidders, and the Debtors shall use reasonable efforts to clarify any and all questions that the Auction Bidders may have regarding the Debtors' announcement of the then-current highest and best bid;

(j)  the Debtors and their professional advisors, in consultation with the Consultation Parties, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make subsequent bids) for conducting the Auction, provided that such rules are (i) not inconsistent with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or any applicable order of the Court entered in connection with these

70690192.5

chapter 11 cases, including, without limitation, the Bidding Procedures Order, and (ii) disclosed to the Auction Bidders;

(k) each Auction Bidder shall (i) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating the Bidding Procedures, the Sale, the Auction and the construction and enforcement of the contemplated transaction documents of the Auction Bidders, (ii) bring any such action or proceeding in the Court, and (iii) be deemed to have consented to the Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law;

(l) Auction Bidders shall have the right to make additional modifications to their respective Purchase Agreements or any Stalking Horse Agreement, as applicable, in conjunction with each Qualifying Bid submitted in each round of bidding during the Auction, provided that (i) any such modifications on an aggregate basis and viewed in whole, shall not, in the Debtors' discretion, in consultation with the Consultation Parties, be less favorable to the Debtors and their estates than the terms of the Auction Bidders' respective Purchase Agreements or any Stalking Horse Agreement, as applicable, and (ii) each Qualifying Bid shall constitute an irrevocable offer and shall be binding on the Auction Bidder submitting such bid until such party shall have submitted a subsequent Qualifying Bid at the Auction or the conclusion of the Sale Hearing, whichever occurs sooner, unless such bid is selected as the Successful Bid or the Back-Up Bid, which shall remain binding as provided for herein;

(m) the Debtors and the Consultation Parties shall have the right to request any additional financial information that will allow the Debtors and the Consultation Parties to make a reasonable determination as to an Auction Bidder's financial and other capabilities to consummate the transactions contemplated by their proposal or any Stalking Horse Agreement, as applicable, as may be amended during the Auction, and any further information that the Debtors may believe is reasonably necessary to clarify and evaluate any bid made by an Auction Bidder during the Auction;

70690192.5

(n) upon the conclusion of the Auction, the Debtors shall determine, in consultation with the Consultation Parties, and subject to Court approval, the offer or offers for the Assets that is or are the highest or best from among the Qualifying Bids submitted at the Auction, which may be a Stalking Horse Agreement (the "Successful Bid"). In making this decision, the Debtors shall consider, in consultation with the Consultation Parties, the amount of the purchase price, the likelihood of the bidder's ability to close a transaction and the timing thereof, the nature and impact of any variances from the form Purchase Agreement requested by each bidder, and the net benefit to the Debtors' estates and their creditor constituencies. The bidder submitting such Successful Bid, which may be the Stalking Horse Purchaser, shall become the "Successful Bidder," and shall have such rights and responsibilities of the purchaser as set forth in the subject Purchase Agreement, as applicable. The Debtors may, in their sole discretion, designate Back-Up Bids (and the corresponding Back-Up Bidders) to purchase the Assets in the event that the Successful Bidder does not close the Sale; and

(o) prior to the Sale Hearing, the Successful Bidder shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made.

**THE SUCCESSFUL BID AND ANY BACK-UP BIDS SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE SUCCESSFUL BIDDER AND THE BACK-UP BIDDER, RESPECTIVELY, FROM THE TIME THE BID IS SUBMITTED UNTIL TWO (2) BUSINESS DAYS AFTER THE SALE HAS CLOSED. EACH QUALIFYING BID THAT IS NOT THE SUCCESSFUL BID OR BACK-UP BID SHALL BE DEEMED WITHDRAWN AND TERMINATED AT THE CONCLUSION OF THE SALE HEARING. NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, IF THE SUCCESSFUL BID IS IN THE FORM OF A RESTRUCTURING TERM SHEET, ANY BACK-UP BID SHALL REMAIN IRREVOCABLE AND BINDING ON THE BACK-UP BIDDER UNTIL TWO (2) BUSINESS DAY AFTER THE ENTRY OF AN ORDER CONFIRMING THE SUCCESSFUL BID IN THE FORM OF A RESTRUCTURING TERM SHEET AS THE SUCCESSFUL BID (OR SUCH FURTHER PERIOD SET FORTH IN ANY ORDER ENTERED AT THE SALE**

20

| | |
|---|---|
| | **HEARING).** |
| Sale Hearing. | The Successful Bid and any Back-Up Bid (or if no Qualifying Bid other than that of any Stalking Horse Purchaser is received, then the Stalking Horse Agreement) will be subject to approval by the Court. The hearing to approve such Successful Bid and any Back-Up Bid (the "**Sale Hearing**") shall take place, subject to the Court's availability, on **December 11, 2019 at _____ a.m./p.m.** The Sale Hearing may be adjourned by the Debtors from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or by filing a hearing agenda or notice on the docket of the Debtors' chapter 11 cases. **For the avoidance of doubt, by no later than the time of announcement of the Baseline Bid for the Auction, the Debtors may determine, in consultation with the Consultation Parties, to withdraw the Assets or any subset thereof, from the Auction and sale process, and adjourn the Sale Hearing with respect to these Assets on the terms set forth herein.** <br><br> At the Sale Hearing, the Debtors will seek entry of an order that, among other things: (i) authorizes and approves the Sale to the Successful Bidder (and, if applicable the Back-Up Bidder), pursuant to the terms and conditions set forth in the applicable Stalking Horse Agreement or Purchase Agreement executed by the Successful Bidder (and, if applicable the Back-Up Bidder), and that the Assets being transferred in such transaction shall be transferred free and clear of all liens, claims and Encumbrances pursuant to Bankruptcy Code section 363(f); (ii) unless otherwise ordered by the Court, directing that all Encumbrances on the Assets that are sold shall attach to the cash proceeds generated from the sale of such Assets in the same order of priority as they existed prior to the consummation of such sale; (iii) finding that the Stalking Horse Purchaser or Successful Bidder, as applicable, is a good faith purchaser pursuant to Bankruptcy Code section 363(m); and (iv) as appropriate, exempting the Sale(s) and conveyance(s) of the Assets from any transfer tax, stamp tax or similar tax, or deposit under any applicable bulk sales statute. Notwithstanding anything in the foregoing to the contrary, if the Successful Bid is in the form of a Restructuring Term Sheet, the Debtors will seek authorization to proceed with the Transaction contemplated by such Restructuring Term Sheet, including all other relief necessary to proceed with implementation of such a Transaction. |
| Modification of the Bidding | Notwithstanding any of the foregoing, the Debtors and their |

| | |
|---|---|
| and Auction Procedures.<br><br>Local Rule 6004-1(c)(i)(D) | estates reserve the right to, after consultation with the Consultation Parties, modify these Bidding Procedures at or prior to the Auction, including, without limitation, to extend the deadlines set forth herein, allow for bidding on only a portion of the Assets and not all of them, modify bidding increments, waive terms and conditions set forth herein with respect to any or all potential bidders (including, without limitation, the Bid Requirements), impose additional terms and conditions with respect to any or all Potential Bidders, adjourn or cancel the Auction at or prior to the Auction, and adjourn the Sale Hearing. |
| Closing with Alternative Backup Bidders.<br><br>Local Rule 6004-1(c)(i)(E) | Notwithstanding any of the foregoing, in the event that the Successful Bidder fails to close the Sale by December 31, 2019 (or such date as may be extended by the Debtors, in consultation with the Consultation Parties, and with the agreement of the Back-Up Bidder), the Back-Up Bid will be deemed to be the Successful Bid, the Back-Up Bidder will be deemed to be the Successful Bidder, and the Debtors will be authorized, but not directed, to close the Sale to the Back-Up Bidder subject to the terms of the Back-Up Bid without the need for further order of the Court and without the need for further notice to any interested parties, as soon as practicable, but not later than January 10, 2019. |
| Return of Deposits. | All Deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder or the Back-Up Bidder no later than three (3) business days following the conclusion of the Sale Hearing. The deposit of the Successful Bidder or, if the Sale is closed with the Back-Up Bidder, the deposit of the Back-Up Bidder, shall be applied to the purchase price for the Sale. If the Successful Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) fails to consummate the Sale because of a breach or failure to perform on the part of such bidder, then, subject to the terms of the Purchase Agreement or any Stalking Horse Agreement, as applicable, the Debtors and their estates shall be entitled to retain the Deposit of the Successful Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) as part of the damages resulting to the Debtors and their estates for such breach or failure to perform. |
| Notice and Consultation Parties | (a) The term "Notice Parties" as used in these Bidding Procedures shall mean: (i) counsel to the Debtors, Polsinelli PC, 222 Delaware Avenue, Suite 1101, Wilmington, Delaware 19801, Attn: Christopher A. Ward (cward@polsinelli.com) and Shanti Katona (skatona@polsinelli.com); and (ii) investment banker to the |

Debtors, Candlewood Partners, LLC Grant Pollack (gyp@candlewoodpartners.com) and Rishi Agarwal (ra@candlewoodpartners.com).

(b) The term "Consultation Parties" as used in these Bidding Procedures shall mean: (i) counsel to the official committee of unsecured creditors appointed in the Debtors' chapter 11 cases (the "**Committee**"), Kelley Drye & Warren LLP, 101 Park Avenue, New York, New York 10178, Attn: Jason R. Adam (jadams@kelleydrye.com) and Lauren S. Schlussel (lschlussel@kelleydrye.com), and Cole Schotz P.C., 500 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801, Attn: G. David Dean (ddean@coleschotz.com) and Patrick J. Reilley (preilley@coleschotz.com); (ii) counsel to the Prepetition Agent, Vinson & Elkins LLP, 2001 Ross Avenue, Suite 3900, Dallas, Texas 75201-2975, Attn: William L. Wallander (bwallander@velaw.com) and Bradley R. Foxman (bfoxman@velaw.com), and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, Attn: Mark D. Collins (Collins@rlf.com); and (iii) counsel to Black Diamond Commercial Finance, LLC, Winston & Strawn LLP, 35 Wacker Dr., Chicago, Illinois 60601, Attn: Dan McGuire (dmcguire@winston.com) and Fox Rothschild LLP, Citizens Bank Center, 919 North Market Street, Suite 300, Wilmington, Delaware 19899-2323, Attn: Seth Niederman (sniederman@foxrothschild.com)

For the avoidance of doubt, any consultation rights provided to the Consultation Parties by these Bidding Procedures shall not limit the Debtors' discretion in any way and shall not include the right to veto any decision made by the Debtors in the exercise of their business judgment.

If a member of the Committee submits a Qualifying Bid, the Committee will continue to have consultation rights as set forth in these Bidding Procedures; *provided* that the Committee shall exclude such member from any discussions or deliberations regarding the sale of the Assets and shall not provide any information regarding the sale of the Assets to such member.

In the event that any Consultation Party (other than the Committee) or an affiliate of any of the foregoing submits a bid that is a Qualifying Bid, any obligation of the Debtors to consult with the bidding party established under these Bidding Procedures will be waived, discharged and released without further action; *provided* that the bidding party will have the same

70690192.5

| | rights as any other Qualifying Bidder set forth above. |
|---|---|

22.     Importantly, the Bid Procedures recognize the Debtors' fiduciary obligations to maximize the value of their assets and, as such, do not impair the Debtors' ability to consider all qualified bid proposals. Additionally, as noted above, the Bid Procedures preserve the Debtors' rights to modify the Bid Procedures as necessary or appropriate to maximize value of the Debtors' estates.

**II.    The Auction and Sale**

23.     If one or more Qualified Bids are received by the Bid Deadline, the Debtors will conduct an Auction to determine the highest and best Qualified Bid. This determination shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, including, without limitation, the following:

a.      the amount and nature of the consideration,

b.      whether the Qualified Bid intends to re-start operations and offer employment to the former employees of the Debtors,

c.      the proposed assumption of any liabilities and/or executory contracts or unexpired leases, if any, and the excluded assets and/or executory contracts or unexpired leases, if any,

d.      the ability of the Qualified Bidder to close the proposed transaction and the conditions related thereto, and the timing thereof,

e.      whether the bid is a bulk bid or a partial bid for only some of the Debtors' assets,

f.      the proposed closing date and the likelihood, extent and impact of any potential delays in closing, including delays owing to regulatory uncertainty,

g.      any purchase price adjustments,

h.      the impact of the transaction on any actual or potential litigation,

i.       the net after-tax consideration to be received by the Debtors' estates, and

      j.      the tax consequences of such bid (collectively, the "**Bid Assessment Criteria**").

24.    The Debtors seek authority from the Court to schedule the Auction on a date as further described in the Bid Procedures.

## III.    <u>Form and Manner of Sale Notice</u>

25.    On or within two (2) business days after entry of the Bid Procedures Order, the Debtors will cause the Sale Notice to be served on (a) the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**"); (b) counsel to Bank of America, N.A. as administrative agent (the "**Prepetition Agent**") for itself and the other lenders (the "**Prepetition Lenders**"); (c) counsel to Black Diamond Commercial Finance, LLC as agent (the "**Subordinated Term Loan Agent**"); for itself and the other lenders (the "**Subordinated Term Loan Lenders**"); (d) counsel to the Committee; (e) counsel to the Stalking Horse Bidder, if any; (f) all other parties who have expressed a written interest in the Assets; (g) the United States Attorney's Office for the District of Delaware; (h) the Internal Revenue Service; (i) all state and local taxing authorities with an interest in the Assets; (k) the Attorney General for the State of Delaware; (k) the Securities and Exchange Commission; (l) all other governmental agencies with an interest in the Sale and transactions proposed thereunder; (m) all parties known or reasonably believed to have asserted an Interest in the Assets; (n) the counterparties to the Contracts (the "**Contract Counterparties**"); (o) the Debtors' insurance carriers; (p) all parties entitled to notice pursuant to Local Rule 9013-1(m); and (r) any party that has requested notice pursuant to Bankruptcy Rule 2002.

70690192.5

26.     In addition, the Debtors propose to publish the notice attached hereto as <u>Exhibit C</u> (the "**Bid Procedures Notice**") once in a newspaper in national circulation as soon as practicable after entry of the Bid Procedures Order. Finally, the Debtors will post a copy of the Sale Notice at the website of their claims and noticing agent, Kurtzman Carson Consultants LLC, located at http://kccllc.net/bayousteel.

## IV.     Summary of the Assumption Procedures

27.     The Debtors are also seeking approval of certain procedures to facilitate the fair and orderly assumption and assignment of the Contracts in connection with the Sale (the "**Assumption Procedures**"). Pursuant to the Bid Procedures Order, notice of the proposed assumption and assignment of the Contracts to the Successful Bidder, the proposed cure amounts related thereto, and the right, procedures, and deadlines for objecting thereto, will be provided in separate notices, attached to the Bid Procedures Order as <u>Exhibit 3</u> (the "**Cure and Possible Assumption and Assignment Notice**") and <u>Exhibit 4</u> (the "**Assumption Notice**") to be sent to the applicable Contract Counterparties. Because the Bid Procedures Order sets forth the Assumption Procedures in detail, they are not restated herein. Generally, however, the Assumption Procedures: (i) outline the process by which the Debtors will serve notice to all Contract Counterparties regarding the proposed assumption and assignment and related cure amounts, if any, informing such parties of their right, and the procedures, to object thereto, and (ii) establish objection and other relevant deadlines and the manner for resolving disputes relating to the assumption and assignment of the Contracts to the extent necessary.

70690192.5

**BASIS FOR RELIEF**

I.    **The Relief Sought in the Bid Procedures Order Is in the Best Interests of the Debtors' Estates and Should Be Approved**

    A.    **The Proposed Notice of the Bid Procedures and the Sale Process Is Appropriate**

28.    The Debtors seek authority to sell the Assets through an Auction and related sale process, subject to the Debtors' right to seek an alternative course of action to maximize the value of their estates. The Debtors and their advisors have conducted and will conduct an extensive marketing process. The Debtors have developed a list of "Contact Parties" who will receive a copy of the "Information Package" (both as defined in the Bid Procedures). The list of Contact Parties will encompass those parties whom the Debtors believe may be potentially interested in pursuing a Sale and whom the Debtors reasonably believe may have the financial resources to consummate such a transaction. The Bid Procedures are designed to elicit bids from one or more parties and to encourage a robust auction of the Assets, thus maximizing the value of the Debtors' estates for the benefit of their creditors and other stakeholders.

29.    Under Bankruptcy Rule 2002(a) and (c), the Debtors are required to notify creditors of the proposed sale of the Assets, including a disclosure of the time and place of any auction, the terms and conditions of a sale, and the deadline for filing any objections.

30.    The Debtors respectfully submit the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including: (i) the date, time, and place of the Auction (if one will be held), (ii) the Bid Procedures, (iii) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing, (iv) a reasonably specific identification of the Assets, (v) a description of the Sale as being free and clear of liens, claims, encumbrances, and other interests other than Permitted Encumbrances and Assumed Liabilities, with all such liens, claims, encumbrances,

and other interests attaching with the same validity and priority to the Sale proceeds, and (vi) notice of the proposed assumption and assignment of the Contracts to the Successful Bidder.

31.     The Debtors further submit that notice of this Motion and the related hearing to consider entry of the Bid Procedures Order, coupled with service of the Sale Notice, the Cure and Possible Assumption and Assignment Notice, and the Assumption Notice, and publication of the Bid Procedures Notice, as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. The Debtors further submit the proposed notice procedures are designed to maximize the chance of obtaining the broadest possible participation in the Debtors' marketing process, while minimizing costs to the estates. Accordingly, the Debtors respectfully request the Court find the proposed notice procedures set forth in this Motion are sufficient, and no other or further notice of the Bid Procedures, Auction, Sale, or Sale Hearing is required.

### B.     The Bid Procedures Are Appropriate and Will Maximize Value

32.     Bid procedures should be approved when they provide a benefit to the debtor's estate by maximizing the value of the debtor's assets. *See In re Edwards*, 228 B.R. 552, 361 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."). Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g., In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'") (internal citations omitted)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (quoting *Schipper*); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (same); *see also In re Integrated Resources, Inc.*, 147 B.R. 650, 656-57 (S.D.N.Y.

1992) (noting that bid procedures that have been negotiated by a trustee are to be reviewed in accordance with the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

33.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See Mushroom Transp. Co., Inc.*, 382 F.3d 325, 339 (3d Cir. 2004); *Official Comm. of Unsecured Creditors of Cybergenics, Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003); *see also In re Food Barn Stores, Inc.*, 101 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted); *Edwards*, 228 B.R. at 561.

34.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore appropriate in the context of bankruptcy transactions. *See, e.g., In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *Integrated Resources*, 147 B.R. at 659 (bid procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y.1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

35.     The Debtors believe the proposed Bid Procedures will establish the parameters under which the value of the Sale may be tested at the Auction. The Bid Procedures will increase

the likelihood the Debtors will receive the greatest possible consideration because they will ensure a competitive and fair bidding process.

36.     The Debtors believe the proposed Bid Procedures will promote active bidding from seriously interested parties and will elicit the highest or otherwise best offers available for the Assets. The proposed Bid Procedures will enable the Debtors to conduct the Sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the Assets and who can demonstrate the ability to close the transaction.

37.     Specifically, the proposed Bid Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

38.     At the same time, the proposed Bid Procedures provide the Debtors with a robust opportunity to consider competing bids and select the highest or otherwise best offer for the completion of the Sale. As such, creditors of the Debtors' estates can be assured the consideration obtained will be fair and reasonable and at or above the market.

39.     The Debtors submit the proposed Bid Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and are consistent with other procedures previously approved in this District. *See, e.g., In re Emerald Oil, Inc.*, No. 16-10704 (KG) (Bankr. D. Del. July 28, 2016); *In re Quicksilver Res. Inc.*, No. 15-10585 (LSS) (Bankr. D. Del. Oct. 6, 2015); *In re Source Home Entm't LLC*, No. 14-11553 (KG) (Bankr. D. Del. July 21, 2014); *In re Palm Harbor Homes, Inc.*, No. 10-13850 (Bank. D. Del. Jan. 6, 2011); *In re Ultimate Escapes Hldgs,*

*LLC*, No. 10-12915 (Bankr. D. Del. Oct. 8, 2010); *In re PTC Alliance Corp.*, No. 09-13395 (Bankr. D. Del. Nov. 6, 2009); *In re Hayes Lemmerz Int'l, Inc.*, No. 09-11655 (Bankr. D. Del. Sept. 22, 2009); *In re VeraSun Energy Corp.*, No. 08-12606 (Bankr. D. Del. Feb. 19, 2009); *see also In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (KJC) (Bankr. D. Del. July 14, 2007); *In re New Century TRS Holdings, Inc.*, Case No. 07-10416 (KJC) (Bankr D. Del. Apr. 20, 2007); *In re Three A's Holdings, L.L.C.*, Case No. 06-10886 (BLS) (Bankr. D. Del. Sept. 7, 2006).[5]

40.    Thus, the Bid Procedures are reasonable, appropriate, and within the Debtors' sound business judgment under the circumstances because the Bid Procedures are designed to maximize the value to be received by the Debtors' estates.

### C.    The Minimum Overbid Increment is Appropriate

41.    One important component of the proposed Bid Procedures is the "Overbid" provision. Once the Debtors determine the Starting Bid, as determined by the Debtors in consultation with the Committee, plus the Initial Overbid, and hold the Auction, bidding on the Assets must be in Minimum Overbid Increments of at least $250,000.

42.    The Debtors believe such Minimum Overbid Increment is reasonable under the circumstances, and will enable the Debtors to maximize the value received for the Assets while limiting any chilling effect in the marketing process. The Minimum Overbid Increment is also well within the increment level previously approved by courts in this District. *See In re Emerald Oil, Inc.*, No. 16-10704 (KG) (Bankr. D. Del. July 28, 2016) (approving $500,000 bid increment); *In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (KJC) (Bankr. D. Del. July 24, 2007) (approving $750,000 increment); *In re New Century TRS Holdings, Inc.*, Case No. 07-10416 (KJC) (Bankr D. Del. Apr. 20, 2007) (approving $500,000 increment); *In re Three A's Holdings,*

---

[5] Because the number of orders cited is voluminous, individual orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

*L.L.C.*, Case No. 06-10886 (BLS) (Bankr D. Del. Sept. 7, 2006) (approving $500,000 increment).

> **D.      The Proposed Notice Procedures for the Assigned Contracts and the Identification of Related Cure Amounts Are Appropriate**

43.      As set forth above, the Sale contemplates the potential assumption and assignment of the Contracts to the Successful Bidder arising from the Auction, if any. In connection with this process, the Debtors believe it is necessary to establish a process by which: (i) the Debtors and the Contract Counterparties can reconcile cure obligations, if any, in accordance with Bankruptcy Code sections 105(a) and 365, and (ii) such counterparties can object to the potential assumption and assignment of the Contracts and/or related cure amounts (the "**Assumption Procedures**").

44.      The Bid Procedures specify the process by which the Debtors will serve Cure and Possible Assumption and Assignment Notices and the procedures and deadline for Contract Counterparties to Assigned Contracts to file and serve Cure or Assignment Objections.

45.      Except as may otherwise be agreed to in the Successful Bid or by the parties to an Assigned Contract, at the closing of the Sale, the Successful Bidder shall cure those defaults under the Assigned Contracts that need to be cured in accordance with Bankruptcy Code section 365(b), by (i) payment of the undisputed cure amount (the "**Cure Amount**") and/or (ii) reserving amounts with respect to any disputed cure amounts.

46.      As set forth in the Bid Procedures Order, the Debtors also request any party that fails to object to the proposed assumption and assignment of any Contract be deemed to consent to the assumption and assignment of the applicable Contract pursuant to Bankruptcy Code section 365, along with the Cure Amounts identified in the Cure and Possible Assumption and Assignment Notice. *See, e.g., In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not

objecting to the Motion, a creditor is deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

47.     The Debtors believe the Assumption Procedures are fair and reasonable, provide sufficient notice to the Contract Counterparties of the potential assumption and assignment of its Contracts, and provide certainty to all parties in interest regarding their obligations and rights with respect thereof. Accordingly, the Debtors request the Court approve the Assumption Procedures set forth in the Bid Procedures Order.

## II.     Approval of the Proposed Sale is Appropriate and in the Best Interests of the Estates

### A.     The Sale of the Acquired Assets Should be Authorized Pursuant to Bankruptcy Code Section 363as a Sound Exercise of the Debtors' Business Judgment

48.     Bankruptcy Code section 363(b)(1) provides a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A sale of the debtor's assets should be authorized pursuant to Bankruptcy Code section 363 if a sound business purpose exists for the proposed transaction. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) ("Under Section 363, the debtor-in-possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (Bankr. D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 174 (Bankr. D. Del. 1991); *see also In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Telesphere Commc'ns, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999).

49.     Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (i) whether a sound business justification exists for the sale,

70690192.5

(ii) whether adequate and reasonable notice of the sale was given to interested parties, (iii) whether the sale will produce a fair and reasonable price for the property, and (iv) whether the parties have acted in good faith. *See Del. & Hudson*, 124 B.R. at 176; *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987).

50.      A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estates, creditors, or interest holders. *See, e.g., In re Abbotts Dairies of Pa, Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983).

51.      "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re Integrated Res.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995) ("The business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company.") (citations omitted); *In re Filene's Basement, LLC*, No. 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate.") (citations omitted). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question

should be approved under Bankruptcy Code section 363(b)(1). Indeed, when applying the business judgment standard, courts show great deference to a debtor's business decisions. *See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.)*, 1989 WL 106838, at *3 (N.D. Ill. 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

52.     As set forth above, and in the First Day Declaration, the Debtors have a sound business justification for selling the Assets. First, the Debtors believe the Sale will maximize the Assets' going-concern value by allowing a party to bid on business assets that would have substantially less value on a stand-alone or liquidation basis. Moreover, to the extent the Successful Bidder assumes certain of the Contracts, it will result in payment in full for a number of the Debtors' creditors.  In addition, the sale may pave the way for the re-start of business operations and the re-employment of the Debtors' former employees.

53.     Second, the sale of the Assets will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Assets. The value of the Assets will be tested through the Auction conducted pursuant to and according to the Bid Procedures. Ultimately, the Successful Bid, after being subject to a "market check" in the form of the Auction and accepted by the Debtors in the exercise of their reasonable business judgment, will constitute the highest or otherwise best offer for the Assets and at this time the Debtors believe will provide a greater recovery for their estates than any known or practically available alternative. *See, e.g., In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure . . . the auction procedure has developed over the years as an effective means for

producing an arm's-length fair value transaction"). Consequently, the fairness and reasonableness of the consideration to be paid by the Successful Bidder ultimately will be demonstrated by adequate "market exposure" and an open and fair auction process — the best means for establishing whether a fair and reasonable price is being paid.

54.     Thus, absent a change in circumstances that causes the Debtors to abandon the sale process, the Debtors submit the Successful Bidder's purchase agreement will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. As such, the Debtors' determination to explore selling the Assets through an Auction process and subsequently to enter into the asset purchase agreement with the Successful Bidder will be a valid and sound exercise of the Debtors' business judgment. The Debtors will submit evidence at the Sale Hearing to support these conclusions. Therefore, the Debtors request the Court make a finding the proposed sale of the Assets is a proper exercise of the Debtors' business judgment and is rightly authorized.

**B.     Adequate and Reasonable Notice of the Sale Will Be Provided**

55.     As described above, the Sale Notice will: (i) be served in a manner that provides at least 21-days' notice of the date, time, and location of the Sale Hearing, (ii) inform parties in interest of the deadlines for objecting to the Sale or the assumption and assignment of the Contract, and (iii) otherwise include all information relevant to parties interested in or affected by the Sale. Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bid Procedures Order, after notice and a hearing, before it is served on parties in interest.

### C.     The Sale and Purchase Price Will Reflect a Fair-Value Transaction

56.     It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999). The Debtors will continue to market the Assets and solicit offers consistent with the Bid Procedures, including, without limitation, by providing acceptable Bidders with access to the Data Room and requested information. In this way, the number of Bidders that are eligible to participate in the competitive Auction process will be maximized. On the other hand, if the Debtors enter into a Stalking Horse Agreement and no Auction is held because no Auction is necessary, the Stalking Horse Agreement's purchase price conclusively will have been demonstrated to be fair value.

### D.     The Sale of the Acquired Assets Should Be Free and Clear of Interests Pursuant to Bankruptcy Code Section 363(f)

57.     The Debtors further submit it is appropriate to sell the Acquired Assets free and clear of all liens, claims, encumbrances, and other interests (collectively, the "**Interests**") other than Permitted Encumbrances and Assumed Liabilities pursuant to section Bankruptcy Code 363(f), with any such Claims and Interests attaching to the net sale proceeds of the Acquired Assets, as and to the extent applicable.

58.     Bankruptcy Code section 363(f) permits a debtor to sell property free and clear of another party's interest in the property if (i) applicable nonbankruptcy law permits such a free and clear sale, (ii) the holder of the interest consents, (iii) the interest is a lien and the sale price of the property exceeds the value of all liens on the property, (iv) the interest is the subject of a *bona fide* dispute, (v) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. *See* 11 U.S.C. § 363(f).

59.     Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to permit the Debtors' sale of the Acquired Assets free and clear of all interests (*i.e.*, all liens, claims, rights, interests, charges, or encumbrances), except with respect to any interests that may be assumed liabilities under the applicable purchase agreement. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *see also In re Dundee Equity Corp.*, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); *Citicorp Homeowners Servs., Inc. v. Eliot (In re Eliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same); *Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating Bankruptcy Code section 363(f) is written in the disjunctive; holding the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) has been satisfied).

60.     The Debtors submit, excluding assumed agreements, if any, the Acquired Assets may be sold free and clear of liens, claims, encumbrances, and other interests—all in accordance with at least one of the five conditions of Bankruptcy Code section 363(f). Consistent with Bankruptcy Code section 363(f)(2), each of the parties holding liens on the Acquired Assets, if any, will consent, or absent any objection to this Motion, will be deemed to have consented to, the Sale and transfer of the Acquired Assets. Furthermore, any party holding a valid lien against the Acquired Assets will be adequately protected by having its liens, if any, attach to the sale proceeds received by the Debtors from the sale of the Acquired Assets to the Successful Bidder, in the same order of priority, with the same validity, force, and effect such creditor had prior to

such sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto. Accordingly, Bankruptcy Code section 363(f) authorizes the sale and transfer of the Acquired Assets free and clear of any such Interests.

> **E.      The Acquired Assets and Assigned Contracts Should be Sold Free and Clear of Successor Liability**

61.      The Sale Order provides the Purchaser shall not have any successor liability related to Seller or the Acquired Assets to the maximum extent permitted by law. Extensive case law establishes that claims against a winning bidder may be directed to the proceeds of a free and clear sale of property, and may not subsequently be asserted against that buyer.

62.      Although Bankruptcy Code section 363(f) provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code. *Folger Adam Security v. DeMatteis/MacGregor JV*, 209 F.3d 252, 257 (3d Cir. 2000). In the case of *In re Trans World Airlines. Inc.*, 322 F.3d 283, 288-89 (3d Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interest." The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is towards "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'" *Id.* at 289 (citing 3 Collier on Bankruptcy 363.06[1]). As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-82 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in *Folger*, the scope of section 363(f) is not limited to *in rem* interests. Thus, the Third Circuit in *Folger* cited *Leckie* for the proposition that the debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute." *Folger*, 209 F.3d at 258.

63.     Courts have consistently held a buyer of a debtor's assets pursuant to a section 363 sale takes free from successor liability resulting from pre-existing claims. *See The Ninth Avenue Remedial Group v. Allis-Chalmers Corp.*, 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); *MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under Bankruptcy Code section 363(f)); *In re New England Fish Co.*, 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale was free and clear of Title VII employment discrimination and civil rights claims of debtor's employees); *In re Hoffman*, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes); *American Living Systems v. Bonapfel (In re All Am. of Ashburn, Inc.)*, 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product liability claims precluded from being asserted against his successor in a sale of assets free and clear); *WBQ P'ship v. Virginia Dept. of Medical Assistance Services (In re WBQ P'ship)*, 189 B.R. 97, 104-05 (Bankr E D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is an "interest" as used in section 363(f)).

64.     The purpose and value of an order authorizing the transfer of the Assets would be frustrated if claimants thereafter could use the transfer as a basis to assert claims against the Purchaser. Under Bankruptcy Code section 363(f), the Purchaser is entitled to know the Assets are not tainted by latent claims that could be asserted against the Purchaser after the proposed transaction is completed. Absent that ruling, the value of the Assets could be severely compromised.

65.     Accordingly, consistent with the above-cited case law, the order approving the sale of the Assets should state the Purchaser is not liable as a successor under any theory of successor liability, for Interests that encumber or relate to the Assets.

**F.     The Sale Has Been Proposed in Good Faith and Without Collusion, and the Successful Bidder Will Be a "Good-Faith Purchaser" Entitled to the Full Protection of Bankruptcy Code Section 363(m); and the Sale of the Acquired Assets Does Not Violate Bankruptcy Code Section 363(n)**

66.     The Debtors request the Court find the Successful Bidder is entitled to the benefits and protections provided by Bankruptcy Code section 363(m) in connection with the sale of the Acquired Assets.

67.     Bankruptcy Code section 363(m) provides, in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

68.     Bankruptcy Code section 363(m) thus protects the purchaser of assets sold pursuant to Bankruptcy Code section 363 from the risk it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser purchased or leased the assets in "good faith." While the Bankruptcy Code does not define "good faith," courts have held a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that, where there is a lack of such integrity, a good-faith finding may not be made. *See, e.g., Abbotts Dairies of Pa.*, 788 F.2d at 147 ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take

grossly unfair advantage of other bidders."); *In the Matter of Andy Frain Servs., Inc.*, 798 F.2d

1113 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

69.     The Debtors submit a Successful Bidder would be a "good faith purchaser" within

the meaning of Bankruptcy Code section 363(m), and the resulting purchase agreement would be

a good-faith agreement on arm's-length terms entitled to the protections of Bankruptcy Code

section 363(m).[6] *First*, as set forth in more detail above, the consideration to be received by the

Debtors pursuant to the Sale will be subject to a market process by virtue of Debtors' marketing

efforts and the Auction and will be substantial, fair, and reasonable. *Second*, the asset purchase

agreement entered into by the Debtors and the Successful Bidder will be the result of extensive

arm's-length negotiations, during which all parties will have the opportunity to be, and the

Debtors will be, represented by competent counsel, and any purchase agreement with a

Successful Bidder will be the culmination of the Debtors' competitive market process and, if

necessary, the Auction, in which all negotiations will be conducted on an arm's-length, good-

faith basis. *Third*, where—as the Debtors anticipate will be the case here—there is no indication

of any "fraud or collusion between the purchaser and other bidders or the trustee, or an attempt to

take grossly unfair advantage of other bidders" or similar conduct, there is no cause that would

permit the Sale to be avoided pursuant to Bankruptcy Code section 363(n). Moreover, with

respect to potential bidders, the Bid Procedures are designed to ensure no party is able to exert

undue influence over the process. *Finally*, the Successful Bidder's offer will be evaluated and

approved by the Debtors in consultation with their advisors. Accordingly, the Debtors believe the

---

[6]  The Debtors believe a finding of good faith within the meaning of Bankruptcy Code section 363(m) will be appropriate for the Successful Bidder arising from the Auction and the Bid Procedures. Pursuant to the Bid Procedures, any Successful Bidder will have had to present a proposal in accordance with the Bid Procedures. In addition, the Debtors will not choose as the Successful Bidder or the Backup Bidder any entity whose good faith under Bankruptcy Code section 363(m) can reasonably be doubted, and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of Bankruptcy Code section 363(m) has been satisfied.

Successful Bidder and the resulting purchase agreement should be entitled to the full protections of Bankruptcy Code section 363(m).

70.     Moreover, because there will be absolutely no fraud or improper insider dealing of any kind, the Sale does not constitute an avoidable transaction pursuant to Bankruptcy Code section 363(n), and, as a result, the Purchaser should receive the protections afforded good faith purchasers by Bankruptcy Code section 363(m). Accordingly, the Debtors request the Court make a finding at the Sale Hearing that the agreement reached with the Successful Bidder was at arm's length and is entitled to the full protections of Bankruptcy Code section 363(m). The Debtors will submit evidence at the Sale Hearing to support these conclusions.

### G.     Credit Bidding Should be Authorized Pursuant to Bankruptcy Code Section 363(k)

71.     A secured creditor is allowed to "credit bid" the amount of its claims in a sale of assets in which it has a security interest. Bankruptcy Code section 363(k) provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k). Even if a secured creditor is undersecured as determined in accordance with Bankruptcy Code section 506(a), section 363(k) allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the creditor's economic value. *See In re Submicron Sys. Corp.*, 432 F.3d 448, 459-60 (3d Cir. 2006) (explaining "[i]t is well settled . . . that creditors can bid the full face value of their secured claims under section 363(k)").

72.     In this District, absent cause for restriction on credit bidding, courts have consistently ruled in favor of reserving a secured creditor's right to credit bid its claim. *See In re Source Home Entm't, LLC*, No. 14-115533 (KG) (Bankr. D. Del. July 21, 2014) (order

approving Bid Procedures which authorized parties with secured claims to credit bid); *In re Fisker Auto. Hldgs, Inc.*, No. 13-13087 (KG) (Bankr. D. Del. Jan. 23, 2014) (order authorizing secured creditors to exercise right under Bankruptcy Code section 363(k) to make a credit bid); *In re PTC Alliance Corp.*, No. 09-13395 (Bankr. D. Del. Nov. 6, 2009) (order authorizing, but not directing, the administrative agent to credit bid); *In re Hayes Lemmerz Int'l, Inc.*, No. 09-11655 (Bankr. D. Del. Sept. 22, 2009) (order authorizing interested party to exercise its right under Bankruptcy Code section 363(k) to make a credit bid); *In re Foamex Int'l Inc.*, 09-10560, (Bankr. D. Del. May 27, 2009) (order authorizing the sale of substantially all of the debtor's assets in a $155 million credit bid over a $151.5 million all-cash bid); *see also Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 459-60 (3d Cir. 2006) (citations omitted).

73.     Thus, subject to the Bid Procedures, the Prepetition Lenders and Subordinated Term Loan Lenders should be allowed to submit a Credit Bid.

**III.     The Assumption and Assignment of the Contracts Should be Approved**

    **A.     The Assumption and Assignment of the Contracts Reflects the Debtors' Reasonable Business Judgment**

74.     To facilitate and effectuate the sale of the Acquired Assets, the Debtors are seeking authority to assign the Assigned Contracts to the Successful Bidder to the extent required by such Successful Bidder.

75.     Bankruptcy Code section 365 authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, provided the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. *See* 11 U.S.C. § 365(b)(1).

76.    The standard applied by the Third Circuit in determining whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional") (superseded in part by 11 U.S.C. § 1113).

77.    Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract. *See In re Decora Indus., Inc.*, 2002 WL 32332749, at *8 (D. Del. 2002); *Official Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp)*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule"); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard"); *see also Phar Mor, Inc. v. Strouss Bldg. Assocs.*, 204 B.R. 948, 952 (N.D. Ohio 1997) ("Courts should generally defer to a debtor's decision whether to reject an executory contract.") (citation omitted). A debtor's decision to assume or reject an executory contract or expired lease will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pac. Ry. Co.*, 318 U.S. 523 (1943) (applying Bankruptcy Act section 77(b), predecessor to Bankruptcy Code section 365, and rejecting a test of whether an executory contract was burdensome in favor of determining whether rejection is within the debtor's business judgment); *see also Sharon Steel*, 872 F.2d at 40 (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to

consider whether to reject or assume executory contracts under the Code"); *Network Access Solutions*, 330 B.R. at 75; *Exide Techs.*, 340 B.R. at 239.

78.     Here, the Court should approve the decision to assume and assign the Assigned Contracts in connection with the Sale as a sound exercise of the Debtors' business judgment. *First*, the Assigned Contracts are necessary to operate the Acquired Assets and, as such, they are essential to inducing the best offer for the Acquired Assets. *Second*, it is unlikely any purchaser would want to acquire the Acquired Assets unless a significant number of the contracts and leases needed to manage the day-to-day operations were included in the transaction. *Third*, the Assigned Contracts will be assumed and assigned as part of a process approved by the Court pursuant to the Bid Procedures Order and, thus, will be reviewed by key constituents in these Chapter 11 Cases. Accordingly, the Debtors submit the assumption and assignment of the Assigned Contracts, if required by the Successful Bidder, should be approved as a sound exercise of the Debtors' business judgment.

79.     A debtor in possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with Bankruptcy Code section 365(a), and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. *See* 11 U.S.C. § 365(f)(2). Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating adequate assurance of future performance is present when the prospective assignee of a lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

80.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng' g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), *aff'd*, 993 F.2d 300 (2d Cir. 1993); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

81.     Counterparties to Assigned Contracts will have the opportunity to object to adequate assurance of future performance by any of the Bidders. Accordingly, the Debtors submit the assumption and assignment of the Assigned Contracts as set forth herein should be approved.

82.     To assist in the assumption, assignment, and sale of the Assigned Contracts, the Debtors also request the Sale Order approving the sale of the Acquired Assets provide that anti-assignment provisions in the Assigned Contracts shall not restrict, limit, or prohibit the assumption, assignment, and sale of the Assigned Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of Bankruptcy Code section 365(f).

83.     Bankruptcy Code section 365(f)(1) permits a debtor to assign unexpired leases and contracts free from such anti-assignment restrictions, providing, in pertinent part, that:

> [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection . . . .

11 U.S.C. § 365(f)(1).

84.     Bankruptcy Code section 365(f)(1), by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired lease. *See,*

70690192.5

*e.g., Coleman Oil Co., Inc. v. The Circle K Corp. (In re The Circle K Corp.)*, 127 F. 3d 904, 910-11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365"), *cert. denied*, 522 U.S. 1148 (1998). Bankruptcy Code section 365(f)(3) goes beyond the scope of Bankruptcy Code section 365(f)(1) by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof. *See, e.g., In re Jamesway Corp.*, 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (Bankruptcy Code section 365(f)(3) prohibits enforcement of any lease clause creating right to terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

85.     Other courts have recognized provisions that have the effect of restricting assignments cannot be enforced. *See In re Rickel Home Ctrs., Inc.*, 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 365(f) [*sic*], courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions."). Similarly, in *In re Mr. Grocer., Inc.*, the court noted that:

> [the] case law interpreting § 365(f)(1) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves ipso facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987). Thus, the Debtors request any anti-assignment provisions be deemed not to restrict, limit, or prohibit the assumption, assignment, and sale of

the Assigned Contracts, and be deemed and found to be unenforceable anti-assignment provisions within the meaning of Bankruptcy Code section 365(f).

86.    Orders granting motions to sell property and for the assumption and assignment of executory contracts frequently contain language explicitly stating the counterparty to the assumed contracts are barred from asserting against the debtor any default by reason of the closing, including any breach or right of termination relating to a change in control of the debtor. *See, e.g., In re Irish Bank Resolution Corp. Ltd.*, No. 13-12159 (CSS), 2014 WL 1759609, at *8 (Bankr. D. Del. Feb. 14, 2014) ("[n]o sections or provisions of the Contracts that purport to....declare a breach or default as a result of a change in control in respect of the Debtor…shall have any force and effect, and such provisions constitute unenforceable anti-assignment provisions under 11 U.S.C. § 365(f) and/or are otherwise unenforceable under 11 U.S.C. § 365(e)."); *see also In re McPhillips Motors, Inc.*, No. 6:09-BK-37488-RN, 2010 WL 3157062, at *7 (Bankr. C.D. Cal. Feb. 9, 2010) ("any breach related to or arising out of change-in-control or other assignment in such Assumed Contracts, or any purported written or oral modification to the Assumed Contracts" was unenforceable); *In re Bethel Healthcare, Inc.*, No. 1:13-BK-12220-GM, 2014 WL 12758523, at *4 (Bankr. C.D. Cal. May 1, 2014) ("[a]ny provision in the Lease that purports to declare a breach or default as a result of a change in control of the Debtor's business or requires the consent of a non-seller party is hereby determined unenforceable under section 365(f) of the Bankruptcy Code…").

## IV.    <u>Relief Pursuant to Bankruptcy Rule 6004(h) and 6004(d) is Appropriate</u>

87.    Bankruptcy Rule 6004(h) provides an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14

days after the entry of the order, unless the court orders otherwise." The Debtors request the Sale Order be effective immediately upon its entry by providing the 14-day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

88.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay periods, the leading treatise on bankruptcy suggests the 14-day stay periods should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 *Collier on Bankruptcy* ¶ 6004.10 (15th rev. ed. 2006). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

89.     To maximize the value received from the Acquired Assets, and to ensure they are in compliance with the requirements of the Interim Cash Collateral Order, the Debtors seek to close the Sale as soon as possible after the Sale Hearing. Accordingly, the Debtors hereby request the Court waive the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

<u>**CONSENT TO JURISDICTION**</u>

90.     Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

<u>**NOTICE**</u>

91.     Notice of this Motion will be given to: (a) the U.S. Trustee; (b) counsel to the Prepetition Agent; (c) counsel to the Subordinated Term Loan Agent; (d) counsel to the

70690192.5

Committee; (e) counsel to the Stalking Horse Bidder, if any; (f) all other parties who have

expressed a written interest in the Assets; (g) the United States Attorney's Office for the District

of Delaware; (h) the Internal Revenue Service; (i) all state and local taxing authorities with an

interest in the Assets; (j) the Attorney General for the State of Delaware; (k) the Securities and

Exchange Commission; (l) all other governmental agencies with an interest in the Sale and

transactions proposed thereunder; (m) all parties known or reasonably believed to have asserted

an Interest in the Assets; (n) the Contract Counterparties; (o) the Debtors' insurance carriers; (p)

all parties entitled to notice pursuant to Local Rule 9013-1(m); and (r) any party that has

requested notice pursuant to Bankruptcy Rule 2002.

## **NO PRIOR REQUEST**

92.     No prior motion for the relief requested herein has been made to this or any other

court.

**WHEREFORE**, the Debtors respectfully request that the Court: (i) enter the Bid Procedures Order, the form of which is attached as <u>Exhibit A</u> hereto, (ii) enter the Sale Order, and (iii) grant such other and further relief as is just and proper.

Dated:    October 11, 2019
       Wilmington, Delaware

Respectfully submitted,

**POLSINELLI PC**

_/s/    Christopher A. Ward_
Christopher A. Ward (Del. Bar No. 3877)
Shanti M. Katona (Del. Bar No. 5352)
Stephen J. Astringer (Del. Bar No. 6375)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
cward@polsinelli.com
skatona@polsinelli.com
sastringer@polsinelli.com

_Proposed Counsel to the Debtors and Debtors in Possession_

70690192.5