**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BAYOU STEEL BD HOLDINGS, L.L.C., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 19-12153 (KBO)<br><br>**Objection Deadline: November 5, 2019 at 4:00 p.m. (ET)**<br>**Hearing Date: November 12, 2019 at 11:00 a.m. (ET)** |

**MOTION OF DEBTORS FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO IMPLEMENT THE KEY EMPLOYEE INCENTIVE PLAN AND KEY EMPLOYEE RETENTION PLAN, AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "**Debtors**") hereby move (the "**Motion**") for entry of an interim order, substantially in the form attached hereto as Exhibit A (the "**Proposed Order**"), pursuant to sections 105(a), 363(b) and (c), and 503(c) of title 11 of the United States Code (the "**Bankruptcy Code**"), and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), (i) authorizing the Debtors to implement the key employee incentive plan (the "**KEIP**") for four employees (the "**KEIP Participants**") and key employee retention plan (the "**KERP**") for sixteen employees (the "**KERP Participants**", and together with the KEIP Participants, the "**Participants**"), and (ii) granting administrative expense priority status to all payments to be made by the Debtor pursuant to the KEIP and KERP, and (iii) granting such other relief as the Court deems proper and just. In support of the Motion, the Debtors rely upon the *Declaration of Glenn C. Pollack in Support of Motion of Debtors for Entry of An Order Authorizing the Debtors to Implement the Key Employee Incentive Plan and Key Employee Retention Plan, and (II) Granting Related Relief* (the "**Pollack Declaration**") attached hereto as Exhibit B, and the *Declaration of Alton Davis, President and*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Bayou Steel BD Holdings, L.L.C., a Delaware limited liability company (1984), BD Bayou Steel Investment, LLC, a Delaware limited liability company (1222), and BD LaPlace, LLC, a Delaware limited liability company (5783). The location of the Debtors' mailing address is 138 Highway 3217, LaPlace, Louisiana 70068.

*Chief Operating Officer of Bayou Steel BD Holdings, L.L.C., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 14] (the "**First Day Declaration**"). In further support of this Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## JURISDICTION AND VENUE

1. This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b). Under Local Rule 9013-1(f), the Debtors consent to entry of a final order under Article III of the United States Constitution. Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicates for the relief requested herein are Bankruptcy Code sections 105, 363, and 503 and Bankruptcy Rule 6004.

## BACKGROUND

3. On October 1, 2019 (the "**Petition Date**"), each of the Debtors filed a voluntary petition in this Court commencing a case for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**"). The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the First Day Declaration and fully incorporated herein by reference.

4. The Debtors continue to manage and operate their business as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108. No trustee or examiner has been requested in the Chapter 11 Cases.

5. On October 10, 2019, the Office of the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors in these Chapter 11 Cases (the "**Committee**").

## THE KERP AND KEIP

6. The Debtors have determined that the expeditious sale of finished inventory as well as a sale of the business itself to a potential buyer (the "**Buyer**") as detailed in the *Motion of Debtors for Entry of (I) an Order (A) Approving Bid Procedures in Connection with the Potential Sale of Substantially All of the Debtors' Assets, (B) Scheduling an Auction and Sale Hearing, (C) Approving the Form and Manner of Notice Thereof, (D) Authorizing the Debtors to Enter Into a Stalking Horse Agreement, (E) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (F) Granting Related Relief; and (II) an Order (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief* (the "**Bidding Procedures Motion**") [Docket No. 73], will maximize value to the Debtors' estates.

7. Presently, the Debtors have approximately 75,000 tons of finished steel on hand (the "**Inventory**"). The Debtors recognize that certain key employees are needed to, among other things, liquidate the Inventory (the "**Liquidation**"), satisfy cash flow requirements, monetize the Debtors' other assets, and successfully consummate the Sale for the highest possible price, and effect an orderly wind down of the estates. The Participants will be critical to a successful Liquidation and Sale, in addition to performing their day-to-day activities. Additionally, the Participants work in robust geographic economies where individuals seeking employment can easily find alternate opportunities. In fact, the Debtors have received a number of resignations from key employees post-petition, underscoring the importance of the KEIP and KERP.

8. The list of Participants was developed by the Debtors' advisors and management team. The terms of the KEIP and KERP were carefully formulated in good faith and reviewed and compared to similar programs in other chapter 11 cases to determine that the KEIP and KERP are fair, reasonable, and within statutory standards.

9. Payment of the Board-approved amounts under the KEIP and KERP will be critical to maximizing proceeds in the Chapter 11 Cases. The Participants are all critical, have assumed and will continue to assume greater responsibilities due to the Chapter 11 Cases, the Liquidation, and the Sale. The Participants have been willing to accept these responsibilities, some even turning down other job offers, in the reliance that they will be rewarded for their efforts in the Chapter 11 Cases.

10. Prior to the filing of this Motion, the Debtors have consulted with Bank of America, N.A. as administrative agent (the "**Prepetition Agent**") for itself and the other lenders (the "**Prepetition Lenders**"), Black Diamond Commercial Finance, LLC as agent (the "**Subordinated Term Loan Agent**"); for itself and the other lenders (the "**Subordinated Term Loan Lenders**", and together with the Prepetition Lenders, the "**Secured Lenders**"), and the Committee regarding the KEIP and KERP. To that end, the payments to be made under the KEIP and KERP are included in the budget (the "**Budget**") attached to the *Agreed Interim Order (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV) Setting a Final Hearing, and (V) Granting Related Relief* [Docket No. 42] (the "**Interim Cash Collateral Order**").

11. Accordingly, the Debtors believe that implementation of the KEIP and KERP is a sound exercise of their business judgment and request that the Court approve such programs.

70604529.7

## II. THE KEIP

12. The KEIP Participants consist of four members of the Debtors' senior management who are wholly responsible for the continuity of the Debtors' daily operations and whose presence is critical for the Liquidation. A schedule of the KEIP Participants is attached hereto as Schedule 1.[2] The KEIP Participants are also heavily involved to the Sale process contemplated by the Bidding Procedures Motion as they have been and will assist the Debtors' professionals and advisors in connection with diligence. The KEIP Participants were carefully selected because they are essential to the success of these Chapter 11 Cases.

13. The KEIP was designed to incentivize the KEIP Participants, each of whom is a member of senior management or an insider, based on metrics tied to the Liquidation of the Debtors' Inventory. As discussed in detail below, the KEIP is performance-based and therefore, not subject to Bankruptcy Code section 503(c)(1).

14. A summary of the KEIP terms is as follows:

   a. *Participants*. The Debtors have limited the KEIP Participants to four individuals.

   b. *Payments*. KEIP Participants will receive incentive payments (the "**KEIP Payments**") as set forth on Schedule 1. KEIP Payments will range between $60,000 and $125,000, and the aggregate of KEIP Payments will be $435,000 (the "**KEIP Pool**").

   c. *Performance*. KEIP Participants are being incentivized to sell, ship, and release approximately 50,000 tons of Inventory for $525 per ton on a gross revenue basis.

   d. *Timing*. KEIP Participants will receive KEIP Payments upon the completion of the Liquidation of Inventory (the "**Liquidation Completion**"). Upon voluntary termination or termination for cause prior to the receipt of any earned KEIP Payment, a KEIP Participant's KEIP Payment, if any, will be forfeited. Such forfeited KEIP Payments will not be made available to other employees.

---

[2] Because of the sensitive information contained on redacted Schedule 1, as well as to protect the privacy of the Debtors' employees, the Debtors have filed a corresponding motion to seal concurrently herewith.

5

15. The Debtors submit that the KEIP is reasonable when compared to similar key employee incentive plans in similar cases. The KEIP is contingent on (a) the Liquidation Completion and (b) that the proceeds of the Liquidation Completion substantially pay down the Prepetition Lenders. The KEIP is limited in terms of the number of participants and the aggregate amount to be paid. The total cost of the KEIP if the targets are met is $435,000, with the average cost per KEIP Participant at $108,750. As a percentage of base salary, the KEIP Payments range from 33.33% to 50%, with an average of 41.43%.

16. Before determining that the KEIP was necessary, the Debtors and their advisors considered alternatives but ultimately determined that the KEIP represented the most cost-effective and fastest way to sell the Inventory. As detailed in the Pollack Declaration, the KEIP is comparable to similar programs in other chapter 11 cases.

17. The KEIP Participants have been playing a key role in the liquidation of the Inventory and Sale process. The size of KEIP Payments was based upon a number of factors including the KEIP Participants' salaries, importance to the Sale and Liquidation processes, and the market. The KEIP Participants are also the individuals who are most affected by the Chapter 11 Cases, requiring them to take on more responsibilities than contemplated by the normal terms of their employment and working at levels far exceeding prior expectations for company operations.

18. The Debtors are not utilizing postpetition financing, and instead are funding operations using the cash collateral of the Secured Lenders, who each consent to the KEIP Payments. Moreover, KEIP Payments will only be made if the Inventory is sold for $525 per ton on a gross revenue basis, which will equal at least $26,520,000. This amount will be used to significantly pay down the Prepetition Agent. Such a metric incentivizes the KEIP Participants to

maximize the value of the Inventory as quickly as possible. The KEIP Participants will also be maximizing potential recovery for other stakeholders because the Prepetition Lenders have first priority liens on a many of the Debtors' assets. Assuming the Liquidation Completion occurs on the schedule contemplated, the Sale should allow other creditors to receive recovery.

### III.   The KERP

19.    The KERP Participants consist of sixteen individuals who serve a variety of corporate and operational functions. A schedule of the KERP Participants is attached hereto as Schedule 2. The majority of KERP Participants serve in procurement, shipping, and sales roles. Many of the KERP Participants have worked for the Debtors for years, and their institutional knowledge is critical to achieving the Debtors' goals in these Chapter 11 Cases. The loss of KERP Participants would cause significant disruption to the Debtors' operations and sales.

20.    The KERP was designed to provide non-executive, non-insider key employees with a retention bonus to encourage the KERP Participants to remain with the Debtors through the Liquidation Completion and, hopefully, the Sale process.

21.    A summary of the KERP terms are as follows:

   a.   *Participants*. The Debtors have limited the KERP Participants to sixteen individuals critical to the Debtors' day-to-day operations and liquidation of the Inventory.

   b.   *Payments*. KERP Participants will receive retention payments (the "**KERP Payments**") as set forth on Schedule 2. KERP Payments will range between $7,500 and $125,000 and the aggregate of KERP Payments will be $382,500 (the "**KERP Pool**").

   c.   *Timing*. KERP Participants will receive KERP Payments upon the Liquidation Completion. Upon voluntary termination or termination for cause prior to the receipt of any earned KERP Payment, a KERP Participant's KERP Payment, if any, will be forfeited. Such forfeited KERP Payments will not be made available to other employees.

7

22. The Debtors submit that the KERP is reasonable when compared to similar key employee retention plans in similar cases. While the KERP Payments are retention payments, the timing of the KERP Payments are tied to the Liquidation Completion like the KEIP Payments. The KERP is limited in terms of the number of participants and the aggregate amount to be paid. The total cost of the KERP is $382,500, with the average cost per KERP Participant approximately $23,000. As a percentage of base salary, the KERP Payments range from 12.5% to 68.7%., with an average of 23.7%.

23. The Debtors' management team and advisors identified individuals critical to the Liquidation and Sales processes. Because of the industry in which the Debtors operate, KERP Participants are necessary to the Debtors' efforts in these Chapter 11 Cases as they have unique or significant knowledge of the steel industry, including the Debtors' customers. Further, the Sale process contemplates the Liquidation Completion. The loss of KERP Participants would hinder such efforts and slow down the Sale process, in addition to cost and difficulty of finding adequate replacements.

24. The Debtors have determined that there would be a disproportionate and negative impact on the Debtors' estates if any of the KERP Participants left the Debtors' employ. On average, the KERP Participants have more than 15 years' experience with the Debtors and cannot be readily or easily replaced Thus, the loss of KERP Participants would substantially impair the Debtors' efforts in the Chapter 11 Cases. Accordingly, the Debtors have determined that a non-insider retention plan is crucial here.

## RELIEF REQUESTED

25. By this Motion, the Debtors respectfully request entry of an order, substantially in the form attached hereto as Exhibit A (i) authorizing the Debtors to implement the KEIP and KERP, (ii) authorizing the Debtors to make payments under the KEIP and KERP to Participants,

(iii) granting administrative expense priority to all payments to be made by the Debtors thereunder, and (iv) granting related relief.

## BASIS FOR RELIEF

26. Approval of key employee incentive and retention plans in large cases in this District have been approved. *See, e.g.*, *In re L.K. Bennett U.S.A., Inc.*, Case No. 19-10760 (KG) [Docket No. 131] (Bankr. D. Del. May 7, 2019) (approving KEIP and KERP); *In re Charlotte Russe Holding, Inc.*, Case No. 19-10210 (LSS) [Docket No. 313] (Bankr. D. Del. Mar. 6, 2019) (approving KEIP and KERP); *In re American Apparel, LLC*, Case No. 16-12551 (BLS) [Docket No. 422] (Bankr. D. Del. Jan. 4, 2017) (approving KEIP and KERP). *See also In re Sears Holdings Corp.*, Case No. 18-23538 (RDD) [Docket No. 1437] (Bankr. S.D.N.Y. Dec. 28, 2018) (approving KEIP and KERP).

**II.    The KEIP Should be Approved Pursuant to Bankruptcy Code Section 505(c)(3)**

    **A.    Bankruptcy Code Sections 503(c)(1) and (c)(2) Do Not Apply to the KEIP**

27. Bankruptcy Code sections 503(c)(1) and (c)(2) govern retention and severance payments to insiders. However, these sections are not applicable because the KEIP is performance based, not retention or severance based.

28. Importantly, however, Bankruptcy Code sections 503(c)(1) and (c)(2) do not apply to performance-based incentive plans, such as the KEIP here. *See, e.g.*, *In re Global Home Products, LLC*, 369 B.R. 778, 786 (Bankr. D. Del. 2007) (finding proposed incentive plans to be "primarily incentivizing and only coincidentally retentive . . . . The fact, as Debtors pointed out, that all compensation has a retention element does not reduce the Court's conviction that Debtors' primary goal to create value by motivating performance. All companies seek to retain employees they value by fairly compensating them."); *In re Dana Corp.*, 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006) ("because a plan has some retentive effect does not mean that the plan, overall,

9

is retentive rather than incentivizing in nature."); *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 802 (Bankr. D. Del. 2007) (finding that although a bonus plan for insiders had "some retentive effect, it is for the primary purpose of motivating employees and, thus, the limitations of section 503(c)(1) are not applicable").

29.     Here, while some of the KEIP Participants are insiders, the KEIP is not aimed at retaining the KEIP Participants. Instead, the KEIP is tied to performance, namely the Liquidation of the Inventory in a timely fashion. The KEIP Participants must liquidate the Inventory for at least $26 million, which will come into the Debtors' estates and may be used to significantly pay down the amount outstanding to the Prepetition Lenders. This proposed target is designed to motivate the KEIP Participants. *See, e.g.*, *In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012). Stated another way, the KEIP requires more than simply remaining employed, it requires the KEIP Participants to meet specific goals and there is no guarantee KEIP Payments will be made. As such, Bankruptcy Code sections 501(c)(1) and (2) do not apply to the KEIP.

**B.     The KEIP Satisfies Bankruptcy Code Section 503(c)(3)**

30.     In relevant part, Bankruptcy Code section 503(c)(3) provides that "there shall be neither allowed, nor paid . . . other transfers or obligations that are outside the ordinary course of business and not justified the facts and circumstances of the case." 11 U.S.C. § 503(c)(3). This language closely mirrors the language of Bankruptcy Code section 363(b) and (c), which permits a debtor to "use property of the estate in the ordinary course of business," and, with court approval, to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(c), (b)(1). As such, bankruptcy courts will often apply the business judgment standard of Bankruptcy Code section 363(b) when evaluating a KEIP under Bankruptcy Code section 503(c)(3). *See, e.g.*, *In re Global Home Prods., LLC*, 369 B.R. at 783

10

("If [the proposed plans are] intended to incentivize management, the analysis utilizes the more liberal business judgment review under § 363."); *In re Velo Holdings, Inc.*, 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012) ("Courts have held that the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)."). *See also In re Alpha Natural Resources. Inc.*, 546 B.R. 348, 356 (Bankr. E.D. Va. 2016) (collecting cases).

31.     The use of estate property outside the ordinary course of business is left to the sound judgment of the debtor under Bankruptcy Code section 363(b)(1). *See, e.g., Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d. Cir. 1996) ("[U]nder normal circumstances the [bankruptcy] court would defer to the trustee's [or debtor-in-possession's] judgment so long as there is a legitimate business justification.") (citation omitted). Under Bankruptcy Code section 363(b), courts require only that a debtor "show that a sound business purpose justifies such actions." *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (citations omitted). Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted).

32.     While "[c]ompensation issues are normally governed by business judgment standards, i.e., proof that there is a broad business purpose for an action," with respect to incentive or retention plans, courts consider a number of non-exhaustive factors:

> a.     Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance?

      b.      Is the cost of the plan reasonable in the context of the debtor's assets, liabilities, and earning potential?

      c.      Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?

      d.      Is the plan or proposal consistent with industry standards?

      e.      What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?

      f.      Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*In re Global Home Products*, 369 B.R. at 786 (citing *In re Dana Corp.*, 358 B.R. at 576-77). The Debtors submit that the implementation of the KEIP is a sound exercise of the Debtors' business judgment.

      33.      First, there is a reasonable relationship between the KEIP and the desired results. Liquidation of the Inventory will provide the Debtors with working capital and will ensure that the Prepetition Lenders are significantly paid down. Lowering the amount outstanding to the Prepetition Lenders will allow the Debtors to implement a Sale for the remaining assets. The Debtors have determined that this course of action is the best course to maximize the value of the Debtors' assets for the benefit of all stakeholders. If the Liquidation of the Inventory does not occur, or the price is not high enough, KEIP Payments will not be made.[3] Further, the KEIP Payments are conditioned on the Liquidation Completion. If a KEIP Participant departs before the Liquidation Completion, the accompanying KEIP Payments are forfeited. In short, the motivated, best efforts of the KEIP Participants are essential to optimizing operational performance and achieving the maximum value that can be obtained for the Debtors' estates. As set forth above, in addition to overseeing the Debtors' businesses and maintaining key

---

[3] Incentive payments for similar inventory dispositions have previously been approved in this District. *See, e.g.*, *In re L.K. Bennett U.S.A., Inc.*, Case No. 19-10760 (KG) [Docket No. 131] (Bankr. D. Del. May 7, 2019); *In re Samuels Jewelers, Inc.*, Case No. 18-11818 (KJC) [Docket No. 291] (Bankr. D. Del. Oct. 2, 2018).

70604529.7

relationships with customers, the KEIP Participants must work with potential purchasers to complete their due diligence in an accelerated timeframe. Thus, the KEIP Participants are essential to achieving the highest and otherwise best possible value for the Debtors' estates.

34. Second, the cost of the KEIP is reasonable in the context of the Debtors' assets, liabilities, and earning potential, and are consistent with industry standards. The Debtors arrived at this conclusion after performing substantial due diligence in investigating the need for a KEIP, analyzing which key employees needed to be incentivized, and determining what is generally applicable in their particular industry. Moreover, the KEIP Pool of $435,000 may only be paid out if the Debtors liquidate the Inventory for at least $26 million.

35. Third, the scope of the KEIP is fair and reasonable and does not discriminate unfairly. As discussed above, KEIP Participants were carefully selected and the KEIP was designed as a performance-based incentive structure to maximize the value of the Debtors' assets.

36. Because due diligence and bidding related to the proposed Sale process, the proposed auction, and the Debtors' efforts to collect other non-operating receipts will all occur postpetition, the Debtors submit that the KEIP Payments will incentivize and compensate the postpetition efforts of the KEIP Participants. If the KEIP Payments are not paid in full, there is a risk that the employees will be demoralized, which could diminish the value of the Debtors' estates.

37. Accordingly, the implementation of the KEIP was the result of the Debtors' sound business judgment and the KEIP is justified by the facts and circumstances of these Chapter 11 Cases.

### III. The KERP Should be Approved

#### A. The KERP is Not Governed by Bankruptcy Code Sections 503(c)(1) and (c)(2)

38. The definition of "insider" under the Bankruptcy Code includes directors, officers, and persons in control of the debtor. 11 U.S.C. § 101(31)(B). A person holding an officer's title is presumptively an "officer" and an insider, that presumption may be rebutted with "evidence sufficient to establish that the person holds the title of an officer in name only and, in fact, does not meet the substantive definition of the same, i.e., he or she is not taking part in the management of the debtor." *In re Foothills Texas, Inc.*, 408 B.R. 573, 574-75 (Bankr. D. Del. 2009). For example, this presumption may be rebutted when an individual is not a member of the board, does not report to the board or participate in corporate governance, and reports to officers. *In re Global Aviation Holdings, Inc.*, 478 B.R. 142, 148 (Bankr. E.D.N.Y. 2012).

39. Here, no KERP Participant is an insider. Instead, each KERP Participant reports to an officer.[4] While certain individuals may have "manager" in their title, none are insiders or take part in the management of the Debtors. *See, e.g.*, *In re NMI Sys., Inc.*, 179 B.R. 357, 370 (Bankr. D.D.C. 1995) (finding that an individual was not an insider when he was not "in the inner circle of making the company's critical financial decisions.").

40. Thus, while the KERP Payments are retention payments, Bankruptcy Code sections 503(c)(1) and (2) are not applicable.[5] *See, e.g.*, *In re Borders Grp., Inc.*, 453 B.R. 459, 468-69 (Bankr. S.D.N.Y. 2011).

---

[4] Each KERP Participant reports to a KEIP Participant.
[5] Additionally, the KERP does not complete severance payments, so Bankruptcy Code section 503(c)(2) does not apply.

14

### B.   The KERP is a Reasonable Exercise of the Debtors' Business Judgment

41.   Therefore, the analysis of the KERP is the same analysis as the KEIP, *i.e.*, whether the Debtors exercised their business judgment under Bankruptcy Code sections 363(b) and 503(c)(3). *In re Global Home Products*, 369 B.R. at 786.

42.   The implementation of the KERP represents the sound business judgment of the Debtors. Under the *In re Global Home Products, LLC* factors and for the reasons stated above, the KERP Participants are necessary to maximize the value of the Debtors' estates for the benefit of stakeholders.  The KERP ensures that key employees will remain employed by the Debtors during the Sale and Liquidation processes. Because these processes are occurring simultaneously, the premature loss of any of KERP Participants would harm the Debtors' efforts in the Chapter 11 Cases.  The KERP aligns the interests of the Debtors and certain non-insider employees.

43.   Accordingly, the Debtors submit that the KERP is justified by the facts and circumstances of the Chapter 11 Cases and the Debtors respectfully request that the Court authorize and approve the KERP.

### CONSENT TO JURISDICTION

44.   Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

### NOTICE

45.   Notice of this Motion will be given to: (a) the United States Trustee for the District of Delaware the U.S. Trustee; (b) counsel to the Prepetition Agent; (c) counsel to the Subordinated Term Loan Agent; (d) counsel to the Official Committee of Unsecured Creditors;

and (e) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, under the circumstances, no other or further notice is required.

## NO PRIOR REQUEST

46.     No prior motion for the relief requested herein has been made to this or any other court.

**WHEREFORE**, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as Exhibit A, granting the relief requested in the Motion and such other and further relief as the Court deems appropriate.

Dated:   October 29, 2019
         Wilmington, Delaware

Respectfully submitted,

**POLSINELLI PC**

*/s/ Shanti M. Katona*
Christopher A. Ward (Del. Bar No. 3877)
Shanti M. Katona (Del. Bar No. 5352)
Stephen J. Astringer (Del. Bar No. 6375)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
cward@polsinelli.com
skatona@polsinelli.com
sastringer@polsinelli.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## Schedule 1

KEIP Participants

| Name | Title | Area | Salary | KEIP Payment | | |
|---|---|---|---|---|---|---|
| ███ | ███ | ███ | █ | ███ █ | ███ | 33.33% |
| ███ | ███ | ███ | $ ███ | $ ███ | ███ | 42.86% |
| ███ | ███ | ███ | $ ███ | $ ███ | ███ | 50.00% |
| ███ | ███ | ███ | $ ███ | ███ | ███ | 43.86% |
| | | | | | | |
| | | **Average** | $ ███ | ███ 0 | | 41.43% |

**Schedule 2**

KERP Participants



| Name | Title | Area | Salary | KERP Payment | | |
|---|---|---|---|---|---|---|
| | | | | | | 28.57% |
| | | | | | | 11.54% |
| | | | | | | 31.25% |
| | | | | | | 17.43% |
| | | | | | | 31.25% |
| | | | | | | 16.30% |
| | | | | | | 12.78% |
| | | | | | | 15.42% |
| | | | | | | 18.78% |
| | | | | | | 13.33% |
| | | | | | | 13.32% |
| | | | | | | 24.00% |
| | | | | | | 21.93% |
| | | | | | | 12.05% |
| | | | | | | 68.68% |
| | | | | | | 12.50% |
| | | Average | $ | | 5 | 23.92% |

2