|    |                                                                          |
|----|--------------------------------------------------------------------------|
| 1  |              UNITED STATES BANKRUPTCY COURT                                |
|    |                  DISTRICT OF DELAWARE                                      |
| 2  |                                                                          |

```
 3   IN RE:                        .  Chapter 11
                                   .
 4   BAYOU STEEL BD                .  Case No. 19-12153 (KBO)
     HOLDINGS, LLC, et al.,        .  (Jointly Administered)
 5                                 .
                       Debtors.    .  Courtroom No. 1
 6                                 .  824 Market Street
                                   .  Wilmington, Delaware 19801
 7                                 .
                                   .  Tuesday, November 5, 2019
 8   . . . . . . . . . . . . . . . .  1:09 P.M.

 9                      TRANSCRIPT OF HEARING
                 BEFORE THE HONORABLE KAREN B. OWENS
10                 UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:          Christopher A. Ward, Esquire
                               Shanti M. Katona, Esquire
13                             POLSINELLI, PC
                               222 Delaware Avenue
14                             Suite 1101
                               Wilmington, Delaware 19801
15
     For the Official
16   Committee of Unsecured
     Creditors:                Jason R. Adams, Esquire
17                             KELLEY DRYE & WARREN, LLP
                               101 Park Avenue
18                             New York, New York 10178

19   (APPEARANCES CONTINUED)

20   Electronically
     Recorded By:              Al Lugano, ECRO
21
     Transcription Service:    Reliable
22                             1007 N. Orange Street
                               Wilmington, Delaware 19801
23                             Telephone: (302) 654-8080
                               E-Mail:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording:
25   transcript produced by transcription service.
```

1  <u>APPEARANCES (CONTINUED)</u>:

2  For The Travelers
   Indemnity Company:          Karen C. Bifferato, Esquire
3                              CONNOLLY GALLAGHER, LLP
                               1201 North Market Street
4                              20th Floor
                               Wilmington, Delaware 19801
5
   For Bank of
6  America, N.A.:              William L. Wallander, Esquire
                               VINSON & ELKINS, LLP
7                              Trammell Crow Center
                               2001 Ross Avenue
8                              Suite 3900
                               Dallas, Texas 75201
9
   For Entergy
10 Louisiana, LLC:             Kevin J. Mangan, Esquire
                               WOMBLE BOND DICKINSON (US), LLP
11                             1313 North Market Street
                               Suite 1200
12                             Wilmington, Delaware 19801

13 For the WARN Act
   Claimants:                  James G. McMillan, III
14                             HALLORAN FARKAS + KITTILA, LLP
                               5803 Kennett Pike
15                             Suite C
                               Wilmington, Delaware 19807
16
                               -and-
17
                               Brent B. Barriere, Esquire
18                             FISHMAN HAYGOOD, LLP
                               201 St. Charles Avenue
19                             Suite 4600
                               New Orleans, Louisiana 70170
20
   For Black
21 Diamond Commercial
   Finance, LLC:               Daniel J. McGuire, Esquire
22                             WINSTON & STRAWN, LLP
                               35 West Wacker Drive
23                             Chicago, Illinois 60601

24

25

1  APPEARING (TELEPHONICALLY):

2  For The Travelers
   Indemnity Company:          Joshua W. Cohen, Esquire
3                              DAY PITNEY, LLP
                               195 Church Street
4                              15th Floor
                               New Haven, Connecticut 06510
5
   For the State of
6  Louisiana:                  Christopher Lento, Esquire
                               STATE OF LOUISIANA DEPARTMENT OF
7                                 JUSTICE
                               1885 North 3rd Street
8                              Baton Rouge, Louisiana 70802

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            INDEX

2  MOTIONS:                                               PAGE

3  Agenda Item 7:  Application of the Debtors (I) to Employ     8
                   and Retain Candlewood Partners, LLC as
4                  Financial Advisor and Investment Banker
                   for the Debtors Nunc Pro Tunc to the
5                  Petition Date and (II) Modifying Certain
                   Information Requirements of Del. Bankr.
6                  L.R. 2016-2
                   [Docket No. 87; Filed: 10/15/2019]
7     Court's ruling. . . . . . . . . . . . . . . . . . .10

8  Agenda Item 10: Motion of Debtors for Order (I)            10
                   Authorizing Continuation of, and Payment
9                  of Prepetition Obligations Incurred in
                   the Ordinary Course of Business in
10                 Connection With, Various Insurance
                   Policies, (II) Authorizing Banks to Honor
11                 and Process Checks and Electronic Transfer
                   Requests Related Thereto, (III) Preventing
12                 Insurance Companies From Giving Any Notice
                   of Termination or Otherwise Modifying Any
13                 Insurance Policy Without Obtaining Relief
                   from the Automatic Stay, and (IV)
14                 Authorizing the Debtors to Continue to
                   Honor Premium Financing Obligations
15                 [Docket No. 4; Filed: 10/1/2019]
      Court's ruling. . . . . . . . . . . . . . . . . . .16
16
   Agenda Item 11: Motion of Debtors for an Order Authorizing 17
17                 Payment of Prepetition Taxes and Fees
                   [Docket No. 6; Filed: 10/1/2019]
18    Court's ruling. . . . . . . . . . . . . . . . . . .18

19 Agenda Item 12: Motion of Debtors for Entry of Interim and 18
                   Final Orders (I) Prohibiting Utility
20                 Providers from Altering, Refusing, or
                   Discontinuing Service, (II) Approving the
21                 Debtors' Proposed Adequate Assurance of
                   Payment for Post-petition Services, and
22                 (III) Establishing Procedures for
                   Resolving Requests for Additional Adequate
23                 Assurance of Payment
                   [Docket No. 11; Filed: 10/1/2019]
24    Court's ruling. . . . . . . . . . . . . . . . . . .22

25

1                                INDEX

2  MOTIONS:                                        PAGE

3  Agenda Item 15: Motion of Debtors for Entry of (I) an        23
                   Order (A) Approving Bid Procedures in
4                  Connection with the Potential Sale of
                   Substantially All of the Debtors Assets,
5                  (B) Scheduling an Auction and Sale
                   Hearing, (C) Approving the Form and
6                  Manner of Notice Thereof, (D) Authorizing
                   the Debtors to Enter Into a Stalking Horse
7                  Agreement, (E) Approving Procedures for
                   the Assumption and Assignment of Contracts
8                  and Leases, and (F) Granting Related
                   Relief; and (II) an Order (A) Approving
9                  the Sale of Substantially All of the
                   Debtors Assets Free and Clear of All Liens,
10                 Claims, Encumbrances, and Interests, (B)
                   Authorizing the Assumption and Assignment
11                 of Contracts and Leases, and (C) Granting
                   Related Relief
12                 [Docket No. 73; 10/11/2019]
       Court's ruling. . . . . . . . . . . . . . . . . . . .41
13
   Agenda Item 13: Motion of Debtors for Entry of Interim      42
14                 and Final Orders (I) Authorizing the Use
                   of Cash Collateral, (II) Granting Adequate
15                 Protection, (III) Modifying the Automatic
                   Stay, (IV) Setting a Final Hearing, and (V)
16                 Granting Related Relief
                   [Docket No. 24; Filed: 10/2/2019]
17     Court's ruling. . . . . . . . . . . . . . . . . . . .55

18 Agenda Item 14: Motion of WARN Act Claimants to Transfer     82
                   Venue of Three Affiliated Chapter 11
19                 Bankruptcy Cases to the United States
                   Bankruptcy Court for the Eastern District
20                 Of Louisiana
                   [Docket No. 68; Filed: 10/10/2019]
21     Court's ruling. . . . . . . . . . . . . . . . . . . .98

22 Transcriptionist's Certificate. . . . . . . . . . . . . 105

23

24

25

1                                   INDEX

2  WITNESSES CALLED BY
   THE WARN ACT CLAIMANTS:                                PAGE
3
           ALTON W. DAVIS
4          Direct examination by declaration              --
           Cross-examination by Mr. Barriere              58
5
                            -o0o-
6
                           EXHIBITS
7
   EXHIBIT NO.                                            PAGE
8
   1) Declaration of Alton W. Davis                       80
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Proceedings commenced at 1:09 p.m.)

2              THE COURT OFFICER:  All rise.

3              THE COURT:  Good afternoon.  Please be seated.

4              MS. KATONA:  Good afternoon, Your Honor.

5              Shanti Katona of Polsinelli, on behalf of the

6    debtors Bayou Steel BD Holdings, LLC, and their affiliated

7    debtors.

8              Your Honor, before we turn to the items on the

9    agenda this morning, with your indulgence, I'd like to

10   introduce some new parties in the case if that's all right.

11   Your Honor, obviously with me this afternoon at counsel table

12   is my colleagues, Christopher Ward and Brenna Dolphin, of

13   Polsinelli.

14   Also in the courtroom today we have Mr. Alton Davis, who was

15              previously here at the first day hearing.  He's

16   the debtors' president and COO.  Today, we also will be

17   introducing Mr. Charles Deutchman.  The debtors have filed a

18   CRO retention application for the retention of Mr. Deutchman,

19   but he's here.  He was engaged by the debtors on October 19th

20   to help the debtors through this process.

21              THE COURT:  Okay.  Welcome, gentlemen.

22              MS. KATONA:  So, Your Honor, with that, unless you

23   have any preliminary questions for the debtors, I'd like to

24   turn to the items on the agenda this afternoon.

25              THE COURT:  Please proceed.  No questions.

1          MS. KATONA:  First off, thank you to you and your

2    chambers.  A number of the items -- we had, originally, I

3    believe, 15 matters scheduled to go forward this afternoon --

4    many of them have been entered under certification of counsel

5    and we appreciate that.  I can walk you through those or we

6    can turn to the first matter that we believe is presently

7    contested, or at least at a minimum, needs to be addressed

8    before Your Honor.

9          THE COURT:  Okay.

10          MS. KATONA:  And that is Agenda Item Number 7 and

11   it is Docket Number 87, and it's the application of the

12   debtors to employ and retain Candlewood Partners, LLC, as the

13   debtors' financial advisor and investment banker for the

14   debtors, *nunc pro tunc* to the petition date.

15          Your Honor, we filed a revised form of order which

16   incorporated comments from both, Bank of America, in its

17   capacity as the prepetition agent, as well as comments from

18   the Office of the United States Trustee.  I wasn't sure if

19   there were additional questions or if you wanted me to

20   address the application in general.

21          Mr. Pollack, who's the declarant under Candlewood

22   Partners, under that retention application, is here in the

23   courtroom today and available to address any questions, as

24   well.

25          THE COURT:  Okay.  I did not enter the order

1   because I had just one simple question about Paragraph 7 of

2   the revised blackline -- the blackline of the revised order.

3   If you can just -- I didn't understand that language.  So, I

4   was wondering if you could walk me through what that is.

5          MS. KATONA:  No problem, Your Honor.

6   And, I guess, for the record, you're talking about new

7   Paragraph 7, which reads, "As used in the engagement letter,

8   "sale" shall mean ..."

9          THE COURT:  Yes, uh-huh.

10          MS. KATONA:  I believe this is additional language

11   provided by Bank of America.  They wanted to ensure that to

12   the extent Candlewood was going to be paid out of the sale

13   proceeds, that it was not going to come from Bank of

14   America's collateral, and they wanted to ensure that "sale"

15   was limited to the going-concern sale of the debtors.

16          THE COURT:  Okay.  Should it say at the very

17   end -- I trust your drafting -- is it "shall be subject to

18   the sale" or "subject to the sale fee"?

19          I'm sure you've had lots of people look over this,

20   so if you're saying it is, in fact, "sale," that's fine.  I

21   just didn't know if that got you to what you're --

22          MS. KATONA:  Do you mind if I take one moment,

23   Your Honor?

24          THE COURT:  Yes.

25       (Pause)

1           MS. KATONA:  Your Honor, the sale trigs the sale

2   fee, so I think the debtors are okay with the language, as

3   drafted.

4           THE COURT:  Okay.  All right.

5           And it sounds like that's the intention, so --

6           MS. KATONA:  Yeah.

7           THE COURT:  All right.  I will go ahead and

8   approve the relief sought and we will upload an executed

9   order at the conclusion of today's hearing.

10          MS. KATONA:  Thank you, Your Honor.

11          May I approach with some redlines, with respect to

12  the other three matters: the debtors' tax motion, insurance

13  motion, and utilities motion?

14          THE COURT:  Yes, thank you.

15          MS. KATONA:  So, Your Honor, turning to Agenda

16  Item Number 10, which is Docket Number 4, which is the

17  debtors' motion seeking authority to continue using or to

18  continue paying under the debtors' insurance programs.

19          Your Honor, you likely may have remembered that

20  from the first day hearing, there was some additional

21  language that was proposed in the interim insurance order,

22  with respect to Travelers, the indemnity company, and some

23  limitations, with respect to the letter of credit that the

24  debtors have with Travelers.

25          Since the entry of the interim order, counsel --

1  the debtors have heard from counsel to Travelers and they

2  have raised some concerns with respect to the language that

3  was in the original interim order, and counsel for Travelers

4  is here today.

5          But I wanted to draw your attention to the revised

6  language that the debtors are proposing in Paragraph 11,

7  which essentially notes that none of the rights of the

8  parties, at least from the debtors' perspective, are

9  implicated by entry of this order; notwithstanding, Bank of

10 America, as the prepetition agent, does want it to be made

11 clear that to the extent that Travelers is drawing down on

12 the letter of credit, with respect to premium payments, that

13 the debtors are not going to be similarly using Bank of

14 America's cash collateral to pay premium payments.  They were

15 hoping to eliminate any of the prospect of a double payment

16 through the inclusion of this language.

17         I'm going to allow counsel to Travelers to address

18 their concerns with the proposed language that we have in

19 this particular paragraph.

20         THE COURT:  Okay.

21         MS. BIFFERATO:  Good afternoon, Your Honor.

22         THE COURT:  Good afternoon.

23         Can I get one second to look at the language

24 before we start on that?

25         MS. BIFFERATO:  Sure.

1          (Pause)

2                THE COURT:  Okay.

3                MS. BIFFERATO:  Okay.  Karen Bifferato, on behalf

4     of Travelers Indemnity Company.  My co-counsel Josh Cohen, is

5     also on the phone, but he will jump in if he needs to.

6                MR. COHEN:  Good afternoon, Your Honor.

7                MS. BIFFERATO:  Your Honor, essentially what

8     happened here --

9                THE COURT:  Good afternoon, Mr. Cohen.

10               MS. BIFFERATO:  What happened here is the debtor

11    filed their motion asking to continue certain prepetition

12    programs and payments and such.  And they filed their motion,

13    they filed an original order granting that motion on an

14    interim basis and there was no language in there about the

15    letter of credit or what we call -- what they ended up

16    inserting in Paragraph 11 of the interim order, which does

17    address the letter of credit and prevents Travelers from

18    drawing down on it.

19               Travelers never saw that language head of time.

20    It didn't consent to it and we now oppose it, as set forth in

21    the objection that we filed the other day.  We think, Your

22    Honor, there should be nothing in this order that addresses

23    the letter of credit, specifically, as that is completely

24    outside of the estates, the Court doesn't have jurisdiction,

25    and the language that's been proposed here for this revised

1  Paragraph 11, just simply isn't necessary and only serves to

2  confuse things.

3        So, what Travelers has proposed and said is that

4  we have a clean order that removes the old Paragraph 11.  It

5  doesn't address the letter of credit rights, because,

6  honestly, Your Honor, in Paragraph 3 now, everything is

7  covered with respect to Travelers because the Paragraph 3

8  authorizes the debtors, without interruption, to continue

9  their prepetition insurance obligations.

10        That's all that's needed.  Everything else is just

11  going to serve to confuse parties, possibly, and possibly,

12  also, alter contractual rights that Travelers doesn't believe

13  should be altered, nor does this Court have the jurisdiction

14  to alter then.

15        So, Your Honor, if you wouldn't mind, I'd like to

16  hand up what we would propose is a clean final order and also

17  a blackline that removes the paragraph, I guess, that --

18  Paragraph 11 that the debtors put before you, and, instead,

19  has in its place, a Paragraph 11 that just simply says the

20  Paragraph 11 from the interim order is hereby vacated and

21  superceded by this order.

22        We think this covers all concerns and doesn't

23  improperly try to affect any parties contractual rights that

24  shouldn't be affected by this type of motion or order.

25        May I hand that up to the Court so you can see

1  what we're proposing?

2          Unfortunately, we couldn't get agreement to ahead

3  of time, but since they handed up their order, I'd like to

4  hand up our blackline if that's appropriate.

5          THE COURT:  That's fine.

6          And to the extent that you haven't shared it with

7  other parties --

8          MS. BIFFERATO:  Yes --

9          THE COURT:  -- go ahead and do that.

10          MS. BIFFERATO:  -- I have, but thank you.

11          THE COURT:  Thank you.

12          And just one question:  So, with specificity, can

13  you give me an example of a concern where --

14          MS. BIFFERATO:  Well, Your Honor, I know --

15          THE COURT:  -- you think Travelers' rights -- I

16  think I can imagine something based on the last sentence.

17          MS. BIFFERATO:  Yeah, exactly.  That's a problem.

18  It can be read several different ways.

19          And we have told the debtors that we're not

20  planning on double-dipping or giving a double payment.  I

21  mean, essentially the way, from the way I understand these

22  programs to work, the debtors have the option to either pay

23  under the installment-payment plan or not.

24          If they don't, then we can either seek relief from

25  the stay or just draw down on the letter of credit or we have

1  options.  We're not going to do that without them not paying

2  first.  So, it's not like what they're trying to protect

3  against or what the language that's in here, we don't

4  envision that happening anyway.

5        So, it's really just best and simpler and cleaner

6  to not address this letter of credit that's outside the

7  debtors' estates in any manner, so as to avoid confusion down

8  the road.

9        THE COURT:  Okay.  Why don't I hear from the

10  debtors on, among other things, the necessity of having this

11  paragraph included in the order, or anyone else who wishes to

12  be heard -- sorry about that.

13        MR. WALLANDER:  Thank you, Your Honor.  Bill

14  Wallander, on behalf of Bank of America, just very briefly.

15        Our only intention with the language in this

16  paragraph was to say, you know, Travelers can draw on

17  whatever its right are on the letter of credit; we're not

18  affecting that at all.

19        What we're saying is if Travelers starts drawing

20  to pay the monthly premium, then we don't consent to a use of

21  our cash collateral to double-pay monthly premiums.  That's

22  all that's about from the bank's perspective.  We're not

23  trying to confuse anything here.

24        We have in the budget for them to pay, but if

25  Travelers determines on its own to pay those premiums from LC

1  draws, then they've made that choice.  They've actually got

2  the freedom to make that choice, and if they do, we just

3  don't consent to the double payment.  That's all it is from

4  the bank's perspective, Your Honor.

5          THE COURT:  Okay.

6          MS. BIFFERATO:  Again, Your Honor, the letter of

7  credit terms provide for the rights between the parties and

8  what they can do or not do.  So, we'd rather not affect those

9  through this kind of motion or order.

10          THE COURT:  No, I understand.

11          I'm going to sustain the objection.  I will leave

12  it to the parties to agree on a form of order.

13          The one that, Ms. Bifferato, that you handed up

14  appears to be acceptable to the Court, but I'll leave it to

15  the parties to decide on the form of order.

16          MS. BIFFERATO:  Okay.

17          THE COURT:  But I think we understand Bank of

18  America's position.  I don't think we necessarily need to

19  have it in the order.  I think you've stated it on the record

20  and to the extent that there's going to be debtor funds that

21  are paying Travelers twice, then it will become a problem

22  between you and the debtors, all right.  But I don't want to

23  create a problem now for Travelers.

24          So, I think the simpler the better and we'll

25  proceed, as we must, if that situation arises.

1              MS. BIFFERATO:  Thank you, Your Honor.

2              I have a clean order and I'll leave it with the

3    debtors and we'll get back to Your Honor.  Thank you.

4              THE COURT:  Thank you.

5              MR. COHEN:  Thank you, Your Honor.

6              MS. KATONA:  Thank you, Your Honor.

7              The next item on the agenda going forward is

8    Agenda Item Number 11, which is motion of the debtors for an

9    order authorizing payment of the prepetition taxes and fees.

10             Your Honor, I handed up a revised form of order

11   with respect to this motion, as well.  It's largely similar

12   to what you saw that was filed with the original motion, the

13   change being, of course, the interim order only authorized

14   $80,000 of payments.  This final order authorizes $1.27

15   million of payments on account of taxes that are due and

16   owing over the course of the case.

17             I wanted to draw your attention to -- actually,

18   Your Honor, my apologies.  We might have to enter this order

19   under certification of counsel.  The version that I believe I

20   handed up to you does not include Bank of America's limiting

21   language, with respect to the payment.

22             They had concerns similar to at the interim

23   hearing they had concerns with the use of their cash

24   collateral to pay taxes on property that is not subject to

25   their liens, and so we -- the debtors are comfortable --

1    you'll hear more about this issue when we get to the cash

2    collateral motion and order -- but the debtors are

3    comfortable with the limiting language.

4         I don't believe that any other party has raised

5    concerns.  We shared the language with the other -- with the

6    committee, as well as with the Office of the United States

7    Trustee.

8         And so, if it's okay with you, Your Honor, we'll

9    submit that under certification of counsel.

10        THE COURT:  Okay.  Let me ask:  Does anyone else

11   wish to be heard in connection with the final order

12   authorizing the payment of prepetition taxes.

13       (No verbal response)

14        THE COURT:  Okay.  Hearing nothing, I will go

15   ahead and approve that order once you -- once I've had the

16   opportunity to review your revised form of order under

17   certification of counsel.

18        MS. KATONA:  And, Your Honor, to the extent

19   anybody who's not here today has a concern, we're happy to

20   address their issues in advance of uploading it, as well.

21        THE COURT:  Okay.

22        MS. KATONA:  The next item on the agenda is Agenda

23   Item Number 12, which is the debtors' utilities motion.

24        Your Honor, since filing the motion in advance of

25   the first day hearing, we have had the opportunity to confer

1  with a number of parties, with respect to utility usage.  And

2  this is a little bit of a different circumstance, Your Honor.

3          These debtors have largely idled their operations

4  since they filed for bankruptcy, and so the utility usage is

5  a bit different than what you would normally see in a normal,

6  ongoing operational company.

7          THE COURT:  Uh-huh.

8          MS. KATONA:  And so, to address that, the debtors

9  actually proposed to deposit into an adequate assurance

10 account, two weeks' worth of insurance or -- sorry -- of

11 utility usage, with respect to the highest month, post-

12 petition.  So, to the extent that you have three months'

13 worth of usage since we filed on October 1 and the highest

14 month was going to be, say, $20,000 for a particular utility

15 provider, the debtors are proposing to deposit $10,000 for

16 the benefit of that particular utility provider.

17         We believe that that adequately protects the

18 utilities on a go-forward basis.  Our understanding is that

19 October is in the budget to be paid and so there should be no

20 concern with respect to October, which was, frankly, the

21 debtors' highest use month.  So, on a go-forward basis, we

22 believe that the majority of the utility providers are more

23 than covered.

24         We heard comments to the proposed form of order

25 from Entergy, which is the debtors' electricity provider in

1  Louisiana, as well as Entergy's -- there's a surety, with

2  respect to the Entergy relationship.  Westchester Fire, they

3  filed an objection to this motion.  We have reached a

4  resolution with respect to Entergy and we understand that

5  Westchester is similarly onboard with Entergy's satisfaction

6  of the terms of this order.

7          So, unless Your Honor has any questions, we

8  believe that this order sufficiently and adequately creates

9  procedures for our utility providers to come back and address

10 any concerns that they have on a go-forward basis, as far as

11 utility usage, and we do believe that there are funds

12 sufficient to satisfy any concerns that they might have.

13         THE COURT:  Okay.  And this revised proposed form

14 of order reflects your resolution with Entergy?

15         MS. KATONA:  It reflects -- there's a change to

16 the adequate assurance deposit, but Entergy is -- there's

17 some additional language that Entergy and the debtors will

18 likely enter into, pursuant to the procedures here, with

19 respect to where the deposit is going to be held and things

20 of that nature.

21         THE COURT:  Okay.

22         MR. MANGAN:  Good afternoon, Your Honor.

23         THE COURT:  Good afternoon.

24         MR. MANGAN:  Kevin Mangan, of Womble Bond

25 Dickinson, on behalf of Entergy.

1          I have Alan Katz, my co-counsel, is also on the

2    line, but I just wanted to confirm that we have reached a

3    resolution, with regard to the utility motion and we're

4    working out the odds and (indiscernible) I understand of what

5    we have to do.

6          THE COURT:  Okay.  So, I'll expect

7    (indiscernible)?

8          MR. MANGAN:  No, I think this order will be

9    sufficient.

10          THE COURT:  Great.

11          MR. MANGAN:  It'll just be between us and the

12   debtor.

13          THE COURT:  Excellent.  Okay.

14          MR. MANGAN:  Thank you, Your Honor.

15          THE COURT:  Thank you.

16          Does anyone else wish to be heard in connection

17   with the debtors' final utility motion?

18       (No verbal response)

19          THE COURT:  Okay.  Hearing nothing, I am prepared

20   to approve this revised form of order and we will go ahead

21   and do so after the hearing today.

22          Has it been uploaded?

23          MS. KATONA:  I believe it has, but we will confirm

24   that.

25          And, Your Honor, just before we move on, I do want

1  to say that there have been a few utility providers that have

2  reached out as seeking additional adequate assurance and we

3  are working with them; specifically, Rockwood is mentioned,

4  as well as the Harriman Utility Board.

5          THE COURT:  Okay.  Actually, why don't you, to the

6  extent that you have not done so already, file this under a

7  certification of counsel and we'll upload it under that

8  vehicle and we'll go ahead and get that approved.

9          MS. KATONA:  Okay.  That sounds great.

10          THE COURT:  Thank you.

11          MS. KATONA:  With that, Your Honor, the next item

12  on the agenda -- if it's all right with you, we may take

13  things a little bit out of order -- we believe that the next

14  item on the agenda that might be the easiest to handle is the

15  debtors' bid procedures motion; that's Agenda Item Number 15.

16          THE COURT:  Okay.  I know we have a venue-transfer

17  motion pending, so, does anyone in the courtroom object to

18  the Court hearing bid procedures currently?

19          MR. BARRIERE:  Your Honor, Brent Barriere.  I

20  represent the party movant to venue.  We're ready to go

21  whenever the Court is ready to hear us, so ...

22          THE COURT:  Okay.  Do you object to me hearing the

23  bid procedures motion before that?

24          MR. BARRIERE:  Actually, I have no objections,

25  Your Honor.

1          THE COURT:  Okay.  Great.

2          All right.  Let's go forward.

3          MR. WARD:  Thank you, Your Honor.

4   Good afternoon.  For the record, Chris Ward, Polsinelli, on

5   behalf of the debtors.

6          The next matter on the agenda is Item 13; it is

7   the debtors' cash collateral motion.  We're here for final

8   approval.

9          I think the Court may have seen the committee --

10  oh, bid procedures -- I'm sorry.

11         THE COURT:  I thought I was mistaken.

12         MR. WARD:  No.  As usual --

13         THE COURT:  So, I'm glad to hear I do have any

14  listening ears on.

15         MR. WARD:  -- (indiscernible), Your Honor, so I'll

16  skip the bid procedures and grab my -- a different pile.

17         I apologize, Your Honor.

18         THE COURT:  That's okay.

19         MR. WARD:  So, there are issues with cash

20  collateral.

21         Our bid procedures is completely consensual moving

22  into today, so I'm happy to report there should be a clean

23  and redlined copy of the bid procedures order in your folder,

24  I believe.  You should have a redline of the bid procedures

25  order.

1          THE COURT:  I do not.

2          MR. WARD:  And if not, we will hand one up to Your

3   Honor.

4          I'll take full blame for the confusion over here.

5          THE COURT:  I would expect nothing less.

6          MS. KATONA:  May I approach, Your Honor?

7          THE COURT:  Yes.

8          I know Ms. Katona would never make that mistake.

9      (Laughter)

10          MR. WARD:  Your Honor, we have just handed up to

11  the Court a redline of the bid procedures order.  It probably

12  makes sense to page-turn.

13          I'm also going to make a proffer of Mr. Glenn

14  Pollack of Candlewood Partners, our financial advisor and

15  investment banker, in support of the bid procedures.  It

16  might make sense to get that done first before we move

17  through the redlined bid procedures order, if that's okay?

18          THE COURT:  That is fine.

19          MR. WARD:  Your Honor, Mr. Glenn Pollack is in the

20  courtroom and available to testify, if called, and if he was

21  called, he would testify that the debtors have engaged

22  Candlewood Partners as financial advisor and investment

23  banker.

24          Prior to the bankruptcy filing, the company

25  suffered under its debt load, which eventually led to severe

1   liquidity issues and eventually defaults under its

2   prepetition loan agreements.

3           Mr. Pollack would testify that in the weeks

4   leading up to the bankruptcy, the debtors had no liquidity.

5   The debtors then made a decision not to purchase any further

6   raw materials, and as it has done in the ordinary course of

7   business in the past when faced with excess inventory or

8   liquidity concerns, the debtors began selling off its

9   finished goods, inventory in order to pay down its secured

10  debt and other operating costs.

11          Mr. Pollack would further testify the debtors also

12  commenced discussions with its lenders and Black Diamond

13  regarding an orderly liquidation of the remaining inventory

14  and assets through a Chapter 11 bankruptcy filing.  As a

15  result of those discussions, on September 30th, 2019, the

16  debtors conducted a reduction of force and idled most of its

17  operations and filed, and then on October 1st, filed for

18  protection under Chapter 11 of the Bankruptcy Code.

19          Mr. Pollack would further testify that the debtors

20  continued to engage in limited production to finalize

21  finished goods over the next few weeks and intend to use the

22  bankruptcy process to sell off the remainder of its inventory

23  in an attempt to sell off all of its remaining assets, via

24  Section 363 of the Bankruptcy Code to a strategic or

25  financial buyer that will hopefully restart operations.  In

1  furtherance of this goal, the debtors filed the bid

2  procedures motion on October 11th, 2019.

3          Mr. Pollack would testify that as noted in the bid

4  procedures motion, there was no prepetition marketing

5  process.  Post-petition marketing started on the petition

6  date and has continued through today.  Immediately after the

7  bankruptcy filing, the Candlewood developed a teaser of

8  information to be sent to investors to garner interest in the

9  sale.

10          Three hundred and one investors were identified

11  and approached by Candlewood.  Forty-nine nondisclosure

12  agreements have been signed.  All parties that signed NDAs

13  have been granted access to the data room.  All 49 parties

14  with access to the data room have also received a more

15  comprehensive, confidential offering memorandum about the

16  debtors and the sale process; of those 49 parties in the data

17  room, there are 6 parties that have or scheduled site visits,

18  with one of those entities making multiple trips to the

19  Laplace facility.

20          Mr. Pollack would testify that this -- the

21  interest that has been gauged to date has happened from the

22  petition date through November 5th, 2019, and that all

23  negotiations with interested parties have been at arm's

24  length and no parties, thus far, are insiders of the debtors.

25          Mr. Pollack would testify the dates contained in

1  the bid procedures that we are asking approval for today are

2  as follows:  The deadline to serve the assumption notices in

3  the bid procedures would be November 13th, 2019; the debtors

4  would have until November 27th to designating a stalking

5  horse purchaser; the cure objection deadline would be

6  December 2nd; the bid deadline would be December 12th; the

7  sale objection deadline would be December 13th; there would

8  be an auction in Wilmington, Delaware, on December 18th; the

9  prepetition agent sale objection deadline would be

10  December 19th; and the sale hearing before Your Honor would

11  be December 19th at 10:00 a.m.

12          Mr. Pollack would testify that in his opinion, the

13  proposed bid procedures are in the best interests of all of

14  the debtors' creditor constituencies and will help maximize

15  the value of the debtors' assets.

16          It is Mr. Pollack's understanding that all

17  objections to the bid procedures have been consensually

18  resolved and a revised form of order has been submitted to

19  the Court.

20          Mr. Pollack would conclude his testimony by urging

21  the Court to approve the bidding procedures in order for the

22  debtors to find a potential strategic or financial purchaser

23  that may restart operations and rehire the laid-off

24  employees, and that would conclude Mr. Pollack's testimony.

25          As I mentioned, he is available in the courtroom

1  to the extent that any parties want to cross-examine him.

2           THE COURT:  Okay.  Does anyone wish to cross-

3  examine Mr. Pollack?

4       (No verbal response)

5           THE COURT:  Okay.  Hearing nothing, the proffer is

6  admitted.

7           MR. WARD:  With that, Your Honor, it's probably

8  make sense to page-turn on the bid procedures.  You will see

9  there's -- as we go through, there are fairly substantial

10  revisions that have come at the negotiation with the

11  creditors' committee, with Bank of America, and other parties

12  in interest.

13           Other than procedural issues, the first

14  substantive change is Paragraph 4 -- or Paragraph J on

15  Page 4, Your Honor.  (Indiscernible) everything the debtors

16  are doing is pursuant to the bidding procedures.

17           THE COURT:  Okay.

18           MR. WARD:  Paragraph 4 on Page 6 is the additional

19  language that was asked for by Bank of America, and I will

20  give the Court a second to read some of the additional

21  language, Your Honor.

22       (Pause)

23           THE COURT:  Okay.  All right.  Thank you.

24           MR. WARD:  Paragraph 5 has some changes to the

25  dates that were originally proposed that have been negotiated

1   with the Office of the United States Trustee and the

2   creditors' committee and Bank of America.  They are

3   consistent with the dates that were in Mr. Davis' proffer.

4   Paragraph 6, it gets into the entry of a stalking horse

5   agreement, Your Honor.  In addition --

6          THE COURT:  Okay.  I have one question.

7          MR. WARD:  Yes.

8          THE COURT:  Is there a supplemental deadline --

9   excuse me -- a deadline by which you are going to send a

10  supplemental assumption notice?

11         MR. WARD:  It is not addressed in your procedures,

12  but to the extent there is a stalking horse and then

13  successful bidder, I think we will have to update our cure

14  notice that goes out --

15         THE COURT:  Okay.

16         MR. WARD:  -- to address whatever list of

17  contracts and leases will be assumed in a stalking horse and

18  then to the extent that the successful bidder is different,

19  we'll have to file a notice with the revised parties for the

20  successful bidder.  But that is not addressed in the bid

21  procedures, themselves, Your Honor.

22         THE COURT:  Okay.  I was just confused, because in

23  the motion it said by November 22nd, the debtors would file

24  and serve a cure and possible assumption and assignment

25  notice, I guess, to the parties that have been identified by

1  a stalking horse.

2          Is that what was contemplated?

3          MR. WARD:  That is what was contemplated and the

4  feedback we got from parties in the case was that the motion

5  was complicated and it over-confused things.  So, we have

6  simplified it, but our intent is if there is a stalking horse

7  agreement filed, we will notice up the cure amounts and

8  contract counterparties from that motion, and to the extent

9  there's a successful bidder, we'll have to do the same

10 thing --

11         THE COURT:  Okay.

12         MR. WARD:  -- if the successful bidder is

13 different than the stalking horse.

14         Moving on to the next paragraph, Your Honor.  I'll

15 give you a second to read Paragraph 6, which is a change to

16 the procedures for entry into a stalking horse agreement.

17     (Pause)

18         MR. WARD:  And these revisions were made at the

19 request of the United States Trustee, Your Honor.

20         THE COURT:  Okay.  So, you'll be filing an

21 expedited motion now?

22         MR. WARD:  Originally, we had filed -- we had a

23 noticed procedure in there --

24         THE COURT:  What's my takeaway?

25     (Laughter)

1              MR. WARD:  You're good, Your Honor.

2              THE COURT:  Thank you.  I try.

3              MR. WARD:  But, to the extent we have a stalking

4    horse, we'll file a motion under shortened notice to approve

5    the stalking horse and any bid protections that a stalking

6    horse requests.

7              THE COURT:  Okay, great.  You addressed my

8    concern.

9              MR. WARD:  We figured that would be the case, Your

10   Honor.

11             THE COURT:  And then when would you expect to have

12   a hearing on that?

13             MR. WARD:  Our deadline is November 27th.  We will

14   be at the Court's mercy, I think, as to what -- as quick as

15   we can get before the Court.

16             THE COURT:  Okay.  Just so everyone is aware, I'm

17   not in the office the last two weeks of November, so it would

18   have to be the first week of December.

19             MR. WARD:  And we appreciate that, Your Honor.

20   Thank you.

21             Moving down the order, Paragraph 8, there's a

22   change that if there's no qualifying bids received, that the

23   subordinated term loan lender and the prepetition agent

24   retain their credit bid rights to submit a bid.

25             THE COURT:  Okay.

1          MR. WARD:  Paragraph 12 is the next substantive

2    change and it deals with credit bidding rights, as well.

3          THE COURT:  So, this has been agreed to by the

4    committee?

5          MR. WARD:  This has been agreed to by the

6    committee, by Bank of America, and by Black Diamond, Your

7    Honor, Paragraphs 12, 13, and 14 all going to credit bid

8    rights and then the rights *vis-a-vis*, the first and second

9    liens in their intercreditor agreement.

10          THE COURT:  So, just to let me know, so, is the

11   credit bid subject to the committee's investigation or is it

12   just 363(k)?  There's a lot here I haven't looked at, I want

13   to make sure I capture it all.

14          MR. WARD:  It's just 363(k), pursuant to the

15   order, Your Honor.

16          THE COURT:  Okay.  So, what's the mechanism if you

17   file a lien challenge and we haven't had it resolved before

18   we get to the auction?

19          MR. ADAMS:  Your Honor, the agreed language is

20   that the credit bid rights -- I apologize, Your Honor.

21          Jason Adams, Kelley Drye & Warren, on behalf of

22   the unsecured creditors committee, Your Honor.

23          THE COURT:  Welcome.

24          MR. ADAMS:  It's my first opportunity before Your

25   Honor, so thank you for having me today.

1          Your Honor, the language is essentially that the

2    credit bid rights are subject to the rights of the collateral

3    order.  If we have a challenge, we have a deadline we need to

4    bring it and we need to adjudicate that issue.

5          In accordance with Section 363(k), they have their

6    rights to do it.  We have our rights to oppose it.  That is,

7    hopefully, a problem that we will never get to, but if there

8    is a problem here, we'll raise it with the Court in advance

9    of the sale hearing.

10          THE COURT:  Okay.

11          MR. ADAMS:  And if that has to be litigated at the

12    settlement hearing, it's obviously on an expedited basis, but

13    given the exigent circumstances of this case, we think it's

14    appropriate.

15          THE COURT:  Okay.  Thank you.

16          MR. ADAMS:  Thank you, Your Honor.

17          MR. WARD:  And has the Court had an opportunity to

18    look at 12, 13, and 14?

19          THE COURT:  I'm not that fast, so no.

20          MR. WARD:  And we apologize that this did not get

21    over before the hearing.  It, literally, was not in this form

22    to come to the Court until late this morning.

23          THE COURT:  Why don't you give me a summary of

24    what's in 13 and 14.

25          MR. WARD:  Thirteen deals with the issues that we

1   had just spoken about, Your Honor, and the ability to request

2   adequate assurance under 365 for parties, to the extent there

3   is a credit bid right is exercised at the auction or in the

4   bidding and how that will be adjudicated.

5                    THE COURT:  Okay.

6                    MR. WARD:  And then 4 deals with the intercreditor

7   agreement issues between Black Diamond and Bank of America,

8   Your Honor.  And it has the language -- it's -- 363(k) and

9   the cash collateral order will govern to the extent there is

10  any challenge that is filed.

11                   THE COURT:  Okay.  All right.

12                   Let's continue.

13                   MR. WARD:  Thank you.  The next new paragraph --

14  the next new language, Your Honor, is Paragraph 16 on

15  Page 12.  It deals with price allocation on bids.

16                   THE COURT:  Okay.

17                   MR. WARD:  And I think we can skip a few pages

18  here to Page 15 at the end of paragraph -- new Paragraph 20,

19  and that deals with the supplemental assumption notice, Your

20  Honor.  And that's the issue that we have just discussed.

21                   THE COURT:  Okay.  Thank you that captured another

22  comment I had.

23                   MR. WARD:  Thank you, Your Honor.

24                   I think we can move down to Page 19, Paragraph 29,

25  which sets the settlement hearing as December 19th at

1    10:00 a.m., and it has some additional rights for

2    consultation parties; obviously, unless Your Honor has

3    something before that.

4              THE COURT:  Okay.  One moment.

5         (Pause)

6              THE COURT:  So, at the end of new Paragraph 22,

7    I'm a little concerned that it discuss the timing with

8    respect to the deadline to object to assumption and

9    assignment, solely with respect to adequate assurance of

10   future performance if there's a new successful bidder.  I

11   think that the auction and the hearing -- what's the time

12   between the auction and the hearing now?

13             MR. WARD:  It is the next day, Your Honor.

14             THE COURT:  So, this language doesn't really work,

15   so I think we need to say that it can be brought at the

16   hearing.

17             MR. WARD:  And we understand that concern and we

18   can make that change, Your Honor.  We'll make that revision

19   to 22.

20             Unless the Court has anything else, I think it

21   takes us back to 29, dealing with the settlement hearing and

22   the consultation rights.  Nothing --

23             THE COURT:  Okay.

24             MR. WARD:  -- object -- I don't think anything

25   objectionable; just changing dates in Paragraph 30, as well,

1   Your Honor.

2           THE COURT:  Actually, at the end of new

3   Paragraph 22 -- sorry, I'm trying to connect the pages

4   here -- Paragraph 23, I think at the end where it says, "Will

5   be determined at the settlement hearing," I think, can you

6   add, "Unless otherwise agreed to by the parties or ordered by

7   the Court."

8           MR. WARD:  We will do that, Your Honor.

9           THE COURT:  Okay, great.

10          MR. WARD:  With the Court seeing that in most sale

11  hearings, that if it's not going to get resolved overnight

12  and will be adjourned to --

13          THE COURT:  Yeah, I don't think I'll be doing a

14  cure hearing at the sale hearing.

15          MR. WARD:  -- do another hearing.

16          We'll make that revision.

17          THE COURT:  It just makes it clear to the parties

18  who maybe are unfamiliar with our practices.

19          Okay.  So, where are we?  Twenty-nine?

20          MR. WARD:  Twenty-nine -- 29 is the change of sale

21  hearing date to December 19th at 10:00 a.m. to obtain from

22  your chambers --

23          THE COURT:  Okay.

24          MR. WARD:  -- and it adds in the consultation

25  parties as a party that we need to address before adjourning

1  the sale hearing.

2          Paragraph 30 sets the objection deadline as

3  December 13th, Your Honor.

4          THE COURT:  Okay.

5          MR. WARD:  And it includes additional noticed

6  parties that have joined the case.

7          Paragraph 35 adds "reasonable" to four actions

8  that are necessary to effectuate the relief granted in this

9  order.

10          That is the final change to the order.  There are

11  changes to the exhibits, Your Honor.  They are fairly

12  significant and all conform to what is in the bid procedures

13  order.  I can give the Court a few minutes to --

14          THE COURT:  Let me just thumb through these.

15          MR. WARD:  -- page through those, but I can

16  highlight a few that resolve objections.

17          Specifically, on Page 7 of the first notice, Your

18  Honor --

19          THE COURT:  Uh-huh.

20          MR. WARD:  -- there's language regarding the bids.

21          This language was requested in (L) by the Unions

22  and (M), by the PBGC, asking that any bidders state their

23  intention with respect to the CBAs and with respect to the

24  pension in their bids so that the Union and the PBGC is aware

25  of that.

1            THE COURT:  Okay.

2            MR. WARD:  And there's also one further change

3  that we need to make at the request of the trustee and I

4  don't have the paragraph in front of me, but it was not

5  deleted.  So, in our certification of counsel, there'll be an

6  additional redline for a paragraph that basically absolved

7  the debtors of any obligation for information that it was

8  sharing with the parties.

9            THE COURT:  Uh-huh.

10            MR. WARD:  We will remove that paragraph at the

11  trustee's request.  It just did not make it into this

12  version.

13            THE COURT:  Okay.

14            MR. WARD:  And most of the other language, Your

15  Honor, is at the request of the official committee of

16  unsecured creditors regarding their consultation rights and

17  ability to participate in the process, and we've added all of

18  their requested language to the bid procedures and the bid

19  procedures order.  And those are the substantive changes to

20  the notices, Your Honor; everything else conforms with the

21  order.

22            We also received comments from Westchester

23  Insurance to several of the motions today and they have asked

24  us to put on the record that Westchester reserves all rights,

25  if any, including the right to object to any sale or

1   confirmation or structured dismissal in order to preserve

2   their rights for the sale hearing and the final hearing.

3          I don't have anything else, Your Honor.

4          THE COURT:  Okay.  Unless you have anything

5   further, I'll ask if anyone else wishes to be heard in

6   connection with the bid procedures order?

7          MR. ADAMS:  Your Honor, again for the record,

8   Jason Adams, Kelley Drye & Warren, proposed counsel for the

9   official committee of unsecured creditors.

10          It's an extensive redline; I know there was a lot

11   to go through there.

12          The committee, and as you probably saw in our

13   objection, had, I would say, kind of two primary concerns.

14   One was the timeline here; we are dealing with a fairly

15   aggressive timeline, especially given the fact that there was

16   a lack of prepetition marketing.

17          And so, when the committee was formed, our primary

18   concern was:  Are we moving too quickly?

19          What I can tell you is that the committee was

20   pleasantly surprised by the work that Candlewood had done

21   since the petition date.  And you heard through the proffer,

22   the extensive amount of parties that have been contacted, the

23   NDAs that have been signed, and the parties that are actually

24   in the data room, doing visits; that gave us more comfort.

25          So, well, we did agree -- and we understood the

1  debtors' desire not to push this process off extensively,

2  especially considering the administrative burn and what that

3  could mean overall to the estates here -- we tried to build

4  in a little bit more time, and as Your Honor has seen, we

5  have built in a little bit more time, and hopefully that will

6  give parties extra time to do their diligence, to consider

7  their offers, and hopefully, we will have a robust process

8  with lots of bidders.  So, that was addressed very early on.

9          The remaining issues really dealt with how are we

10 running the process.  Obviously, we wanted to ensure that we

11 had consultation rights, with respect to the entire process.

12 I think the debtors did an admirable job in the first draft.

13 We ratcheted it up a little just to make sure that we were in

14 all the right places.

15         The hardest part that we had to deal with, Your

16 Honor, as I'm sure you saw, we just talked -- there's a lot

17 of consent rights for the lenders and that's something that

18 the committee normally doesn't like to see.  We don't want

19 lenders taking control and saying, You can or can't do this;

20 it's really the debtors' process to run and maximize the

21 value for all of the creditors.

22         We reached an accord on this.  Does the committee

23 love it?  Not necessarily, but they are reasonable consent

24 rights and this order does now provide the opportunity that

25 if we have a disagreement on this, we can come to Your Honor

1  and have that adjudicated.

2         So, while it's broader than what we would normally

3  want as a committee, given those limitations on it, we found

4  that acceptable so that if there are disputes, much like the

5  credit bid issue that we just talked about, we can be in

6  front of Your Honor and we can deal with those issues.

7         So, with that, Your Honor, the committee is

8  onboard with this.  We are hopeful that we are going to have

9  a very successful process here that is going to result in

10  value for all of the creditors.

11         THE COURT:  Okay.  Thank you.

12         Does anyone else wish to be heard in connection

13  with the debtors' request for bid procedures order?

14     (No verbal response)

15         THE COURT:  Okay.  Hearing nothing, I will approve

16  the relief that has been requested by the debtors in the form

17  of the revised bid procedures order.  I am very impressed

18  with the parties' ability to come to an agreement on these

19  issues and I look forward to hear there was a robust process

20  and look forward to perhaps even hearing that there's a

21  stalking horse.  So, I will wait to hear for that, I guess,

22  around the 27th.

23         But I'll look to see your further certification of

24  counsel with a revised or -- excuse me -- certification of

25  counsel with a further revised bid procedures order and if

1  it's acceptable, I'll go ahead and enter it after the

2  hearing.

3          MR. WARD:  Thank you very much, Your Honor.

4          Our goal here is to -- we got through my

5  presentation without using the word "robust," but we are

6  hopeful to have a very robust marketing process and be back

7  here with a successful auction.  As is usual, there was a lot

8  that went into this order.  Providing a consensual order

9  was -- it was hard-fought, but I'm glad we got to this point

10 and we look forward to pushing it forward.

11         With that, Your Honor, I think I will move back to

12 where I tried to start, which is Number 13 on the agenda, the

13 debtors' motion for final cash collateral order.  The

14 original motion was filed at Docket Number 24.

15         Again, Your Honor, there was a lot of back-and-

16 forth between Bank of America, Black Diamond, the committee,

17 the debtors, the U.S. Trustee to an extent, but I can tell

18 you that we are going to present an agreed-upon, final cash

19 collateral order.  We'll walk through the revisions, but I

20 think the goal of all the parties here was what we just

21 discussed in the bid procedures.  Nobody wanted to get in the

22 way of this hopefully robust marketing and sale process to

23 see if there's a buyer out there that's willing to come in

24 and, you know, potentially restart operations and rehire the

25 employees.

1        And I think that helped lead to getting to this

2   agreed-upon, final cash collateral order.  The main revisions

3   that I'll highlight for the Court at the outset before we get

4   to the actual terms that are going to be in the order --

5   we're going to have additional changes to the order -- is the

6   order is going to be entered on a final basis today.  There

7   will be two provisions that will be entered, you know, with

8   the reservation of rights, subject to further review.

9        And as we're going to remove the Section 506(c)

10  waiver and the Section 552(b) waiver, as to Bank of America.

11  Subject to a hearing on December 19th, Your Honor, which is

12  the sale hearing, the cash collateral order will be revised

13  to expire on December 20th.

14       Some of the issues that were raised by the

15  committee regarding administrative solvency and the funding,

16  moving that date up provides adequate funding for us to get

17  through a sale process, and that was the parties' goal here,

18  was to fund the administrative claims, to get through a sale

19  process, to see where the bids come in on December 12th, and

20  hopefully, on December 19th, we're all standing here hand-in-

21  hand with a purchaser with a consensual cash collateral

22  usage.  And we're going to have to talk about what we do from

23  that date forward with what then may be a different fulcrum

24  security.

25       But for today's purposes, I think we're all

1  standing here, hand-in-hand, with an agreement that we're

2  going to push forward through the sale process and come back

3  before the Court on certain issues on December 19th, which

4  hopefully will be including the sale successful bidder.

5           THE COURT:  Okay.

6           MR. WARD:  One of the other provisions will be

7  that Black Diamond Capital Management will be completely

8  removed from the final cash collateral order.  They received

9  certain protections in the interim cash collateral order and

10 those will be addressed on December 19th, if we're in a

11 position to move forward with the case and address any

12 further issues.

13          THE COURT:  It seems like a reasonable resolution.

14          MR. WARD:  It is a very reasonable resolution

15 under the circumstances, Your Honor.

16          We appreciate both, our lenders and the committee,

17 working with the debtors.  We had a tough couple of days to

18 get to this point, but I think, given the approval of the bid

19 procedures, hopefully given approval of the cash collateral

20 order, the debtors stand here ready to go forward with their

21 marketing process and come back to this Court on the 19th

22 and, you know, hopefully in a much better situation than we

23 are now, Your Honor.

24          May I approach with a redline of the final cash

25 collateral order?

1          THE COURT:  Yes.  Is this a cumulative blackline

2  or does it reflect changes made subsequent to the --

3          MR. WARD:  Yes, it's cumulative, Your Honor.

4          THE COURT:  Okay.

5          MR. WARD:  And that's --

6          THE COURT:  There was the order attached to the

7  DIP lender's (indiscernible) --

8          MR. WARD:  I would ignore that for today.

9      (Laughter)

10          MR. WARD:  Those changes are in this order.

11          There's additional changes, as well.

12          THE COURT:  Okay.

13          MR. WARD:  There were two other points, Your

14  Honor, with respect to the committee that I neglected.  The

15  committee professional fee budget will be raised to $650,000

16  in the budget and their investigation cap will be $75,000.

17          THE COURT:  Okay.

18          MR. WARD:  And so, with Black Diamond coming out

19  complete, Your Honor, they also come out of the sharing --

20  there was a sharing mechanism --

21          THE COURT:  Yes.

22          MR. WARD:  -- between the first and the second

23  interim order.  They're coming out completely, so that clause

24  will come out, as well.

25          THE COURT:  Okay.

1          MR. WARD:  So, I think with that high-end

2    presentation of where we're at, Your Honor, all of those --

3    none of those changes are in this order that you're seeing.

4          THE COURT:  Okay.

5          MR. WARD:  We'll have to make another

6    certification of counsel and order for the Court to review;

7    though, that resolution was literally reached in the hallway

8    when we saw Your Honor walk into chambers, to show you how

9    late the negotiations went on this and took.  So, the

10   black -- the redline that was handed up to you has very

11   minimal changes, Your Honor.

12         THE COURT:  Okay.

13         MR. WARD:  I think I have them all here and I can

14   walk you through the few that are in here, but the rest will

15   have to be submitted under certification of counsel.

16         But I think for today's purposes, we can focus on

17   Page 39.  Paragraphs 74 and 75 are new paragraphs that were

18   added.

19         THE COURT:  I'm sorry, what paragraphs?

20         MR. WARD:  On Page 39 of the redline, new

21   Paragraph 74 --

22         THE COURT:  Thank you.

23         MR. WARD:  -- and that deals with issues between

24   Westchester and Entergy that Ms. Katona addressed as part of

25   the utility motion.  That was a paragraph to give them

1  comfort.

2          THE COURT:  Okay.

3          MR. WARD:  And then when you get through that,

4  Your Honor, Paragraph 75 goes to the challenge deadline and

5  standing for the committee.

6          THE COURT:  Okay.

7          MR. WARD:  And then on Paragraph 41, there's an

8  additional -- when it talks about the committee complaint, it

9  says, "Or other objection," which goes to the 363(k)-credit

10  bid issue, as well, Your Honor.

11          THE COURT:  Okay.  Your Honor.

12          MR. WARD:  And those are the -- the revisions that

13  are done today will address the 506(c), 552(b), the removal

14  of Black Diamond, and the committee professional fees and

15  investigation cap in the next turn of the cash collateral

16  order, which we'll file under certification of counsel unless

17  the Court has any questions or concerns that it would like to

18  address.

19          THE COURT:  I do not have any questions or

20  concerns.

21          Does anyone else wish to be heard in connection

22  with the final cash collateral order?

23          Mr. Adams?

24          MR. ADAMS:  Thank you, Your Honor.

25          Your Honor, this was much more difficult than the

1  bid procedures.

2          THE COURT:  I didn't think you would get there.

3          MR. ADAMS:  Until about two and a half minutes

4  before this hearing started, I didn't think we were getting

5  there, either.

6          Your Honor, there's a tension in this case and

7  it's not being dealt with today, but we've got two sets of

8  lenders with different priorities here and there's a large

9  question about who's funding what.  What we have here is a

10 stopgap and I think the committee obviously would have loved

11 to have been here today with a fully consensual, global case

12 cash collateral order that dealt with everybody, but we

13 couldn't get there.  And that's just the realities of

14 intercreditor relationships between lenders and we get that.

15         The big concern that you saw in our objection,

16 Your Honor, was the administrative solvency issue.  Your

17 Honor has probably noticed that you don't have a final budget

18 in front of you.  That's something that needs to be worked on

19 between the parties.

20         What I can tell you is that final budget is going

21 to show some meaningful increases in the administrative costs

22 of this estate and an agreement to a certain point of paying

23 those.  There is a lump sum, which you will see in the final

24 order, that there really isn't consent on as to who is

25 actually flipping the bill for those.  That was very

1  problematic to us and I will tell you that was the thrust of

2  what we were going to be arguing about today.

3          I think today is the stopgap, which is to say,

4  there are concerns that neither lender at this point, neither

5  group of lenders at this point has agreed, yes, you can use

6  our collateral to pay those known administrative claims, and

7  that is why the 506(c) waiver, the 552 waiver had to come

8  out, because those are rights that had to be preserved for

9  the estate, until we figure out who's flipping the bill here.

10          So, that was a significant issue; specifically,

11 given the fact that we're granting some pretty significant

12 adequate protection in this order.  Because Black Diamond was

13 essentially in this order not really agreeing to any cash

14 collateral use, it was our request -- and it's been agreed

15 to, whether consensually or forcibly -- that we've got to

16 bring them out of this, and that means, you know, the

17 adequate protection liens, the adequate protection claims,

18 the stipulations, the committee's challenge period, all of

19 that needed to come out because we really weren't getting any

20 consensual cash collateral use from them.

21          We're hopeful that that's all going to get

22 resolved, Your Honor, and we've now created a mechanism where

23 we will be here before cash collateral use from the ABL

24 lenders expires and hopefully cooler minds will prevail and

25 we'll have an agreement that there is real funding to get us

1  through not just this current process that's going on, in

2  terms of the liquidation of finished goods, but the sale and

3  an endgame for this case.

4          Your Honor, the remainder of the issues, I think

5  most of them, we were able to deal with them in advance of

6  today's hearing; certainly, we wanted to ensure that the

7  adequate protection liens and claims that were being provided

8  were subject to diminution.  There was no predetermination.

9  The lenders agreed to that language; you'll see that in the

10 order.

11          We had some minor issues with the budget

12 variances.  The final budget is going to address a lot of

13 that.  You're going to see a little bit of a smoothing out of

14 things in the budget and the lenders -- the ABL lenders have

15 agreed that there's going to be a roll-forward variance on

16 receipts for a cumulative of a three-week period.  So,

17 that'll smooth things out a little.  Somebody advanced, is

18 it -- right -- a two-week period.  I don't want to get over

19 my skis here, Your Honor.  That resolves the initial problem

20 if somebody pays early and next week we don't get enough

21 money and then all of a sudden we have a budget default.

22          The investigation budget, the increase to $75,000,

23 that's, of course, now limited solely to the ABL lenders.

24 Obviously, we're going to have to deal with Black Diamond

25 another day and we'll deal with that.

1           The challenge-right provisions, Your Honor, we

2    made some revisions, there, as well.  You now have the

3    typical provisions that provide that a filing of a motion for

4    standing will address that.  Also deals with -- this is an

5    issue now that is popping up in cases, given the Delaware

6    Chancery Court's ruling, with respect to standing of

7    committees, with respect to LLCs.

8           We needed to ensure that the debtors' stipulations

9    here wasn't going to be a *fait accompli*; essentially, that we

10   can't do anything because they've now stipulated and it's all

11   off the books.  So, we've now manipulated the language here.

12          We're not changing our need to come before Your

13   Honor and say, We think we have these claims -- and hopefully

14   we don't, Your Honor --

15          THE COURT:  Uh-huh.

16          MR. ADAMS:  -- but we think we have these claims,

17   Your Honor needs to rule on that, and then there's a

18   mechanism to basically say, Look, it's not just a derivative

19   standing.  We will get the right to do that.

20          And then the last issue, which always seems to be

21   the last issue:  the committee budget, Your Honor.  We did

22   get to resolution on that.  That gets us through this period

23   and, obviously, what happens after that from a global case

24   budget, from a wind-down perspective.  It would have been

25   nice to have been able to deal with that today, but we will

1  live to fight another day on that.

2              So, Your Honor, that's really the genesis of the

3  resolution here.  It's not a perfect solution, but it's a

4  solution that allows us to keep this case moving forward

5  towards the hopeful end goal of money for everybody.

6              THE COURT:  Okay.  I think in your objection you

7  had mentioned that the ABL lender was excepted to be repaid

8  by December 13th.

9              MR. ADAMS:  Well --

10             THE COURT:  It seems like that is not actually

11  going to happen (indiscernible) --

12             MR. ADAMS:  The amended budget --

13             THE COURT:  Is that expected to happen, because

14  then we're going to need a hearing.

15             MR. ADAMS:  It's going to --

16             THE COURT:  We'll need a hearing to deal with

17  contested cash collateral --

18             MR. ADAMS:  Sure.

19             THE COURT:  -- earlier than expected.

20             MR. ADAMS:  And, again, I -- we're going to have

21  to see the final budget.  I did see a final budget last

22  night.  I think it's in line.

23             It's going to be later than that, Your Honor.  It

24  looks like it's going to be somewhere in the Week 13 range,

25  which would get us past that hearing date.

1          Do you want --

2          THE COURT:  And it's perfectly fine.  I just think

3  from a calendar-management --

4          MR. ADAMS:  I -- yes, I --

5          THE COURT:  -- we're going to be punting to the

6  sale hearing, we would be -- we would need a hearing.

7          MR. ADAMS:  I agree, Your Honor.

8          We -- this is going to face -- we're going to hit

9  a critical juncture in this case, right, and hopefully what's

10  going to happen is we're going to have a great bidding

11  process, we're going to have lots of money here, and people

12  are going to say, We've got a solution to this.

13          But you're right there, is a situation -- it's not

14  ideal -- where we may be here on contested cash collateral

15  use.  That's, hopefully, not going to happen.

16          THE COURT:  Okay.  All right.

17          MR. WALLANDER:  Your Honor, Bill Wallander, on

18  behalf of Bank of America.

19          The 13th would be wonderful.  I'd put a low

20  handicap on that, at this point.  And Bank of America has

21  been working with the debtor.  We've had a number of issues

22  getting settled into the case.

23          But it's not been an easy case, and it came about

24  very quickly, as Your Honor knows.  We've tried to set a

25  platform for have a going-concern sale process here and

1   that's what we have now.  And I have a lot of appreciation

2   for all the professionals who have been involved in the

3   negotiations, because we were able to get everything put

4   together.

5           So that Your Honor understands, we've got a

6   platform now built to get as much value as we can out of this

7   process.  We have a number of parties that have come to look

8   at the assets of the company, and we're hoping that that will

9   continue.

10          But on the cash collateral order, on the 506(c)

11  and the 552, we'll continue that until the 19th.  It's still

12  something we'd like to get, but we appreciate the concerns

13  the committee has and we took to heart their questions about

14  budget and everything else there and also tried to, you know,

15  work with the debtors on some of the issues that they had.

16          So, we appreciate all of that and we appreciate

17  Your Honor, you know, what you've approved today, and hope we

18  can keep the process going here smoothly to try to get value

19  from this estate.

20          Thank you, Judge.

21          THE COURT:  Okay.  Thank you.

22          Does anyone else wish to be heard in connection

23  with the final cash collateral order?

24      (No verbal response)

25          THE COURT:  Okay.  I am prepared to approve the

1  relief, subject to reviewing the final form of proposed

2  order.  Like I said, I think the resolutions reached here are

3  reasonable and ensure that the parties are working towards

4  not missing the forest through the trees and it makes a lot

5  of sense to, perhaps, adjourn some of the issues to avoid the

6  cost of a contested hearing today if those issues would never

7  come to fruition.  So, I think it makes a lot of sense, the

8  agreement that has been reached.

9          And I can't say that I've seen it often, so to the

10  extent that this is sort of a first-time agreement, maybe

11  I'll start to see it in other cases, which would be nice.

12          MR. WARD:  That would be nice, Your Honor.

13          THE COURT:  Yeah.  So, fingers crossed.

14          Okay.  So, I will approve the cash collateral

15  usage, subject to seeing the final form of order.

16          MR. WARD:  Thank you, Your Honor.

17          We'll submit that under certification of counsel.

18          The last item on the agenda is venue.

19          THE COURT:  Yes.

20          MR. WARD:  It may make sense to take a five-minute

21  break and re-situate counsel table, because to my

22  understanding, there's going to be testimony and evidence for

23  this portion of the hearing.

24          THE COURT:  Okay.  One question of the timing of

25  the submissions of the orders, just so I can --

1          MR. WARD:  It'll definitely be tomorrow, Your

2   Honor.

3          THE COURT:  Okay.  It'll be tomorrow, overall,

4   then?

5          MR. WARD:  Yep.

6          THE COURT:  Okay.  So, I can let everyone know in

7   chambers.

8          MR. WARD:  Uh-huh.

9          THE COURT:  So, we'll take -- you said, five

10  minutes?

11         MR. WARD:  I think we just need five minutes to

12  re-situate up here, Your Honor.

13         THE COURT:  Okay.  So, I'll see you at a quarter

14  after.

15         MR. WARD:  All right.  Thank you.

16         THE COURT:  Thank you.

17      (Recess taken at 2:08 p.m.)

18      (Proceedings resumed at 2:17 p.m.)

19         THE COURT OFFICER:  All rise.

20         THE COURT:  Please be seated.

21         Okay.  Let's turn to the venue motion.

22         MR. MCMILLAN:  Good afternoon, Your Honor.

23         THE COURT:  Good afternoon.

24         MR. MCMILLAN:  James McMillan from Halloran Farkas

25  + Kittila for the WARN Act claimants.  With me is my co-

1  counsel, Brent Barriere from Fishman Haygood in New Orleans,

2  and he's been admitted *pro hac vice*, and he'll be presenting

3  the motion.

4            THE COURT:  Okay.  Mr. Barriere, welcome.

5            MR. BARRIERE:  Thank you, Your Honor.

6            And thank you for permitting me to appear this

7  afternoon, Your Honor.  This is a motion seeking to transfer

8  this case to the Eastern District of Louisiana where the

9  debtors personal place of business is located in Laplace,

10 Louisiana.

11           I'm not sure of the Court's protocol.  I'm happy

12 to dispense with the opening statements and go directly to

13 the evidence.

14           I'll be calling on cross-examination, Alton Davis,

15 who is the president and chief operating officer of the

16 debtors.

17           THE COURT:  Okay.  We can go right into evidence.

18           MR. BARRIERE:  Very good.

19           Mr. Davis?

20           THE COURT:  Mr. Davis, why don't you step forward

21 and remain standing so you can be sworn in.

22           MR. DAVIS:  Yes, ma'am.

23           THE COURT:  Thank you.

24 BY MR. BARRIERE:

25 Q     Alton Davis, president and chief operating officer --

1           THE COURT:  Oh, I'm sorry.

2           You want to come up and stand in the witness box.

3           MR. BARRIERE:  You've got a special seat,

4   Mr. Davis.

5           MR. DAVIS:  Oh, I see.

6           THE COURT:  My apologies.

7           MR. BARRIERE:  My apologies, too.

8           THE CLERK:  Raise your right hand.

9       ALTON DAVIS, WITNESS FOR THE WARN ACT CLAIMANTS, SWORN.

10          THE CLERK:  Please state your full name and spell

11  your last name, please.

12          THE WITNESS:  Alton W. Davis, D-A  -V-I-S.

13          THE CLERK:  Thank you, sir.

14                      CROSS-EXAMINATION

15  BY MR. BARRIERE:

16  Q    Good afternoon, Mr. Davis.  Nice to see you again.  You

17  may recall we met last week in connection with the 30(b)(6)

18  deposition.

19       Sir, what is your position with Bayou Steel BD

20  Holdings, LLC?

21  A    President and chief operating officer.

22  Q    All right.  And what is your position with BD Bayou

23  Steel Investment, LLC?

24  A    Same.

25  Q    And, finally, what is your position with BD

1  Laplace, LLC?

2  A     Same.

3  Q     All right.  Now, we went through those names last week

4  and you and I got hung up.

5        May I just refer to those three entities, collectively,

6  as "Bayou Steel"?

7  A     As I agreed with you last time, that would be great.

8  Q     All right.  And you see these as one in the same, I

9  take it?

10 A     They are.

11 Q     All right.  Does Bayou Steel have a chief executive

12 officer?

13 A     Chief executive officer?

14 Q     Yes, sir.

15 A     No, sir.

16 Q     All right.  And did it, at one time, until the recent

17 past, Bayou Steel have a chief executive officer?

18 A     Yes, sir.

19 Q     And who was that, sir?

20 A     Mike Williams.

21 Q     All right.  And when did Mr. Williams leave Bayou

22 Steel?

23 A     He resigned on September the 30th, 2019.

24 Q     And have you assumed his duties?

25 A     No.

1  Q     Does Bayou Steel have a chief financial officer?

2  A     No.

3  Q     Who is the chief accounting person at Bayou Steel?

4  A     Kevin Kirkland.  He's the vice president of finance.

5  Q     And where are your offices located, Mr. Davis?

6  A     I have several offices:  I have an office in my home in

7  Jacksonville, Florida -- just out of Jacksonville, Florida; I

8  have one in Laplace, Louisiana; and I have one in Harriman,

9  Tennessee.

10 Q     All right.

11            THE COURT:  I'm sorry.  Where?

12            THE WITNESS:  Harriman, Tennessee.

13            THE COURT:  Okay.

14 BY MR. BARRIERE:

15 Q     And Mr. Kirkland, does he have an office in Laplace,

16 also?

17 A     He has one in Laplace.  He also works out of his home

18 in -- near Jacksonville, Florida.

19 Q     All right.  You consider Laplace to be the headquarters

20 of Bayou Steel?

21 A     Yes, it.

22 Q     And that's where the Accounting Department is

23 headquartered?

24 A     Yes, it is.

25 Q     That's where the human relations folks are?

1    A       Yes, it is.

2    Q       All right.  As of September 30th, how many salaried

3    employees were working at Bayou Steel?

4    A       September 30th?  About 160 salary and hourly, so about

5    probably 70 or 80 salaried people.

6    Q       And this was after the termination, is that correct, or

7    before the termination that occurred on September 30th?

8    A       The termination took place on September 30th.

9    Q       30th.

10           Well, let's go to that date.  How many employees were

11   there in Laplace, Louisiana, as of that date?

12   A       Before the termination?

13   Q       Yes, sir.

14   A       About 390.

15   Q       All right.  And after the termination, how many

16   employees were in Laplace?

17   A       I'm trying to remember -- about 90.

18   Q       Ninety.

19           And of those 90, how many are the salaried employees?

20   A       It would have been about 40.

21   Q       Forty.

22           So, of the total 62 salaried employees at Bayou Steel,

23   approximately 40 at Laplace; is that correct?

24   A       Repeat the question.

25   Q       Sure.  So, I understood your testimony a moment ago,

1  post the mass termination, you had 62 salaried employees.

2       Did I understand you correctly?

3  A     I said about 60.

4  Q     About 60.

5       And about 40, or two-thirds of those, were Laplace;

6  that's my question.

7  A     Probably a little more than that.

8  Q     A little more than that.

9  A     Right.  But in that ballpark, though.

10 Q     Okay.  Now, in addition to the Laplace facility, your

11 headquarters, where else in Louisiana do you have facilities

12 of Bayou Steel?

13 A     We have a scrap operation that's in Laplace.  We also

14 have a scrap operation, which is a raw-material feed for our

15 production process, in Harvey, Louisiana.

16 Q     All right.  Would you describe for the Court, the

17 facility in Laplace.

18 A     The facility is -- has an is scrap operation for

19 producing raw material, feedstock for the melting operation.

20 It has an automobile shredder; it shreds automobiles,

21 appliances, collects other types of scrap and that becomes

22 the feedstock for the melting operation, the melting-and-

23 casting operation.

24      The melting is an electric arc furnace where you charge

25 the scrap into the furnace, you melt it, you refine it, and

1  then you tap it at about 3,000 degrees or so.

2       And then that goes to the ladle furnace operation.

3  There, the final temperature and chemistry adjustments are

4  made.

5       That goes to the billet caster, a continuous billet

6  caster, which makes a square, normally a square semi-finished

7  product that can either be sold, but most of the time, it

8  goes to one of the two rolling mills that we have -- the one

9  in Laplace or the one in Harriman, Tennessee.

10 Q    All right.  And how many acres are at the Laplace

11 facility?  How large is that facilitate?

12 A    Three hundred and forty.

13 Q    Three hundred and forty acres.

14      Can you --

15 A    I'm sorry, 430 -- I had those numbers reversed.

16 Q    Fair enough.  Four hundred and thirty acres.

17      And your headquarters facility is there also, the

18 office building?

19 A    Office building, also.

20 Q    Sir, I know you are the president of these three

21 entities, but do you have an employment contract?

22 A    I do.

23 Q    And with whom do you have that employment contract?

24 A    Black Diamond Capital Management.

25 Q    All right.  And none of the Bayou Steel entities are a

1  party to that employment contract, are they?

2  A     I'm sorry?

3  Q     Are any of the Black Diamond -- I'm sorry -- are any of

4  the Bayou Steel entities signatories to that employment

5  contract?

6  A     No.

7  Q     All right.  Just Black Diamond?

8  A     Right.

9  Q     All right.  And how is Black Diamond Capital

10 Management, as you understand it, affiliated with Black

11 Diamond Financial?

12 A     I think it's only a subsidiary.  I know that it is a

13 subordinated debtor to us and we're a subordinated debtor to

14 them.

15 Q     And when did you execute that employment agreement?

16 A     April of 2016.

17 Q     And you've operated under that same agreement or worked

18 under that same agreement for the three and a half years

19 since that time?

20 A     It was extended one time.

21 Q     When was that?

22 A     After -- sometime April the 4th for three --

23 Q     After this year?

24 A     It was a three-year contract.

25 Q     And is it a new three-year contract?

1  A      No, it's one year.

2  Q      All right.  Now, you mentioned -- we discussed the

3  facility in Laplace.

4         Tell me about the other facilities.  There's one in

5  Tennessee, Harriman; is that correct?

6  A      Yes, sir.

7  Q      What sort of facility is that?

8  A      It's a rolling mill.  It takes the semi-finished

9  product and makes rolls -- and heats it and rolls it into

10 structural products.

11 Q      All right.  Now, prior to the terminations of

12 September 30th, how many employees were located in Harriman?

13 A      Seventy-two.

14 Q      And how many are there now?

15 A      About 40.

16 Q      All right.  Now, you also have facilities in Oklahoma,

17 Illinois, and Pennsylvania; is that correct?

18 A      Correct.

19 Q      Now, let's start with the, I guess Catoosa -- if I'm

20 pronouncing it correctly --

21 A      Correct.

22 Q      -- Oklahoma.  What sort of facility is that?

23 A      It's a warehousing and distribution center.  It -- we

24 ship product to that location by barge, normally -- sometimes

25 we'll ship it by rail -- but it goes to that location on the

1  river.  It's offloaded and then it's sold out of that

2  location.

3  Q    Now, the Laplace location is owned by Bayou Steel,

4  correct?

5  A    Correct.

6  Q    Harriman facility owned by Bayou Steel?

7  A    Correct.

8  Q    And what about the Catoosa, Oklahoma, facility?

9  A    It's a leased property, but Bayou Steel owns the

10  land -- I mean the building.

11  Q    The building, all right.

12       Now, you have a facility in East Chicago, Illinois; is

13  that a leased or owned facility?

14  A    It's owned.

15  Q    And what sort of facility is that?

16  A    It's the same as -- same, generally, as Catoosa; it's a

17  distribution, unloading, and warehousing-distribution center.

18  Q    All right.  And, finally, you have a facility in

19  Pittsburgh; what sort of a facility is that?

20  A    It's the same as the Catoosa and Chicago, but it's

21  leased.

22  Q    Does Bayou still have a facility in Delaware?

23  A    No.

24  Q    Have you ever heard a facility of any sort in Delaware?

25  A    Not to my knowledge.

1  Q     All right.  Have you ever heard any employees located

2  in the state of Delaware?

3  A     No.

4  Q     All right.  Have you ever heard any assets, Bayou Steel

5  ever had any assets of any type or description in the state

6  of Delaware?

7  A     Not to my knowledge.

8  Q     Now, Bayou Steel has outside auditors; is that correct?

9  A     Correct.

10 Q     And who is -- what firm do y'all use?

11 A     KPMG.

12 Q     KPMG.

13       And which office of KPMG is providing those accounting

14 services?

15 A     I'm not positive.

16 Q     All right.  Have you dealt with auditors or accountant

17 with KPMG from the New Orleans office?

18 A     I wouldn't know for sure.  I suspect they're from New

19 Orleans.

20 Q     All right.  But that's not part of your job

21 description?

22 A     Not part of my job.

23 Q     Fair enough.

24       All of the accounting people for Bayou Steel are

25 located in Laplace; is that correct?

1   A      That's correct.

2   Q      And all of the books and records are also located in

3   Laplace; is that correct?

4   A      Correct.

5   Q      Okay.  And there are no books and records located here

6   in Delaware, other than what you've left with your lawyers;

7   is that correct?

8   A      As far as I know, yes.

9   Q      Now, is Bayou Steel's Laplace facility currently

10  subject to the regulatory oversight of the Louisiana

11  Department of Environmental Quality?

12  A      It is.

13  Q      Okay.  Can you describe for the Court in what regard.

14  A      We have a federally granted Title V air permit.  What

15  that is, is a permit that -- where you recognize all of your

16  potential or actual sources of air emissions and you're

17  permitted based on whatever that calculations come out and

18  actual measurements come out.  And then you're given a permit

19  that's administered by the State of Louisiana DEQ.

20  Q      Is Bayou Steel's Laplace facility currently the subject

21  of an audit by St. John the Baptist Parish in Louisiana?

22  A      Yes.

23  Q      All right.  Is it also currently the subject of an

24  audit by the Louisiana Department of Revenue and Taxation?

25  A      I think that's one in the same.

1  Q     Is the Laplace facility the most valuable asset of

2  Bayou Steel?

3  A     From a fixed-asset standpoint, yes.

4  Q     How many would you compare the value of the Laplace

5  facility to, for example, the Harriman, Tennessee, facility?

6  A     From a fixed-asset standpoint, it's probably five times

7  or so bigger; however, the whole Bayou Steel Corporation

8  functions as an entire unit that includes scrap operations.

9  It includes the Laplace plant.  It includes the Harriman

10 plant.  It includes the three depots and all those

11 functioning in conjunction to make one overall operating

12 business.

13 Q     Sir, before you took the stand, I put before you a

14 declaration you executed in connection with today's motion.

15       Do you recognize that document?

16 A     I do.

17       MR. BARRIERE:  Your Honor, would you like me to

18 provide you a copy?

19       THE COURT:  Yes, please.  Thank you.

20       Do you have an extra copy for my law clerk?

21       MR. BARRIERE:  Yes.

22       Give him a copy.

23 BY MR. BARRIERE:

24 Q     You reviewed this declaration, prior to execution?

25 A     Yes, sir, I did.

1  Q      Very well.

2         If I may ask you to turn to Page 3 under the heading of

3  "unsecured debt" --

4  A      Okay.

5  Q      -- the first paragraph, (i)(1) reads, in part:

6         "Only one of the top-ten unsecured creditors is located

7  in Louisiana.  Of the debtors' top-thirty unsecured

8  creditors, only 8 are located in Louisiana."

9         Do you see what I'm referring to?

10 A      I see that.

11 Q      All right.  From what source or sources did you obtain

12 that information, sir?

13 A      The listing of unsecured creditors.

14 Q      All right.  Are any of the debtors' top-ten or top-

15 thirty unsecured creditors located in the state of Delaware?

16 A      No.

17 Q      Indeed, are there any creditors of any type or

18 description, located in the state of Delaware?

19 A      I any our law firm is located in the state of Delaware.

20 They may be a creditor -- I don't know.

21 Q      All right.  I hope they're only post-petition

22 creditors.

23        How about prepetition creditors?  Do you have anyone

24 you owe any money to located in the state of Delaware?

25 A      Not that I know of.

1  Q    All right.  And you have reviewed the listing of all

2  the creditors of this company, have you not?

3  A    I have.

4  Q    Okay.  And did your review confirm to you there are no

5  creditors located in this state?

6  A    Correct.

7  Q    Now, (ii) reads:

8         "As of the petition date, the debtors have

9  approximately $41 million of outstanding and trade debt, and

10 secured trade debt comprises the majority of the debtors'

11 unsecured debt.  The unsecured trade debt is held by

12 approximately 760 parties."

13        Do you see what I'm referring to?

14 A    I see that.

15 Q    All right.  And you have reviewed a list or lists,

16 plural, identifying each of those 760 parties, haven't you?

17 A    Correct.

18 Q    All right.  And based on that, in Paragraph (iii) you

19 attest, and I'm going to quote:

20        "Approximately $9.62 million in unsecured trade debt is

21 attributable to creditors located in Louisiana.  This

22 represents approximately 23.3 percent of the total unsecured

23 trade debt."

24        Do you see what I'm referring to?

25 A    Yes.

1  Q     And do you believe that to be an accurate statement?

2  A     I believe that to be accurate.

3  Q     All right.  Have you calculated the number of unsecured

4  creditors located throughout the Gulf Coast Region?  I'm

5  referring not only to Louisiana -- Mississippi, Texas, and

6  Alabama?

7  A     No.

8  Q     Okay.  Have you calculated the amount of all debt,

9  unsecured debt owed to trade creditors throughout the Gulf

10 Region?

11 A     No.

12 Q     You then go on to state, and I quote:

13        "Approximately 225 of the unsecured trade creditors are

14 located in Louisiana.  This represents approximately 29.6

15 percent of the total unsecured trade creditors."

16        That's the next page.  Do you see what I'm referring

17 to?

18 A     I see it.

19 Q     And do you believe that to be an accurate statement?

20 A     I do.

21 Q     All right.  Now, Paragraph 8 attests, and I'm, again,

22 going to quote:

23        "The debtors decided to file the Chapter 11 cases in

24 the District of Delaware after consulting with counsel.  The

25 debtors selected the District of Delaware as the proper venue

1  because they believe it is the best and most convenient forum

2  to implement a successful and expeditious sale process."

3       Do you see what I'm referring to?

4  A    I see that.

5  Q    All right.  Were you a party to any of the

6  conversations concerning filing in Delaware as opposed to

7  another venue?

8  A    No.

9  Q    What is your understanding as to why Delaware

10 represents the "best and most convenient forum to implement a

11 successful and expeditious sale process"?

12 A    Because the corporation was incorporated in the state

13 of Delaware.

14 Q    Okay.  Anything else?

15 A    Advice from counsel.

16 Q    All right.  Do you have any understanding of why

17 Delaware is, for example, a more expeditious potential forum

18 than the Eastern District of Louisiana or any other

19 Bankruptcy Court, for that matter?

20 A    Other than general awareness, a tremendous number of

21 corporations are incorporated in the state of Delaware.

22 Q    All right.  Now, in that regard, we heard earlier today

23 that some 43 interested parties have been given the

24 opportunity to inspect the debtors' facilities.

25      Is that your understanding?

1  A      No.  I don't think that was the statement.

2  Q      I'm sorry?

3  A      I don't think that was the statement.

4  Q      I'm sorry.

5         Let me ask you, then:  How many parties, do you

6  understand have come and looked at -- will likely come and

7  look at the Laplace facility as potential buyers?

8  A      Thirty-two.

9  Q      Thirty-two, okay.  Fair enough.

10 A      Others to come.

11 Q      Others to come.

12 A      Right.

13 Q      And you told us a moment ago that Bayou Steel is an

14 integrated operation, but isn't the fulcrum of the entire

15 operation Laplace?

16 A      I'm not sure what you mean by "fulcrum."

17 Q      Well, it's the core.  It's what -- the basis of the

18 entire operation is Laplace, is it not?

19 A      It is a key component of the operation; however, we

20 have, in the past, operated the facility in Harriman with

21 billets purchased from some other steel producer, so it could

22 be done.

23 Q      Okay.  Is it your expectation that any party interested

24 in purchasing Bayou Steel's assets will inevitably want to

25 evaluate the Laplace facility?

1  A     Not a hundred percent.  We have had people visit

2  Harriman that have not visited Laplace.  We've had a person

3  that visited both facilities in Laplace and Harriman, who's

4  also scheduled a repeat visit to Harriman and not Laplace.

5  Q     Now, you go on to note in Paragraph 14 that inventory

6  of raw or finished goods are located in each of the depots

7  and the production facilities.

8        Do you see what I'm referring to?

9  A     I see that.

10 Q     Okay.  And that's typical, is it not?  Isn't that the

11 way the operation has always worked, that you have inventory

12 of raw and finished goods at all three or all five

13 facilities?

14 A     That's correct.

15 Q     All right.  So, it wouldn't be unusual that, say, 33

16 percent of your on-hand product is in Laplace?

17 A     It varies by the time of year, a number of other market

18 circumstances, and a number of other circumstances.

19 Q     Now, Paragraph 16, you conclude:

20       "I do not believe the interests of justice would be

21 served if the Chapter 11 cases were transferred to the

22 Eastern District of Louisiana; in fact, the debtors' right to

23 justice would be greatly impeded as the transfer of venue

24 would only delay the administration of these Chapter 11 cases

25 and thwart a sales process that's being run in an attempt to

1  find a strategic or financial buyer that will restart

2  business operations."

3       How, sir, do you understand that entrusting this case

4  to another Bankruptcy Court would "thwart" the sales process?

5  A    My comment would be that this process was started on --

6  with the filing on the 1st of October.  We have already moved

7  quite far down the road as far as the ability to try to

8  implement this Chapter 11, Section 363.  And I think it was

9  even stated earlier today that Candlewood, our financial

10 advisor, complimented on the ability to move this along very

11 rapidly to support that.

12      I'm the one who has shown the people the facilities and

13 have dealt with the financial advisors and the legal counsel,

14 and this Court has been very impressed with the outcome.

15 Q    Understood, sir.

16      And, in fact, you've been working diligently --

17 Candlewood has been working diligently since October 1st to

18 find and identify, and hopefully secure a buyer, correct?

19 A    Correct.

20 Q    And until today's hearings, you've not required the

21 Court's involvement in order to do that, have you?

22 A    We involved the Court, obviously, in the original

23 filing on the 1st.  We were here on the 3rd of October with

24 my declaration, that was some, I think, 19 pages or so.  So,

25 yeah, I'd say the Court has been very involved here in the

1   state of Delaware.

2   Q     Okay.  This is your, what, third visit to the state of

3   Delaware; is that correct?

4   A     It's my second visit.

5   Q     Second visit to the state of Delaware, all right.

6         And none of the other members of management are located

7   in Delaware, are they?

8   A     No.

9   Q     Okay.  And those members are either operating out of

10  their homes in Florida, like yourself, or in Laplace; is that

11  correct?

12  A     Management --

13  Q     Yeah.

14  A     -- as in each one of our location, each one of our

15  depots, our warehouses, which is Chicago, Pittsburgh, Tulsa.

16  Q     Uh-huh.

17  A     It's in our Harriman, Tennessee, location.  It's in

18  Laplace.  It's in Harvey, Louisiana.  So, it's in a multitude

19  of locations (indiscernible).

20  Q     How many department heads are there in Laplace?

21  A     Department heads?

22  Q     Yes, sir.

23  A     Let's see -- about seven.

24  Q     Seven department heads.

25        And they all remain on the job as of today?

1  A     They all remain on the job?

2  Q     Do they remain on the job or have they been terminated?

3  A     Some of them have been terminated.

4  Q     All right.  How many department heads do you have

5  today?

6  A     Probably five, maybe six, depending on how you define

7  it.

8  Q     And which departments still have heads?

9  A     The -- obviously myself, as the president.  We have a

10 guy that heads up sales; and we have someone that still heads

11 up procurement, logistics, and he did handle scrap -- still

12 is handling scrap on some of the projects that has to be

13 scrap; the HR lady, Ms. Marnie (ph); and shipping department

14 head in Laplace.

15 Q     Who is the department head for accounting; is that

16 Mr. Kirkland?

17 A     Mr. Kirkland.  I forgot him --

18 Q     All right.

19 A     -- the finance VP.

20 Q     All right.  But to the extent the Court should need to

21 hear testimony from any of those folks, they're going to need

22 to transfer or travel here to Delaware.

23       You have no management folks on the ground here in this

24 state, correct?

25 A     That's correct.

1          MR. BARRIERE:  I'll tender the witness, Your

2    Honor.

3          THE COURT:  Okay.  Thank you.

4          Does anybody else wish to cross?

5          MR. WARD:  No redirect, Your Honor.

6          THE COURT:  Okay.  All right.

7          Thank you, Mr. Davis.  You may step down.

8        (Witness excused)

9          THE COURT:  All right.  Would you like to call

10   another witness?

11         MR. BARRIERE:  That's it, Your Honor.

12         THE COURT:  Okay.

13         MR. BARRIERE:  I'm prepared to argue whenever the

14   Court is prepared to entertain it.

15         THE COURT:  Okay.  Do the debtors have any

16   witnesses?

17         MR. WARD:  Well, Your Honor, I think for the

18   record, the debtor would like to enter the declaration of

19   Alton Davis, which was just cross-examined.  I think the way

20   the motion was procedurally -- they went first -- but we

21   would like to enter Docket Number 143 into evidence.

22         THE COURT:  Okay.  I do think we need to go ahead

23   and do that.

24         Does anyone object to the admission of the

25   declaration of Mr. Davis?

1           UNIDENTIFIED:  No objection, Your Honor.

2           THE COURT:  Okay.  Hearing none, it is admitted.

3       (Davis Declaration received in evidence)

4           MR. WARD:  Your Honor, from the debtors'

5   perspective, there were two declarations that were filed on

6   the docket, as well.  One was filed at Docket Number 85 and

7   one was filed at Docket Number 183.  Neither one of those

8   declarants are in the courtroom.  Neither one of those

9   declarants have proffered any evidence today.

10          The debtors have asked that both of those

11  declarations be stricken from the record, if they're not

12  admissible evidence in support of the motion that's been

13  proffered.

14          THE COURT:  Okay.  Let me take a look at these.

15      (Pause)

16          THE COURT:  Can you -- can someone hand up the

17  most recent declaration.

18          MR. WARD:  Of Mr. Davis, Your Honor?

19          THE COURT:  No, I'm sorry.  Of the two

20  declarations that you just mentioned.  I don't have the

21  single page for the two.

22          MR. WARD:  These are right off the docket, Your

23  Honor.

24          THE COURT:  Okay.

25          MR. WARD:  May I approach?

1              THE COURT:  I just lost them somewhere in the

2   shuffle.  Thank you.

3          (Pause)

4              THE COURT:  Well, let me ask first:  Is there

5   anyone in the courtroom or on the phone -- is Mr. Chad

6   Bourgeois (ph) on the phone or in the courtroom?

7          (No verbal response)

8              THE COURT:  Okay.  Then I will not move this into

9   evidence, this declaration.

10             However, the declaration of the Attorney General

11  seems to be more styled as a pleading, as opposed to sort of

12  a factual declaration, so I don't think we -- unless you feel

13  otherwise, I don't feel like we need to move that into

14  evidence at this time.

15             Is that acceptable to all the parties?

16             MR. BARRIERE:  That is acceptable to the movant,

17  Your Honor.

18             MR. WARD:  If it's considered as a pleading, Your

19  Honor, then --

20             MR. LENTO:  (Via telephone)  Your Honor, this is

21  Chris Lento, State of Louisiana.

22             THE COURT:  Hi, how are you?

23             MR. LENTO:  I'm very well, Your Honor.  Thank you.

24             I just wanted to make you aware that we are on the

25  phone and we did file that more in the form of a motion -- I

1  apologize for that -- we're just appearing solely to support

2  the WARN Act claimants, and so I just wanted to make you

3  aware that we are on the phone and we do support that.

4          THE COURT:  Okay.  Thank you, Mr. Lento.

5          Also, with respect to the declaration that was

6  filed by River Parish Contractors, I will note that although

7  it's not admitted into evidence, I will note that for the

8  record that I find that River Parish Contractors also are in

9  support of the venue transfer motion today.

10         Okay.  So, does that conclude the evidentiary

11  record?

12         MR. BARRIERE:  It does, Your Honor.

13         THE COURT:  Okay.  So, let's move to argument.

14         MR. BARRIERE:  Your Honor, I have to say there's

15  prejudice -- little factual dispute pertaining to this motion

16  for transfer.  I don't think there's any dispute that under

17  1408, this case could have been filed in the Eastern District

18  of Louisiana; it's the principal place of business.  I think

19  it's also where the principal asset is located.  And,

20  obviously, this District is the domicile; the three LLCs were

21  chartered here.

22         By every other indicia, though, the Eastern

23  District strikes me as a far more compelling venue.

24  Obviously, our first and greatest concern is the approximate

25  three hundred -- I think we're in the neighborhood of 380

1  employees terminated at this facility, who we are represented

2  as a punitive class.  Their ability to participate in this

3  proceeding in Delaware is not great.  These are, typically,

4  blue-collar workers, hourly workers who are simply not in a

5  position to travel 1200 miles to make an appearance in this

6  courthouse.  That's a far cry from the 12 miles they would

7  have to travel to appear in the Eastern District.

8            There is no connexity between Delaware and this

9  case, other than the reality that the three entities were

10  chartered here.  The assets are located elsewhere.  The

11  creditors are located elsewhere.  The books and records are

12  located elsewhere.  The greatest number of employees,

13  obviously, are in Louisiana.  The greatest number of

14  creditors are in Louisiana.  The greatest percentage of

15  unsecured debt is located in that state and the principal

16  assets are located within that state.

17            Indeed, there are no assets in this state.  There

18  are no liabilities in this state.

19            Your Honor, ultimately, the question is going to

20  evolve down to efficiency of administration.  I think that it

21  could be done promptly and economically in the Eastern

22  District.  Needless to say, I have not called upon a

23  bankruptcy judge in the Eastern District to commit to a

24  schedule for the prosecution of this case, and, particularly,

25  of the sales process.

1           Our docket is light -- it's much lighter than this

2    District -- and I dare say that the Eastern District is

3    equally capable of overseeing the sales process and doing so

4    in an expeditious and efficient manner.

5           Ultimately, Your Honor, this is a liquidation.

6    There is hope, perhaps, fate that a successor entity will

7    restart operations, put my clients back to work, and ramp-up

8    Bayou Steel again.  We don't know if that's the case or not.

9           What we do know is these debtors will liquidate.

10   That can be done efficiently and economically in Louisiana

11   and we would urge the Court to transfer both, for the

12   convenience of the parties -- not merely the debtor -- and I

13   understand the debtors' view and I understand the debtors'

14   view is entitled to deference, but it's not dispositive.  And

15   of the folks who are most dramatically affected by this case,

16   many of whom I represent, the Eastern District is a far, far

17   more convenient forum.

18          With respect to the interests of justice, the

19   other component on which the Court can make its decision,

20   again, economy and efficiency of administration are the core

21   considerations.  Undoubtedly, this Court can handle this

22   case, but I submit to you that it can be done less

23   expensively and with equal efficiency in the Eastern

24   District, and I would urge the Court to grant the motion.

25          Thank you, Your Honor.

1          THE COURT:  Thank you.

2          Mr. Ward?

3          MR. WARD:  Good afternoon, Your Honor.  For the

4    record, Chris Ward, on behalf of the debtors.

5          I tend to agree with Counsel, Your Honor; not many

6    of the facts here are in dispute.  I agree that the judges in

7    the Eastern District of Louisiana, I'm sure, are more than

8    capable to handle a case like this.

9          The 28 U.S.C. 1408 allows the debtors to file

10   their bankruptcy cases in this venue and once they do that,

11   "When venue is proper, the debtor's choice of forum is

12   entitled to 'great weight'," In re Ocean Properties of

13   Delaware, 95 B.R. 304.

14         And we have a case here where the debtors; Bank of

15   America, as the agent for our first lien debt; Black Diamond,

16   as our second lien debt; and the official committee of

17   unsecured creditors, all support venue in Delaware, Your

18   Honor.

19         As such, there's a strong presumption in favor of

20   maintaining venue in Delaware; I'd point the Court to

21   Hechinger Investment, 288 B.R. 398.

22         And that the party seeking to transfer venue bears

23   the burden of proof, DBSI, 478 B.R. 192, Your Honor.

24         We heard some eloquent words from the podium from

25   Counsel, but what we've not heard is evidence; we've heard

1  argument, Your Honor.  When you bear the burden of proof, you

2  have to put on evidence in support of your case, and here, we

3  don't have any evidence.

4          What we have -- the evidence that we do have is

5  the declaration of Alton Davis that was entered into evidence

6  at today's hearing.  He was cross-examined by Counsel.

7          So, let's look at what Mr. Davis' testimony was,

8  Your Honor.  He testified that all three debtors are Delaware

9  limited liability companies.  He testified that the debtors

10  are a national steel producer with facilities and warehouses

11  in five different states, not just Louisiana, and that they

12  deliver steel, not just in Louisiana, but nationally and

13  internationally, Your Honor.

14          While headquartered in Laplace, Louisiana, the

15  debtors operate production facilities in Harriman, Tennessee,

16  and have depots in Chicago, Leetsdale, and Catoosa, Oklahoma.

17  Those are the general -- they go by different names, Your

18  Honor.  We actually call the Oklahoma plant "Tulsa," but

19  there's three different depots and two different production

20  facilities, Your Honor.

21          Let's look at the evidence in Mr. Davis'

22  declaration.  The debtors' professionals, my firm is a

23  Delaware PC, Your Honor.  The debtors' financial advisors,

24  based in Cleveland with offices in New York.  Bank of

25  America, the team handling this is in Dallas.  Their lawyers

1  are in Dallas.  They have Delaware counsel here in the

2  courtroom.  They're owed approximately $41.25 million, Your

3  Honor.

4         Black Diamond Commercial Finance owed $36 and a

5  half million.  They are based in Connecticut.  Their

6  professionals in the courtroom today are from Chicago and

7  Wilmington, Delaware.

8         Looking at the debtors' unsecured debt, the

9  testimony is that one of the top-ten unsecured creditors is

10 located in Louisiana.  Of the debtors' top-thirty unsecured

11 creditors, eight are located in Louisiana.  The vast majority

12 are located outside of Louisiana.  And that unsecured debt,

13 Your Honor, is approximately $41 million.  It flails in

14 comparison to the $70 million owed to our two senior secured

15 parties.

16         Mr. Davis testified there were 760 parties on the

17 creditor matrix that he looked at, and that 23.3 percent of

18 those, by amount, were in Louisiana.  That still leaves the

19 vast majority in the amount of unsecured creditors outside

20 the State of Louisiana, and that 225 of that 761 were located

21 in Louisiana; that's roughly 30 percent, Your Honor.  That

22 leaves 70 percent of the creditors outside the State of

23 Louisiana.

24         Mr. Davis' testimony is absolutely what Counsel

25 said.  Most of the WARN Act claimants are Louisiana

1  residents.  The debtors are not here to try to hide that

2  fact -- that is true, Your Honor -- and they're here and

3  they're represented by competent counsel, here in this

4  courtroom.  So, their voice is being heard.  The State of

5  Louisiana's voice is being heard on the microphone, this

6  morning, Your Honor, telephonically.

7          But the debtors have employees in other places,

8  not just Louisiana.  They have employees in Illinois,

9  Georgia, Ohio, Oklahoma, Pennsylvania, Tennessee, and Texas.

10 In fact, Mr. Davis resides in Florida; he's the debtors'

11 30(b)(6) witness, and he routinely travels to Tennessee.

12 This is his second trip to Delaware.

13          Mr. Kirkland, who was mentioned in the testimony,

14 he has traveled to Delaware on two occasions in this case for

15 the first day hearing, the initial debtor interview, and the

16 formation meeting.

17          So, the debtors' management is ready, willing and

18 able to travel to Delaware.  There'll be no disruption of the

19 business.

20          The testimony is that no member of the debtors'

21 Board of Directors is located in Louisiana; the entire Board

22 is located outside of Louisiana and, in fact, the debtors'

23 Board only had one in-person meeting ever in Louisiana, Your

24 Honor.

25          And it cannot be rebutted that the testimony is

1  that if this case was transferred, it would harm the

2  administration of this case.  Mr. Davis was very clear on the

3  stand that the train has left the station, to steal Judge

4  Shannon's metaphor.

5          We have the bid procedures approved.  We are

6  moving forward with the sale process.  The debtors' goal is

7  to sell substantially all of their assets to a strategic or

8  financial buyer who's going to hopefully restart operations

9  or rehire the employees; the very employees that Counsel

10 represents here.  That is how we want to see this case end

11 up, Your Honor.

12         The testimony is also that the vast majority of

13 the inventory is located outside of Louisiana; in fact, only

14 about 30 percent of the debtors' inventory is actually

15 located at Laplace.  And the debtors' inventory, at this

16 point in time, Your Honor, as of the petition date, I should

17 say, is worth millions of dollars -- tens of millions of

18 dollars and is a significant asset of the debtors' estates.

19         The declaration sets forth that the debtors' books

20 and records are mostly electronic, Your Honor.  They can be

21 accessed anywhere.  I think Judge Gross has a great quote in

22 the Caesars opinion that in this day and age, it doesn't

23 really matter -- and I'm paraphrasing -- it doesn't matter

24 where you're located.  This is an electronic world that we

25 live in; it doesn't matter where the books and records are.

1  I'm sure we can bring them up on a laptop at any time, Your

2  Honor.

3          And so, most importantly, there's been allegations

4  in the pleadings and the cross today that there's

5  environmental issues that are out there.  Mr. Davis'

6  testimony is that he's not aware of any environmental issues

7  that are affecting the property in Laplace, Your Honor.

8          So, I think with that, and the burden of proof

9  lying with the movants here, Your Honor, they've not put on

10  any affirmative evidence to support their case.

11          The debtors have put on a case that demonstrates

12  that the economic administration of this case is already

13  moving forward in Delaware.  The debtors' representatives are

14  in the courtroom.  They are routinely on the phone with

15  Counsel, with their lenders, with the committee in moving

16  this case forward.

17          They have come to Delaware -- two different

18  employees on two different locations -- or two different

19  times, each, have been before this Court.  I was with

20  Mr. Davis last week in New Orleans for his deposition.  The

21  parties are mobile, Your Honor, so it's not going to affect

22  the administration of this case with it moving forward in

23  Delaware.

24          In looking at the interests of justice, Your

25  Honor, the interests of justice is stand for keeping this

1  case here, allowing this sale process to move forward and

2  letting this case play out; hopefully finding a buyer that

3  will come in, restart operations, and rehire the employees,

4  which are mainly the WARN Act claimants in this case, Your

5  Honor.

6          So, unless the Court has any other questions of

7  Counsel, I think that the evidence that is before the

8  Court -- and it's important that there is no rebuttal

9  evidence -- the evidence before the Court is that this case

10  is properly venued in Delaware and that burden has not been

11  rebutted here, Your Honor.

12          THE COURT:  Okay.

13          MR. WARD:  Thank you.

14          THE COURT:  Thank you.

15          Does anybody -- is there anyone else who wishes to

16  be heard for or against the venue-transfer motion?

17          I apologize, Mr. Lento.  If you wanted to

18  participate in the argument, I didn't give you the

19  opportunity before debtors' counsel took the podium.

20          MR. WALLANDER:  Your Honor, Bill Wallander, on

21  behalf of Bank of America.

22          I would second the arguments that debtors' counsel

23  made, which I think covers --

24          THE COURT:  That's okay, go ahead.  We'll hear

25  from Mr. Lento (indiscernible) --

1          MR. WALLANDER:  I'm sorry, Your Honor.  I'm happy

2   to wait.

3          THE COURT:  Nope.  Please go ahead.  You've got

4   the podium.

5          MR. WALLANDER:  Okay.  Thank you, Your Honor.

6          Debtors' counsel has made sufficient --

7          MR. LENTO:  Your Honor?

8          THE COURT:  Is this Mr. Lento?

9          MR. LENTO:  Can you hear from me, Your Honor?

10          Yes, Your Honor?

11          THE COURT:  Okay.  You know what?

12          MR. LENTO:  Can you hear from me?

13          THE COURT:  Sure.  I just wanted to make sure you

14   had the opportunity to voice any support for the WARN Act

15   claimants' motion to transfer venue, if you wanted to; if

16   not, we would just turn to the parties that are objecting to

17   the venue-transfer motion.

18          MR. LENTO:  Yes, Your Honor.

19          I don't have anything additional to put before the

20   Court, other than what the WARN Act claimants' attorney had

21   said.  So, I appreciate the opportunity to be heard.

22          THE COURT:  Okay.  Thank you, Mr. Lento.

23          Okay.  Mr. Wallander?

24          MR. WALLANDER:  Thank you, Your Honor.

25          Apologies for getting a little ahead of that.

1          THE COURT:  No, it's my apologies.

2          MR. WALLANDER:  I think debtors' counsel has made

3  virtually all the arguments that we have in our papers.  I

4  would simply add that the WARN Act claimants are ably

5  represented.  They've already filed litigation, you know, in

6  this District and have accepted the District as the place to

7  get that started.

8          The one thing that we are very sensitive to, and

9  particularly when it comes to the location of the assets,

10  which are spread all over the United States, is our

11  collateral.  It's just to make sure that we have a process

12  that's well-coordinated by a Court that really understands

13  where this case is.  We think that's very important and we

14  got that started today.

15          The parties have worked together on that and I

16  think there's a good deal of time pressure here to get this

17  done without a hiccup.  We recognize that the sale is going

18  to be very important to where this case goes.  We've tried to

19  reserve rights appropriately for parties in that regard.

20          As far as the creditors, they're spread all over

21  the place, as well.  We included the data points that we

22  could derive from Mr. Davis' declaration, and that shows

23  that, you know, by amount, you have 96 percent of the

24  creditors outside of Louisiana and the top-thirty creditors

25  in numerosity, you've got 24 out of 30.

1            And I'm not in any way suggesting that the small

2    claimant doesn't count; I would say, however, that in this

3    case in particular, the WARN Act claimants have organized.

4    They have firms representing them.  Those firms have been

5    able to file litigation in this court.  They have found their

6    way to this court, and I'm certain that in that litigation,

7    that people will find efficient means to deal with anything

8    that is necessary with the underlying claimants, themselves,

9    whether it means going to Louisiana for discovery or whatnot,

10   but it is not much of an convenience to come to Delaware to

11   litigate, and they've already chosen this Court for that

12   litigation.

13            Thank you, Your Honor.

14            THE COURT:  All right.  Thank you.

15            Does anybody -- does anyone else wish to be heard

16   in connection with the venue-transfer motion?

17            MR. MCGUIRE:  Good afternoon, Your Honor.  Dan

18   McGuire for Black Diamond Capital Management.

19            I won't repeat the arguments that have been made

20   in opposition to the motion.  I just want to add, Your Honor,

21   if you look at what happens happened here today, in terms of

22   the interests of justice prong, you heard that there's an

23   arrangement relative to cash collateral, but there's open

24   issues there that have basically been pushed down the road

25   until later.

1          We had the bid procedures approved today, but

2   there's no stalking horse bidder in this case.

3          This case is on track right now, but it's fragile,

4   and the last thing this case needs is the disruption of

5   moving venue.  We need to attract a stalking horse bidder to

6   these assets at a price that is workable for all the parties

7   in the room.  The best way for that to happen is for it to

8   just stay in the jurisdiction with predictable procedures and

9   predictable results in connection with that, in a case that

10  is already in this venue.

11         For better or for worse, when it's in the media,

12  the case is transferring venue, it's viewed as a negative,

13  and we just can't have that in this case; this is not the

14  case for that.  Things are precarious, but on track and

15  disruption of the change of venue could be devastating for

16  all the parties in the case.

17         So, I encourage you to keep the case here and keep

18  us on the track that we are on right now.

19         Thank you, Your Honor.

20         THE COURT:  Thank you.

21         MR. BARRIERE:  Your Honor --

22         THE COURT:  One moment.  I think we have one last

23  person.

24         MR. ADAMS:  It'll be quick.

25         Your Honor, Jason Adams, again, on behalf of the

1  committee.

2          Your Honor, I rise only to note the committee's

3  joinder to the debtors' objection to the venue transfer,

4  which is Docket Number 144.  Your Honor, it was an issue that

5  the committee carefully considered.  We have creditors from

6  multiple jurisdictions, including Louisiana, on our

7  committee -- it's one of five.

8          Your Honor, there is no dispute here that venue in

9  this jurisdiction is appropriate; that has not been disputed

10  today, and so it is a very heavy burden that the movants have

11  here to demonstrate through competent evidence that the

12  interests of justice or the convenience of all parties and

13  not just their clients, but of all parties in interest here,

14  require and demand that venue be transferred.  And we haven't

15  seen any evidence presented that demonstrates that.

16          So, we continue to support the debtors' objection

17  here, Your Honor.

18          THE COURT:  Thank you.

19          Mr. Barriere, you have the last word.

20          MR. BARRIERE:  Thank you, Your Honor.

21          Your Honor, I think conjecture that another

22  Bankruptcy Court would not be able to handle this in an

23  effective, efficient manner is just that:  conjecture.  And I

24  think it's wrong.

25          But I do know this, I know the Court is going to

1  give it serious consideration.  The one thing you're not

2  going to have to worry about is Bank of America and Black

3  Diamond being adequately represented, regardless of what

4  venue you may send this to.

5       The other things you may not be concerned with is

6  how fundamentally devastating this filing has been for the

7  folks who have worked at this facility for many, many years.

8  Ultimately, this process requires, and should require,

9  transparency and access.

10       We've got hundreds of hourly employees who

11  received no advance warning whatsoever that they're losing

12  their jobs.  They quit work on Saturday.  They came back.

13       Indeed, they just signed off on a new Union

14  contract on Friday.  Work continued to Saturday, came in

15  Monday morning, probably (indiscernible), the Saints played

16  the Cowboys the night before in New Orleans, and was called

17  in to be told, Your jobs are done, you leave immediately.

18       Now, Your Honor, I submit to you those folks, the

19  other many small creditors in Southwestern Louisiana, are

20  entitled to be able to participate meaningfully in this

21  process.  And I understand if they could somehow get to

22  Wilmington, they would be, but they can't.

23       Given that reality, given the reality that this

24  case could move as effectively and efficiently in another

25  District, I urge the Court to transfer it.

1          This isn't about the access of Black Diamond.

2   It's not about the access of Bank of America.  They can be

3   taken care of in any district; it's about the access of the

4   many, many individuals who have been brutalized by this

5   development, and I submit, are entitled to have a meaningful

6   day in court.

7          Thank you, Your Honor.

8          THE COURT:  Okay.  Thank you.

9          Okay.  Let's take a break and I'll come back at

10  3:30, and I'm going to rule from the bench.

11         COUNSEL:  Thank you, Your Honor.

12      (Recess taken at 3:07 p.m.)

13      (Proceedings resumed at 3:31 p.m.)

14         THE COURT OFFICER:  All rise.

15         THE COURT:  Please be seated.

16         All right.  I'll note at the outset that the Third

17  Circuit has instructed that an analysis of venue transfer in

18  a ruling is -- it's good to write an opinion on that, given

19  the amount of factors that are balanced, but in the interests

20  of this case and the circumstances it presents, as I

21  mentioned, the Court is going to rule from the bench today.

22  I have tried to tailor a ruling that is specific and,

23  perhaps, a little bit lengthier than one would expect.

24         So, before the Court is the motion to transfer

25  venue filed by the WARN Act claimants and supported by the

1  Louisiana Attorney General's Office and River Parish

2  Contractors, requesting that venue transfer from the

3  Bankruptcy Court for the District of Delaware to the Eastern

4  District of Louisiana.

5          Here, the parties do not dispute that the debtors'

6  chosen forum of Delaware is proper under Section 1408;

7  rather, the movants seek to transfer venue under Section 412,

8  and under Section 412, the movants bear the burden to

9  sufficiently prove that either the convenience of the parties

10 or the interests of justice warrants the transfer of these

11 cases to Louisiana.

12         If the Court is persuaded by the movants' argument

13 by a preponderance of the evidence, then the Court may grant

14 the transfer motion.  For its analysis, the Court must

15 consider the two prongs under 1412, as well as the various

16 supported factors developed and commonly relied upon by

17 courts.

18         First, in determining the convenience of the

19 parties, the Court looks to the six CORCO factors, which are

20 consistent with the factors considered by the Third Circuit

21 under Jumar (ph) (indiscernible), a 1404 transfer.

22         Second, in determining interests of justice, the

23 Court considers any other outstanding public or private

24 interests that necessitates the Court's consideration,

25 including but not limited to administrative difficulty, local

1 interests, and public policies.

2          The grant or denial of the transfer motion is a

3 fact-intensive inquiry, and so, accordingly, for each factor,

4 the Court must balance the facts and interests tendered by

5 the parties.

6          Turning first to the convenience of the parties

7 prong in the CORCO factors, under the first factor, the Court

8 must consider the proximity of creditors.  The movants

9 rightfully contend that a portion of the creditor body reside

10 in Louisiana.  The Court, however, finds that the majority of

11 the creditor body, including the secured prepetition lenders

12 and more than one-half of the unsecured creditors committee

13 are located outside of Louisiana.

14          It is significant to the Court that the

15 prepetition secured parties, as well as the UCC oppose the

16 transfer motion, as they are key stakeholders and that

17 indicates the UCC serve as fiduciaries to the creditor body.

18          As enumerated by the second and fourth CORCO

19 factors, the Court must also consider the proximity of the

20 debtors and the location of their assets.  Contrary to the

21 movants' claims, the debtors' business operations and assets

22 are not concentrated in Louisiana; rather, the business

23 operations are also in Illinois, Pennsylvania, Tennessee,

24 Oklahoma, and only 30 percent of the debtors' assets are in

25 Louisiana.

1          As Mr. Davis testified, the entire operations of

2    the debtors function as a unit on a national and

3    international level.  In addition, the debtors' books and

4    records may be located in Louisiana, but they are

5    electronically stored, and thus, are accessible remotely.

6          Jumping around a bit, under the sixth factor, the

7    Court considers the necessity for ancillary administration if

8    liquidation should result.  That's relatively here because

9    the debtors' assets and business operations span across five

10   different states which may require the Court to apply five

11   different state's laws, it's not clear that the

12   administration of the bankruptcy proceeding would be better

13   served in Louisiana; moreover, it goes without saying that

14   all of our fine Bankruptcy Courts are up to the challenge of

15   applying any State law that may apply, as well as the

16   Bankruptcy Code.  So, this factor is neutral in the Court's

17   analysis today.

18         Under the third factor, the Court considers the

19   proximity of witnesses necessary to the administration of the

20   bankruptcy estate.  The movants argue that the Eastern

21   District of Louisiana would be closer to debtors' management

22   and employees.  It is unclear that testimony of the WARN Act

23   claimants will be necessary in these proceedings, if any, but

24   what is clear is that the debtors' principal management are

25   necessary.

1        Debtors' management and its Board members do not

2    reside in Louisiana.  They would need to travel regardless of

3    venue.  They, in fact, do so, as we have heard today, and

4    they've expressed support for retaining venue in Delaware and

5    the travel it will entail.

6        Finally, under the fifth CORCO factor, the Court

7    must consider the economic administration of the estate.

8    While the movants aver that the administration of the

9    bankruptcy would be more cost-efficient in Louisiana, the

10   movant neither sufficiently support their claims, nor respond

11   to the debtors' argument that the transfer of the bankruptcy

12   case would incur additional costs and time.

13       Government counsel can and do participate without

14   local counsel under our Local Rules and, furthermore, parties

15   can access all pleadings free of charge on the claims agent's

16   website and can file documents electronically through CM/ECF.

17       While the Court is certainly sympathetic to the

18   position of the employees as a result of the turn of events

19   that led to the unfortunate layoff, should the parties wish

20   to meaningfully participate, there are measures in place to

21   help them do so remotely, and I expect and, quite frankly,

22   demand that the parties will work to accommodate them.

23       Based on the foregoing, the Court concludes that

24   the movants did not show by a preponderance of the evidence

25   that the transfer of the debtors' cases would be more

1  convenient for the parties in Louisiana.

2          While the movants stress that the debtors have no

3  ties to Delaware except for formation, it is their burden to

4  show that the venue of these cases is more convenient in

5  Louisiana and they have failed to do so.

6          Turning next to the interests of justice prong,

7  which can serve as an independent basis for venue transfer,

8  the State raised, and the movants raised two colorable

9  issues.  First, the State argues that the debtors may owe

10 taxes to the State; however, there's been no claim

11 articulated, just that an audit is ongoing.

12         Furthermore, the movants have not shown how the

13 resolution of any tax disputes through a claims

14 administration process conducted in this Court, that is of

15 equal and competent jurisdiction to the Eastern District of

16 Louisiana, would harm the interests of justice.

17         Second, the State raises issues -- excuse me --

18 the State raises public concern over the State's oversight of

19 debtors' Louisiana property, with respect to environmental

20 issues.  While this Court is sympathetic to the State's

21 environmental concerns, neither the State, nor the movants,

22 have shown that there are historical or ongoing environmental

23 violations, penalties, enforcement proceedings, or current

24 hazardous conditions giving rise to immediate health and

25 safety concerns.

1            Accordingly, the Court does not find that the

2    movants have shown the interests of justice warrant the

3    Court's grant of the movants' transfer motion; therefore, the

4    Court denies, with prejudice, the transfer of the debtors'

5    bankruptcy case to Louisiana and will enter an appropriate

6    order in due course.

7            The Court notes that in the reply, the movants

8    have asked this Court, alternatively, to transfer venue of

9    their adversary proceeding.  This relief is not procedurally

10   proper at this time, as it must be done by separate motion in

11   the adversary and address facts specific to that proceeding.

12           All parties' rights are reserved, with respect to

13   such a motion.

14           So, unless anyone has any questions, I will go

15   ahead and issue an order following this hearing -- most

16   likely tomorrow -- and we'll stand adjourned.

17           COUNSEL:  Thank you, Your Honor.

18         (Proceedings concluded at 3:39 p.m.)

19

20

21

22

23

24

25

1                          CERTIFICATION

2              I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7

8

9    /s/ William J. Garling                    November 6, 2019

10   William J. Garling, CET**D-543

11   Certified Court Transcriptionist

12   For Reliable

13

14

15

16

17

18

19

20

21

22

23

24

25