# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BAYOU STEEL BD HOLDINGS, L.L.C., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 19-12153 (KBO)<br><br>(Jointly Administered)<br><br>**Re: Docket No. 137** |

**DECLARATION OF CHARLES S. DEUTCHMAN IN SUPPORT OF MOTION OF DEBTORS FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO IMPLEMENT THE KEY EMPLOYEE INCENTIVE PLAN AND KEY EMPLOYEE RETENTION PLAN, AND (II) GRANTING RELATED RELIEF**

I, Charles S. Deutchman, hereby declare under penalty of perjury and to the best of my knowledge, information and belief:

1. I am the Managing Director of Shared Management Resources, Ltd. ("**SMR**"), a restructuring/financial advisory services firm, and serve as the Chief Restructuring Officer ("**CRO**") for Bayou Steel BD Holdings, L.L.C. and its affiliates (collectively, the "**Debtors**" or the "**Company**") in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**") since my engagement on October 19, 2019.

2. Since my engagement I have developed personal knowledge of, and am familiar with, the business affairs, day-to-day operations, books and records, and financial condition of the Debtors. I am authorized to make this declaration (this "**Declaration**") on behalf of the Debtors. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' employees, agents, attorneys, and advisors, the accuracy and completeness of which information I relied upon to provide this

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Bayou Steel BD Holdings, L.L.C., a Delaware limited liability company (1984), BD Bayou Steel Investment, LLC, a Delaware limited liability company (1222), and BD LaPlace, LLC, a Delaware limited liability company (5783). The location of the Debtors' mailing address is 138 Highway 3217, LaPlace, Louisiana 70068.

71124767.1

Declaration. References to the Bankruptcy Code (as hereafter defined), the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

3. I submit this Declaration on behalf of the Debtors in support of the *Motion of Debtors for Entry of An Order Authorizing the Debtors to Implement the Key Employee Incentive Plan and Key Employee Retention Plan, and (II) Granting Related Relief* (the "**Motion**").[2]

## BACKGROUND

4. Based on my knowledge of the Debtors' operations and from my discussions with, and information provided by, members of the Debtors' management team I have gained knowledge regarding the Debtors' budgets, cash flow, financial analysis, and the overall sale efforts during these Chapter 11 Cases. I understand that the Debtors had approximately 75,000 tons of finished prime steel on hand (the "**Inventory**") at the commencement of the Chapter 11 Cases, and the Debtors recognize that certain key employees are needed to, among other things, liquidate the Inventory (the "**Liquidation**"), satisfy cash flow requirements, monetize the Debtors' other assets, and successfully consummate the Sale for the highest possible price, and effect an orderly wind down of the estates. The Participants will be critical to a successful Liquidation and Sale, in addition to performing their day-to-day activities. Further, I have learned that the Participants work in robust geographic economies where individuals seeking employment can easily find alternate opportunities. In fact, the Debtors have received a number of resignations from key employees post-petition, underscoring the importance of the KEIP and KERP. Additionally, I am aware of several current key employees interviewing for employment opportunities outside of the Debtors' operations.

---

[2] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the Motion.

2

71124767.1

5. The list of Participants was developed by the Debtors' financial advisors and management team. The terms of the KEIP and KERP were carefully formulated in good faith and reviewed and compared to similar programs in other chapter 11 cases to determine that the KEIP and KERP are fair, reasonable, and within statutory standards.

6. Payment of the Board-approved amounts under the KEIP and KERP will be critical to maximizing proceeds in the Chapter 11 Cases. The Participants are all critical, have assumed and will continue to assume greater responsibilities due to the Chapter 11 Cases, the Sale, and Liquidation. The Participants have been willing to accept these responsibilities, some even turning down other job offers, in the reliance that they will be rewarded for their efforts in the Chapter 11 Cases.

7. Prior to the filing of this Motion, the Debtors have consulted with designated representatives of Bank of America, N.A. as administrative agent (the "**Prepetition Agent**") for itself and the other lenders (the "**Prepetition Lenders**"), Black Diamond Commercial Finance, LLC as agent (the "**Subordinated Term Loan Agent**"); for itself and the other lenders (the "**Subordinated Term Loan Lenders**", and together with the Prepetition Lenders, the "**Secured Lenders**"), and counsel and professionals to the Committee regarding the KEIP and KERP. To that end, the payments to be made under the KEIP and KERP are included in the budget (the "**Budget**") attached to the *Agreed Interim Order (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV) Setting a Final Hearing, and (V) Granting Related Relief* [Docket No. 42] (the "**Interim Cash Collateral Order**"), and as amended.

8. Accordingly, the Debtors believe that implementation of the KEIP and KERP is a sound exercise of their business judgment and request that the Court approve such programs.

3

71124767.1

## THE KEIP

9. The KEIP Participants consist of four (4) members of the Debtors' senior management who are wholly responsible for the continuity of the Debtors' daily operations and whose presence is critical for the Liquidation. A schedule of the KEIP Participants is attached to the Motion as Schedule 1. The KEIP Participants serve in roles that are heavily supportive of the Sale process contemplated by the Bidding Procedures Motion as they have been and will assist the Debtors' professionals and advisors in connection with diligence. The KEIP Participants were carefully selected because they are essential to the success of these Chapter 11 Cases.

10. The KEIP was designed to incentivize the KEIP Participants, each of whom is a member of senior management or an insider, based on metrics tied to the Liquidation of the Debtors' Inventory. As discussed in detail below, the KEIP is performance-based and therefore, not subject to Bankruptcy Code section 503(c)(1).

11. A summary of the KEIP terms is as follows:

*Participants*. The Debtors have limited the KEIP Participants to four individuals.

*Payments*. KEIP Participants will receive incentive payments (the "**KEIP Payments**") as set forth on Schedule 1. KEIP Payments will range between $60,000 and $125,000, and the aggregate of KEIP Payments will be $435,000 (the "**KEIP Pool**").

*Performance*. KEIP Participants are being incentivized to sell, ship, and release approximately 50,000 tons of Inventory for $525 per ton on a gross revenue basis.

*Timing*. KEIP Participants will receive KEIP Payments upon the completion of the Liquidation of Inventory (the "**Liquidation Completion**"). Upon voluntary termination or termination for cause prior to the receipt of any earned KEIP Payment, a KEIP Participant's KEIP Payment, if any, will be forfeited. Such forfeited KEIP Payments will not be made available to other employees.

12. The Debtors submit that the KEIP is reasonable when compared to similar key employee incentive plans in similar cases. The KEIP is contingent on (a) the Liquidation Completion and (b) that the proceeds of the Liquidation Completion substantially pay down the Prepetition Lenders. The KEIP is limited in terms of the number of participants and the aggregate amount to be paid. The total cost of the KEIP if the targets are met is $435,000, with the average cost per KEIP Participant at $108,750. As a percentage of base salary, the KEIP Payments range from 33.33% to 50%, with an average of 41.43%.

13. Before determining that the KEIP was necessary, the Debtors and their advisors considered alternatives but ultimately determined that the KEIP represented the most cost-effective and fastest way to sell the Inventory.

14. In my experience, courts approve KEIPs when the following considerations are satisfied with respect to the KEIP: (1) the scope is reasonable; (2) suitable independent counsel undertook due diligence for its adoption; (3) the targeted management team is appropriate; (4) the cost is reasonable in the context of the Debtors' assets, liabilities and earnings potential; (5) it is properly designed to achieve performance standards; (6) it is consistent with industry standards; (7) it falls within the fair and reasonable business judgment of the Debtors; and (8) it is not a disguised KERP. With this framework in mind, we worked cautiously and diligently with the Debtors to craft the KEIP, and, I believe that each and every one of these considerations is satisfied.

15. The ability to incentivize certain key employees is crucial to ensuring that the overall Inventory is liquidated and a Sale closes without material delay. As set forth below, I believe that the KEIP appropriately rewards, motivates, and reassures the KEIP Participants in connection with their extraordinary efforts.

16. The KEIP is entirely performance-based and is designed to achieve meaningful and challenging targets. The targets and objectives which the KEIP was tailored to incentivize are a far cry from the façade of targets contained in disguised retention plans that are easily achieved through minimal effort. The dedication, energy, and attention required to achieve the KEIP targets here is real and far from illusory.

17. In my judgment, the performance benchmarks set out in the KEIP are indeed challenging. As detailed above, the KEIP Participants are tasked with selling, shipping and releasing approximately 50,000 tons of Inventory for $525 per ton on a gross revenue basis. This target is far from easy considering the following factors that the KEIP Participants face, namely (i) the 50,000 tons of Inventory are primarily being sold within a short 10 weeks (which for most of the Debtors' customers represents a very significant period of supply), (ii) the Inventory is being sold on an "as is, where is" basis (the customers here will not have recourse against a manufacturer, and as such, customers have been demanding discounts and deductions to account for their assumed risk), and (iii) the Inventory is being sold without any corresponding rebate or allowance program to customers who were accustomed to that discount and a majority of customers did not receive their full prepetition contracted and allowed rebates. Sales under these circumstances are incredibly challenging and the KEIP Participants have been exerting substantial efforts to succeed under the terms of the KEIP.

18. Ultimately, in my opinion, the facts and circumstances of these Chapter 11 Cases justify approval of the Motion. Substantial work remains prior to the liquidation of the Inventory and closing of a Sale. The failure of the employees included in the KEIP to effectively manage the Liquidation and Sale process could materially delay each by months or even result in the Inventory or other assets not being sold.

19. I do not believe the Debtors will be able to complete a Liquidation or Sale in a expeditious fashion without the carefully selected KEIP Participants, as they have the unparalleled and unique understanding of the operation of the Debtors' facilities, the industry, and the Debtors' operations. Again, without the intimate and diligent involvement of the KEIP Participants, there is a substantial risk that the Liquidation and Sale could be delayed for months which could most likely have a negative impact on the liquidation effort. Accordingly, these circumstances render the KEIP a crucial mechanism in incentivizing the KEIP Participants to overcome the many obstacles that will be presented on the road to Liquidation and eventually closing the Sale.

20. Importantly, the KEIP Participants have been doing the foregoing in addition to their respective ordinary employment activities of overseeing the Debtors' businesses and maintaining key relationships with customers and vendors. The KEIP is designed to reward KEIP Participants for the extraordinary work that they are required to do beyond their normal job requirements in connection with the Liquidation and Sale.

21. Moreover, based upon the performance of the KEIP Participants, the Debtors' operating net cash flow will be stabilized and the Prepetition Lenders will be paid a substantial portion of their prepetition claim.

22. The cost of the KEIP is reasonable in the context of the Debtors' assets, liabilities, and earning potential, and is consistent with industry standards. It is my observation that Candlewood Partners, LLC ("**Candlewood**") performed due diligence in investigating the need for a KEIP, analyzing which key employees needed to be incentivized, and determining what is generally applicable in the Debtors' particular industry. As discussed above, the Debtors carefully selected the KEIP Participants because they are essential to the successful operation of

7

71124767.1

the Debtors through the Liquidation and Sale process, and because the Debtors believe that the KEIP Participants have the ability to maximize the recovery to creditors by effectuating a Sale at the highest possible price and recovering other non-operating receipts.

23. I know that the Debtors' financial advisor reviewed the terms of the KEIP to determine whether the KEIP Payments are within the range of market practice as compared to incentive programs for similarly situated companies. To evaluate the reasonableness and market alignment of the proposed KEIP, Candlewood performed a comparable analysis.

24. I understand that Candlewood compared the KEIP to other asset sale-based incentive plans implemented by similar companies who filed for chapter 11 bankruptcy protection. Candlewood limited the comparison group to (a) incentive plans for which payout was wholly or partially tied to sale of the company or significant assets of the company, or the liquidation of available inventory; (b) with assets less than $400 million; and (c) that implemented plans that contained 10 or fewer participants (the "**KEIP Comparable Group**").[3]

25. In comparison to the incentive plans in the KEIP Comparable Group, Candlewood determined that the KEIP Payments are approximately (a) at or below average target payout of the market in terms of total cost, and (b) below the market range average minimum payout on a cost per participant basis. I have reviewed Candlewood's analysis and agree with Glenn Pollack that the terms of the KEIP are appropriate and within market.

26. I believe this is a sound exercise of the Debtors' business judgment and that the Debtors used their best efforts to craft a KEIP program that requires the KEIP Participants to earn their payouts through hard work and not by way of the mere fact that they are retained through certain milestones.

---

[3] The KEIP Comparable Group consists of the following: Trident Microsystems, Inc.; Charlotte Russe Holding, Inc.; Fred's Inc.; BPZ Resources Inc.; Parallel Energy LP; Achaogen, Inc.; Ciber Inc.; Brookstone Holdings Corp.; Brookstone, Inc.; and L.K. Bennett U.S.A..

71124767.1

**I.      The KEIP is Not a Retention Program**

27.     While some of the KEIP Participants are insiders, the KEIP is not aimed at retaining the KEIP Participants. Instead, the KEIP is tied to performance, namely the Liquidation of the Inventory in a timely fashion. The KEIP Participants must liquidate the Inventory for at least $26 million, which will come into the Debtors' estates and may be used to significantly pay down the amount outstanding to the Prepetition Lenders. This proposed target is designed to motivate the KEIP Participants. Stated another way, the KEIP requires of the Participants, more than simply remaining employed, it requires the KEIP Participants to meet specific goals and there is no guarantee KEIP Payments will be made.

**II.     The KEIP is Justified by the Facts and Circumstances of these Chapter 11 Cases**

28.     The Debtors submit that the implementation of the KEIP is a sound exercise of the Debtors' business judgment.

29.     First, there is a reasonable relationship between the KEIP and the desired results. Liquidation of the Inventory will provide the Debtors with working capital and will ensure that the Prepetition Lenders are significantly paid down. Lowering the amount outstanding to the Prepetition Lenders will allow the Debtors to implement a Sale for the remaining assets. The Debtors have determined that this course of action is the best course to maximize the value of the Debtors' assets for the benefit of all stakeholders. If the Liquidation of the Inventory does not occur, or the price is not high enough, KEIP Payments will not be made.[4] Further, the KEIP Payments are conditioned on the Liquidation Completion. If a KEIP Participant departs before the Liquidation Completion, the accompanying KEIP Payments are forfeited. In short, the motivated, best efforts of the KEIP Participants are essential to optimizing operational

---

[4] Incentive payments for similar inventory dispositions have previously been approved in this District. *See, e.g.*, *In re L.K. Bennett U.S.A., Inc.*, Case No. 19-10760 (KG) [Docket No. 131] (Bankr. D. Del. May 7, 2019); *In re Samuels Jewelers, Inc.*, Case No. 18-11818 (KJC) [Docket No. 291] (Bankr. D. Del. Oct. 2, 2018).

71124767.1

performance and achieving the maximum value that can be obtained for the Debtors' estates. As set forth above, in addition to overseeing the Debtors' businesses and maintaining key relationships with customers, the KEIP Participants must work with and support potential purchasers to complete their due diligence in an accelerated timeframe. Thus, the KEIP Participants are essential to achieving the highest and otherwise best possible value for the Debtors' estates.

30. Second, the cost of the KEIP is reasonable in the context of the Debtors' assets, liabilities, and earning potential, and are consistent with industry standards. The Debtors arrived at this conclusion after performing substantial due diligence in investigating the need for a KEIP, analyzing which key employees needed to be incentivized, and determining what is generally applicable in their particular industry. Moreover, the KEIP Pool of $435,000 may only be paid out if the Debtors liquidate the Inventory for at least $26 million.

31. Third, the scope of the KEIP is fair and reasonable and does not discriminate unfairly. As discussed above, KEIP Participants were carefully selected and the KEIP was designed as a performance-based incentive structure to maximize the value of the Debtors' assets.

32. Because due diligence and bidding related to the proposed Sale process, the proposed auction, and the Debtors' efforts to collect other non-operating receipts will all occur postpetition, the Debtors submit that the KEIP Payments will incentivize and compensate the postpetition efforts of the KEIP Participants. If the KEIP Payments are not paid in full, there is a risk that the employees will be demoralized, which could diminish the value of the Debtors' estates.

10
71124767.1

33. Accordingly, the implementation of the KEIP was the result of the Debtors' sound business judgment and the KEIP is justified by the facts and circumstances of these Chapter 11 Cases.

**THE KERP**

34. The KERP Participants consist of sixteen (16) individuals who serve a variety of both corporate and operational functions. A schedule of the KERP Participants is attached to the Motion as Schedule 2. The majority of KERP Participants serve in procurement, shipping, and sales roles. One half of the KERP Participants have worked for the Debtors for 20 years, and their institutional knowledge is critical to achieving the Debtors' goals in these Chapter 11 Cases. The loss of KERP Participants would cause significant disruption to the Debtors' operations and sales.

35. The KERP was designed to provide non-executive, non-insider key employees with a retention bonus to encourage the KERP Participants to remain with the Debtors through the Liquidation Completion and, hopefully, the Sale process.

36. A summary of the KERP terms are as follows:

*Participants*. The Debtors have limited the KERP Participants to sixteen individuals critical to the Debtors' day-to-day operations and liquidation of the Inventory.

*Payments*. KERP Participants will receive retention payments (the "**KERP Payments**") as set forth on Schedule 2. KERP Payments will range between $7,500 and $125,000 and the aggregate of KERP Payments will be $382,500 (the "**KERP Pool**").

*Timing*. KERP Participants will receive KERP Payments upon the Liquidation Completion. Upon voluntary termination or termination for cause prior to the receipt of any earned KERP Payment, a KERP Participant's KERP Payment, if any, will be forfeited. Such forfeited KERP Payments will not be made available to other employees.

37. The Debtors submit that the KERP is reasonable when compared to similar key employee retention plans in similar cases. While the KERP Payments are retention payments, the timing of the KERP Payments are tied to the Liquidation Completion like the KEIP Payments. The KERP is limited in terms of the number of participants and the aggregate amount to be paid. The total cost of the KERP is $382,500, with the average cost per KERP Participant approximately $23,000. As a percentage of base salary, the KERP Payments range from 12.5% to 68.7%., with an average of 23.7%.

38. The Debtors' management team and advisors identified individuals critical to the Liquidation and Sales processes. Because of the industry in which the Debtors operate, KERP Participants are necessary to the Debtors' efforts in these Chapter 11 Cases as they have unique or significant knowledge of the steel industry, including the Debtors' customers. Further, the Sale process contemplates the Liquidation Completion. The loss of KERP Participants would hinder such efforts and significantly slow down the Sale process, in addition to cost and difficulty of finding adequate replacements.

39. The Debtors have determined that there would be a disproportionate and negative impact on the Debtors' estates if any of the KERP Participants left the Debtors' employ. On average, the KERP Participants have more than 15 years' experience with the Debtors and cannot be readily or easily replaced. Thus, the loss of KERP Participants would substantially impair the Debtors' efforts in the Chapter 11 Cases. Accordingly, the Debtors have determined that a non-insider retention plan is crucial in this situation.

**I.     No KERP Participant is an Insider**

40.     No KERP Participant is an insider. Instead, each KERP Participant reports to an officer or Vice President.[5] While certain individuals may have "manager" in their title, none are insiders or take part in the management of the Debtors.

**II.    The KERP is a Reasonable Exercise of the Debtors' Business Judgment**

41.     The implementation of the KERP represents the sound business judgment of the Debtors. For the reasons stated above, the KERP Participants are necessary to maximize the value of the Debtors' estates for the benefit of stakeholders.  The KERP ensures that key employees will remain employed by the Debtors during the Sale and Liquidation processes. Because these processes are occurring simultaneously, the premature loss of any of KERP Participants would harm the Debtors' efforts in the Chapter 11 Cases.  The KERP aligns the interests of the Debtors and certain non-insider employees.

42.     Accordingly, the Debtors submit that the KERP is justified by the facts and circumstances of the Chapter 11 Cases and the Debtors respectfully request that the Court authorize and approve the KERP.

Executed this 7th day of November.

> */s/ Charles S. Deutchman*
> Charles S. Deutchman
> Chief Restructuring Officer
> The Debtors and Debtors in Possession

---

[5] Each KERP Participant reports to a KEIP Participant.