## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BAYOU STEEL BD HOLDINGS, L.L.C., *et al.*,[1] | Case No. 19-12153 (KBO) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. 137** |
| | **Hearing Date: November 12, 2019 at 11:00 am (ET)**<br>**Objection Deadline: November 7, 2019 at 12:00 pm (ET)**[2] |

### OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF DEBTORS FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO IMPLEMENT THE KEY EMPLOYEE INCENTIVE PLAN AND KEY EMPLOYEE RETENTION PLAN, AND (II) GRANTING RELATED RELIEF

The Official Committee of Unsecured Creditors (the "Committee") of Bayou Steel BD Holdings, L.L.C., *et al.*, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through its proposed undersigned counsel, hereby submits this objection (the "Objection") to the *Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to Implement the Key Employee Incentive Plan and Key Employee Retention Plan, and (II) Granting Related Relief* (the "Motion").[3]  In support of this Objection, the Committee respectfully states as follows:

### PRELIMINARY STATEMENT

1.      Subject to certain clarifications, the Committee does not oppose the KERP. As currently designed, however, the Committee cannot support the KEIP.  While the Committee is not fundamentally opposed to a KEIP that is designed to incentivize the Debtors' executives to

---

[1]      The Debtors in these cases are: Bayou Steel BD Holdings, L.L.C.; BD Bayou Steel Investments, LLC; BD LaPlace, LLC.

[2]      Extended as to the Committee with the consent of the Debtors.

[3]      Docket No. 137.  Capitalized terms used but not otherwise defined in this Objection shall have the meanings set forth in the Motion.

maximize value for all creditors, the current proposal woefully fails to do so.  The Debtors seek approval of $435,000 in KEIP payments to four insiders based upon a single metric—the shipment of 50,000 tons of finished goods for $525 per ton on a gross revenue basis.  This equates to $26.25 million of receipts.  The insiders, therefore, will receive full KEIP payments for only achieving 60% of their $43.6 million budget requirement for finished goods receipts.  If the insiders do nothing more than hit this mark, they will have defaulted under the cash collateral order and will not have achieved their budgeted goal of fully paying off the ABL lenders by year end.  As detailed below, when accounting for shipped inventory and ordered inventory, the Debtors are already well in excess of the target, providing no further incentive for the insiders to maximize value for the benefit of creditors.

2.      The Debtors' characterization of the KEIP as incentivizing is belied by the facts.  The Committee understands that the Debtors have already achieved over 85% of the $26.25 million target and have orders in hand for well beyond the target inventory needed to be sold to achieve the bonus.  The KEIP target, therefore is a simple "layup" and provides no incentive to the insiders.  As courts have made clear, a KEIP must be tied to challenging goals that are difficult to achieve.  The proposed KEIP fails to meet this standard.  It further fails to provide any incentive to maximize the value of the going-concern sale of the Debtors' operations, which is critical if creditors other than the ABL lenders are to receive any value from these cases.  As such, the KEIP is really a disguised retention plan for the Debtors' most senior management that does not satisfy the strict requirements of section 503(c)(1) of the Bankruptcy Code.

3.      The Debtors present no evidence that the insiders need to be incentivized in these cases beyond the payment of their negotiated salaries.  The proposed KEIP seeks to reward the insiders for merely continuing to perform only limited responsibilities as executives of a

2

company that is now a debtor-in-possession.  The proposed KEIP is not properly designed to incentivize the insiders to maximize value and achieve a successful chapter 11 process.

4.      While the Committee does not oppose the proposed KERP payments in and of themselves, the Committee objects to the extent either the KEIP or the KERP is being proposed in addition to: (i) other bonus programs the participants may be entitled to, including change of control payments; and (ii) severance payments, even if such payments will be reduced by the applicable bonus.  The Committee understands that this will be clarified in any order approving the KEIP and KERP.

## BACKGROUND

### I.      General Background

5.      On October 1, 2019 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.  Since the Petition Date, the Debtors have remained in possession of their assets and have continued to conduct limited operations and manage such businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

6.      On October 10, 2019, the Office of the United States Trustee for Region 3 appointed a five member Committee consisting of: (i) Tokai Carbon GE LLC; (ii) Tri Coastal Trading, L.L.C.; (iii) Louisiana Scrap Metal Recycling of Baton Rouge, Inc.; (iv) American State Equipment Co., Inc.; and (v) United Steelworkers.[4]  The Committee selected Kelley Drye & Warren LLP as its lead counsel and Cole Schotz P.C. as its Delaware counsel.  The Committee also selected Alvarez & Marsal North America, LLC as its financial advisor.

---

[4]      Docket No. 67.

II.    **The Proposed KEIP**

7.    The Debtors seek approval of: (i) a key employee incentive plan (the "KEIP") providing $435,000 in bonus payments to four insider executives (the "Insiders") based upon the value realized from the liquidation of the Debtors' inventory; and (ii) a key employee retention plan (the "KERP") providing $382,500 in retention payments to 16 non-insider employees, if they stay through the completion of the inventory liquidation.[5]

8.    The Debtors assert that the "KEIP was designed to incentivize the KEIP Participants, each of whom is a member of senior management or an insider, based on metrics tied to the Liquidation of the Debtors' inventory."[6]    The Debtors, however, did not retain a compensation expert to assist in the formulation of the KEIP.    Instead, the KEIP was formulated by the Debtors' advisors and management team including, upon information and belief, the Insiders themselves.    Other than listing various cases purportedly used in formulating the KEIP, the Motion does not include any information regarding its formulation, including detail regarding the basis for the metrics or the selection of the Insiders as KEIP Participants.

9.    In support of the KEIP, the Debtors submit the declaration of Glenn C. Pollack, the founder and managing director of Candlewood, the Debtors' financial advisor and investment banker (the "Pollack Declaration").    The Pollack Declaration concludes that the KEIP Payments are (a) at or below average target payout of the market in terms of total cost, and (b) below the market range average minimum payout on a cost per participant basis.[7] The Motion does not provide any details regarding the facts of those cases, the details of the underlying KEIPs,

---

[5]    Motion, ¶¶ 14, 21.

[6]    *Id.* ¶ 13.

[7]    Pollack Declaration, ¶ 24.

or the basis for the Debtors' conclusion that the proposed KEIP is reasonable.[8]

10.     The Debtors' request authority to pay the entirety of the KEIP bonus if a single criteria is met—the shipment of 50,000 tons of inventory for $525 per ton on a "gross revenue basis"—which is not defined.[9]

11.     The Pollack Declaration asserts that the "KEIP is entirely performance-based and was designed to achieve meaningful and challenging targets."[10]  Merely achieving the KEIP target, however, would constitute a significant underperformance of the Debtors' budget in these cases.  The Committee understands that as of November 6, the Debtors have already shipped 40,930 tons of inventory (approximately 82% of the KEIP target), yielding approximately $23.6 million of gross revenue  (approximately 90% of the KEIP target).  In fact, as of the date of this Objection, the Committee has been informed that the Debtors have committed orders that have not yet been shipped of an additional 20,766 tons of inventory with a value of approximately $11.3 million. Together with the already shipped inventory, the Debtors have already exceeded the KEIP target by a considerable margin.

12.     The proposed order approving the KEIP and KERP provides that each of the Insiders, as well as the KERP participants, would still be entitled to an allowed administrative expense claim for any severance due, subject to a reduction by the applicable bonus.[11]  The Committee understands based upon conversations with the Debtors that this provision is being struck from the proposed order and the Insiders and KEIP participants will be required to release any other claims against the Debtors, including any severance.

---

[8]      Motion, ¶ 15.

[9]      *Id.* ¶ 14.

[10]     *Id.* ¶ 16.

[11]     *See* Motion, Exhibit A - Proposed Order, ¶ 5.

60280/0001-18114346v2

**OBJECTION**

I.      **The KEIP Is A Disguised Insider Retention Plan That Fails
        To Satisfy Section 503(c)(1) Of The Bankruptcy Code**

        13.     The proposed KEIP, formulated by the Insiders for their own benefit, is not incentivizing in any discernable way and will not motivate the Insiders to maximize value for all creditors.  It is, instead, a poorly disguised retention plan that cannot be approved under the Bankruptcy Code.  Section 503(c)(1) was enacted to impose strict limitations on a debtor's ability to make retention payments to insiders in order to "eradicate the notion that executives were entitled to bonuses simply by staying with the Company through the bankruptcy process."[12] Section 503(c) was "enacted to limit a debtor's ability to favor powerful insiders economically and at estate expense during a chapter 11 case."[13]

        14.     Section 503(c)(1) imposes upon a debtor a strict evidentiary burden before a court can authorize payments to insiders to induce them to remain with the debtor.[14]  Specifically, section 503(c)(1) provides:

> [t]here shall neither be allowed, nor paid…a transfer made to…an insider of the debtor for the purpose of inducing such person to remain with the debtor's business…[unless] (A) the transfer…is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation; (B) the services provided by the person are essential to the survival of the business; and (C) [the transfer falls below certain relative payment amounts].[15]

The effect of section 503(c) therefore, is to put in place "a set of challenging standards" and "high hurdles" for debtors to overcome before retention bonuses can be paid to insiders.[16]

---

[12]     *In re Global Home Prods., LLC*, 369 B.R. 778, 784 (Bankr. D. Del. 2007).

[13]     *In re Pilgrim's Pride Corp.*, 401 B.R. 229, 234 (Bankr N.D. Tex. 2009).

[14]     *In re Dana Corp.*, 351 B.R. 96, 100 (Bankr. S.D.N.Y. 2006).

[15]     11 U.S.C. § 503(c)(1).

[16]     *Global Home Prods.*, 369 B.R. at 784–85.

6

15.     The proponent of the plan bears the burden of proving that the plan is truly incentivizing, and therefore governed by section 503(c)(3), rather than a disguised retention plan governed by section 503(c)(1).[17]  A debtor's characterization of a plan as incentive-based is not determinative.  Bankruptcy courts have frequently uncovered retention plans masquerading as incentive plans, finding that "courts must be wary of attempts to characterize what is essentially an insider retention plan as an 'incentive' plan 'to bypass the requirements of section 503(c)(1).'"[18] Courts look with disfavor upon such attempts.[19]

16.     A debtor must closely link the proposed bonuses to metrics that "are directly tied to challenging financing and operational goals for the business, tailored to the facts and circumstances of the case."[20]  For a plan to be incentivizing, it should be tied to significant goals that are difficult to achieve.[21]  In determining whether a proposed plan is a true incentive plan or simply a disguised retention program, a court must "determine whether the proposed targets are designed to motivate insiders to rise to a challenge or merely report to work."[22]  If the Debtors fail

---

[17]     *In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012); *see also In re Mesa Air Group, Inc.*, 2010 WL 3810899 at *3 (Bankr. S.D.N.Y. Sept. 24, 2010); *In re Residential Capital, LLC*, 478 B.R. 154, 170 (Bankr. S.D.N.Y. 2012).

[18]     *Hawker Beechcraft*, 479 B.R. at 313 (quoting *In re Velo Holdings Inc., et al.*, 472 B.R. 201, 209 (Bankr. S.D.N.Y. 2012); *see also In re Borders Group Inc.*, 453 B.R. 459, 470 (Bankr. S.D.N.Y. 2011).

[19]     *See Borders Group*, 453 B.R. at 470.

[20]     *Residential Capital*, 478 B.R. at 173.

[21]     *See id.* at 164 (when analyzing a KEIP, "the issue is whether each of these hurdles is sufficiently challenging and incentivizing"); *see also Hawker Beechcraft*, 479 B.R. at 313 (performance targets must be "designed to motivate insiders to rise to a challenge"); *Velo Holdings*, 472 B.R. at 209 (section 503(c) requires "a set of challenging standards and high hurdles") (internal quotations omitted); *Mesa Air Group*, 2010 WL 3810899 at *2 (incentive plans must "motivate"); *Global Home Prods.*, 369 B.R. at 784–85 (section 503(c) "impose[s] a set of challenging standards debtors must meet).

[22]     *Hawker Beechcraft*, 479 B.R. at 313.

to establish that the KEIP is truly an incentive plan, the KEIP fails under the strict standards of section 503(c)(1).[23]

17.    The Debtors fail to offer anything beyond conclusory statements that the "KEIP was designed to incentivize the KEIP Participants."[24]  The facts demonstrate it will not have the stated effect.  Merely stating that the KEIP is incentivizing does not make it so.  Other than sweeping generalizations that achieving the target liquidation value is incentivizing and real, the Debtors present no evidence that the KEIP is "directly tied to challenging financing and operational goals for the business, tailored to the facts and circumstances of the case."[25]

18.    The Debtors similarly fail to provide sufficient evidence that the KEIP "is entirely performance-based and was designed to achieve meaningful and challenging targets."[26] As of November 6, the Debtors have already liquidated 40,930 tons of inventory at an average price per ton of nearly $577.  Moreover, the Debtors already have additional committed orders that have not yet been shipped for 20,766 tons of inventory at an estimated average price per ton of more than $544, well in excess of the 50,000 tons at $525 per ton target.  To the extent the target liquidation value has already been met, the KEIP cannot be considered incentivizing in nature.

19.    The Committee further notes that merely achieving the KEIP metric and nothing more would result in a significant underperformance of the Debtors' budget and a default under the cash collateral order.  There is simply no set of circumstances where a cash collateral default could be seen as achieving a high hurdle in these cases.  Instead, the metric proposed by

---

[23]    *See id.* at 312–13.

[24]    Pollack Declaration, ¶ 10.

[25]    *Residential Capital*, 478 B.R. at 173.

[26]    Pollack Declaration, ¶ 16.

60280/0001-18114346v2

the Debtors is a *fait accompli*, falling far short of the requirement that "the proposed targets …

motivate insiders to rise to a challenge" and not "merely report to work."[27]

20.    Further, the Debtors maintain that the "KEIP is designed to reward KEIP

Participants for the extraordinary work they are required to do beyond their normal every day job

in connection with the Liquidation and the Sale."[28]  The involvement of executives in the day-to-

day operations of a debtor's business is nothing more than the discharge of an executive's duties

in the context of a bankruptcy case and does not support the allowance and payment of a bonus

award.[29]  The Debtors present no factual support for any substantial efforts the Insiders have or

will continue to make in merely liquidating the Debtors' inventory.  Moreover, although the

Debtors rely on the fact that in addition to their customary duties and the inventory liquidations,

the Insiders "must work with potential purchasers to complete their due diligence in an accelerated

time frame,"[30] no portion of the KEIP is tied to the Insiders' involvement in the sale process or the

results to be achieved by such process.

21.    The Debtors, therefore, have failed to satisfy their burden of demonstrating

the KEIP is a true incentive plan.  The Debtors have also failed to present sufficient evidence that

the target is a real and rationally-based incentivizing goal as opposed to an easily obtainable target

designed to provide retention bonuses to the Insiders.  Thus, absent a showing that the Debtors can

meet the requirements of section 503(c)(1), the KEIP must fail.

---

[27]    *Hawker Beechcraft*, 479 B.R. at 313

[28]    Pollack Declaration, ¶ 19.

[29]    *See Residential Capital*, 478 B.R. at 168 ("While it is no doubt true that the requirements of these chapter 11 cases and the proposed assets sales have altered or increased the work required of insiders, such would also be true in virtually all chapter 11 cases; section 503(c) requires more than increased responsibilities to justify increased pay for insiders").

[30]    Pollack Declaration, ¶ 21.

60280/0001-18114346v2

II.      **The KEIP Does Not Satisfy Sections 363(b)(1) Or 503(c)(3)**

22.      Even if the Court were to determine there is sufficient evidence to demonstrate the KEIP is incentivizing under the stringent standards of section 503(c)(1), the KEIP still fails under sections 363(b)(1) and 503(c)(3) of the Bankruptcy Code.

23.      The Debtors fail to demonstrate the KEIP is the product of the Debtors' reasonable business judgment under section 363(b)(1).  Similarly, section 503(c)(3) prohibits transfers or obligations to insiders that are "not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition."[31]

24.      Consideration of the KEIP, and whether the Debtors have exercised their sound business judgment, is based upon the totality of the circumstances of these cases.  The court "should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interest of the debtor, creditors and equity holders, alike."[32]  The Debtors have the burden to prove that the development of the KEIP was a proper exercise of their business judgment.[33]  The Debtors, therefore, must demonstrate not only an exercise of sound business judgment in proposing the KEIP, but also that it is warranted under the facts and circumstances of these cases.

25.      The Debtors have not demonstrated the KEIP is appropriate given the facts and circumstances of these cases.  The Debtors are in the process of liquidating their inventory and pursuing a "going concern" sale for their remaining assets.  Assuming the Debtors meet the target $26.25 million of liquidation value, which they are poised to do under their own cash collateral budget, the Debtors' senior lenders would still be owed more than $13 million, exclusive of the

---

[31]      11 U.S.C. § 503(c)(3).

[32]      *In re Montgomery Ward Holding Corp.,* 242 B.R. 147, 153 (D. Del. 1999).

[33]      *See id.* at 154.

cost of administering these estates. Further, the KEIP is not tied to the satisfaction of administrative expenses or achieving a successful sale process. In fact, the KEIP would be payable even if the Debtors' assets are never sold and these cases are converted to chapter 7. In light of these facts, the KEIP is not justified by the current facts and circumstances of these cases and is in no way tied to a successful outcome for stakeholders.

26.    Factors that courts consider when determining whether the structure of a compensation proposal and the process for its development meet the business judgment test include:

- *First*, is there a reasonable relationship between the plan proposed and the results to be obtained?

- *Second*, is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?

- *Third*, is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?

- *Fourth*, is the plan or proposal consistent with industry standards?

- *Fifth*, what were the due diligence efforts of the debtor in (a) investigating the need for a plan, (b) analyzing which key employees need to be incentivized, and (c) reviewing what is generally applicable in a particular industry?

- *Sixth*, did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?[34]

27.    The Debtors have failed to demonstrate that the results to be achieved justify bonus payments to the Insiders of $435,000. An incentive plan for senior executives should be tied to their direct contributions and benefits to the estates. As stated above, at the $26.25 million

---

[34]    *See Global Home Prods.*, 369 B.R. at 786 (evaluating an incentive plan under the business judgment standard of section 363 by applying the factors listed above).

threshold, the ABL lenders will still be owed more than $13 million and would be payable regardless of whether the Debtors remain administratively solvent or confirm a chapter 11 plan.

28.     Second, and for the same reasons, the cost of the KEIP is not justified in the context of the Debtors' assets and liabilities.  In support of this factor, the Debtors maintain that they determined the KEIP was reasonable and consistent with industry standards "after performing substantial due diligence in investigating the need for a KEIP, analyzing which key employees needed to be incentivized, and determining what is generally applicable in the particular industry."[35]  The Debtors, however, provide no information regarding what is generally applicable in their industry.  Nor do the Debtors include an analysis of the KEIP in relation to the Insiders' compensation expectations, including any historic bonus programs.

29.     Third, the Debtors submit no evidence as to the due diligence conducted in determining the need for the KEIP.  Notably, the Motion is silent as to whether the KEIP was presented to any compensation committee or independent members of the Debtors' board of directors.  The only conclusion, therefore, the Committee can reach with respect to the need for the KEIP is simply that the Insiders want one.  The Motion similarly offers no evidence as to how the Debtors selected these Insiders and what their respective contributions will be to achieving the target inventory liquidations established in the proposed KEIP.

30.     Fourth, although the Debtors include the list of cases against which the KEIP was formulated, the Motion does not include the details of such plans or a summary of what any such KEIP provided.  Further, the Debtors fail to indicate the metrics used in those incentive plans, including whether those metrics included other variables, such as proceeds generated from asset sales.  Finally, the Debtors do not disclose the impact that meeting those metrics had on the

---

[35]     Pollack Declaration, ¶ 29.

value of the estates and overall outcome of the cases.  Simply because Candlewood was able to

identify KEIPs that appear similar on their face, does not make the KEIP rational in the context of

these cases.[36]

31.    Finally, the KEIP was formulated by Debtors' management, which includes

the KEIP Participants, in consultation with their advisors.  Accordingly, not only did the Debtors

not receive independent counsel in the formulation of the KEIP, but the Insiders themselves helped

formulate it.

## III.    Modifications To The Terms Of The KEIP And KERP

32.    To the extent the Court is inclined to approve the KEIP or KERP, it should

be modified as follow:

- "Gross revenue basis" is not defined anywhere in the Motion.  The KEIP must be clarified to indicate what proceeds and payments will be taken into account.

- The Insiders should not be awarded a bonus in a scenario where the estates are left administratively insolvent or the cases are converted to chapter 7.

- No Insider or KERP participant should receive a bonus without waiving any claims against the Debtors or their estates with respect to any prepetition bonus programs or other potential payments under their respective prepetition employment agreements, including any severance payments.

---

[36]    *See Residential Capital,* 478 B.R. at 166 ("The fundamental flaw in Mercer's analysis is the assumption that a KEIP can be approved simply because the amount of KEIP Awards falls within a range of reasonableness based on a percentage of asset sales proceeds.  While limiting the amount of the aggregate KEIP Awards to a percentage of sale proceeds may be a *necessary* requirement for reasonableness of the amount of the awards, it is not a *sufficient* requirement for approval of the KEIP"). (emphasis in original)

WHEREFORE, the Committee respectfully requests that the Court (i) deny the Motion as set forth in this Objection; and (ii) grant the Committee such further relief as the Court deems just and appropriate.

Dated:    November 7, 2019
           Wilmington, Delaware

                                     COLE SCHOTZ P.C.

                                     */s/ Katherine M. Devanney*
                                     G. David Dean (No. 6403)
                                     Patrick J. Reilley (No. 4451)
                                     Katherine M. Devanney (No. 6356)
                                     500 Delaware Avenue, Suite 1410
                                     Wilmington, DE 19801
                                     Telephone: (302) 652-3131
                                     Facsimile: (302) 652-3117
                                     ddean@coleschotz.com
                                     preilley@coleschotz.com
                                     kdevanney@coleschotz.com

                                     and

                                     KELLEY DRYE & WARREN LLP
                                     Jason R. Adams
                                     Lauren S. Schlussel
                                     101 Park Avenue
                                     New York, New York 10178
                                     Telephone: (212) 808-7800
                                     Facsimile: (212) 808-7897
                                     Email: jadams@kelleydrye.com
                                             lschlussel@kelleydrye.com

                                     *Proposed Counsel to the Official Committee of Unsecured Creditors of Bayou Steel BD Holdings, L.L.C., et al.*