UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
                                    . Chapter 11
                                    .
IN RE:                              .
                                    . Case No. 19-12153(KBO)
BAYOU STEEL BD HOLDINGS, LLC,       .
et al,                              .
                                    . Courtroom No. 1
                                    . 824 Market Street
                        Debtors.    . Wilmington, Delaware 19801
                                    .
. . . . . . . . . . . . . . . . . . Tuesday, November 12, 2019
```

TRANSCRIPT OF HEARING ON MOTION OF DEBTORS FOR ENTRY OF AN
ORDER (I) AUTHORIZING THE DEBTORS TO IMPLEMENT THE KEY
EMPLOYEE INCENTIVE PLAN AND KEY EMPLOYEE RETENTION PLAN, AND
(II) GRANTING RELATED RELIEF
BEFORE THE HONORABLE KAREN B. OWENS
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

```
For the Debtor:            Christopher A. Ward, Esq.
                           Shanti M. Katona, Esq.
                           POLSINELLI
                           222 Delaware Avenue, Suite 1101
                           Wilmington, Delaware 19801


For the U.S. Trustee:      Linda Casey, Esq.
                           OFFICE OF THE U.S. TRUSTEE
                           844 North King Street
                           Wilmington, Delaware 19801
```

(Appearances Continued)

```
Audio Operator:            Electronically Recorded
                           by Al Lugano, ECRO


Transcription Company:     Reliable
                           1007 N. Orange Street
                           Wilmington, Delaware 19801
                           (302)654-8080
                           Email:  gmatthews@reliable-co.com
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
APPEARANCES:  (Continued)

For the Official Committee
of Unsecured Creditors:      Katherine M. Devanney, Esq.
                             COLE SCHOTZ, PC
                             500 Delaware Avenue, Suite 1410
                             Wilmington, Delaware 19801

                             Lauren S. Schlussel, Esq.
                             KELLEY, DRYE & WARREN, LLP
                             101 Park Avenue
                             New York, New York 10178

For Bank of America:         David T. Queroli, Esq.
                             RICHARDS, LAYTON & FINGER, PA
                             One Rodney Square
                             920 North King Street
                             Wilmington, Delaware 19801

For Black Diamond:           Seth A. Niederman, Esq.
                             FOX ROTHSCHILD, LLP
                             919 North Market Street
                             Suite 300
                             Wilmington, Delaware 19899

APPEARANCES VIA TELEPHONE:

For the Official Committee
of Unsecured Creditors:      Jason Adams, Esq.
                             KELLEY, DRYE & WARREN, LLP

For Bank of America:         Brad Foxman, Esq.
                             Matthew J. Pyeatt, Esq.
                             William Wallander, Esq.
                             VINSON & ELKINS, LLP

ALSO APPEARING VIA TELEPHONE:

                             Glenn Pollack
                             CANDLEWOOD PARTNERS, LLC
```

INDEX

|                                                          | Page |
|----------------------------------------------------------|------|
| PRESENTMENT/ARGUMENT BY MS. KATONA RE:  KERP             | 5    |
| COMMENTS BY MS. SCHLUSSEL RE:  KERP                      | 10   |
| PRESENTMENT/ARGUMENT BY MS. KATONA RE:  KEIP            | 12   |
| ARGUMENT BY MS. SCHLUSSEL RE:  KEIP                      | 37   |
| ARGUMENT BY MS. CASEY RE:  KEIP                          | 41   |
| FURTHER ARGUMENT                                         | 44   |
| COURT DECISION                                           | 49   |

| WITNESS          | DIRECT | CROSS | REDIRECT | RECROSS |
|------------------|--------|-------|----------|---------|
| FOR THE DEBTOR   |        |       |          |         |
| CHARLES S. DEUTCHMAN | *  | 23    |          |         |

*Via Declaration

| Exhibit                             | Evid. |
|-------------------------------------|-------|
| Deutchman Declaration               | 9     |
| Deutchman Supplemental Declaration  | 9     |

4

1          (Proceedings commence at 11:03 a.m.)

2          (Call to order of the Court)

3                THE COURT:  Good morning.  Please be seated.

4                Ms. Katona, good to see you.

5                MS. KATONA:  Good morning, Your Honor.

6                THE COURT:  Good morning.

7                MS. KATONA:  Shanti Katona of Polsinelli on behalf

8     of the debtors.

9                Your Honor, our apologies.  You received an amended

10    agenda a short while ago.  Included in the amended agenda was

11    a supplemental declaration that we just filed this morning.

12                Before we turn to the agenda, Your Honor, I wanted

13    to provide you with one update.  I know, from last week's

14    hearing, we are still waiting to finalize the cash collateral

15    order.  The debtors and all the parties-in-interest, we

16    believe, have reached agreement, and so we are hopeful that

17    we will be submitting that under certification of counsel

18    today.

19                THE COURT:  Okay.

20                MS. KATONA:  Attached to that order will be a

21    budget.  Your Honor, if I may approach?

22                THE COURT:  Sure.  Thank you.

23                MS. KATONA:  Your Honor, as part of the revised

24    KEIP that I'll discuss momentarily, the metrics are tied to

25    this budget.  So, to the extent you need to have something to

1    reference, I wanted to make sure that you had a copy, even

2    though the order has not yet been entered.  And all parties

3    under -- or at least the debtors understand, obviously, this

4    is subject to your approval.

5              THE COURT:  Okay.

6              MS. KATONA:  So, turning to the agenda, Your Honor,

7    Item Number 1 is the debtors' motion to seal.  We had some

8    comments from the office of the United States Trustee.  We've

9    revised the redacted version that was available and Your

10   Honor entered the order, so we believe, moving forward now,

11   with respect to the KEIP and the KERP motion that was

12   actually filed under seal --

13             THE COURT:  Uh-huh.

14             MS. KATONA:  -- at Docket Number 136.

15             If I can provide you with some background.  As you

16   can imagine, since the debtors filed the motion, it's been a

17   fluid process.  Obviously, there have been a lot of

18   conversations that have been had between the debtors, the

19   committee, as well as the Office of the United States

20   Trustee.

21             Last week, the debtors filed the declaration of

22   Charles Deutchman, who is the debtors' CRO, who was engaged

23   on August -- or sorry -- October 19th.  And this was in

24   response to some of the informal comments that were received

25   from the Office of the United States Trustee and the

1    committee.  The debtors, through the declaration, addressed

2    some of the informal comments relating to the KERP plan, as

3    well, through conversations with the party -- with the case

4    constituents.

5         Ultimately, the debtors' position is that nobody

6    has really raised any concerns with the KEIP.  The debtors

7    have limited the KEIP -- sorry.  No one has raised issues

8    with the KERP.  The debtors have limited the KERP

9    participants to 16 individuals that the debtors believe are

10   instrumental and critical to the daily operations, as well as

11   the liquidation of the inventory.

12        Under the plan, the KERP participants will receive

13   retention payments, as set forth in Schedule 2 attached to

14   the motion.  The payments will range anywhere from $7,500 to

15   $12,500.  And the aggregate of the KERP payments will be

16   $382,500.

17        The KERP payments will receive -- the KERP

18   participants -- sorry -- will receive the payments upon

19   liquidation of 50,000 tons of steel at $525 a ton.

20        And upon the voluntary termination or termination

21   for cause prior to the receipt of any of the unearned KEIP

22   payments, a KEIP -- or a KERP participant's KERP payment will

23   be forfeited, and any forfeited amounts will not be made

24   available to the other KERP pool participants.

25        The debtors submit that the KERP is reasonable when

compared to similar key employee retention plans in other

comparable cases.  While the KERP payments are retention

payments, the timing, we believe, is sufficiently tied to

metrics.  The KERP is limited to the number of participants,

as well as the aggregate amount to be paid.

The total cost of the KERP, as mentioned, is

$382,000 and -- $382,500, with the average cost per KERP

participant at approximately $23,000.  And as a percentage of

base salary, the KERP payments range anywhere between 12 and

a half percent to 68.7 percent, with an average of 23.7

percent.

The debtors determined that it would be

disproportionate -- there would have -- be a disproportionate

and negative impact on the debtors' estates, as well as the

debtors' ongoing operations, if any of the KERP participants

were the leave the debtors' employment.  On average, the

participants have more than 15 years of experience with the

debtors and can't be easily or readily replaced.

Thus, it's the debtors' position that the loss of

the KERP participants would substantially impair the debtors'

efforts in the Chapter 11 cases.

Moreover, no KERP participant is an insider;

meaning, we understand that, under this District's rulings,

as well as the Bankruptcy Code, "insider" is denoted by even

individuals that may not have dominion and control over the

1    operations of the debtors, but have officer titles.  And none

2    of the participants under this -- under the KERP are

3    considered insiders.

4          It's the debtors' position that the implementation

5    of the KERP represents the sound business judgment of the

6    debtors and believes that the KERP participants are necessary

7    to maximize the value of the debtors' estate for the benefit

8    of all stakeholders.  So, accordingly, the debtors have

9    determined that a non-insider retention plan is crucial in

10   this situation.

11         As I mentioned, we filed the declaration of Mr.

12   Charles Deutchman last week, addressing a lot of the factors

13   with respect to the KERP.  Your Honor, we would submit the

14   declaration that was filed last week at Docket Number 210 in

15   support of the debtors' motion to approve the employee

16   retention program.

17         We understand that, after conferring with the

18   parties, the party -- the case constituents, the debtors

19   believe that the concerns that were raised were allayed.  We

20   were -- we shared additional information with respect to the

21   participants, as well as the basis for the payments that were

22   being proposed, and our understanding -- obviously, we'll --

23   I'll defer to everybody who's here today.  But the debtors'

24   understanding is that, with respect to the KERP component of

25   the retention/incentive motion that's on deck for today, the

1    KERP payments are largely uncontested.

2         And at this time, unless Your Honor has any

3    questions for me, I'll cede the podium who wishes to address

4    the KERP, but we would seek approval of the KERP, pursuant to

5    the motion that was filed.  And we understand that the order

6    addresses both the KEIP and the KERP.  But in light of the

7    objections from our position only relating to the KEIP, and

8    depending on how things go today, we would like at least, at

9    a minimum, the KERP to be approved.

10        THE COURT:  Okay.  Well, let me first ask.  Does

11   anybody object to the admission of Mr. Deutchman's

12   declaration, found at Docket Number 210?

13        (No verbal response)

14        THE COURT:  And does anyone object to the admission

15   of the supplemental declaration that was filed this morning

16   at two -- at Docket Number 235?

17        MS. CASEY:  No objection, Your Honor, but subject

18   to cross.

19        THE COURT:  Of course.  Okay.  Then I'll admit both

20   declarations.

21        (Deutchman Declaration received in evidence)

22        (Deutchman Supplemental Declaration received in

23   evidence)

24        THE COURT:  Should we just go ahead and move the

25   admission of Mr. Pollack's declaration, as well?

1         MS. KATONA:  Yes, Your Honor.  That would be great.

2    He's available on the phone today.  He's, unfortunately, not

3    -- due to personal reasons, is not able to be here for cross.

4    So we understand if Your Honor has reservations about

5    admitting a declaration where the deponent may not be -- the

6    witness may not be available for cross.

7         THE COURT:  Okay.  Why don't we hold that in

8    abeyance.

9         Okay.  So let me say, for the record, that both

10   declarations of Mr. Deutchman, found at Docket Number 210 and

11   Docket Number 235, are admitted, subject to the parties'

12   right to cross-examine Mr. Deutchman.

13        MS. KATONA:  Thank you, Your Honor.

14        THE COURT:  All right.  So let's hear others with

15   respect to the KERP then.

16        MS. SCHLUSSEL:  Good morning, Your Honor.

17        THE COURT:  Good morning.

18        MS. SCHLUSSEL:  Lauren Schlussel from Kelley, Drye

19   & Warren, proposed counsel for the committee.

20        Your Honor, Ms. Katona's were correct, we did not -

21   - as I'm sure you saw from our objection -- raise underlying

22   issues with the KERP; the payments, the participants,

23   numbers, and they are, you know, the sort of more rank-and-

24   file people at the company, and they are instrumental in

25   getting through this process.

1          The one issue we did raise -- and I did speak to

2   Ms. Katona about this at some point in our various

3   discussions -- was that we didn't believe that any, frankly,

4   KEIP or KERP participants should be entitled to a bonus while

5   retaining other claims against the estates.  So, while we do

6   not have an objection to the underlying KERP, we believe that

7   the order should be revised, such that there is an agreement

8   that, to receive the KERP payment, that there is a release of

9   any other claims, including any severance claims, that are to

10  be filed against or could be filed against the debtors.  And

11  I understood that to be an agreement, although it's been a

12  few days since we've had that discussion.  But that was the

13  one reservation that we had with respect to the KERP that's

14  before you.

15          THE COURT:  Okay.  All right.  Does the U.S.

16  Trustee wish to be heard on the KERP?

17          MS. CASEY:  We don't have any (indiscernible)

18          THE COURT:  Okay.  Ms. Katona, do you agree --

19          MS. KATONA:  Yes, Your Honor.

20          THE COURT:  -- with the committee --

21          MS. KATONA:  And that was the debtors'

22  understanding, as well --

23          THE COURT:  Okay.

24          MS. KATONA:  -- that we understood that, to the

25  extent there are any severance payments that are due and

owing to any of these KERP participants, that the KERP plan
would actually supercede and supplant that.

THE COURT:  Okay.  Is that reflected in the form of
order?

MS. KATONA:  It is not, Your Honor.  And the form
of order will have to be revised because it presently
approves both the KEIP and the KERP.

THE COURT:  Okay.

MS. KATONA:  So, with your approval, to the extent
we have your -- we would file that under certification of
counsel.

THE COURT:  Okay.  All right.  I'll just -- since
we're taking -- I know you're presenting them separately, but
I'll just make a ruling at the end with respect to both.  So
why don't we move on to the KEIP.

MS. KATONA:  Okay.  Thank you, Your Honor.

So, as I mentioned, and as you saw, obviously,
objections were filed last week with respect to the debtors'
KEIP plan.  Since Thursday, the debtors' management, the
debtors' board of directors, and the debtors' professionals
have been working with the committee's professionals to try
to formulate a revised KEIP that would be mutually agreeable.
Unfortunately, as I stand here this morning, the parties have
not been able to reach a consensus on the terms or the
parameters.

1       Notwithstanding, after conferring with the debtors'

2    board of directors and the debtors' management last night,

3    considering the pending objections, the debtors have revised

4    the KEIP terms and parameters and filed -- as we noted at the

5    outset, filed a supplemental declaration detailing the

6    debtors' proposed revised KEIP this morning.  So, again, my

7    apologies for the late notice and the inconvenience that was

8    caused to your court.

9       Your Honor, if I can take a step back and provide

10   some background.  So the original KEIP was crafted at the

11   time when the board of directors had no way of knowing

12   exactly how these Chapter 11 cases were going to turn out or

13   what was going to happen upon a filing.

14      As Your Honor may recall from the testimony at the

15   first-day hearing, as well the declaration of Mr. Alton Davis

16   that was filed in support of the first-day pleadings, the

17   record reflected that this was an emergency filing; that

18   there was not a lot of preparation that was done and there

19   was not a lot of understanding.  The debtors had a number of

20   factors that came upon them at the last minute, and they had

21   no choice but to file for bankruptcy.

22      And so, in light of that, the debtors had no way of

23   knowing exactly what the impact of the bankruptcy was going

24   to have on their ongoing operations.  They knew that they

25   needed to liquidate substantial inventory.  And a lot of the

1  factors and things that they used to assist them previously,

2  they had no idea whether or not those were going to continue

3  on a post-petition basis.

4      So specifically items like commonplace industry

5  rebates, the debtors, at that point, and the board of

6  directors did not know whether or not those were going to be

7  honored and in what capacity they were going to be honored or

8  how they were going to be implemented through the course of

9  the bankruptcy.  The debtors were losing employees, in

10  addition to the fact that they had to, unfortunately, undergo

11  a substantial reduction in force leading up to the

12  bankruptcy.  And on top of it, there was a lot of feedback

13  coming from customers, as far as what the status and the

14  landscape of the debtors on a go forward basis.

15      So, taking that into consideration, the debtors'

16  board of directors decided on the original metric, which you

17  saw in the original filed motion, which was sell -- shipping

18  and releasing 50,000 tons at $525 a ton.  At the time, it

19  seemed to the board of directors far from a lay-up and was --

20  in fact, seemed to be sufficiently incentivizing, in light of

21  the factors that were very unclear and tenuous at best.

22      And thanks to the incredible work of the debtors'

23  management and the executives that were incentivized by this

24  original revised -- this original KEIP metric, the debtors

25  actually fell into a great rhythm.  They managed to do

exceptionally well in the weeks immediately following the
filing.  Specifically, they were able to ship and release and
recover on a good portion of the prime steel inventory, in
accordance with the original KEIP terms.

And I'll note that there are judges in this
District that have approved KEIPs, where the metrics have
already been achieved.

Understanding that the objections were filed,
though, and understanding that, you know, it was this
tremendous performance by the debtors' management that, you
know, kind of led to these objections, frankly, the debtors -
- you know, and the debtors' position that, while these KEIP
participants have done an exceptional job, they
simultaneously shouldn't be penalized for making great
progress, you know, prior to the approval of an incentive
plan, especially when there was still work to be left -- you
know, the debtors thought that they should move forward with
the original KEIP.

Notwithstanding, obviously, we have the objections
that are before us today.  And you know, taking into account
what the committee has raised, as well as the Office of the
United States Trustee, the debtors have spent considerable
time over the last few days trying to formulate a revised
KEIP that would be tied to goals that are sufficiently
difficult to achieve, considering the facts and circumstances

1  of this case.

2      So -- and Your Honor, I'll lay it out because I

3  understand that maybe not everybody has had an opportunity to

4  review the supplemental declaration filed this morning.  But

5  under the revised KEIP, the KEIP is now divided basically

6  into two parts:  Sale of inventory, and then sale of the

7  debtors' business/other assets.

8      So the revised KEIP still involves the same capped

9  amounts for the four individual KEIP participants -- and that

10  was previously disclosed in Schedule 2 to -- or sorry --

11  Schedule 1 to the motion.  However, the revised KEIP now also

12  provides that KEIP participants will be entitled to partial

13  payments of their respective capped amounts upon the

14  occurrence of certain triggering events or certain -- or the

15  meeting of certain metrics.  And so the revised KEIP metrics

16  are as follows:

17      So, with respect to the inventory sales, for the

18  individual who is responsible and considered the VP of Sales,

19  the Vice President of Sales, if the debtors are able to

20  recover 92 percent of the budgeted finished goods A/R -- and

21  Your Honor, that's a term that's laid out in the budget.

22  It's under the "Receipts" section, and it's the second row.

23  So 92 percent of budgeted finished goods A/R, including

24  finished goods sold as scrap, so approximately $40 million,

25  if the debtors are able to recover $40 million and change,

1    then this individual would receive a hundred percent of the

2    KEIP that's been allotted to him.

3          If the debtors are able to recover 85 percent of

4    the budgeted finished goods A/R, or approximately $37 million

5    -- and again, these are estimates, there's change behind

6    that, but $37 million, approximately -- then this individual

7    would be entitled to 70 percent of the KEIP.

8          And once the collections are achieved, even if they

9    are -- even if they are collected after the thirteen-week

10   period which the budget covers, the KEIP will still be paid.

11         We want to make a note that we had, initially, in

12   the declaration, that, even if those collections were

13   achieved earlier, that the KEIPs would be paid earlier.

14   We've spoken with our lender, Bank of America, and their

15   preference is that we maintain the payment item in the line

16   that is budgeted for, which we believe is the thirteenth week

17   or slightly thereafter.

18         THE COURT:  Okay.

19         MS. KATONA:  So -- and the debtors are fine with

20   that, and the management understands that that's been a

21   change from what was proposed this morning.

22         So, with -- and so that's with respect to inventory

23   sales.

24         So, with respect to the individual who primarily is

25   handling and shepherding the sales process, or the President

and Chief Operating Officer, 50 percent of his KEIP shall be

earned if the debtors are able to receive to receive a

qualified bid valued cumulatively at about $10 million for

all of the debtors' operating assets, including real estate.

And then 80 percent shall be earned if the debtors

receive qualified bids -- bid or bids valued cumulatively at

least $15 million for all of the debtors' operating assets,

including real estate.

And then, finally, a hundred percent shall be

earned if the debtors are able to receive qualified bids

valued cumulatively at at least $20 million for all of the

debtors' operating assets, including real estate.

And Your Honor, "qualified bid" is the definition

that we've used in the debtors' sale motion, which is Docket

Number 73 -- I believe it's Docket Number 73.  It's the

debtors' bid procedures motion, which lays out exactly what a

"qualified bid" is.

So -- and then, with respect to the last two

individuals, their KEIP is tied to both metrics.  So,

specifically, part one, they will receive 50 percent of the

original KEIP amount if the debtors are able to recover 92

percent of the budgeted finished good A/R, including finished

goods sold as scrap, or approximately the $40 million that I

mentioned earlier.  But they'll only be able to recover 85

percent of the budgeted finished goods -- if the debtors are

only able to recover 85 percent of the finished goods A/R,

including finished goods sold as scrap, then 40 percent of

the KEIP would be earned for their benefit.

And then there's a second component for them

because they are heavily involved in both aspects; they're

both involved in the sale of the inventory, as well as the

going concern sale of the debtors' facilities and assets.

So, under the second part, which is tied to the sale of the

full company, 25 percent will be earned if the debtors

receive a qualified bid valued cumulatively at at least $10

million for all of the debtors' operating assets, including

real estate.

Forty percent would be earned if the debtors

receive a qualified bid or bids valued cumulatively at at

least $15 million for all of the debtors' operating assets,

including real estate, and fifty percent shall be earned if

the debtors receive a qualified bid valued cumulatively at at

least $20 million for all of the debtors' operating assets,

including real estate.

So, essentially, to the extent that they're -- the

debtors are able to sell all of their inventory and recover

92 percent of the budgeted finished goods A/R, as well as

receive a qualified bid valued -- bid or bids valued at $20

million for the debtors' remaining assets, those two

participants would receive a hundred percent of their KEIP.

1     And then it goes down from there, depending on where the

2     recoveries are.

3          Your Honor, it's the debtors' position -- and it's

4     detailed in the Deutchman -- in the supplemental Deutchman

5     declaration, that this revised KEIP is not a disguised

6     retention plan, as presented.  These executives here are

7     truly stretching.  Any counter-argument really understates

8     the substantial work that's being done to accomplish the

9     KEIP.  These metrics -- and frankly, ignores the significant

10    efforts by the KEIP participants here.

11         The revised KEIP incentivizes them by tying

12    payments directly to proceeds from the debtors' sales -- sale

13    processes, as well as being compensated for ensuring that the

14    collections remain close to the permitted variances allowed

15    under the budget.  This ensures that the debtors are able to

16    pay down their first lien debt as expeditiously as possible.

17         The revised KEIP isn't intended to provide bonuses

18    for retention.  We understand that it may not provide benefit

19    to the general unsecured creditors, but that's -- that

20    doesn't mean that it's not incentivizing.  And in fact, this

21    revised KEIP still is not a retention plan.

22         Finally, it would be remiss of the debtors not to

23    highlight some of the concerns with respect to -- you know,

24    raised in Mr. Deutchman's declaration, specifically relating

25    to crafting a plan that adds additional components, metrics,

1    or milestones, which is -- and the committee may address some

2    of this.  As we went back and forth over the last week, there

3    were some proposals that came back to the debtors and

4    management to revise some of the terms.  It's the debtors'

5    position that some of those -- that those additional factors

6    will not function to serve as incentivizing parameters in

7    this particular case.

8        And Mr. Deutchman can testify to that further, if

9    necessary.  But it's his understanding that any of those

10   additions will actually be de-incentivizing, especially if

11   the factors are 100 percent wholly outside of these KEIP

12   participants' control, which is what some of those factors

13   were.

14       So, Your Honor, I know we've already entered into -

15   - entered the two declarations of Mr. Deutchman into evidence

16   in support of the KERP.  You know, with Your Honor's

17   permission, we would like to enter them in support of the

18   KEIP, as well, the revised KEIP, as well.  And Mr. Deutchman

19   is in the courtroom today and he's available for cross-

20   examination, should anyone have any questions.

21       But Your Honor, with that, the debtors wish to seek

22   approval of the revised KEIP program.

23       THE COURT:  Okay.  Well, Mr. Deutchman's

24   declarations were already admitted into evidence, so that's

25   been taken care of.

1          Why don't I hear from the objecting parties then.

2    Thank you.

3          MS. CASEY:  Your Honor, the U.S. Trustee would like

4    to cross-examine.  I don't know if you'd like to take

5    argument from the committee first, but we would like to

6    cross-examine the witness.

7          THE COURT:  Okay.  Does the committee wish to

8    cross-examine, Ms. Deutchman?

9          MS. SCHLUSSEL:  We do not, Your Honor.

10         THE COURT:  Okay.  Let's hear Mr. Deutchman's

11   testimony, and then we'll proceed to, I guess, argument.  All

12   right.  Do you want to call him right now.

13         MS. CASEY:  Yes, please.

14         THE COURT:  All right.

15         MS. CASEY:  I'm sorry.

16         THE COURT:  Mr. Deutchman, can you please come to

17   the stand and remain standing to be sworn.

18         THE ECRO:  Raise your right hand.

19   CHARLES DEUTCHMAN, WITNESS FOR THE DEBTOR, AFFIRMED

20         THE ECRO:  Please be seated.  State your full name

21   for the record and spell your last.

22         THE WITNESS:  Charles Deutchman, the last name is

23   D, for David, e-u-t-c-h-m-a-n.

24         THE ECRO:  Thank you, sir.

25         MS. CASEY:  For the record, Linda Casey on behalf

1    of the United States Trustee.

2                        CROSS-EXAMINATION

3    BY MS. CASEY:

4    Q    Good morning, Mr. Deutchman.  I have a few questions

5    about the various programs.

6         Just initially, rather than going through what they are,

7    do you agree with your counsel's representation of what the

8    KEIP structure is now?

9    A    Yes, I do.

10   Q    Okay.  So the -- there's two basic components; the first

11   is the selling off of the inventory, so I'm going to deal

12   with that first.  The metric is that the debtors recover a

13   certain percentage of the budgeted finished goods A/R, and

14   that budgeted finished goods is tied to the revised thirteen-

15   week cash flow.  Is that correct?

16   A    Correct.

17   Q    Okay.  That revised thirteen-week cash flow, that was

18   created after the debtors had determined to enter into

19   bankruptcy, correct?

20   A    Correct.

21   Q    And the thirteen-week cash flow is used to -- in

22   connection with the -- obtaining DIP financing, correct?

23   A    Correct.

24   Q    And in obtaining DIP financing, the debtors established

25   that the debtors would not be administratively insolvent if

Deutchman - Cross                                          24

1    they obtained that DIP financing, correct?

2    A    I believe that's correct.

3    Q    And the thirteen-week cash flow budget is a reasonable

4    estimate of what will occur in this case, correct?

5    A    Yes.

6    Q    Okay.  And at the time that you determined the thirteen-

7    week cash flow budget, since it was done in connection with

8    the bankruptcy, you were aware that there was potentially a

9    problem with the -- excuse me -- the rebates and the fact

10   that the inventory was somehow impaired to some degree.  Is

11   that correct?

12   A    I would -- I'd have to take exception with that --

13   Q    Okay.

14   A    -- statement, from the standpoint that I was brought

15   onto the case around the end of third week of October.  So a

16   lot of this development of the thirteen-week cash flow was

17   done prior to my involvement in the case.  And certainly,

18   with the customer rebate issue -- which was approved by the

19   Court and there are still issues related to it, and we're

20   trying to deal with those, as well.

21   Q    Okay.  So I'm looking at a document called the "Revised

22   Thirteen-Week Cash Flow Budget."  Did you have input into the

23   creation of the revised thirteen-week cash flow budget?

24   A    We did.

25   Q    And is it the revised thirteen-week cash flow budget

1    that we're -- that is tied to the KEIP, or is it the initial,

2    as of the first day budget?

3    A    I believe it's the revised.

4    Q    Okay.  And so when you determined the revised thirteen-

5    week cash flow budget -- or you assisted the debtors in

6    getting it, was the fact that there were issues with the

7    rebates taken into account when determining the amount for

8    the inventory line?

9    A    Can you just repeat that question again?  I'm sorry.

10   Q    When the revised thirteen-week cash flow budget was

11   negotiated, did the debtors include in their analysis of the

12   amount of the post -- of the finished goods A/R the fact that

13   there was an issue with rebates?

14   A    Yes.

15   Q    And did they take into account when determining the

16   amount of the A/R for finished goods the fact that there was

17   some impaired -- I think is the language you used --

18   inventory?

19   A    Yes.

20   Q    Okay.  And the -- that portion of the KEIP is payable

21   whether the percentage is achieved during or even after the

22   forecasted budget period, correct?

23   A    I believe that's correct.

24   Q    Do you know whether the DIP order permits the revised

25   budget to be further revised with agreement with the DIP

1    lender?

2    A    I'm not aware of that.

3    Q    Okay.

4              THE COURT:  Let me just interrupt you for one

5    second.  I just want to make the record clear that there

6    hasn't been a DIP approved in this case, so all your

7    references to "DIP" are references (indiscernible)

8              MS. CASEY:  I'm sorry (indiscernible)

9              THE COURT:  (indiscernible)

10             MS. CASEY:  Cash -- I --

11             THE COURT:  So I just want to --

12             MS. CASEY:  I apologize.

13             THE COURT:  -- make sure the --

14             MS. CASEY:  I get --

15             THE COURT:  -- record is very --

16             MS. CASEY:  -- my (indiscernible) --

17             THE COURT:  -- clear on that.

18             MS. CASEY:  -- confused.

19             THE COURT:  And it's totally fine.

20             MS. CASEY:  Thank you.

21             THE WITNESS:  I was going to --

22             MS. CASEY:  The --

23             THE WITNESS:  -- make that reference, as well.

24             THE COURT:  (indiscernible)

25             MS. CASEY:  I apologize.

1          THE COURT:  That's okay.

2          MS. CASEY:  Thank you.

3    BY MS. CASEY:

4    Q    So is it your understanding, if the budget is revised,

5    does the revision -- will the 92 and 85 percent metrics for

6    the KEIP be as to the revised budget that's before the Court

7    today, or would it be as it's revised ongoing?

8    A    I -- I think that we're locked into the numbers for

9    purposes of calculating what the distribution would be under

10   the KEIP, using the numbers that are in the revised budget

11   today.

12   Q    Okay.  Thank you.

13        Then I'm going to move on to the sale portion of the

14   KEIP.  Is it my -- it's my understanding that the KEIP

15   participants will earn their percentage of their KEIP

16   payments simply upon the receipt of a qualified bid and not

17   upon closing of the sale.  Is that correct?

18   A    I think that's the -- the definition.

19   Q    So, if, in fact, the sale never closes, they would still

20   be entitled to their KEIP payments?

21   A    I think that's more of a legal definition.  I -- I'm not

22   clear on that.

23   Q    Okay.  Thank you.

24        And your affidavit indicates that there has been no

25   valuation of the debtors' business, so that the determination

1    of whether the amounts -- the 10 million, the 15 million, or

2    the 20 million -- are reached.  What was that based on, if

3    there has been no valuation?

4    A    Well, it -- there has been no recent appraisal or

5    valuation of the business.  I think the last one that is --

6    exists, what -- relates to when this group purchased the

7    assets from ArcelorMittal, which was in 2016.  I -- I believe

8    that these -- these three numbers were kind of discussed and

9    -- and negotiated as a low -- a low bar, a medium bar, and a

10   high bar to achieve.

11   Q    And what was -- how was it determined that they would be

12   low bars, medium bars, and high bars, based on the value of

13   what the assets are?

14   A    I think from input from the Candlewood folks, as to

15   where they believe a sale price is going to come in.

16   Q    Okay.  Was there any discussion of the likelihood of a

17   20 million?  Was it considered to be like a 90 percent

18   chance, and 80 percent chance?  Was there any discussion

19   along those lines?

20   A    I -- I think that they believed that that would be --

21   that would be a phenomenal sale price.  And they're not --

22   you know, there's -- there's been no pre-marketing of these

23   assets, so it's -- it's kind of difficult to figure out what

24   they're truly worth, in light of the fact that they're shut

25   down.

1   Q    Uh-huh.

2   A    This is a -- these plants are shut down; they're not an

3   operating entity.  So it requires a buyer that sees real

4   value in the assets, as they are today, needs to figure out

5   what it would take to get these -- these pieces of equipment

6   back up and running properly and not knowing how much

7   maintenance or -- or capital investment would be -- be

8   required to get them back up and running.  So there's a lot

9   of large-dollar factors that go into consideration of a

10  purchase price.

11  Q    Okay.  Has there been any recent appraisals of the real

12  estate that the debtor owns?

13  A    Not that I'm aware of.

14  Q    Okay.  One last line of questioning.  So the VP of

15  Sales, his entire metric relates to the inventory.  Can you

16  please tell me what efforts he will need to put in to realize

17  the KEIP metrics relating to the inventory?

18  A    Just managing the sales of -- of the prime and secondary

19  steel.  I can also add that, though part of his KEIP may not

20  be related, tied to the sales process -- which the other

21  three are --

22  Q    Uh-huh.

23  A    -- he has been intimately involved in plant visits by

24  strategic buyers.  Now we've had a group of people come in

25  that are -- were, quote/unquote, "liquidators."

1    Q    Uh-huh.

2    A    And then there's been a group of people that have come

3    in that would be financial buyers.  But we've had three --

4    well, at the end of this week, we will have had three groups

5    that have come in and visited.  One has already made three

6    visits to our location, to our LaPlace location, and has been

7    at at least Harriman, if not the other depots.  Now the

8    depots are merely steel service centers; they just hold steel

9    and they ship out the steel.  But they have made three

10   visits.  And to this -- today, we have a strategic buyer who

11   will be there today and tomorrow.  And I believe tomorrow,

12   one of the other major strategics in the industry is visiting

13   us at LaPlace, and they plan to be there for, I believe, two

14   days.

15   Q    Okay.  Thank you.

16        Narrowing in specifically to the inventory sales, the

17   question relates to this -- the testimony is that it is going

18   to be difficult to achieve an 85 percent of the budgeted

19   finished goods A/R, and that the VP of Sales is integral to

20   doing that.  What is it that the VP of Sales is going to do

21   that will affect whether we -- the debtors receive 50 percent

22   of the budgeted amount, 82 percent, or 95 percent; what is

23   his role in getting that price up?

24   A    That is one thing that we struggle with almost on a

25   daily basis.  His office is right next to mine.  And it's a -

1    - it's a sales process and it's a sales game to -- to try to

2    encourage customers to pay as much as possible for the steel.

3         Now we have maintained a relatively high level of value

4    per ton, and we've moved over 45 million -- 45,000 tons

5    inception to date, inception of Chapter 11 to date, of which

6    the first two weeks were relatively slow because people were

7    trying to figure out -- both internal people and customers,

8    trying to figure out what is it that we're probably doing in

9    the Chapter 11 case.  But sales have picked up.

10        We want to try to maintain a sales level that's robust.

11   But there comes a point in time -- and I have emphasized this

12   with him and he -- I believe he truly understands that

13   there's going to be a point in time where we're going to have

14   to sell steel -- and some of it may be prime, and I encourage

15   him not to -- at a lower rate.

16        And we're -- like, right now, we have an offer for 7,000

17   tons of secondary and distressed steel, and it's well below

18   525.  And that may dilute the ongoing rate of what he's

19   selling the material at.  But is that good for the debtor?

20   Absolutely.  Is there some negative incentive there for him?

21   I -- you know, it may be.  But it's to the benefit of the --

22   of the debtor that we sell this material because it would be

23   a shame to have it on site on the last day, once we -- once

24   we sell the hard assets, and we have to walk away from the

25   hard -- the inventory.

Deutchman - Cross

1    Q    Okay.  But I'm going to go back.  When the -- in the

2    budget, in the thirteen-week budget, the finished goods.  Do

3    you know what the amount per tonnage was -- the average

4    amount of tonnage was for the sale -- the finished goods in

5    the budget, that the debtors anticipated receiving?

6    A    Not off the top of my head.

7    Q    Okay.  So I understand what the debtors are going to do.

8    Can you tell me what the VP Sales -- the VP of Sales and

9    Logistics, what his role is going to be in increasing the

10   amount of recovery on the finished goods?

11   A    He's primarily responsible for the scrap inventory.  So

12   Dan, the VP of Sales, does not get involved with sale of

13   scrap material.

14   Q    Okay.

15   A    So, as product is evaluated, distressed product is

16   evaluated for whether it can be sold as distressed or it

17   needs to go scrap -- which you're going to drop down the

18   sales price -- it's the VP of Sales and Logistics who's

19   responsible for liquidating the scrap inventory.

20   Q    Okay.

21   A    And you know, he has scrap located at three locations;

22   two in the New Orleans area, and one in the Harriman area.

23   So he's got a big geographical area of -- that he has to

24   liquidate some of the material.

25   Q    Okay.  And then, finally, the VP of Finance.  What is

Deutchman - Cross                              33

1   his role in increasing the recovery on the budgeted financial

2   goods -- finished goods?  Excuse me.

3   A    He -- he -- he's over -- he oversees the gentleman that

4   is in charge of collections, so maybe that's the connection.

5   Q    Okay.

6   A    I think his -- his role in selling the hard assets, not

7   the inventory, is much more pronounced.

8   Q    And by "selling the hard assets," you mean the KEIP

9   metric that's relating to the sale of the debtors' business.

10  A    Correct.

11  Q    Okay.  I have no further questions, Your Honor.

12          THE COURT:  Okay.  Any further cross?

13          MS. SCHLUSSEL:  Again, for the record, Lauren

14  Schlussel from Kelley, Drye & Warren, proposed counsel to the

15  committee.

16                      CROSS-EXAMINATION

17  BY MS. SCHLUSSEL:

18  Q    Do you have a copy of the thirteen-week budget in front

19  of you?

20  A    It's not in front of me.

21          MS. SCHLUSSEL:  Can I hand this to the witness?

22          THE COURT:  Yes.

23      (Participants confer)

24  BY MS. SCHLUSSEL:

25  Q    Mr. Deutchman, under the top portion of the budget,

Deutchman - Cross                                34

1    where it says "Receipts," do you see the line item that says

2    "A/R and miscellaneous assets"?  It's about six or eight

3    lines down.

4    A    Yeah, it's the last one.

5    Q    Correct.

6         And what's the dollar amount that you see there at the

7    end?

8    A    Ten million, three ninety --

9    Q    Thank you.

10   A    -- thousand.

11   Q    And are you familiar with what is included in that line

12   item?

13   A    I believe that that is the sale proceeds from hard

14   assets, other than LaPlace, the LaPlace plant.

15   Q    So "hard assets," meaning there are, as I understand,

16   some real estate and maybe some buildings --

17   A    And -- and --

18   Q    -- related to --

19   A    And machinery and equipment.

20   Q    And machinery --

21   A    Yes.

22   Q    -- related to the debtors' other depots.

23        Do you have any memory of what valuation -- I mean, this

24   is a round number -- but of what those hard assets are, the

25   value that's attributed to them in this budget?

1    A     Not specifically here, at this time.  I can -- I can get

2    it for you.

3          MS. SCHLUSSEL:  All right.  May I hand up to the

4    witness the sort of backup to the budget?

5          (Participants confer)

6          MS. SCHLUSSEL:  Sorry.  I didn't realize.

7    BY MS. SCHLUSSEL:

8    Q     If you'd turn to the second page.

9    A     The second page.  The Chicago depot is a million, two

10   fifty; Harriman building and PP&E is 2 million; excess land

11   in LaPlace is a million; and accounts receivable sold at

12   auction is five five four oh.

13   Q     Okay.  So, rough math, is it fair to say that it's about

14   $5 million is attributed to sort of this other real estate

15   and --

16   A     The --

17   Q     -- other like

18   A     The top three items?

19   Q     Yep.

20   A     Correct.

21   Q     Correct.

22         And so it's been our understanding there's this real

23   estate, and then there is the LaPlace, you know, facility,

24   with just really sort of the core -- as we understand it --

25   of the operations.  Is that a fair --

1    A     That's correct.

2    Q     -- assessment?  Okay.

3    A     This will only occur if we don't get, you know, bids for

4    those specific assets.

5    Q     Correct, correct.  Understood.

6          Last question.  You mentioned, as part of your colloquy

7    with the United States Trustee's Office regarding the fact

8    that there's no current valuation of these assets, other than

9    what you know of, in terms of the fact that these were

10   acquired about two years ago.  Is that correct?

11   A     Three and a half years ago.

12   Q     That --

13   A     April of -- April of '16.

14   Q     Okay.  Fair.

15   A     So, you know, as time --

16   Q     Right.

17   A     -- goes by --

18   Q     Yes.

19   A     -- they become less relevant.

20   Q     Understood.  But do you have a -- do you have any

21   knowledge of what that sale price was?

22   A     I believe -- and this is just from memory.  I think that

23   they purchased the assets for roughly 40 million, I believe.

24            MS. SCHLUSSEL:  Okay.  Thank you.

25            THE COURT:  Okay.  Any redirect?

1          MS. KATONA:  No, Your Honor.

2          THE COURT:  Okay.  Thank you, Mr. Deutchman.

3          THE WITNESS:  Thank you.

4          THE COURT:  You can step down.

5      (Witness excused)

6          THE COURT:  Okay.  How about some argument from the

7    committee then?  And then we'll allow the trustee -- U.S.

8    Trustee to argue, as well.

9          MS. SCHLUSSEL:  Thank you, Your Honor.

10          Your Honor, the committee is not trying to be

11    obstructionist in this case or litigious for litigation's

12    sake.  I think that's apparently from last week's hearing,

13    where, you know, all the parties -- the lenders, the debtors

14    -- were able to come to a reasonable resolution on both the

15    bid procedures and the cash collateral order that was in

16    front of you.  And certainly, that was our intent with the

17    KEIP proposal, as well.

18          We had some significant concerns with the KEIP

19    proposal that was initially proposed.  As you saw in our

20    objection, it would have required the participants to

21    liquidate a little bit more than half of the inventory.  They

22    could have done nothing more, defaulted under their cash

23    collateral order, and still received a KEIP.  And we thought

24    that that was inappropriate and we didn't see that it was

25    incentivizing.

1          And so we've engaged in negotiations with the

2    debtors on this point.  And we're pleased with the progress

3    that has been made on the inventory liquidations.  This was,

4    you know, substantial back-and forth on how to get it to a

5    place where we felt it was significantly higher than what was

6    initially proposed.  And we think that this 85 percent and 92

7    percent is materially better than where we were initially.

8    So we -- we're glad that we were able to push to envelope, so

9    to speak, to get to what we think is more incentivizing.

10         And so we are comfortable with the inventory

11   liquidation piece of the KEIP metric, subject to two caveats

12   or confirmations, rather; the first of which is that --

13   similar to the KERP participants, that none of the KEIP

14   participants be entitled to any other retention bonuses or

15   other bonuses or severance in exchange for the KEIP payment.

16         And the second is that they be required to stay

17   through the inventory liquidations, in order to earn the

18   bonus.  I believe that is the intent as that was initially

19   contemplated in the motion, but it was not entirely clear for

20   me here, and so I wanted to make that statement on the record

21   for Your Honor.  So we certainly feel as though we've made

22   progress on what was initially before you.

23         We do still continue to have concerns with the sale

24   metric.  In the first instance, we're glad that there is one.

25   I mean, one of our primary concerns with the initial KEIP is

1    that it wasn't at all tied to the other fundamental piece of

2    what's happening in this case, which is a sale process.  So

3    we would have, you know, liquidated the inventory and gotten,

4    hopefully, the ABL lenders out.  But you know, there was

5    still a big question about the subordinated lenders and the

6    trajectory of the rest of the case.  So we're glad that that

7    is a part of this revised KEIP proposal.

8            We have questions about the metrics.  It doesn't

9    seem as though there's any evidence in this declaration that

10   was submitted as to how these numbers were formulated, and it

11   doesn't seem incentivizing to us.  You just heard from Mr.

12   Deutchman that, under their own budget, they have about $5

13   million of liquidation value that is attributed to these non

14   -- these real estate assets that are outside of, you know,

15   the LaPlace operations.

16           So, at this ten-million-dollar base number, the

17   debtors would only have to achieve a five-million-dollar bid

18   for the LaPlace facility to hit that initial metric and be

19   entitled to 50 percent of their KEIP bonus.  If this is the

20   scenario, the subordinated lenders are significantly under

21   water.

22           And that doesn't even require that an actual sale

23   be consummated, or that a sale be consummated that's a going

24   concern sale that, you know, has some requirement or some

25   plan that they're going to restart operations and rehire

1   employees and continue to do -- continue vendor

2   relationships.  There is none of that.  So we could have a

3   ten-million-dollar bid, not consummate a sale, and these KEIP

4   payments would still be earned.  So we, frankly, don't see

5   how this is incentivizing in nature.

6        We recognize how important these employees are to

7   the business and to the sale process.  And I think our

8   objection was incredibly clear, insofar as we are not

9   objecting to and have no concern with the dollar amount and

10  recognize the important in incentivizing them to reach goals

11  that are helpful to the estate as a whole, but we don't

12  believe this does it.  And we don't believe that the debtors

13  have met their burden of proving that these various metrics

14  are incentivizing in nature.  And so, for those reasons, we

15  continue to have an objection to the sale piece of the KEIP

16  metric, as currently proposed.

17       THE COURT:  Okay.  Thank you.

18       MS. SCHLUSSEL:  Thank you.

19       THE COURT:  Ms. Casey, if you could give me just

20  one moment, my computer seems to have --

21       MS. CASEY:  Absolutely, Your Honor.

22       THE COURT:  -- shut down here.

23    (Pause in proceedings)

24       THE COURT:  Okay.  Thank you.

25       MS. CASEY:  Thank you, Your Honor.  For the record,

1    again, Linda Casey for the U.S. Trustee.

2            Your Honor, in 2005, Congress amended the

3    Bankruptcy Code to put in place its policy that retention

4    bonuses should not be regularly paid to insiders in

5    bankruptcy cases.  I know that's not been very popular with

6    debtors, but that is a congressional policy and that is why

7    the U.S. Trustee here is objecting.

8            There are two metrics, the inventory metric and the

9    sale metric.  As to the inventory metric, the U.S. Trustee is

10   somewhat pleased to hear that it will be tied to this current

11   budget and it won't be, as the amounts drop lower and lower,

12   they revise the budget and maybe they're able to get it as

13   sort of a fait accompli.  But we would request, if Your Honor

14   otherwise approves it, that that concept be somehow

15   memorialized in the order.

16           However, we do object to the metric as being a

17   reach.  You know, the metric is tied to the cash collateral

18   budget, and they have to receive -- to recover less than what

19   is budgeted.  And Your Honor approves the cash collateral

20   budget based on its reasonableness.  And if Your Honor had

21   been told that this budget is going to be a reach, at least

22   the U.S. Trustee would have serious concerns about

23   administrative insolvency and we would have to address that.

24           But this budget should, in fact, be reasonable and

25   be something, you know, expected to occur.  And to tie a KEIP

payment on receiving less than the budgeted amounts does not

seem to be something that incentivizing, in the sense of

being difficult to achieve.  But the U.S. Trustee would say

that it seems to be more of the disguised retentive bonus,

where they pick a metric that is expected to occur -- is

expected to occur in an amount greater than that, or they

wouldn't have put it in there cash collateral budget.

There's also an issue here as to what the three

KEIP participants who are going to receive an amount based on

the inventory will actually do to recover that amount.  It is

not simply -- I mean, it would be a disguised retention --

retentive payment if they are simply there and the lower-

level employees do what they're to do to get this amount, and

they just recover as in the insiders, in particular the VP of

Finance.  The record is not very strong that his activities

are the activities that will increase the recovery.

Finally, the evidence suggests that this is a reach

because there are issues relating to the rebates and the

impairment of certain inventory.  But the evidence today was

that this revised budget took those factors into

consideration when the revised budget was made.

So it is the U.S. Trustee's position that this is,

in essence -- we appreciate that it's more difficult than

what was originally in the motion, but that it is, in

essence, an easy-to-achieve target, an expected target, and a

1    target that the three participants don't necessarily have a

2    lot of control over whether -- especially as to the VP of

3    Finance, as to whether they're achieved.  So we would say

4    that they are, in fact, a disguised retentive plan.

5              As to the sale metric, I think we have the same

6    concerns that the committee has, is we don't have any

7    evidence that this is a reach, an easy to achieve -- we've

8    been told we don't know what the value is, so we picked the

9    value based on what we think will be difficult.  But as they

10   point out, they already have in their budget a certain

11   amount.  And there's just simply nothing on the record that

12   the Court can determine that this is, in fact, difficult-to-

13   achieve metrics.

14             However, more concerning to the U.S. Trustee is

15   that it can be achieved simply by getting a qualified bid and

16   not having a closing of the sale.  I don't know if Your Honor

17   is aware, but very recently Judge Sontchi had two cases where

18   the sale didn't close and the debtors had to scramble to get

19   another sale done.  And we would say that there is certainly

20   not very much of a financial benefit to the estate of simply

21   bringing in a qualified bid and that it should be tied to an

22   actual closing.

23             And unless Your Honor has any further questions,

24   that --

25             THE COURT:  No, I do not.  Thank you.

1          Okay.  Why don't I hear from the debtors in reply.

2          MS. KATONA:  Your Honor, thank you.  Again, Shanti

3     Katona on behalf of the debtors.

4          Your Honor, I -- if I understand, Mr. Deutchman is

5     no longer on the stand, but I would like to correct the

6     record.  And I appreciate that it may not be appropriate for

7     counsel to be the one saying this.  But I do want to note

8     that there are certain rebate and allowance issues that have

9     arisen post-petition, since the KEIP motion was filed, that

10    are not accounted for.

11         There is one particular issue.  So, when Mr.

12    Deutchman said that, yes, he believed that all of the rebate

13    issues were acknowledged and appreciated under this line

14    item, that's, in fact, not true, so -- and we believe that

15    it's anywhere between $500,000 to a million dollars that

16    remains at issue with respect to that program, so --

17         THE COURT:  And I think you need to put Mr.

18    Deutchman back on the stand --

19         MS. KATONA:  Understood.

20         THE COURT:  -- to testify as to that, if you're

21    going to rely upon that --

22         MS. KATONA:  Okay.  Understood.

23         THE COURT:  -- which you are welcome to do.

24         MS. KATONA:  Unfortunately, he may not be the one

25    that can truly testify to that.  So I think we don't have a

1    witness who can --

2            THE COURT:  Okay.

3            MS. KATONA:  -- address that today.  I -- thank

4    you, though, Your Honor.

5            THE COURT:  Okay.

6            MS. KATONA:  We hear both the committee and the

7    U.S. Trustee's concerns with respect to the inventory -- or

8    sorry -- the sale metric being problematic.  One thing that

9    the debtors want to highlight for the Court is, yes, there --

10   it is difficult because we do not have the valuation.  And

11   the understanding, or at least the -- optically, it appears

12   as if these numbers were, you know, pulled from the sky.

13   There is no value.

14           The numbers that are in -- there is no known value

15   with respect to the invent -- the non-inventory.  The numbers

16   that are in the budget, that are in the line item labeled

17   "A/R and miscellaneous assets," and that we have allocated

18   amounts to them, these are still not firm numbers.  These are

19   the debtors' estimates.

20           With respect to the under -- you know, the position

21   that this was a reasonable bud -- a reasonable budget, and

22   you know, for the debtors to meet the numbers in the budget,

23   that's what expected of them.  Under the cash collateral

24   order, which we hope to have entered on a final basis,

25   there's a variance allowed, Your Honor.  So there's a ten

1    percent variance allowed with respect to these rows, meaning

2    that, you know, you can hit 90 percent of these rows and

3    still be within budget and not have defaulted under the cash

4    collateral.  If this budget, as it sits, is intended to be

5    the end all, be all, there would be no basis for a variance

6    to be allowed under an order.

7         Right now, setting the metric at 92 percent of

8    hitting this particular row is, in fact, doing better than

9    what's allowed and above what would trigger a default.  So,

10   Your Honor, the debtors do believe that this is sufficiently

11   incentivizing.

12        As we laid out in mister -- as is laid out in Mr.

13   Deutchman's declaration, with respect to the individuals that

14   are involved in the inventory sales, there are a number of

15   factors that continue to plague their ability to sell the

16   assets.  Not -- you know, in addition to the rebate issue and

17   the allowance issue, we also have the fact that there is

18   about 30 percent of remaining inventory that is not prime

19   steel, meaning that it is challenging to sell that.

20        There are a number of other competitors in the

21   industry that are very well aware of this debtor's

22   bankruptcy, and are very much taking advantage of the fact

23   that the debtors have no -- may end up without a choice and

24   have to liquidate these assets.  So everybody -- the

25   understanding is that there are a number of customers that

are hedging their bets and taking their time, deciding

whether or not they want to, in fact, enter into new

transactions with these debtors.  These are factors that the

inventory -- the individuals that are subject to the

inventory sales metric understand and are trying to tackle on

a daily basis and get ahead of the game.

     With respect to and going back the going concern

sale metric, Your Honor, we appreciate that it is difficult

to say what these debtors are going to be able to achieve, as

far as a qualified bid.  We do believe that qualified bids

should be - and I guess we can clarify.

     To the extent we are talking about a qualified bid,

the debtors understand that it's to enough just to show up

with a bid in hand at an auction.  The position would be that

they would actually take that qualified bid and seek to have

it approved at a sale hearing.  However, it cannot be left on

the shoulders of these individuals to understand that the --

to expect the sale to 100 percent close.

     This is a -- the debtors' facilities are subject to

a number of external factors that these participants have no

control over, including, as was highlighted at the venue

hearing last week, you know, there are parties that are

making allegations with respect to the condition and, you

know, the -- I guess the long-term issues related to these

facilities.  Whether or not they are true or not, there are a

1    number of factors that the debtors have no control over

2    whether or not we can, in fact, get to a sale closing.

3         These individuals, notwithstanding that, are doing

4    everything that they can to work with the prospective

5    bidders, to provide them with information about how they can

6    potentially enter into synergistic relationships, how they

7    can come on board and figure out what they can do with the

8    assets, as they sit at these facilities.  That is not -- the

9    debtors' position is that is not something that should be

10   diminished or discounted.

11        And the last point, Your Honor, that I'll raise is,

12   you know, the debtors -- when the debtors entered bankruptcy,

13   the board of directors shared with them the incentive plan

14   that was filed a few weeks ago.  We understand that the terms

15   have substantially changed.  From a lot of the participants'

16   perspective, this has, essentially, been a bait-and-switch,

17   unfortunately.  And they are now being tasked with achieving

18   far more than what they thought that they needed to achieve

19   in order to obtain their incentive payments.  They

20   understand, notwithstanding, that the term -- you know, that

21   there have been objections raised and there needs to be a

22   showing of their doing.  But Your Honor, it is the debtors'

23   position that these individuals are, in fact, being

24   incentivized to work.  This is not simply a lay-up.  These

25   metrics that have been laid out is -- are stretches.

1            Unless Your Honor has any questions, we would

2    request that the KEIP, as revised, be approved.

3            THE COURT:  Okay.  I have no further questions.

4            Ms. Casey?

5            MS. CASEY:  Just very briefly, Your Honor.  I heard

6    more facts in counsel's closing argument that is not part of

7    the record, more than just the one that you had raised,

8    including issues relating to the sale -- to the closing and

9    the sale.  And I would just object to any facts that were

10   raised by counsel that were not part of the record.

11           And I would also note that the closing of the sale

12   -- you know, short of having it be a closing of the sale,

13   there is no actual financial benefit to the estate, and that

14   it could cause significant harm, especially if the case does

15   convert to a Chapter 7, to have those administrative

16   expenses.  Thank you, Your Honor.

17           THE COURT:  Okay.  Thank you.

18       (Pause in proceedings)

19           THE COURT:  I'm going to go ahead and I'm going to

20   approve the KERP for reasons that were already stated on the

21   record:  No objections have been filed to the KERP and the

22   Court does find that the evidence presented supports that

23   relief.

24           With respect to the KEIP, it's a difficult

25   decision, but I am going to approve the KEIP, subject to a

1    few modifications.

2         First, I do think that the sale metrics need to be

3    tied to a closing of the sale, for the reasons that Ms. Casey

4    and the committee, Ms. Schlussel, have articulated, primarily

5    because, if the sale doesn't close, then there will be

6    absolutely no benefit that has been achieved to the estate

7    with just the added administrative costs of the KEIP.

8         Also, I do believe that -- I do believe, with the

9    committee's position with respect to the inventory

10   liquidation metrics, that the KEIP participants need to stay

11   through the close of the inventory sales.

12        And that -- I guess as a general matter, that the

13   participants have to agree that no other bonuses or severance

14   can be received in exchange.  I didn't hear the debtors

15   address that issue, but I don't imagine it's very

16   controversial.

17        With respect to the KEIP, I do feel that it has --

18   it does, with those changes, satisfy 503(c)(3), that it is a

19   proper exercise of the debtors' business judgment and is

20   warranted by the facts and circumstances of the -- of this

21   case.

22        I do find, based on the evidence presented, that

23   the revised, performance-based bonuses are properly

24   incentivizing.  I agree with the debtors that the metrics are

25   challenging and not necessarily guaranteed; and that both

bonuses -- subject to the modification that the sale

performance bonuses are linked to the closing -- are linked

to achievements that are not easily attainable.

Among other things, the KEIP participants are asked

-- being asked to sell inventory and collect receivables that

are critical to the value of the stakeholders in these

proceedings, and they must do so under challenging and

difficult conditions.

Moreover, the KEIP participants, if they achieve

the -- a closing of what -- of the amount that is outlined in

the revised Deutchman declaration, will have done so with no

pre-petition marketing, no stalking horse, on an accelerated

time frame, and with a company that is largely idled.

I understand the committee's concern and the

concern expressed by the U.S. Trustee regarding the valuation

of the assets.  But at this point, I do think that, given the

amounts at issue, and weighing that concern with the amounts

that would be payable, that the KEIP plan is reasonable for

those sale targets, given all of the benefits that would be

achieved for the estates.  You know, if the KEIP is fully

realized, 486,000 would be expended to achieve 40 million,

just for the inventory, and a potentially twenty more

additional for the sale of operating assets.

And while I certainly understand that there is a

chance that the targeted proceeds here won't yield value to

1    the unsecured creditor body, it's my opinion that that's not

2    a factor that would make a KEIP, per se, inappropriate.  The

3    debtors are tasked with maximizing recovery to all

4    stakeholders in their bankruptcy proceeding, not just the

5    unsecured creditors.

6           And as was discussed at the hearing on the final

7    cash collateral, the issue of the lenders' requested 506(c)

8    waiver is undecided and left open to the conclusion of these

9    cases.  And at that time, the parties and the Court can weigh

10   the circumstances of these cases, including the solvency and

11   the projected recoveries to the various creditor body.  And

12   the parties are going to have an opportunity to discuss the

13   go forward matters, including whether value can be obtained

14   for the general unsecured creditors.

15          One other point to note, I guess, with respect to

16   the budget.  I understand Ms. Casey's concern regarding the

17   concern that the inventory metrics are essentially a lay-up

18   because the budget reflects the parties' understanding of

19   what will be achieved in these cases.  But I think it goes

20   without saying -- and we've been -- all been involved in

21   cases where the forecasted amounts are not achieved.  And

22   they're certainly not a guarantee.  They're, you know,

23   perhaps good faith projections, if all of the best case

24   scenario plays out, as hoped for.  But I think that that's

25   why we often see 506(c) waivers being so critical because of

1    the risk to the estates that the forecasts are not, in fact,

2    achieved.  So I certainly understand that concern.

3              But again, weighing all of the facts and

4    circumstances here, I am prepared to approve the KEIP, but

5    with those, I guess, three changes:  Linking the sale

6    incentives to a closing and requiring that the beneficiaries

7    waive severance and other bonus payments that they may

8    otherwise be entitled to, and then, finally, requiring that

9    the employees stay through the sale of the inventory.

10             MS. CASEY:  Your Honor, a clarifying question.

11   What about --

12             THE COURT:  Sure.

13             MS. CASEY:  -- if they're tied to the current

14   revised budget --

15             THE COURT:  Oh, of course.

16             MS. CASEY:  -- without further revisions.

17             THE COURT:  Of course.  Also, you -- I think that

18   that does make sense.  I don't think there was necessarily an

19   objection to that, that the inventory metrics should be tied

20   to the revised thirteen-week cash flow budget that was

21   presented to the Court today.  I'm not sure if there will be

22   any modifications between now and when it is presented to the

23   Court.  But we all know what budget the Court is holding, so

24   I will leave it to the parties to craft language to

25   adequately reflect that agreement.  Okay.

1          (Participants confer)

2                    THE COURT:  Okay.  Does anyone have any further

3     questions?

4                    MS. KATONA:  No questions, Your Honor.  Shanti

5     Katona on behalf of the debtors.

6                    I think, to allay everybody's concerns with respect

7     to this budget, versus a revision -- a revised iteration

8     later on, we will likely put in a dollar amount to clarify

9     that, so that it's clear that that is, in fact, what we were

10    talking about, the numbers that we discussed on the record

11    today.

12                   THE COURT:  Okay.  That seems reasonable.

13         (Participants confer)

14                   THE COURT:  All right.  So anything further?

15                   MS. KATONA:  No, Your Honor.  We'll work with the

16    Officer of the United States Trustee and committee counsel to

17    get you a revised form of order --

18                   THE COURT:  Okay.

19                   MS. KATONA:  -- (indiscernible)

20                   THE COURT:  Thank you very much.

21                   MS. KATONA:  No.  Thank you.

22                   THE COURT:  All right.  We'll stand adjourned.

23                   UNIDENTIFIED:  Thank you, Your Honor.

24         (Proceedings concluded at 12:07 p.m.)

25                              *****

1                          CERTIFICATION

2              I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7

8

9

10   _____        November 12, 2019

11   Coleen Rand, AAERT Cert. No. 341

12   Certified Court Transcriptionist

13   For Reliable