```
 1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2

 3   IN RE:                      .  Chapter 11
                                 .
 4   BAYOU STEEL BD              .  Case No. 19-12153 (KBO)
     HOLDINGS, LLC, et al.,      .  (Jointly Administered)
 5                               .
                     Debtors.    .  Courtroom No. 3
 6                               .  824 Market Street
                                 .  Wilmington, Delaware 19801
 7                               .
                                 .  Monday, December 23, 2019
 8   . . . . . . . . . . . . . . .  12:33 P.M.

 9                      TRANSCRIPT OF HEARING
                 BEFORE THE HONORABLE KAREN B. OWENS
10                 UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:          Christopher A. Ward, Esquire
                               Shanti M. Katona, Esquire
13                             POLSINELLI, PC
                               222 Delaware Avenue
14                             Suite 1101
                               Wilmington, Delaware 19801
15
     For the Official
16   Committee of Unsecured
     Creditors:                James S. Carr, Esquire
17                             KELLEY DRYE & WARREN, LLP
                               101 Park Avenue
18                             New York, New York 10178

19   (APPEARANCES CONTINUED)

20   Electronically
     Recorded By:              Leslie Murin, ECRO
21
     Transcription Service:    Reliable
22                             1007 N. Orange Street
                               Wilmington, Delaware 19801
23                             Telephone: (302) 654-8080
                               E-Mail:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording:
25   transcript produced by transcription service.
```

1  APPEARANCES (CONTINUED):

2  For Bank of
   America, N.A.:              Bradley R. Foxman, Esquire
3                              VINSON & ELKINS, LLP
                               Trammell Crow Center
4                              2001 Ross Avenue
                               Suite 3900
5                              Dallas, Texas 75201

6  For Westchester Fire
   Insurance Company:          Gary D. Bressler, Esquire
7                              MCELROY DEUTSCH MULVANEY &
                                 CARPENTER, LLP
8                              300 Delaware Avenue
                               Suite 770
9                              Wilmington, Delaware 19801

10 For Entergy
   Louisiana, LLC:             Alan H. Katz, Esquire
11                             LOCKE LORD, LLP
                               Brookfield Place
12                             200 Vesey Street
                               20th Floor
13                             New York, New York 10281

14 For United Steel, Paper
   And Forestry, Rubber,
15 Manufacturing, Energy,
   Allied Industrial and
16 Service Workers
   Industrial Union:           Richard M. Seltzer, Esquire
17                             COHEN, WEISS AND SIMON, LLP
                               900 Third Avenue
18                             21st Floor
                               New York, New York 10022
19
   For the Trustee:            Benjamin A. Hackman, Esquire
20                             OFFICE OF THE UNITED STATES TRUSTEE
                               J. Caleb Boggs Federal Building
21                             844 King Street
                               Suite 2207, Lockbox 35
22                             Wilmington, Delaware 19801

23

24

25

APPEARANCES (CONTINUED):

For Black
Diamond Commercial
Finance, LLC:                  Daniel J. McGuire, Esquire
                               WINSTON & STRAWN, LLP
                               35 West Wacker Drive
                               Chicago, Illinois 60601

                               -and-

                               Seth A. Niederman, Esquire
                               FOX ROTHSCHILD, LLP
                               919 North Market Street
                               Suite 1300
                               Wilmington, Delaware 19899

For Louisiana Health
Service & Indemnity
Company d/b/a Blue
Cross and Blue Shield
of Louisiana:                  David M. Klauder, Esquire
                               BIELLI & KLAUDER, LLC
                               1204 North King Street
                               Wilmington, Delaware 19801


For Liberty BSG
Holdings, Inc.:                Anson B. Frelinghuysen, Esquire
                               HUGHES HUBBARD & REED, LLP
                               One Battery Park Plaza
                               New York, New York 10004


For Air Liquide and
Air Products:                  Victoria A. Guilfoyle, Esquire
                               BLANK ROME, LLP
                               1201 North Market Street
                               Suite 800
                               Wilmington, Delaware 19801

1

INDEX

2    <u>MOTIONS</u>:                                                     PAGE

3    Agenda
     Item 11:    Motion of Debtors for Entry of (I) an Order (A)         6
4                Approving Bid Procedures in Connection with the
                 Potential Sale of Substantially All of the
5                Debtors Assets, (B) Scheduling an Auction and
                 Sale Hearing, (C) Approving the Form and Manner
6                of Notice Thereof, (D) Authorizing the Debtors
                 to Enter Into a Stalking Horse Agreement, (E)
7                Approving Procedures for the Assumption and
                 Assignment of Contracts and Leases, and (F)
8                Granting Related Relief; and (II) an Order (A)
                 Approving the Sale of Substantially All of the
9                Debtors Assets Free and Clear of All Liens,
                 Claims, Encumbrances, and Interests, (B)
10               Authorizing the Assumption and Assignment of
                 Contracts and Leases, and (C) Granting Related
11               Relief [Docket No. 73; 10/11/2019]

12      Court's ruling                                                   85

13   Agenda
     Item 12:    Motion of Debtors for Entry of an Order (I)            87
14               Establishing Bar Dates for Filing Proofs of
                 Claim, Including Section 503(b)(9) Claims and
15               (II) Approving Form and Manner of Notice
                 Thereof [Docket No. 281; Filed: 12/5/2019]
16
        Court's ruling                                                  88
17
     Agenda
18   Item 13:    Motion of Louisiana Health Service & Indemnity         88
                 Company, D/B/A Blue Cross and Blue Shield of
19               Louisiana for Allowance and Payment of Claim
                 Pursuant to the Employee Wages and Benefits
20               Order, or Alternatively, Allowance and Payment
                 of an Administrative Claim Pursuant to
21               11 U.S.C. § 503(b)
                 [Docket No. 311; Filed: 12/13/2019]
22
     Court's ruling                                                     89
23

24

25

1                          <u>EXHIBITS</u>

2     <u>DEBTORS' EXHIBITS</u>                                <u>PAGE</u>

3     1)  Auction transcript                               48

4     2)  Intercreditor agreement                          48

5     Transcriptionist's Certificate. . . . . . . . . . . . . . .90

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commenced at 12:34 p.m.)

2               THE COURT OFFICER:  All rise.

3               THE COURT:  Good afternoon.  Please be seated.

4               Mr. Ward?

5               MR. WARD:  Good afternoon, Your Honor.  For the

6    record, Chris Ward, Polsinelli, on behalf of the debtors.

7               Starting off, Your Honor, thank you for giving us

8    this additional time and coming in today to hear this matter.

9    We were able to conclude the auction on Friday at around

10   4:00 p.m.

11              We met with our board of directors and later that

12   night we filed a notice of successful bidder on the docket,

13   but I'll get to that in a second.

14              On the agenda, the Court was gracious enough to

15   approve our motion for the sale of the Harvey equipment

16   earlier today, so we appreciate that.  The other matter on

17   the agenda is the bar date motion.  I would propose taking

18   that last.  I think we need to assure we have a sale before

19   we move forward with the bar date motion.

20              THE COURT:  Okay.

21              MR. WARD:  With respect to the sale -- and I

22   apologize for jumping out of order there for a second -- we

23   are moving with the sale motion today.  The debtors' Board

24   has selected the GFG Alliance bid at $28 million, cash

25   purchase price with the eventual restart of the operations as

1   the highest and best offer.  We'll get into it in a second.

2           There was a credit bid by back diamond as our

3   second lien lender, which was in a higher amount of 33.65

4   million.  They filed an objection, which I'm sure the Court

5   has seen.

6           So, I think you have the Black Diamond objection,

7   which is to the sale itself for lack of a better term.

8   There's other objections of record; we believe those are

9   substantially resolved through language in the sale order.

10  There may be some cure issues that need to be discussed.

11          So, we have Mr. Glenn Pollack, who's our financial

12  advisor, in the courtroom.  I would -- I'd propose to proffer

13  Mr. Pollack's testimony, make him available for cross-

14  examination, and then we could first deal with the Black

15  Diamond objection and then move on to the sale order and

16  other objections, depending where we are at that point in

17  time, Your Honor.

18          THE COURT:  Okay.  Before we put Mr. Pollack on

19  the stand, I'd like to hear the parties' opening statements

20  of what their positions are.  I've read Black Diamond's

21  submissions, but I think it would be helpful for me to fully

22  understand the issues before we hear testimony on it, okay.

23          MR. WARD:  Absolutely, Your Honor.

24          From the debtors' perspective, as I've stood here

25  from day one, or Ms. Katona stood in front of this podium,

1  our message to the Court has been clear:  We were going to

2  run a sale process with the hopes of finding a purchaser that

3  was going to buy these assets and restart operations,

4  rehiring the hopefully 390-plus employees that were let go

5  the day before the bankruptcy.

6         In doing that, Candlewood Partners ran a marketing

7  process.  As you'll hear in the proffer and as the Court

8  heard in the bid procedures hearing, there was substantial

9  interest in these assets.  We went and had an auction that

10 was on the record.  We received 13 bids and had an auction

11 with time on -- I guess active auction time -- not all on the

12 record -- but 26 total hours, over two days with an

13 intervening hearing, and at the end of that, the highest-and-

14 best offer in the debtors' view was a twenty-eight-million-

15 dollar cash bid from GFG Alliance.

16         That bid will eventually restart operations.  They

17 have committed -- "committed" -- for GFG that they are going

18 to invest under the right circumstances, $90 million into the

19 operations and rehire as many of these employees as they can

20 if they get to that situation.

21         At the auction, there were bids for the lots and

22 the whole.  Black Diamond credit bid for all lots that did

23 not include LaPlace in an amount that added -- including

24 LaPlace for purposes of their credit bid, that total $33.65

25 million.  It is a credit bid.  There is no cash to the

1   estate.   There is no commitment to restart operations.

2   There's no agreement with the Union.   There's nothing that

3   the debtors' Board found would behoove anybody but Black

4   Diamond in that bid.   So, at the end of the day, the debtors'

5   Board elected to choose the GFG Alliance bid as the highest-

6   and-best offer, with respect to the assets, because I think

7   as this Court knows, it's not just the highest monetary

8   value; it's the highest value that's going to benefit all

9   creditors, and in our opinion, that is the bid that benefits

10  all creditors.

11          The issue that the debtors have is once Bank of

12  America is paid in full, Black Diamond becomes our senior

13  secured lender; they will be the first in line.   At the end

14  of the -- at the closing on January 31st, the debtors' estate

15  is going to be approximately $4 million short on

16  administrative claims; however, there are a third -- there's

17  approximately 38 million -- 37 and change million -- in

18  preference actions that are out there that even under a

19  conservative amount, should bring in enough money to pay down

20  the Black Diamond debt.   But even under that -- even with

21  that shortfall, Your Honor, Black Diamond would receive $24

22  million of cash through the sale.

23          So, the debtors believe that they can be in a

24  position to pay all administrative claims over time and pay

25  Black Diamond $24 million plus whatever is received with

1  respect to the preference actions, which, you know, obviously

2  will be subject to another order of the Court.  So, in the

3  debtors' Board of Directors' best business judgment, they

4  think that is the highest-and-best offer that's out there.

5  They believe that the debtors have accounted for payment of

6  all administrative claims, albeit, over time, and not at the

7  closing of the sale.

8         But I think from a legal perspective, I don't

9  think we have to pay all the administrative claims in full.

10  I think Judge Sontchi has said in Goody's that it's

11  administrative claims getting paid pursuant to a plan.  So, I

12  don't know where we end up in the endgame here, Your Honor,

13  but I do think that we can be in a situation that Black

14  Diamond -- that all administrative claims are paid in full

15  and that Black Diamond receives a substantial return on its

16  investment.

17         From the debtors' perspective, Your Honor, I don't

18  think we have any other options at this point.  I think we

19  have met our goal of finding a buyer that's going to buy

20  these assets and eventually restart operations.  I think

21  we've done it in a way that benefits all creditor

22  constituencies, including Black Diamond, although they may

23  not be as benefited as they would like to be under the

24  circumstances, but we do believe that this is the best

25  outcome for these bankruptcy cases, is approval of the sale

1  and allowing us to move forward.

2          THE COURT:  What's the argument to sell free and

3  clear over Black Diamond's lien?

4          MR. WARD:  I think the argument is, Your Honor,

5  that if we're --

6          THE COURT:  I should say what's the basis -- not

7  the argument.

8          MR. WARD:  Well, I think there's -- coming at it

9  from a little different angle, Your Honor, to the extent that

10 we are not allowed to sell free and clear over Black

11 Diamond's debt, we have solely run these bankruptcy cases for

12 the benefit of Bank of America and for Black Diamond.  At

13 this point in time, Black Diamond, subject to an

14 intercreditor agreement, has not even been able to take any

15 action in the case.  We would have solely run these cases for

16 the benefit of Black Diamond to the tune of $28 million with

17 no return to the bankruptcy estate, without paying

18 administrative claims in full, without restarting operations,

19 and without putting employees back to work.

20         So, we think under those circumstances, the Court

21 can allow us to pay admins over time and Black Diamond,

22 eventually, was going to get paid down, hopefully something

23 close to its secured debt, over time through the preference

24 acting and other causes of action.

25         THE COURT:  Refresh my recollection, what's the

1  total amount outstanding for Black Diamond?

2           MR. WARD:  Well, the total amount outstanding,

3  pursuant to their objection that they filed is they credit

4  bid $33.65 million, Your Honor --

5           THE COURT:  Okay.

6           MR. WARD:  -- so, I think that is the --

7           THE COURT:  Totality.

8           MR. WARD:  I think for today's purposes, that's

9  the stated amount of their senior secured debt.

10           THE COURT:  Okay.

11           MR. WARD:  Thank you, Your Honor.

12           THE COURT:  Thank you for that synopsis.  I

13  appreciate it.

14           All right.  Anyone else who -- I'll hear from the

15  committee.

16           MR. CARR:  Good morning, Your Honor.

17           THE COURT:  Good morning, Mr. Carr.

18           MR. CARR:  Jim Carr, Kelley Drye & Warren, on

19  behalf of the committee.

20           I agree with Mr. Ward all the way up until the

21  point where he started talking about Black Diamond.  Your

22  Honor, from the committee's perspective, we believe a viable

23  exit strategy would have LaPlace restarting and operating.

24  We believe having employees working going forward would be

25  appropriate.  We believe having vendors being able to deal

1  with the customer to sell product is appropriate.  We also

2  believe the employees -- as we said last time, we believe the

3  employee health claims should be paid in full and funded.

4  And, finally, we believe, Your Honor, administrative

5  creditors should be paid in full.

6         And that's where we have a disagreement with Mr.

7  Ward, in that by choosing this forum to sell the assets that

8  Black Diamond has collateral on, it was a convenience to them

9  and there's a benefit that was definitely obtained by Black

10  Diamond for that benefit and they should pay for that

11  benefit; that's number one.  Number two, where we disagree,

12  Your Honor, is as of right now, the cash collateral order

13  only covers Bank of America; it doesn't cover Black Diamond.

14         As a committee, we were provided with the

15  obligation to examine the validity and extent of Bank of

16  America's liens.  We have done that.

17         THE COURT:  Okay.

18         MR. CARR:  We haven't had the right yet to go and

19  challenge -- and we don't have a deadline yet to challenge

20  Black Diamond's validity of liens and claims, with respect to

21  the collateral.  And having said that, Your Honor, there's an

22  assumption -- and we disagree with that assumption -- that

23  Black Diamond has a valid, properly perfected lien.  That

24  remains to be seen.

25         Your Honor, there's also a second assumption,

1   which is equally important, and that is Black Diamond assumes

2   the estate has no claims against Black Diamond and the

3   committee believes that it does.  And this will be -- it's

4   not necessary to today, but it's necessary for an appropriate

5   exit strategy.

6            So, in connection with what Mr. Ward said, we

7   agreed with everything in terms of what's necessary for

8   today, but we think on a going-forward basis, we have a

9   little different view of the exit strategy of this case.  In

10  addition, Your Honor, we think it's inappropriate to take a

11  thirty-eight million-dollar -- I understand it's gross

12  preference amounts -- to use that money to pay down Black

13  Diamond, which Black Diamond doesn't have a lien against

14  preference actions.  So, that would be another point of

15  disagreement with what Mr. Ward said.

16           But for today's purposes, Your Honor, all we need

17  to decide today -- because we have a cash collateral order

18  that expired on December 20th that was extended until the end

19  of January for the benefit of Bank of America.  Everyone is

20  agreement that Bank of America is going to be paid in full

21  and that there is going to be a shortfall.

22           The question then becomes, who pays for the

23  benefit of having Your Honor decide that these assets could

24  be sold in this forum, in this jurisdiction, and for the

25  benefit of Black Diamond?  And that's where we have a

1  disagreement, Your Honor.  Thank you.

2           THE COURT:  Okay.  Thank you.

3           MR. FOXMAN:  Good morning, Your Honor.

4           THE COURT:  Good morning.

5           MR. FOXMAN:  Brad Foxman of bank of -- of Vinson &

6  Elkins, on behalf of Bank of America, as the first lien agent

7  here.

8           I wanted to rise this morning to support the

9  debtors' efforts to sell all of its assets and to ask the

10 Court to grant the relief in the motion.  As many parties

11 have pointed out, we are hopeful that we might be paid in

12 full in a few weeks at the closing of the sale.  That's not

13 without risk, however, and in looking at these sales, we

14 believe that consummating one of these particular

15 transactions is the best route to getting Bank of America

16 paid and is also the way to maximize the value of these

17 estates, because any alternative to a sale transaction here

18 would be value destructive.

19          We are pleased that there is no dispute about the

20 sale proceeds being paid at closing to the extent that we're

21 not already paid off at that time.  We hope to be paid off by

22 then, but we have agreed to extend cash collateral use

23 through the end of January in support of this process and to

24 let the debtors continue their efforts to realize that value.

25          The last item I'd like to point out before sitting

1   is just the existence of an intercreditor agreement.  As is

2   common in the intercreditor agreements, it was negotiated

3   heavily between Bank of America and Black Diamond.  The

4   relevant part of the intercreditor agreement for today's

5   purposes states that Black Diamond, defined as a subordinated

6   creditor, agrees that it will be deemed to consent to and not

7   object or pose a sale or other disposition of any property

8   securing all of any part of any senior debt, free and clear

9   of security interests, liens, or other claims of the

10  subordinated creditors, Black Diamond, under the Bankruptcy

11  Code, including Sections 363, 365, and 1129 of the Bankruptcy

12  Code, if senior agent has expressly consented to such sale or

13  disposition.

14          So, for purposes of today's hearing, I would like

15  to put on the record that Bank of America does consent to the

16  sale that the debtors are pursuing and the related

17  implications under the intercreditor agreement.

18          Thank you, Your Honor.

19          THE COURT:  Okay.  And refresh my recollection,

20  under the final cash collateral order, did anyone -- did Bank

21  of America get a 506(c) waiver?

22          MR. FOXMAN:  We did not, Your Honor.

23          THE COURT:  Okay.  Thank you.

24          MR. FOXMAN:  Thank you.

25          MR. BRESSLER:  Good afternoon, Your Honor.

1           THE COURT:  Good afternoon.

2           MR. BRESSLER:  Gary Bressler for Westchester

3   Insurance Company.  The debtor had indicated that they won't

4   contest the facts that we've issued a surety bond to Entergy

5   Louisiana, LLC, for $2 million in connection with the

6   debtors' business operations.  Two debtors executed an

7   indemnity agreement in connection therewith.

8           Westchester was provided with a five-hundred-

9   thousand-dollar letter of credit and Entergy has filed a

10  claim against Westchester for in excess of $1.6 million,

11  alleging that's the amount of prepetition utility severance

12  that have not been paid.

13          Entergy also filed an objection to the cure

14  amount.  In connection with the assumption of Entergy's

15  contract, saying it's owed in excess of $1.6 million, plus

16  whatever's owed post-petition.

17          We also filed a sale objection.  The debtors have

18  added some language in Paragraph 27 of the order to try to

19  deal with our objections, but we think it needs to be made

20  clear that any deposit that Entergy is holding or any deposit

21  the debtor is holding to Entergy aren't affected by the sale

22  or their set-off recoupment rights and that nobody is trying

23  to use our bond going forward, because it's a financial

24  accommodation.

25          Now, I just got the APA at 12:29, so it's possible

1   that some of that is in there.  Because I don't know that for

2   sure, we'd like that to be in an order.

3          In addition, on no prior notice, Entergy -- the

4   debtor has inserted a new paragraph in the order,

5   Paragraph 26, which basically says as follows, that if the

6   bonding company makes a payment to Entergy, that will no

7   longer be a part of the cure amount that is owed to Entergy.

8   We think that is improper because it violates Section 509 of

9   the Bankruptcy Code and our subrogation rights and we don't

10  think they can do that.

11         I have case law to cite to your at closing.  I

12  don't think it's appropriate to do it right now.

13         THE COURT:  Okay.  Thank you.

14         MR. KATZ:  Your Honor, I'm Alan Katz, representing

15  Entergy.  I was going to wait until after the evidence and

16  I'll address these issues, but we are concerned that no order

17  entered should resolve any issues concerning assumption and

18  assignment of Entergy's contract with the debtor, except,

19  perhaps, some bare-bones authorization for the debtor to do

20  that, until the cure amount, which is approximately

21  $2 million, has been determined and paid to Entergy.

22         We have no inherent objection to either potential

23  buyer assuming the contract.  They should pay the cure and

24  they should put up an ongoing utility deposit of $2,090,000

25  or -- I have it in my objection -- or, you know, an

1   equivalent letter of credit or surety bond.

2           And there's been a provision that we were shown

3   last week concerning the buyer entering into an agreement

4   with Entergy that, under which Entergy would pursue the

5   surety and the buyer would back up Entergy if it's not able

6   to collect from the surety.  We think that is just fraught

7   with trouble for Entergy, and even though we understand that

8   the buyer has said that it will reject the contract if

9   Entergy doesn't accept this provision, I think that's a risk

10  that we're probably going to have to take because we have a

11  nice size surety bond here to collect money from and we don't

12  want to jeopardize that.  Thank you.

13          THE COURT:  Thank you, Mr. Katz.

14          MR. SELTZER:  Good afternoon, Your Honor.

15          THE COURT:  Good afternoon.

16          MR. SELTZER:  Richard Seltzer of Cohen, Weiss &

17  Simon for the United Steelworkers.  I'm here with Ms. Susan

18  Kaufman, who is our local counsel.

19          The Steelworkers filed what we believe is a legal

20  and meritorious objection, but in light of the circumstances

21  of this case, including, but not limited to the need to avoid

22  a conversion to Chapter 7 for funding to the effective date

23  of a sale and the existence of only one bidder, who we

24  believe -- and debtors' counsel has stated and we believe

25  they will confirm -- that they intend to continue operations

1  after a substantial investment in the property, and its

2  positive past record with the Union elsewhere, we are

3  withdrawing the objection.

4       But I might say this, sometimes bankruptcy lawyers

5  and professionals focus singularly on the intense process

6  that we're involved in here and become somewhat diverted from

7  the reality that after the sale, there is an operation that

8  must be operated successfully with committed employees, and

9  with the support of those employees, the community, vendors,

10  and customers.

11       The workforce and the Union are disappointed that

12  this bidder was not able or not willing to make more specific

13  commitments about hiring of current employees and recognizing

14  the Union in entering into a contract, and we expect them to

15  engage with the Union as quickly as possible and not risk the

16  success of this purchase and their ability to operate going

17  forward.

18       Two more short points.  We agree with Your Honor

19  that the statement that you made last week that one way or

20  another, the medical claims of current and past employees

21  should be paid and we hope, at minimum, through the

22  administrative claim process or otherwise that there will be

23  funds available and we will continue to focus our attention

24  on that.

25       And, second, as to the revised order that we also

1   just got a short while ago, it is a free-and-clear order.  We

2   understand a free-and-clear order.  There are cases out there

3   that make clear that a bidder's actions after the sale, in

4   labor law and other terms, cannot be insulated from any

5   liabilities they may have for their post-sale activities and

6   we don't interpret the order as doing that and we don't think

7   the order could do that.

8            THE COURT:  Okay.

9            MR. SELTZER:  Thank you very much, Your Honor.

10           THE COURT:  Thank you.

11           MR. FRELINGHUYSEN:  Good afternoon, Your Honor.

12           THE COURT:  Good afternoon.

13           MR. FRELINGHUYSEN:  Anson Frelinghuysen for

14   Liberty BSG Holdings, Inc., also referred to as "GFG

15   Alliance" --

16           THE COURT:  Okay.

17           MR. FRELINGHUYSEN:  -- on the record today and at

18   the auction.

19           Thank you, Your Honor, for making the Court

20   available today to hopefully get this sale approved.  Liberty

21   Steel, as part of GFG Alliance, which is a global group of

22   energy, mining, metals, and logistics companies, with a

23   workforce of approximately 30,000 worldwide.

24           Liberty is very pleased to be designated the

25   purchaser of Bayou Steel Group's assets and respectfully

1 requests the Court approve the sale.

2          We're going to objecting to two objections --

3 addressing two objectives, but now I'll just be addressing

4 one.  With regard to the restart of the LaPlace facility and

5 the investment that Liberty intends to make in the plan, I

6 think that it's important that we talk about that openly.  We

7 expect a substantial capex into the company -- into the

8 business to make it up to snuff for operations in a way that

9 GFG operates its facilities.  That should probably take about

10 a year.  There are also some other -- that's primarily the

11 LaPlace facility.  The other facilities, there's some work,

12 as well.

13          In addition to the capex, there's a substantial

14 infusion of working capital to get everything up and running.

15 In total, you know, we're expecting about $110 of capex,

16 which includes today's purchase price, the capex, and the

17 working capital.  We expect to resume recycling operations --

18 recycling and scrapping operations hopefully in the second

19 half of 2020, and the full operations in early 2021.

20          That, of course, depends on a number of factors,

21 one of which is how quickly we can get the work done at the

22 plant that needs to get done.  The other is that, you know,

23 steel is a commodity and has a pricing and it's difficult,

24 and this operation and this investment right now is worth it,

25 and if the steel prices continue to plummet, that could

1  present a different problem.

2          So, those were our intentions today.  Certainly,

3  we have been and are committed to the twenty-eight-million-

4  dollar purchase price.  We're committed to doing as much as

5  we can to move Bayou Steel Group back into operations within

6  the year.  And part of that, of course, is workers.

7          We do have a very positive -- that is, Liberty has

8  a very positive relationship with the United Steelworkers in

9  other of its operating plants in the United States.  We

10 recognize the benefit that the United Steelworkers bring to

11 both, the plant operations and to their own workers and,

12 certainly, we have no opposition to having experienced

13 workers at our plants.  It is, at the same time, difficult to

14 know the extent of our operations and when they'll restart,

15 which is why we're not able to commit further to the United

16 Steelworkers.

17          At Your Honor's request, I can deal with the

18 Entergy and surety now or we can do that after we've been

19 approved.

20          THE COURT:  Yeah, why don't we wait until the end

21 and see how this falls out.

22          MR. FRELINGHUYSEN:  Great.  Any other questions?

23          THE COURT:  Not at this time.

24          MR. FRELINGHUYSEN:  Okay.  Thank you.

25          THE COURT:  Thank you.

1        MR. HACKMAN:  Good afternoon, Your Honor.

2        THE COURT:  Good afternoon.

3        MR. HACKMAN:  May I please the Court, Ben Hackman

4  for the U.S. Trustee.  I believe this is the first time that

5  I'm appearing before Your Honor and I just want to say it's a

6  privilege to be here.  I'm here for my colleague, Ms. Casey.

7        And counsel for the debtors have provided me with

8  a redline of the form of sale order before the hearing

9  started.  I've been looking through it and with Your Honor's

10 permission, if Your Honor is inclined to grant the sale

11 motion and approve the order, I would respectfully ask the

12 ability to provide discrete comments about the order later at

13 the hearing at the appropriate time.

14        THE COURT:  Okay.

15        MR. HACKMAN:  I would also note that our office

16 does have concerns about a sale being approved, where there

17 appears to be a significant administrative solvency shortfall

18 in the case, but we would defer to Your Honor on how to

19 approach that issue.  Thank you, Your Honor.

20        THE COURT:  Okay.  Thank you.

21        Mr. McGuire, how are you?

22        MR. MCGUIRE:  I'm doing well, Your Honor.  How

23 about yourself?

24        THE COURT:  Save the best for last, I think.

25      (Laughter)

1          MR. MCGUIRE:  Of course.  Of course.

2          For the record, Your Honor, Dan McGuire for Black

3 Diamond.  I'm glad you mentioned the final cash collateral

4 hearing earlier, Judge, because, you know, at the final cash

5 collateral hearing on November 5th, the budget approved at

6 that time had an approximately 6.2-million-dollar shortfall

7 in it.  The budget that was approved by Bank of America at

8 that time did not cover all the projected admins for the case

9 and the parties knew that at the time.

10          Neither of the secured creditors were willing to

11 commit to fund that level for this case at that time and the

12 parties all decided, you know what, let's kick that can down

13 the road.  There's a lot of interest in these assets, we've

14 got a sale process underway, and the hope was that the sale

15 process would moot the issue.  There would be a purchase

16 price high enough that it would cover both, Bank of America

17 and Black Diamond, and there would be excess proceeds and

18 this whole issue would just go away.

19          Well, unfortunately, that did not happen here.

20 The sale process yielded bids that both, were below the

21 stated amount of my client's debt, even though any of the

22 bids would cover Bank of America in any circumstance.  You

23 know, under those circumstances, you know, the Bankruptcy

24 Code's priority scheme is clear in terms of these things.

25 SubMicron is clear.

1           Certainly, there's no 506(c) waiver for either of

2   the secured creditors here.  To the extent that there are

3   admin claims that satisfy 506(c), those can be surcharges,

4   you know, if approved, and would come out ahead of the

5   secured creditors.  But you can't just decide because you

6   want to, that all the other admin claims come ahead of the

7   secured creditors without their consent.

8           And Black Diamond does not consent to all these

9   admin claims being paid ahead of them.  And we understand

10  that could lead to conversion of the case to a 7 and in a 7,

11  there could be some 506(c) claims that are out there, but we

12  have a valid, secured claim that is ahead of all these admin

13  claims, other than the ones that could be 506(c), and we are

14  not willing to allow sale proceeds to be used to fund those

15  claims, period, and full stop.

16          We put a higher bid out, okay -- we did.  If they

17  want to take the lower bid and give us the sale proceeds,

18  we'll live with that, even though we put a higher bid out.

19  If they can use avoidance actions to, you know, fund the rest

20  of those admins, God bless them -- that's great -- and we

21  would support that result if that can happen.

22          But we don't consent to the use of sale proceeds

23  to pay these admin claims.  So, to me, the options are go

24  through -- you know, they could have taken our higher bid.

25  They chose not to.  They can take the lower bid and give us

1  the sale proceeds or -- and find another way to fund the

2  case, or they can convert the case to a 7 and we're okay with

3  that, Your Honor.  So, that's basically our position here

4  with respect to this hearing today.

5           THE COURT:  Okay.  So, after reading your

6  conditional objection, my understanding was there's a little

7  bit more to the sale hearing, with respect to 363, free and

8  clear.  Given what I just heard about the intercreditor

9  agreement and given your statements, is that a live issue

10 today?

11          MR. MCGUIRE:  Yeah, I had think there is more to

12 it in terms of that, yes.  The Bank of America issues -- Bank

13 of America is going to be paid in full no matter what.  Our

14 bids also included cash to take them out.  We've, in fact,

15 offered to just take them out so that they don't have to come

16 to these hearings anymore.

17          But I don't deal with the Bank of America issues

18 with respect to this, my colleague, Mr. Niederman does --

19          THE COURT:  Okay.

20          MR. MCGUIRE:  -- so, to the extent that there are

21 issues relative to that, I'm going to let him address them.

22 But, yes, we think that those issues are live, if you will.

23          THE COURT:  Okay.  Mr. Niederman, good afternoon.

24          MR. NIEDERMAN:  Good afternoon, Your Honor.

25          THE COURT:  I understood the conditional objection

1  to be that if I were to find that the Liberty is the highest-

2  and-best bid, that Black Diamond objects to the sale free and

3  clear --

4           MR. NIEDERMAN:  Correct.

5           THE COURT:  -- unless some other issues are

6  resolved; namely, that they have receive the sale proceeds,

7  minus the current amount of the carve-out that's in the

8  current cash collateral budget.

9           But then I just heard that there's an

10  intercreditor agreement that essentially gave your consent,

11  which would satisfy 363(f).  So, what exactly is the scope of

12  what I'm determining today before we get to the testimony?

13           MR. NIEDERMAN:  Sure, Your Honor.

14           So, at the outset, we would say that the

15  intercreditor agreement is an agreement between Black Diamond

16  and Bank of America, and not necessarily before this Court.

17           THE COURT:  Uh-huh.

18           MR. NIEDERMAN:  But turning to the language that

19  was read into the record, the first time we're hearing that

20  the bank expressly consents to the sale was just five minutes

21  ago when the Court heard it, so it's news to us.  And then,

22  additionally, in addition to the language that was read by

23  counsel for Bank of America, the intercreditor also provides

24  that Black Diamond may bid for or purchase collateral at any

25  sale -- and I'm summarizing a little bit -- and that such bid

1  may not include a credit bid in respect of any subordinated

2  debt, unless the cash proceeds of such sale are otherwise

3  sufficient to cause the payment in full of the senior debt.

4           And so, that's expressly what we have here --

5           THE COURT:  Right.

6           MR. NIEDERMAN:  -- and so we think that that

7  provision moots out any argument that we wouldn't be

8  permitted to consent to the sale.

9           THE COURT:  Okay.  I think I understand your

10  position.  Okay.  Thank you.

11          MR. NIEDERMAN:  Thank you.

12          MR. MCGUIRE:  Your Honor, Dan McGuire, again,

13  just, now as I understand your point further with your

14  question with Mr. Niederman --

15          THE COURT:  Uh-huh.

16          MR. MCGUIRE:  -- just to be clear, even if we

17  consented to the sale --

18          THE COURT:  Uh-huh.

19          MR. MCGUIRE:  -- that doesn't mean we consent to

20  the use of the sale proceeds to pay anything other than our

21  claim, so it doesn't really --

22          THE COURT:  And I certainly understand that and I

23  created a little nifty issue tree --

24          MR. MCGUIRE:  It doesn't get you very far.

25          THE COURT:  -- but it gets me slightly down the

1  issue tree.

2          MR. MCGUIRE:  Right.  But not very far, since we

3  already said we would consent to the sale, if the proceeds

4  went to us.

5          THE COURT:  Right.  But there's been no -- and we

6  can reserve this for later argument -- but to the extent that

7  it's helpful to have some initial observations, what is the

8  requirement, sitting here today, if I were to approve this

9  sale to Liberty that the sale proceeds would go to Black

10 Diamond immediately?  I mean, we don't have a cash collateral

11 order that provides for that and I don't believe there's any

12 other documents that would provide for such an immediate

13 paydown, so it doesn't seem like that's a today issue.

14         MR. MCGUIRE:  They could be held.  It's just that

15 they couldn't be -- there would be no agreement that they

16 could be used for anything else.

17         THE COURT:  Right.  Okay.

18         So, you're not requesting that pursuant to the

19 sale order, that Black Diamond receive a paydown of its debt

20 upon entry of that sale order or do you?

21         MR. MCGUIRE:  I'll talk to my client if we take a

22 break at some point about that issue, understanding your

23 point.

24         THE COURT:  Okay.  Because I don't think I would

25 be amenable to that, given the lack of clarity, with respect

1  to the challenge rights of the committee or any other party

2  in interest.

3            MR. MCGUIRE:  Understood, Your Honor.

4            THE COURT:  I'm not saying that is an implicit

5  ruling that Black Diamond has to cover the freight of these

6  cases -- I'm not saying that at all --

7            MR. MCGUIRE:  Right.

8            THE COURT:  -- but I don't think that it's

9  necessary today to decide a paydown issue in connection with

10  the sale order.

11            MR. MCGUIRE:  Understood, Your Honor.

12            THE COURT:  Okay.  All right.

13            So, I think I understand what the scope of today's

14  hearing will be, so why don't we move forward with the

15  evidence.

16            MR. WARD:  Thank you, again, Your Honor.

17            THE COURT:  Thank you.

18            MR. WARD:  For the record, Chris Ward, on behalf

19  of the debtors.

20            THE COURT:  Actually -- I'm sorry -- before you

21  call any witness or proffer, my computer seems to be on the

22  fritz, so can we take a little five-minute break and

23  hopefully I can get it working again.

24            MR. WARD:  Absolutely, Your Honor.

25            THE COURT:  Okay.  Thank you.

1          We'll stand adjourned.

2      (Recess taken at 1:07 p.m.)

3      (Proceedings resumed at 1:12 p.m.)

4          THE COURT OFFICER:  All rise.

5          THE COURT:  Please be seated.  Thank you for

6  indulging me.

7          Oh, Mr. McGuire, hello.

8          MR. MCGUIRE:  Your Honor, Dan McGuire, again.

9      (Laughter)

10          THE COURT:  I'm glad that -- am I going to be glad

11  that my computer went on the fritz?

12          MR. MCGUIRE:  I used the five minutes to confirm

13  that we understand that it would be just a pot of money;

14  there would be no payment to Black Diamond.

15          THE COURT:  Okay.  Good.

16          MR. MCGUIRE:  One thing off the decision tree.

17          THE COURT:  Okay.  Excellent.

18          All right.  Mr. Ward?

19          MR. WARD:  There's actually one more.

20          THE COURT:  Oh, all right.

21          MS. GUILFOYLE:  Thank you, Your Honor.

22          Victoria Guilfoyle of Blank Rome, on behalf of

23  actually two vendors to the debtor -- one is Air Liquide.

24          We just, you know -- the debtors have circulated

25  the revised proposed sale order.

1           THE COURT:  Okay.

2           MS. GUILFOYLE:  There's language added to

3   Paragraph 7 -- not that you have that in front of you; we

4   just got the language -- I just want to reserve rights,

5   because I haven't had my client sign off on that language,

6   but I think we're going to get there.  The language seems

7   reasonable.

8           THE COURT:  Okay.

9           MS. GUILFOYLE:  So, that takes care of Air

10  Liquide.

11          The other vendor that I represent is Air Products.

12  They're kind of in a similar situation as Air Liquide, but

13  maybe a little bit different.  They -- the debtor -- the

14  purchaser, currently -- or the proposed purchaser -- not the

15  Black Diamond purchaser -- thinks they're going to want to

16  take an assumption and assignment of the Air Products

17  agreement.

18          THE COURT:  Uh-huh.

19          MS. GUILFOYLE:  We have to get to an agreement on

20  the cure amount and any kind of terms and conditions around

21  that assignment.  But if there isn't an assignment, they

22  have -- Air Products has property on the debtors' facility.

23  It's a huge tank, I'm told, that holds some type of chemical

24  gas and we want language -- and I think, you know, we're all

25  in the same agreement, that a language will be added to the

1  proposed sale order that kind of deals with an alternative.

2  If it's not assigned, then Air Products is going to have

3  time, similar to the Air Liquide paragraph to come and

4  collect their property, you know, within so many days of the

5  sale closing.

6              THE COURT:  Okay.

7              MS. GUILFOYLE:  So, you know, I just wanted to get

8  up and say that real quickly, and, if I have your permission,

9  I'd like to be excused.  I have a son who has the flu and

10 have to get to a doctor's appointment.

11             THE COURT:  Absolutely.  You may be excused.

12             MS. GUILFOYLE:  Thank you, Your Honor.  I

13 appreciate it.

14             MR. WARD:  All right.  Your Honor, I think we're

15 prepared to move forward with our evidence in support of the

16 sale.

17             THE COURT:  Okay.

18             MR. WARD:  I'd like to start with the proffer of

19 Mr. Glenn Pollack.  Mr. Pollack is in the courtroom and able

20 to testify.  He is a member of Candlewood Partners.  The

21 debtors have engaged Candlewood Partners as financial advisor

22 and investment banker.

23             Similar to his testimony at the bid procedures

24 hearing, Mr. Pollack would testify that the prior to the

25 bankruptcy, the company suffered under its debt load, which

1  eventually led to severe liquidity issues and eventually a

2  default under its prepetition loan agreements.  In the weeks

3  leading up to the bankruptcy, the debtors had no liquidity.

4  The debtors made the decision not to purchase any further raw

5  materials, and as it had done in the ordinary course of

6  business in the past when faced with excess inventory or

7  liquidity concerns, the debtors began selling off its

8  finished goods and inventory in order to pay down its secured

9  debt and other operating expenses.

10         The debtors also commenced discussions with its

11  lenders, Bank of America and Black Diamond, regarding and

12  orderly liquidation of the remaining inventory and assets

13  through a Chapter 11 bankruptcy filing.  As a result of those

14  discussions, on September 30th, 2019, the debtors conducted a

15  reduction in force and idled most operations before filing

16  for bankruptcy protection on October 1st.  The debtors

17  contained to engage in limited production to finalize

18  finished goods over the next several weeks and used the

19  bankruptcy process to sell off the remainder of its inventory

20  and run a Section 363 sale process with the hope to find a

21  strategic or financial buyer that would restart operations.

22         In furtherance of that goal, Mr. Pollack would

23  testify the debtors filed a bid procedures motion on

24  October 11th, 2019, and as noted in the bid procedures

25  motion, there was no prepetition marketing done in this case;

1  however, immediately upon filing, post-petition was commenced

2  by Candlewood.

3          Mr. Pollack would testify that 301 investors were

4  identified and approached by Candlewood; 58 non-disclosure

5  agreements were signed; and all parties that signed an NDA

6  were granted access to the data room.  All 57 parties -- all

7  58 parties that were given access to the data room also

8  received a more comprehensive confidential offering

9  memorandum regarding the debtors and the sale process.  Of

10 those 58 parties in the data room, 18 parties scheduled site

11 visits, two of those entities made multiple trips to the

12 LaPlace facility and one entity made multiple trips to the

13 Harriman facility.  Those bid procedures were approved by the

14 Court on November 8th and Candlewood continued to market the

15 assets.

16          Mr. Pollack would testify that the bid procedures

17 allowed six additional weeks of marketing after approval of

18 the bid procedures in addition to the five weeks of marketing

19 before the bid procedures were approved by this Court.

20          Despite significant interest in the debtors'

21 assets, no stalking horse bidder came forward prior to the

22 November 27th stalking horse designation.

23          The bid deadline under the bid procedures was

24 December 12th, 2019, at 4:00 p.m.

25          Mr. Pollack would testify that on or prior to the

1  bid deadline, the debtors received 12 bids with the bid

2  deadline being extended for two parties after consultation

3  with the -- after consultation with the consultation parties,

4  as defined in the bid procedures.

5          All parties submitted good faith deposits of at

6  least 10 percent of their opening bid with Polsinelli serving

7  as escrow agent for those bids.  Four bids were from

8  strategic parties, with one of those bids being for

9  substantially all of the debtors' assets, with a stated

10  interest in an eventual restart of operations.  Five of the

11  bids were from liquidators, two of the other bids were from

12  financial parties, and one bid was from a governmental entity

13  for the port at the LaPlace facility.

14          Mr. Pollack would testify that one of the bids

15  received after the bid deadline was not qualified and was not

16  permitted to participate in the auction, as they were bidding

17  on goods that were not -- inventory was not part of the sale

18  process.

19          Mr. Pollack would testify that pursuant to the bid

20  procedures order, the debtors established a data room and

21  shared all of the bids with the consultation parties.

22          On November 19th, 2019, an auction was commenced

23  at Polsinelli's offices in Wilmington, Delaware, and the

24  auction concluded -- excuse me, Your Honor -- the auction

25  included several different lots, Lots A through J:  Lot A was

1  the Chicago real estate; Lot B was the Oklahoma building;

2  Lot C was the Harriman real estate; Lot D was the Harriman

3  machinery and equipment; Lot E was the Harriman real estate,

4  together with the Harriman machinery and equipment; Lot F was

5  the LaPlace excess land; Lot G was the LaPlace real estate;

6  Lot H was the LaPlace machinery and equipment; Lot I was

7  LaPlace real estate, together with LaPlace machinery and

8  equipment; and Lot J was the bid -- was the lot for

9  substantially all of the debtors' assets.

10         At the auction, Lot A consisted of 17 active

11  rounds of bidding; Lot B had 38 active rounds of bidding;

12  Lot C had 5 rounds of bidding; Lot D consisted of 13 rounds

13  of bidding; Lot E has 7 rounds of bidding; Lot F had 26

14  rounds of bidding; Lot G has 6 rounds of bidding; Lot H had

15  26 rounds of bidding; Lot I had 21 rounds of bidding.

16         At the auction, Lot J was opened up with a twenty-

17  eight-million-dollar opening bid of GFG Liberty to purchase

18  substantially all of the debtors' assets, pursuant to the

19  terms of their asset purchase agreement.  Bidding on Lot J

20  did not move forward after being introduced at the auction.

21         Mr. Pollack would testify that from approximately

22  5:30 p.m. to approximately 2:00 a.m., the debtors, the

23  committee, the Union, Bank of America, and Black Diamond

24  discussed the bids received and the Lot J bid, in particular,

25  as well as the cash collateral budget and the administrative

1  solvency of the debtors' estates of.

2         Late in the evening -- Mr. Pollack would testify

3  that late in the evening or likely early in the morning,

4  Black Diamond made additional credit bids on Lot A, Lot B,

5  Lot E, and Lot F, which bids were contingent on the debtors

6  moving forward with GFG Liberty as the winning bidder on

7  Lot I.  At that point in time, the debtors adjourned the

8  auction and moved forward with a call of its Board of

9  Directors to discuss the status of the auction.

10        Mr. Pollack would testify that at the morning of

11 December 19th, the debtors' Board of Directors determined not

12 to accept the Black Diamond contingent credit bids because

13 the debtors believed that there was little likelihood that it

14 could close on the Lot I transaction with GFG Liberty, given

15 the dispute over the terms and amount of the bid and the

16 backup bid.  GFG Liberty also raised concerns with the

17 conduct of the auction at that point in time.

18        Mr. Pollack would testify the debtors' Board

19 determined that subject to further bidding at the adjourned

20 auction, the GFG Liberty cash bid for $28 million, plus the

21 eventual restart of operations, pursuant to the terms and

22 conditions of the GFG Liberty APA, would be considered the

23 highest-and-best offer to purchase substantially all of the

24 debtors' assets if no other bids were received.  Counsel for

25 the debtor advised this Court of those developments at the

1  hearing on December 19th.

2         Mr. Pollack would testify that on December 20th at

3  10:00 a.m., the debtors reconvened the auction

4  telephonically.  After the auction being open for

5  approximately 18 hours the day before -- I apologize, Your

6  Honor -- I struck that from my notes -- from Mr. Pollack's

7  notes.

8         Mr. Pollack would testify that at the adjourned

9  auction, all of the lots, A through J, were open for bidding

10 to all bidders.  At the outset of the auction, with the

11 approval of the committee, Black Diamond, and GFG, the

12 debtors added an additional lot to the auction; the newly

13 created Lot K included all LaPlace assets, which was a

14 combination of lots from the previous day.

15        The auction ran from approximately 10:00 a.m. to

16 approximately 4:00 p.m. on Friday, which at the end of the

17 day meant the auction was open for approximately 26 total

18 hours.  At the adjourned auction, Black Diamond asserted

19 additional credit bids to become the highest bids for Lots A,

20 B, E, F, and I.  The aggregate credit bid purchase price for

21 those lots is $33,650,000.  Black Diamond did not credit bid

22 on Lot J, which left GFG as the high bidder in the amount of

23 $28 million, subject to the terms of their proposed APA.

24        Mr. Pollack would testify that after conferring

25 with the consultation parties at the conclusion of the

1  auction, the debtors announced on the record that subject to

2  approval of the debtors' Board of Directors, the GFG bid

3  for -- the GFG cash bid for $28 million would be deemed the

4  higher-and-better offer.

5          Prior to the conclusion of the auction and in

6  subsequent conversations with the parties both, Black Diamond

7  and GFG relate concerns about the conduct and the outcome of

8  the auction.

9          Mr. Pollack would testify that later that day, the

10  debtors convened a meeting of their Board of Directors to

11  affirm the highest and, otherwise, best bid at the auction.

12          Mr. Pollack would testify that given the concerns

13  and potential objections by both, Black Diamond and GFG, the

14  debtors' Board did not make a final determination at that

15  meeting as to who was the highest-and-best offer.

16          Mr. Pollack would testify that subject to -- that

17  subsequent to the Board meeting, the debtors' were advised by

18  GFG that all of their concerns regarding the conduct and

19  outcome of the auction were alleviated and they were

20  committed to close the transaction on their twenty-eight-

21  million-dollar bid on or before January 31st, 2020, pursuant

22  to the terms of their submitted APA.

23          Mr. Pollack would testify the debtors'

24  professionals also continued to discuss the bids and

25  administrative solvency of debtors' estates with the

1 consultation parties, and on Saturday, December 21st, the

2 debtors' Board of Directors met and approved GFG Liberty as

3 the highest and, otherwise, best bid to purchase

4 substantially all of the assets.  On that same day, the

5 debtors filed a notice of successful bidder on the docket.

6       Mr. Pollack would testify that the debtors believe

7 that the GFG Liberty bid is the highest and, otherwise, best

8 bid because it is an all-cash offer and GFG has noted that it

9 will invest approximately $90 million in improvements in

10 capex into the facility and will eventually restart

11 operations which could lead to employees being rehired in the

12 local community.

13       Mr. Pollack would testify that the GFG Liberty bid

14 is also supported by the consultation parties, which are the

15 committee and Bank of America.

16       Mr. Pollack would further testify that the current

17 cash collateral budget, which was filed with the Court on

18 December 19th and runs through January 31st, 2020, accounts

19 for payment in full of almost all the administrative claims

20 incurred during that period.  The current cash collateral

21 budget does have a shortfall for 503(b)(9) can claims,

22 Candlewood's transaction fee, real estate taxes, KEIP

23 payments that are due at close that have not come due yet and

24 potentially other unquantifiable administrative expenses.

25       Mr. Pollack would testify he believes that the

1  administrative shortfall right now is about $4,400,000;

2  however, Mr. Pollack would testify that we believe -- the

3  debtors believe that there's now an agreement with BlueCross

4  BlueShield regarding payment of employee claims that is

5  subject to approval of the party and would include payment in

6  full of all of those employee claims in that administrative

7  shortfall -- within that administrative shortfall that we

8  discussed.

9          Mr. Pollack would further testify that in addition

10  to the receipts in the budget and the cash proceeds from the

11  sale, the statement of financial affairs for BD LaPlace, LLC,

12  one of the debtors, that has publicly filed in these cases,

13  sets forth that during the 90 days leading up to the

14  bankruptcy filing, approximately $37,120,572.14 in payments

15  were made to third parties.

16          Mr. Pollack believes that the proceeds of these

17  preference actions may assure that all administrative claims

18  in this case will be paid in full.

19          Mr. Pollack would further testify that after

20  payment of all administrative claims in full, the GFG cash

21  purchase price will leave approximately $24 million in cash

22  available to be set aside for Black Diamond.

23          Mr. Pollack would testify the debtors believe they

24  have exercised their best efforts to obtain the highest and,

25  otherwise, best offer for the assets and account for payment

1  of administrative claims as best as possible under the

2  circumstances.

3         Mr. Pollack would further testify no bidders were

4  insiders of the debtors; however, Black Diamond Commercial

5  Finance did participate in the auction as term loan lender

6  and in their capacity as 100-percent equity owner of the

7  debtors through an affiliate of Black Diamond.

8         Mr. Pollack would testify that all the

9  negotiations with GFG Liberty, as well as all other bidders,

10 we're in good faith and at arm's length and he is unaware of

11 any collusion among the purchaser and any other potential

12 bidders, with respect to the assets.

13        Mr. Pollack would testify he's not aware of any

14 pre-existing relationships between the purchaser and

15 management, nor does the company have any ownership or

16 financial stake with respect to the purchaser.

17        Mr. Pollack would testify that to his knowledge,

18 the purchaser is not a shareholder of the debtors and he

19 would further testify the purchaser is not owned or run by

20 any current or former officers or directors of the debtors.

21        Mr. Pollack would testify that GFG Liberty is a

22 disinterested good faith purchaser that is entitled to a

23 good-faith finding under Section 363(m) of the Bankruptcy

24 Code.

25        Mr. Pollack would testify that the proposed form

1  of sale order contemplates selling substantially all the

2  debtors' assets to GFG Liberty free and clear of any lien,

3  claims, and encumbrances, and in his professional opinion,

4  pursuant to the bidding procedures, the marketing, and the

5  auction, the debtors were able to obtain the highest-and-best

6  offer for the debtors' assets.

7           And that would conclude the testimony of Mr.

8  Pollack, Your Honor.  He's in the courtroom and available for

9  cross-examination if any parties have -- want to put him on

10 the stand.

11          THE COURT:  Okay.  Does anyone wish to cross-

12 examine Mr. Pollack?

13          MR. MCGUIRE:  Your Honor, I had one question for

14 Mr. Pollack, but if we could maybe take a two-minute break, I

15 could tell them what it is and they might just add to his

16 proffer to avoid going through all that, if that's okay?

17          THE COURT:  Okay.  That's fine.

18          MR. MCGUIRE:  Okay.  Thank you.

19          THE COURT:  Let's take a five-minute break.

20          We'll stand adjourned.

21      (Recess taken at 1:28 p.m.)

22      (Proceedings resumed at 1:32 p.m.)

23          THE COURT OFFICER:  All rise.

24          THE COURT:  Okay.  Please be seated.

25          Did the break obviate the need for a cross-

1  examination?

2           MR. WARD:  It did, Your Honor.  I will clarify Mr.

3  Pollack's proffer quickly and then I think we can move on.

4           Mr. Pollack would testify that the gross sale

5  proceeds that would be set aside for Black Diamond would be

6  in the amount of $28.45 -- $28,450,000; however, the twenty-

7  four-million-dollar figure that was proffered to the Court is

8  that number and taking out the shortage on administrative

9  claims, which is $4,400,000.

10          THE COURT:  Okay.

11          MR. WARD:  That's how we got to the $24 million.

12          THE COURT:  Understood.

13          MR. WARD:  That's the clarification for the

14  proffer for the record.

15          THE COURT:  Okay.  All right.

16          MR. WARD:  With that, Your Honor, I don't know if

17  we have any further questions for Mr. Pollack.

18          THE COURT:  All right.  Does anyone else wish to

19  cross-examine Mr. Pollack?

20      (No verbal response)

21          THE COURT:  All right.  Thank you very much.

22          MR. WARD:  Your Honor, I think we would like the

23  debtor -- in addition to Mr. Pollack's testimony, we would

24  like to enter the auction transcript into evidence, Your

25  Honor.

1           THE COURT:  Okay.

2           MR. WARD:  It's actually in several different

3 parts; given the length, we had a few different court

4 reporters over the two days --

5           THE COURT:  Okay.

6           MR. WARD:  -- and the lenders asked us to enter

7 the subordination and intercreditor agreement into evidence.

8           THE COURT:  All right.  Does anyone object to the

9 admission of the intercreditor agreement, as well as the

10 auction transcript?

11          MR. NIEDERMAN:  For the record, Seth Niederman, on

12 behalf of Black Diamond.  Judge, we don't see the basis for

13 entering the intercreditor into the record.  As I said

14 before, it's an agreement between two parties.  It has not

15 been set forth or testified to at all into the record and we

16 don't think it's appropriate this Court to have that as part

17 of its record for the sale hearing.

18          THE COURT:  Well, let me ask you and get a yes-or-

19 no answer.

20          MR. NIEDERMAN:  Sure.

21          THE COURT:  Do you object to the sale of the

22 assets free and clear of Black Diamond's lien under 363(f)?

23          MR. NIEDERMAN:  Yes.

24          THE COURT:  Do you stand here and contest that?

25          MR. NIEDERMAN:  Yes.

1            THE COURT:  And under what provision?

2            MR. NIEDERMAN:  Under?

3            THE COURT:  Under what subsection?

4            MR. NIEDERMAN:  I'd have to get my papers, but

5   it's spelled out in our papers.

6            THE COURT:  Okay.  So, 5?

7            MR. NIEDERMAN:  I don't have it right in front of

8   me -- correct.

9            THE COURT:  363(f)(5).

10           MR. NIEDERMAN: (F)(5), correct.

11           THE COURT:  All right.  So, it seems relevant to

12  me, the intercreditor agreement.

13           MR. NIEDERMAN:  Understood.

14           The Court will take whatever position it --

15           THE COURT:  Okay.  All right.

16           MR. NIEDERMAN:  We're lodging our objection for

17  the record to its being admitted into evidence.

18           THE COURT:  Okay.  So, I will overrule your

19  objection and admit the intercreditor agreement, as well as

20  the auction transcript, hearing no further objections.

21       (Debtors' Exhibit 1 received in evidence)

22       (Debtors' Exhibit 2 received in evidence)

23           MR. NIEDERMAN:  Thank you, Your Honor.

24           THE COURT:  Thank you, Mr. Niederman.

25           MR. WARD:  Thank you, Your Honor.  May I approach

1    with copies of those two exhibits?

2              THE COURT:  Yes.  Yes.

3              Okay.  So, for the record, we'll just mark the

4    auction transcript as Debtors' Exhibit 1 and the

5    intercreditor agreement as Debtors' Exhibit 2.

6              Do you have an extra copy that I could have,

7    please, of the intercreditor agreement?

8              MR. WARD:  We do, Your Honor.

9              May I approach with another copy, Your Honor?

10             THE COURT:  Yes, please.

11             And can you point me, again, to the provision

12   under the intercreditor agreement that was cited in argument?

13             MR. WARD:  It's Section 2.2(d), Your Honor.

14             THE COURT:  Okay.

15             MR. WARD:  It's Page 11 of the PDF, the first full

16   sentence on Page 11 of the PDF for the actual hard copy you

17   have.

18             THE COURT:  Okay.  Thank you.

19             MR. NIEDERMAN:  And just for the record, Your

20   Honor, the provision that I read from is in the definition of

21   permitted action, Subsection I.  It's the end of the

22   paragraph on Page 6.

23             THE COURT:  Okay.  Thank you, Mr. Niederman.

24             MR. NIEDERMAN:  Thank you, Your Honor.

25             THE COURT:  Okay.  Thank you.

1      MR. WARD:  Sorry, Your Honor.  There was some

2   colorful language early in the morning on Friday that made it

3   onto the transcript.  It was corrected and not --

4   (indiscernible) that that was not given to one of the parties

5   in this room.

6      (Laughter)

7      THE COURT:  Now I'm going to look for that

8   language.

9      MR. WARD:  With that, Your Honor, the debtors

10  close their evidence in support of their sale --

11     THE COURT:  Okay.

12     MR. WARD:  -- and we're happy to move forward,

13  however the Court deems appropriate.

14     THE COURT:  Why don't I hear from Black Diamond

15  first.

16     MR. MCGUIRE:  Good afternoon, again, Your Honor.

17  Dan McGuire for Black Diamond.

18     Well, Your Honor, most of what I have to say,

19  frankly, I said in my opening.

20     THE COURT:  Okay.

21     MR. MCGUIRE:  Our position, I think, is fairly

22  clear and fairly straightforward.  We're happy to have the

23  case convert to a 7, if need be.  We're also happy to

24  accommodate this transaction in an 11, just respecting our

25  rights as a secured creditor.

1           THE COURT:  Right.

2           MR. MCGUIRE:  And I will just add to that, that

3    there's this notion in a lot of Chapter 11s that you should

4    never approve a sale if it's going to leave an estate

5    potentially administratively insolvent and the secured

6    creditor should pay the freight if they want the sale

7    approved.  Well, two things:  One, the fulcrum debt here is

8    telling you they're okay if the sale doesn't get approved;

9    that's the price of admission for that -- we're okay with

10   that; second, this isn't sort of the traditional situation

11   where first lien, you know, the secured lender with a lien on

12   all the assets effectively pushes the company into

13   bankruptcy, provides them a DIP or cash collateral use with

14   terms for a sale that they support and they want because

15   that's how they want to liquidate their collateral and then

16   they get to the end and say, Well, I don't want to pay the

17   cost of having done that and the Court says, Well, no, this

18   was -- you drove this process, you're going to pay for it.

19          This is not that case in many respects.  One, no

20   506(c) waiver for either of the secured creditors up front.

21   So, if there are people who are entitled to get paid ahead,

22   they still will.

23          Two, fulcrum debt here announced at the

24   beginning -- both of the secured creditors announced at the

25   beginning that there was a shortfall here that neither was

1  willing to commit, you know, to pay at the beginning of the

2  case.

3         Three, the debtors have, you know, creatively

4  looking at their assets, found a way to potentially fill the

5  hole here of the admins through the avoidance actions and,

6  you know, the question is, should we convert the case to a 7

7  and there's a shutdown, and, you know, we think we'll do okay

8  with that.  We're comfortable with that and we we're fine

9  with what we think our recovery will be on that or do you

10  want to stay in an 11, get the sale approved that has the

11  potential for a restart.  Well, we're fine with that, we're

12  just not fine with giving up our secured creditors' rights to

13  get it done.

14         The debtors have sort of weaved a path to get this

15  done while doing both which is, you know, somewhat

16  unconventional for what we see in these types of cases, but I

17  think the facts and circumstances of this case, combined with

18  the lack of the 506(c) waiver, the up-front lack of consent

19  to this, the fact that the secured creditor is not saying,

20  Oh, no, no, no, no, don't convert the case, so I will pay

21  these claims.  It provides a reasonable basis for, I think,

22  going either way on this.

23         But there's no legal basis for us saying, I'm

24  going to approve this sale and I'm going to, today, say that

25  you have to fund all of these expenses that could be junior

1  to you as a secured creditor.

2          THE COURT:  So, let's put away -- let's put aside

3  that issue --

4          MR. MCGUIRE:  Uh-huh.

5          THE COURT:  -- because I can tell you right now

6  I'm not prepared to make that ruling today.  I'm not prepared

7  to give Black Diamond the sale proceeds today and I'm

8  certainly not prepared to tell the committee or any other

9  party that Black Diamond has to pay for the freight of this

10  case, because that's not before me and there's no 506(c)

11  waiver here, so that would be appropriately -- that would

12  teed up before me through a separate mechanism.

13          MR. MCGUIRE:  Agreed.

14          THE COURT:  So, putting aside those two issues and

15  focusing just on what is being asked for the Court to do

16  today which is to declare Liberty the highest-and-best

17  bidder, okay, and to approve the sale free and clear of the

18  liens, what are your arguments, as to those two points.

19          MR. MCGUIRE:  Oh, if the sale to Liberty, free and

20  clear, does not allow the use of any of their sale proceeds

21  today, if that is not decided today and we preserve our

22  rights to say that none of them can be used --

23          THE COURT:  Uh-huh.

24          MR. MCGUIRE:  -- other than to pay us, we do not

25  object to the Liberty sale.  If that money is going to sit in

1  a pot, we're okay with that --

2            THE COURT:  Okay.

3            MR. MCGUIRE:  -- and we'll cross that bridge when

4  we come to it, you know, down the road.

5            THE COURT:  So, the issue really is -- so, in

6  other words, I just want to be abundantly clear, if, you

7  know, subject to if the sale gets approved today, the cash

8  proceeds, the 28 and a half million -- 28.5 -- goes into --

9  just, essentially, is being held by the debtor until the

10 parties decide what to do next --

11           MR. MCGUIRE:  Correct.

12           THE COURT:  -- including the idea that cash

13 collateral is running out and once Bank of America gets paid

14 in full, you're up to determine whether usage of cash

15 collateral happens or not --

16           MR. MCGUIRE:  Correct.  And --

17           THE COURT:  -- you are not objecting to the sale.

18           MR. MCGUIRE:  Right.  We would have the right to

19 say that none of that could be used.  Other parties have the

20 right to say, Oh, there's three million in 506(c) surcharges

21 that all get paid ahead of you.  All of those rights would be

22 preserved.

23           THE COURT:  Okay.  All right.  Well, then, I think

24 this will be easy today.

25           Okay.  Let's hear from the other parties.

1          MR. CARR:  Your Honor, Jim Carr of Kelley Drye &

2 Warren, on behalf of the committee.

3          With respect to my comments earlier, Your Honor, I

4 thought they were brilliant, so I really don't have much to

5 add in that regard --

6          THE COURT:  Okay.

7          MR. CARR:  -- but I think I'll --

8          THE COURT:  Just walk me through why -- walk me

9 through -- I guess I'm trying to understand what the exigent

10 issues are here, what the open issues are, based on my belief

11 that none of the sale proceeds are going to be paid out to

12 Black Diamond if I approve the sale and that all rights are

13 reserved for your committee and your constituencies to argue

14 about the solvency and who bears the freight of the solvency

15 of the case.

16          So, what's left after that, if I were to make

17 those determinations and holdings today?  What's left for the

18 committee?

19          MR. CARR:  If you were to make determinations

20 today to proceed with the sale, Your Honor, we still have to

21 determine how to exit the bankruptcy case.

22          There's only a couple of ways to exit a bankruptcy

23 case:  one is to convert the case to a Chapter 7; one is to

24 dismiss the case; and one is to confirm a plan of

25 liquidation.  Each comes with certain benefits and

1  disadvantages.  For example, what I'm hearing Mr. McGuire say

2  is that he doesn't care if the case converts to a Chapter 7.

3  If the case converts to a Chapter 7, then there's no releases

4  to Black Diamond and the Chapter 7 Trustee would pursue

5  whatever claims that the Chapter 7 Trustee believes it would

6  have against Black Diamond.

7          But to get to an exit strategy, Your Honor, there

8  are certain costs with respect to running this estate to the

9  benefit that was inured to the lenders and that was to sell

10  the assets in a very convenient form under 363, which doesn't

11  exist under the Uniform Commercial Code, and at some point,

12  someone has to pay for that.  And, yes, there is no 506(c)

13  waiver in the cash collateral order and Mr. McGuire may have

14  forgotten, but we objected -- there was, initially, a 506(c)

15  there and we objected to that, and we were successful in

16  getting that removed from the cash collateral order, Your

17  Honor.

18          Secondly, in the cash collateral order, Bank of

19  America and Black Diamond tried to exercise, basically, the

20  same rights.  So, Black Diamond was trying to dovetail onto

21  Bank of America's rights because they had an intercreditor

22  agreement.  If Your Honor may recall, we fought that and Your

23  Honor even applauded the committee's efforts for saying, All

24  right.  This first cash collateral order will cover Bank of

25  America and when that expires, and we see where we are with

1  paying off Bank of America, we'll deal with Black Diamond.

2             THE COURT:  Right.

3             MR. CARR:  And that's why I said at the beginning

4  of this case, it's not a today issue.

5             THE COURT:  Right.  I guess I'm -- you know, at

6  the time that we saw each other with respect to the cash

7  collateral order, I guess all the parties assumed that the

8  today issue would be the sale hearing, but is it really

9  today?

10            MR. CARR:  No.

11            THE COURT:  Okay.

12            MR. CARR:  It's not today.  But the issue still --

13 it's coming up.

14            THE COURT:  Okay.

15            MR. CARR:  There's a couple of issues that have

16 been resolved today.  One of the most important issues that

17 we had, Your Honor, was with respect to the health care

18 claims of the employees.  That seems to have been resolved.

19            THE COURT:  Okay.

20            MR. CARR:  What we're hearing is we have a

21 shortfall.  We're going to have to take hopefully the next 30

22 days to figure out how to deal with that shortfall with some

23 type of negotiation between the debtors, Black Diamond, and

24 the committee.

25            THE COURT:  Okay.  All right.  I think I

1  understand the position of the committee.

2            MR. CARR:  Thank you, Your Honor.

3            THE COURT:  Good afternoon.

4            MR. FOXMAN:  Your Honor, Brad Foxman, on behalf of

5  Bank of America.

6            Just one clarification that I didn't want to get

7  lost in the shuffle today.  When the parties were talking

8  about potentially setting the sale proceeds aside and not

9  using them, at least the parties' understanding is that would

10  be net of a payment to Bank of America from the sale proceeds

11  to the extent that Bank of America hadn't already been paid

12  in full, and I don't believe that there's any objections from

13  any of the parties to that relief.

14            THE COURT:  Okay.  Is there any objection of the

15  parties to that relief if the Court were to approve the sale

16  today?

17        (No verbal response)

18            THE COURT:  Okay.  Thank you.

19            MR. FOXMAN:  Thank you.

20            THE COURT:  Okay.  So, Mr. Ward, what I'm hearing,

21  before you get up, is it sounds like we're kind of all on the

22  same page, all right.

23            MR. WARD:  Uh-huh.

24            THE COURT:  Because I'm hearing from Black Diamond

25  that they consent to the sale, subject to the proceeds of the

1  sale being held by the debtors and all parties' rights

2  essentially being reserved, and the committee is in agreement

3  that it's not a today issue, as well, to decide where the

4  assets -- or excuse me -- the proceeds of the sale are going

5  to flow today.

6            So, what are the open issues?

7            MR. WARD:  Well, I think an open issue from a sale

8  perspective, other than, you know, the Black Diamond part is

9  this Entergy-Westchester issue we can deal with at the end.

10 But, I don't think there are any other issues, Your Honor, do

11 deal with.

12           Part of the -- I won't even call it confusion -- I

13 think the debtors wanted to be completely up front with the

14 Court as to where we are and what we're asking.

15           THE COURT:  Okay.

16           MR. WARD:  We didn't want this to come up at a

17 final cash collateral hearing and the Court to look at us and

18 say, How come you're coming to me and telling me that you

19 can't pay all of your admin claims?

20           THE COURT:  No, I understand.

21           MR. WARD:  So, we wanted to be abundantly clear

22 with the Court that that's where we were.

23           THE COURT:  Okay.

24           MR. WARD:  We totally agree, this is a cash

25 collateral issue with Black Diamond that will have to be

1 | addressed, but I think we all bear the brunt and the risk of
2 | doing that.

3 |        But with respect to the sale, you know, the
4 | debtors believe that this sale is the best outcome for the
5 | company, for the LaPlace community, for the former employees
6 | who will hopefully be rehired at the end of the day in an
7 | eventual restart.  So, we don't think there's any issues with
8 | the sale, itself; it is a sale proceeds issues and that is
9 | what it is.

10 |        THE COURT:  Okay.  Great.

11 |        Well, the U.S. Trustee has mentioned just on the
12 | threshold issue of whether the sale can be approved today,
13 | the trustee had mentioned that there were some concerns over
14 | approval of the sale based on the administrative solvency of
15 | the case.

16 |        Mr. Hackman is a point that you want to address
17 | with the Court right now?

18 |        MR. HACKMAN:  Thank you, Your Honor.

19 |        THE COURT:  Thank you.

20 |        MR. HACKMAN:  Ben Hackman for the U.S. Trustee.

21 |        If the sale proceeds are going to be sort of held,
22 | segregated, or put in a pot or escrow, pending further order
23 | of the Court, I don't think we would need to address it
24 | today.

25 |        THE COURT:  Okay.

 1            MR. HACKMAN:  Thank you.

 2            THE COURT:  All right.  Thank you.

 3            Does anyone else wish to be heard in connection

 4  with the approval of the sale, putting aside the specific

 5  occurrence of Westchester and other parties?

 6            Mr. Klauder, sorry about that.

 7            MR. KLAUDER:  No, I'm sorry, I didn't mean to

 8  screw up your train of thought there.

 9            David Klauder, on behalf of BlueCross BlueShield

10  Louisiana.  Can I have one moment --

11            THE COURT:  Absolutely.

12            MR. KLAUDER:  -- to talk to Mr. Ward about sort

13  of -- because we think we have a resolution on our issue,

14  although, it's not resolved as to everyone, at least the

15  debtors and Blue Cross have got the parameters of a

16  resolution.

17            THE COURT:  Okay.

18            MR. KLAUDER:  If I may have one?

19            THE COURT:  Yes.

20       (Pause)

21            MR. KLAUDER:  No issue with respect to the sale

22  from BlueCross BlueShield.  We'll talk about our resolution

23  or potential resolution in the context of our motion after.

24            THE COURT:  Okay.

25            MR. KLAUDER:  Thank you.

1            THE COURT:  All right.  Now, I understand that

2  other parties object to some mechanics within the sale order

3  and we can address those, but I think it's important for the

4  time being, for me to make my ruling, with respect to the

5  successful bid that has been presented by -- is it Liberty --

6  I'm sorry -- it's GFG?

7            MR. WARD:  GFG Liberty is how we've been referring

8  to them, Your Honor.

9            THE COURT:  GFG Liberty.

10            MR. FRELINGHUYSEN:  I'm sorry, Your Honor.  It's

11  Liberty BSG Holdings, Inc. is the formal name of the party.

12  We're a subsidiary or a part of the GFG Alliance.

13            THE COURT:  Okay.

14            MR. FRELINGHUYSEN:  Thank you.

15            THE COURT:  Okay.  So, having heard the evidence

16  and legal arguments, including the declaration and the

17  proffer -- sorry, not the declaration -- the proffer of Mr.

18  Pollack presented to the Court today, as well as that, which

19  was presented at the prior hearing held in this case

20  approving bid procedures and having heard the argument of the

21  parties, the Court is satisfied that subject to the --

22  satisfied that the statutory predicates for the relief sought

23  have been met, and in particular, Section 363.

24            That, of course, is subject to my prior ruling

25  that I am not -- that the Court today is not making a ruling

1  with respect to the disbursement of the sale proceeds and all

2  parties' rights are reserved, with respect to how those

3  proceeds will be used going forward, including with respect

4  to the use of ongoing cash collateral usage, as well as the

5  satisfaction of the administrative claims to be -- the

6  administrative claims of this case.

7         I will find, based on the parties' submissions and

8  arguments that the sale process was fair and open.  It was

9  designed to maximize value.  That the seller has extensively

10 marketed the subject assets and the process created by the

11 bidding procedures provided a full and fair opportunity to

12 bidders to submit bids and to participate in the auction and

13 that Liberty BSG was selected as the successful bidder, based

14 on the debtors' determination that its bid constituted the

15 highest-and-best offer for the assets.  And, again, based on

16 the arguments of the parties today, the Court will not

17 disrupt that articulated justification.

18         I am satisfied that the sale is in the best

19 interests of the debtors and that the debtors have, in fact,

20 presented evidence supporting that finding and I find that

21 there is a good and sufficient, sound business purpose and

22 justification for the circumstance, as provided and needed by

23 Section 363(b) of the Code.

24         Why don't we talk through the terms of a proposed

25 form of order and maybe the parties could -- do you think

1  it's worthwhile to take a break and try to talk to the

2  parties or we just need to hammer out the issues and make a

3  decision?

4          MR. WARD:  I think we can walk through 90 percent

5  of the changes here without any issues at all, Your Honor.

6          If I may approach with the most recent redline?

7          THE COURT:  Yes.

8          MR. WARD:  All right.  Your Honor, walking through

9  the redline, you'll see on Page 2 we have inserted "Liberty

10 BSG Holdings, Inc." as the buyer.  You will see that a lot of

11 the changes as we go through here are from the buyer with

12 respect to the purchased assets.

13         The next substantive change, Your Honor, is on

14 Page 6 of the redline.  So, the bid submitted by GFG includes

15 some leases and/or contracts that were not on the original

16 cure notice.  So, there are procedures now for serving out

17 notice of additional cures with respect to those parties and

18 then there'll be a cure process and if there's any issues,

19 we'll be back before this Court.

20         On Page 7 there's a process for GFG for the

21 additional contract objection deadline if there's no

22 resolution of the cure amounts if the contracts are rejected.

23         The next substantive change on Page 11, Your

24 Honor, new Paragraph R.  It's a provision provided by the

25 purchaser regarding the valid and binding nature of their

1   asset purchase agreement that was submitted.

2          THE COURT:  Okay.

3          MR. WARD:  And then on Page 12 and 13, you'll see

4   a very long paragraph that has been entered by the purchaser,

5   new Paragraph S, that walks through the free-and-clear

6   language.

7          THE COURT:  Okay.

8          MR. HACKMAN:  Your Honor, Ben Hackman for the U.S.

9   Trustee.

10         On Paragraph S, the one comment I would have on

11  the form of order is in Line 3, there's a reference to rights

12  of offset and recoupment, and then four lines below that,

13  there's another reference to offsets and recoupments.  And as

14  I read it, this is built into the definition of the defined

15  term "claims."

16         I want to be careful about what I say here.  I was

17  looking through this form of order and the sale motion as

18  best I could to locate the definition of the term

19  "encumbrance," --

20         THE COURT:  Okay.

21         MR. HACKMAN:  -- which is part of the

22  strikethrough at the beginning of this or just before this

23  Paragraph S, or just above the added language.

24         I couldn't find it.  If encumbrance had been

25  defined previously in the motion here in the papers as

1  including things like recoupment and set-off, then at this

2  point I don't have a comment about simply re-incorporating a

3  definition that was included earlier on a matter that the

4  objection deadline has already passed on.

5          If the term "claims" is being defined here in a

6  way that expands the definition to include things like offset

7  and recoupment, I would submit, respectfully, that under the

8  Third Circuit's <u>Folger Adam</u> decision the recoupment would be

9  an affirmative defense.  It's not an interest that assets can

10  be sold free and clear under Section 363(b), and that the

11  references to offset should be limited to exclude offsets

12  that were taken prepetition.

13          Thank you, Your Honor.

14          THE COURT:  Okay.  Thank you.

15          MR. WARD:  Your Honor, I think we can -- Chris

16  Ward for the record -- I think we can go back and look at the

17  sale motion and see if offset and recoupment was specifically

18  listed --

19          THE COURT:  Okay.

20          MR. WARD:  -- in the motion and noticed out to

21  parties, and if it wasn't, we understand the trustee's

22  position on that issue.

23          THE COURT:  Okay.  And you would remove that?

24          MR. WARD:  Correct, Your Honor.

25          THE COURT:  And do you anticipate, just as a

1  general matter, do you anticipate if I were to approve this

2  form of order, subject to whatever comments and changes that

3  might be made at today's hearing, that you're going to

4  preview with other parties in interest and give them more

5  opportunity to review the form of order; for instance, Ms.

6  Guilfoyle's clients?

7           MR. WARD:  Yeah, there's going to be other changes

8  we believe that need to be made after the hearing --

9           THE COURT:  Okay.

10          MR. WARD:  -- regardless, and I'm fairly certain

11  that the Entergy-Westchester language that's in here is going

12  to need some tweaking depending on where we end up --

13          THE COURT:  Okay.

14          MR. WARD:  -- so I guess it will be submitted

15  under certification of counsel, regardless.

16          THE COURT:  Okay.

17          MR. WARD:  So, I think with that, Your Honor --

18  that was Page 12 and 13 -- the top of Page 15, and actually

19  all of Page 15 is the next substantive change.  The end of

20  Paragraph U goes towards or the end of Paragraph S goes that

21  the purchaser is buying the claims free and clear and there's

22  a, you know, bar to future claims against them.

23          Paragraph T resolves the Rexel objection, and

24  Rexel filed a notice of perfection lien for a mechanic's lien

25  and this just preserves their rights.

1        THE COURT:  Okay.

2        MR. WARD:  Paragraph U is another free-and-clear

3   language that was provided by the purchaser.  It just states

4   that if it wasn't free and clear -- they would not buy the

5   assets unless it was a free-and-clear transaction.

6        THE COURT:  Uh-huh.

7        MR. WARD:  Paragraph V, Your Honor, addresses that

8   the buyers relied on the sale order and the Court's findings,

9   with respect to the purchase; it wouldn't have done it

10  without the sale order being in place.

11       THE COURT:  Okay.

12       MR. WARD:  And then Paragraph W added by the

13  purchaser, goes to the fact that once the sale closes, it's

14  a -- the sale order proves a valid legal and effective

15  transaction.

16       There are changes to (indiscernible) that I

17  haven't addressed which go to the assumed contracts.  It's

18  just the definition had to add in the additional assumed

19  contracts throughout.

20       On Page 17, this new Paragraph Z incorporates the

21  bidding procedures order, Your Honor.

22       THE COURT:  Uh-huh.

23       MR. WARD:  I think one issue that we need to

24  address was there was an additional Paragraph C was put in --

25  Paragraph 6 was put into the order.  Section 2.2.3(i) of the

1  purchase agreement, we've had a lot of discussion regarding

2  this.  The purchase agreement submitted by GFG had a sale

3  order that needed to be entered by the 19th; obviously, that

4  didn't occur.

5           It is changed, pursuant to the order, to be the

6  23rd.  I think we will have to speak to GFG.  Obviously, the

7  Court has approved the sale.  We're going to have to get an

8  agreeable sale order and we would just ask that that date be

9  moved to whatever date the Court eventually moves the sale

10 order.

11          THE COURT:  Okay.  It seems like a housekeeping

12 matter --

13          MR. WARD:  Correct, Your Honor.

14          THE COURT:  -- that we can deal with after the

15 hearing.

16          MR. WARD:  New Paragraph 7 resolves the Air

17 Liquide equipment objection.  It's a reservation of rights

18 regarding their issues, Your Honor.

19          THE COURT:  Okay.

20          MR. WARD:  New Paragraph 9 goes to the successor

21 liability nature of this order and cutting off all claims for

22 anything that the Court can find in Paragraphs A through T

23 that goes on through Page 21.

24          And then Paragraph 10 -- excuse me -- on Page 22

25 was requested by Bank of America (indiscernible) the

1  prepetition agent's rights and adequate protection, and

2  payment of their claim in full at that closing, which was

3  addressed by Mr. Foxman.

4              THE COURT:  Okay.

5              MR. WARD:  Paragraph 23 has similar language that

6  their liens would attach to the sale proceeds to the extent

7  that they're not paid in full.

8              And that same language is also in Paragraph 17

9  regarding attaching to the sale proceeds if they're not paid

10 in full.

11             Paragraph 21, there's a provision of GFG's

12 purchase agreement.  As the Court has been made aware of

13 today there, is an administrative shortfall.  They provide an

14 additional $200,000 in their bid, which was an administrative

15 bridge to help alleviate some of that burn, and they've also

16 agreed to pay for $250,000 of insurance, because the debtors'

17 insurance expires on December 31st, and without access to

18 cash collateral -- obviously we need insurance -- so there's

19 going to be a two-hundred-and-fifty-thousand-dollar payment.

20             So, that's how the purchase price goes from 28

21 million to 28.45 million, is the inclusion of the

22 administrative bridge in the insurance payment --

23             THE COURT:  Okay.

24             MR. WARD:  -- and that's been added in new

25 Paragraph 21.

1        The remainder of changes on Pages 28 and 29 go to

2   the -- and 30 -- all go to the additional assumed contracts

3   and leases.

4        I think we should probably hold the next two

5   paragraphs as the last two we deal with, Your Honor.  They

6   deal with Entergy and Westchester.

7        THE COURT:  Okay.

8        MR. WARD:  We're going to need to hear from both

9   of those parties and GFG, with respect to those issues.

10       And then on Page 34, Paragraph 36, there's a

11  paragraph added by Bank of America regarding letters of

12  credit (indiscernible) they're fully drawn at closing, Your

13  Honor.

14       And then the final substantive revision is

15  Paragraph 42, a provision regarding the automatic stay to the

16  extent that we need to -- the purchaser needs to revise or

17  come back to this Court with respect to the terms of the sale

18  order.

19       I think with that, Your Honor, that leaves the

20  Westchester and Entergy objections.  And I think GFG probably

21  needs to respond to their opening statement on those issues,

22  so it would probably make sense to hear from them before we

23  move forward with those two cure objections, unless the Court

24  has any issues with the proposed form of sale order, other

25  than what was discussed.

1          THE COURT:  I think I need just five minutes

2   behind, you know, off the bench just to take a look at this,

3   so maybe it makes sense to handle the other issues and then

4   I'll take a break and read the other language a little bit

5   more clearly.

6          So, why don't we deal with the Entergy issues.

7          MR. WARD:  Thank you, Your Honor.

8          THE COURT:  Okay.

9          MR. FRELINGHUYSEN:  Hello, Your Honor.  Anson

10  Frelinghuysen for Liberty BSG Holdings, Inc., the proposed

11  buyer here.

12         With respect to the Entergy contract and the

13  surety bond from Westchester Fire Insurance, you know, our

14  intention is to reach an agreement with these parties as to

15  how we're going to handle the payment of the cure amount to

16  them.  As of now, we think Entergy should obtain its funds

17  from the surety and, you know, do everything it can to get

18  all the money it needs from the surety and to the extent that

19  Entergy is not repaid after pursuing that claim to our

20  satisfaction, we will fill in the rest of the cure amount.

21         THE COURT:  Okay.  So, maybe it will be helpful to

22  me to understand what language is actually in dispute or what

23  Entergy would like to see changed to this proposed form of

24  order, because I'm unclear what the open issues are with

25  respect to --

1          MR. FRELINGHUYSEN:  I'll let Entergy to that.

2          THE COURT:  Okay.

3          MR. KATZ:  Your Honor, Alan Katz, again, for

4 Entergy.

5          There are actually, in addition to the provision

6 that's been added to the draft order that was passed around

7 this morning, there are actually provisions all through here

8 that we object to.  In fact, the draft that was circulated on

9 December 9th, you know, you put tabs on the provisions that I

10 was concerned about and, perhaps, since other holders of

11 executory contracts, other counterparties don't seem to share

12 Entergy's concern about this language, and perhaps the

13 dollars involved don't merit their being concerned, you know,

14 I would suggest that the best way to take care of all of

15 these issues is a general carve-out of all of Entergy's

16 issues.

17          With regard to the specific provision that was

18 inserted here about -- to which Mr. Frelinghuysen just

19 referred, it's a provision that says that the buyer and

20 Entergy can negotiate some agreement to which Entergy goes

21 after the surety and, in essence, it would seem, gives up its

22 cure right.

23          As I think the surety's counsel mentioned earlier,

24 the surety would take the position that if we waive a right

25 that they think they're subrogated to, we don't collect

1   anything from them and, frankly, it would be easier if they

2   just bought -- the buyer just bought Entergy's claim against

3   the surety, then we know we have the money and they can work

4   it out.

5          But we're in a position where there's a very

6   valuable contract that provides a rate for electricity that's

7   not available anymore and I know that there's concerns about

8   whether or not this plant can operate profitability, well,

9   maybe in any case, but certainly without this contract, and

10  yet, no one wants to pay the money that Entergy is owed.  I'm

11  sure that's not terribly unusual, but that's the way it is.

12         And, you know, Entergy is -- you know, it has the

13  benefit of having this bond that would essentially cover the

14  prepetition debt and what we project the post-petition is,

15  because Entergy hasn't received any payments since the

16  bankruptcy was filed, except a hundred-and-twenty-five-

17  thousand-dollar adequate assurance payment that it's holding.

18         The bond would cover all of that, more or less,

19  and Entergy wants to make sure it doesn't jeopardize that.

20  And it also wants to make sure that -- you know, essentially,

21  the way this is set up is everything is taken care of in this

22  order except for the termination of the cure amount.  Entergy

23  is entitled to be paid by, in the Code, the trustee -- not

24  the buyer -- the trustee, before the contract is assumed and

25  assigned.  It's supposed to be paid up to date and provided

1  adequate assurance of future performance.

2          And as I said earlier, the adequate assurance of

3  future performance is Entergy's standard deposit requirement

4  of, in this case, $2,090,000, which is interesting that it's

5  just about the same amount that we're talking about here, and

6  Entergy -- the no assignment of this contract, no assumption

7  or assignment should be allowed to be effective until all of

8  these issues are taken care of and Entergy has either been

9  paid and provided adequate assurance of payment or some

10 mechanism has been set up to make sure that, you know, when

11 the final things are determined, that Entergy is going to get

12 the money.

13         THE COURT:  Uh-huh.  I mean, I tend to agree with

14 you, Mr. Katz.  I mean, there cannot be an assumption or

15 assignment, absent a payment of the cure amount.  So, I

16 understand that -- I mean, the way it usually works is that

17 all rights are reserved and we'll resolve the cure amount

18 after the fact and if the cure amount isn't resolvable, then

19 the contract is not assumed or assigned.

20         What am I missing -- because I have not had the

21 benefit to review any of this language before the hearing.

22 Is this language essentially effectuating assumption and

23 assignment immediately upon the closing and then if the cure

24 amount was not worked out, it would then be rejected?

25         MR. KATZ:  Well, this added language doesn't

1  address that at all, Your Honor.

2            THE COURT:  Okay.  All right.

3            MR. KATZ:  The provisions that I was concerned

4  about throughout the order are provisions that effectively

5  say that the assignment's effective at the closing, without

6  regard to a cure and that all the requirements of 365, with

7  regard to assuming a contract, have been satisfied.

8            THE COURT:  Uh-huh.

9            MR. KATZ:  Eventually, as I said at the beginning,

10  it just leaves only the question of the amount of cure open

11  and (indiscernible) doesn't even provide for when that is

12  determined that someone is going to have the money to hand

13  over to Entergy at that time.  So, that's why I suggested

14  just a general carve-out.

15            I have no particular objection to this provision

16  that's been put in here at Paragraph -- was it 21 or

17  something like that -- 26, because it -- I mean, it doesn't

18  commit Entergy to do anything other than talk to people.  But

19  I'm just saying, I just don't see how Entergy is going to

20  come to any agreement that limits its rights to going after

21  the surety unless the surety steps forward and says that's

22  okay, which we know the surety is not going to do.

23            THE COURT:  Okay.  All right.

24            MR. KATZ:  Thank you.

25            THE COURT:  Thank you.

1          MR. BRESSLER:  Your Honor, the problem is the

2    language says it's okay for Entergy to do.  That Entergy can

3    reduce its cure claim by the amount -- I'm sorry, Gary

4    Bressler for Westchester Fire and Insurance, again -- it's

5    that Entergy can reduce its cure claim by the amount that

6    Westchester pays Entergy and that's appropriate for the Court

7    to be blessing.

8          First of all, to find out about this on a few

9    hours' notice is inappropriate -- this is a big issue -- and

10    they shouldn't be permitted to do that.  I know lots of

11    things happen at the last moment concerning the sale hearing,

12    but this really is a major change from what the Code

13    provides.

14          Under Section 509 of the Code, if Westchester were

15    to pay Entergy, Westchester would take over Entergy's rights.

16    And we didn't have a lot of time to do research because we

17    just found out about this, but in the Wingspread Corp. case,

18    116 B.R. 915, in the United States Bankruptcy Court for the

19    District of New York, they were arguing that the guarantor

20    didn't have the same priority as the original principal and

21    the Court held, no, they do.  And that was affirmed on

22    appeal, 145 B.R. 784, and it was affirmed by the Second

23    Circuit, without opinion, 992 F.2nd 319.

24          They shouldn't be allowed to put in a provision to

25    change Entergy's or Westchester's rights, because they're

1  saying it's okay if Westchester -- if Entergy makes this

2  waiver, all their claims against Westchester are still

3  preserved.  Well, that might be a defense if they were to

4  waive the cure -- part of the cure claim against the debtor

5  and the buyer.  It's just totally inappropriate.

6         I also have now noticed that they have put in a

7  similar provision in the APA, which we just got, and they

8  changed the cure amount in the APA for this contract to zero;

9  all of that is improper.  Let's decide the issues concerning

10  cure another day for this.  It shouldn't be in this

11  agreement.

12         The other issues I had is, like I said, they added

13  inserted language in Paragraph 27, I think it is, but not all

14  the language that we've asked for.  We wanted to make it

15  clear that any money being held for Entergy, whether Entergy

16  (indiscernible) it as a deposit or the debtor (indiscernible)

17  it as a deposit, is not being sold.  It probably isn't, but I

18  haven't had a full chance to read the sale agreement.

19         I can provide Your Honor with the language that we

20  asked be provided.  I also have only one copy because we were

21  scrambling with the blackline of their language versus our

22  language.  So, I would like to hand -- we've already given

23  the debtor our proposed language, but I don't have extra

24  copies of the blackline from what they did this morning.  So,

25  I would like to hand both up to Your Honor.

1              THE COURT:  Okay.

2              MR. BRESSLER:  And we also wanted to make it clear

3    that the buyer can't rely on our bonds, and we put that in

4    the language, as well.

5              THE COURT:  Okay.  And you said that there's a

6    dispute as to your requested language or the parties just

7    haven't had the opportunity to review your language?  I mean,

8    what's the state of play here?

9              MR. BRESSLER:  We requested language.  They put in

10   some language that (indiscernible).

11             THE COURT:  Okay.  Thank you.

12             MR. WARD:  Chris Ward for the record, Your Honor.

13             Let me be clear that, yes, the debtor -- the Code

14   says the debtor has to pay cures.  The Court has heard the

15   debtors' cash position.

16             THE COURT:  Uh-huh.

17             MR. WARD:  The debtor cannot pay any cures.  This

18   is an issue between Entergy, the surety, and GFG to figure

19   out.  If the debtors are left to pay the cure, the contract

20   will be rejected.  There's no other circumstance.

21             THE COURT:  Well, I mean in typical practice, the

22   purchaser pays the cure.

23             MR. WARD:  Yes.

24             THE COURT:  So, I think I need to take a break and

25   I need to review the sale order.

1          I can tell you what I'm not prepared to do.  I'm

2   not prepared to approve an assumption and assignment of

3   Entergy's contracts or any other contracts related to the

4   surety, absent a resolution, with respect to the cure.  So,

5   to the extent that this order needs to be modified to

6   preserve rights so the parties can talk and then come to a

7   resolution or not, and the contract will be rejected and the

8   purchaser will have to make, you know, other accommodations,

9   then that's fine and that's acceptable to the Court at this

10  time.

11          However, to the extent that I need to make any

12  substantive rulings on legal issues, they have not been

13  properly briefed or set up before me, so I am not prepared to

14  do that.

15          So, it sounds like, after hearing the parties, if

16  you're unable to come to an agreement on language, then we're

17  just going to have to carve the issues out and we'll have to

18  take these issues up for another day if they can't come to a

19  resolution.

20          MR. WARD:  The debtors completely agree, Your

21  Honor.

22          THE COURT:  Okay.  But this might be an issue

23  really for the purchaser.

24      (Laughter)

25          THE COURT:  So -- and I understand your position,

1   and it sounds like it might be an acceptable business

2   resolution, but it sounds like there's some issues with the

3   surety.  So, I think the parties need to get together and

4   have some more conversation about it, but like I said, I'm

5   for the prepared to grant and assumption and assignment of

6   their contract through this order at this point in time.

7               MR. FRELINGHUYSEN:  Absolutely, Your Honor.

8               THE COURT:  Okay.

9               MR. FRELINGHUYSEN:  Our intention was to go,

10  either assume the contract and pay the cure under the

11  mechanism we had put in the order that I guess they haven't

12  seen until just now --

13              THE COURT:  Okay.

14              MR. FRELINGHUYSEN:  -- or to reject the contract

15  if it's not acceptable the way we put it out.

16              THE COURT:  Okay.

17              MR. FRELINGHUYSEN:  So, it's one or the other.  It

18  is going to happen at the date of the closing, which is in

19  five weeks.  The way we have tried to set up the order is

20  that it's set up for all rights to be preserved until that

21  time --

22              THE COURT:  Okay.

23              MR. FRELINGHUYSEN:  -- and we can work through

24  this language right now with the surety and with Entergy to

25  try to make that the case.

1          THE COURT:  Okay.

2          MR. FRELINGHUYSEN:  And, hopefully, we can get you

3  some language either, after your break or all of our breaks,

4  or later on submission or as you prefer.

5          THE COURT:  Okay.  So, why don't you try to work

6  with the parties to try to come up with acceptable language

7  while I'm reading the document.

8          I'm going to take like a ten-minute break and come

9  back.  To the extent that you couldn't resolve them, then

10  we'll come up with a solution to deal with the issue.

11          MR. FRELINGHUYSEN:  Sounds good, Your Honor.

12  Thank you.

13          THE COURT:  All right.  Thank you.

14          We'll stand adjourned.

15      (Recess taken at 2:18 p.m.)

16      (Proceedings resumed at 2:43 p.m.)

17          THE COURT OFFICER:  All rise.

18          THE COURT:  Please be seated.  All right.

19          MR. FRELINGHUYSEN:  Your Honor, hello.

20          THE COURT:  Yes, hello.

21          MR. FRELINGHUYSEN:  Anson Frelinghuysen, for

22  Liberty BSG Holdings.

23          Thank you for the 10 minutes, plus the additional

24  10 minutes.  They were not sufficient for us to resolve our

25  issues, with respect to --

1           THE COURT:  Okay.

2           MR. FRELINGHUYSEN:  -- those provisions, 26 and

3  27, in the proposed order.

4           THE COURT:  Okay.

5           MR. FRELINGHUYSEN:  We are dedicated to resolve

6  them in the next several hours --

7           THE COURT:  Okay.

8           MR. FRELINGHUYSEN:  -- without taking up the

9  Court's time.

10          THE COURT:  Great.

11          MR. FRELINGHUYSEN:  We will, along with Mr. Ward's

12  submission of a proposed order, submit language regarding the

13  surety and Entergy regarding those provisions.

14          THE COURT:  Okay.

15          MR. FRELINGHUYSEN:  The APA provision tracks some

16  language and we will address that in our provisions to the

17  order.

18          THE COURT:  Okay.  All right.

19          That sounds like an acceptable resolution, and to

20  the extent that we need to reconvene to talk about open

21  issues, of course we can do that.  It's not the preferred

22  route.  I'm sure that you all will come to an agreement, but

23  if not, you know, I'm available today and then available on

24  the 26th.  So, just so we're all on the same page.

25          MR. FRELINGHUYSEN:  That sounds great.  I

1  appreciate that.

2          THE COURT:  Okay.  Great.

3      (Laughter)

4          MR. FRELINGHUYSEN:  We like to be on the same

5  schedule.

6      (Laughter)

7          THE COURT:  And I had the opportunity to review

8  the form of order during the break and my only comment,

9  actually, is sort of mechanical question with respect to the

10 new Paragraph 7 that talks about the supplemental assumption

11 notice.

12          Is that being served pursuant to the bid

13 procedures order?  So, in other words, what's the timing for

14 objection and of the like?  I know there's a blank.

15          MS. KATONA:  Good afternoon, Your Honor.  Shanti

16 Katona on behalf of the debtors.

17          Our proposal would be that it would be served,

18 along with the provisions that we're using in the bid

19 procedures, so we would anticipate a 14-day objection

20 deadline.

21          THE COURT:  Okay.  And did we already address this

22 form of relief in the bid procedures order or do I need to --

23          MS. KATONA:  We did.  There's an opportunity to

24 file a supplemental cure notice --

25          THE COURT:  Okay.

1    MS. KATONA:  -- for parties, because the proposed

2  purchaser, under the bid procedures, have, I believe, right

3  up until closing to add or remove contracts from their

4  assumed and assigned list.

5    THE COURT:  Okay.  So, I would ask if you could

6  add the following language to the beginning of the second

7  paragraph that starts with, "Nondebtor counterparties to the

8  additional assumed contracts/leases have been provided ..." I

9  would just simply say, "Subject to the procedures set forth

10  in the bid procedures order, nondebtor counterparties to the

11  additional assumed contracts/leases will have been provided

12  an adequate opportunity to object."  And then you can just

13  insert your 14-day objection deadline.

14    MS. KATONA:  Okay.

15    THE COURT:  Okay.  I don't think that changes any

16  of the substance of your relief.

17    MS. KATONA:  Thank you, Your Honor.

18    THE COURT:  Okay.  So, Mr. Ward, based on the

19  rulings of the Court prior and the representations of the

20  parties regarding how the sale proceeds are going to be

21  handled and the rights reserved, I am prepared to approve the

22  sale, as I mentioned, and will go ahead and do that when I

23  receive a revised proposed form of order.

24    Just for the record, I would ask:  Mr. McGuire, do

25  you have any comments to the form of the proposed order based

 1  on the rulings today or are you satisfied with the revised

 2  order that you have seen?

 3          MR. MCGUIRE:  We may have like one or two

 4  sentences, Your Honor, but that's everything.

 5          THE COURT:  Okay.  Good.

 6          All right.  So, Mr. Ward, what are you thinking in

 7  terms of timing, because I want to make sure that we're

 8  available to the extent that you need the order entered

 9  today, but at the same time, I have no staff to do that

10  after, you know, five o'clock today.

11          MR. WARD:  I'm pretty confident it won't get done

12  between now and five o'clock, Your Honor.

13          THE COURT:  Will not?

14          MR. WARD:  Will not.

15          THE COURT:  Okay.

16          MR. WARD:  Especially with the Entergy situation.

17          THE COURT:  Okay.  So, I don't see a need that you

18  would need to have it entered the 24th or the 25th, based on

19  my ruling today that the sale is approved, unless -- are we

20  all okay with that, if I say that if you submit it under

21  certification of counsel, I will have it entered first thing

22  on the 26th.

23          MR. WARD:  That would be incredible if you could

24  do that, Your Honor.

25          THE COURT:  Is that okay?

1           Okay.  Great.

2           MR. WARD:  And we thank you for making yourself

3    available over the holidays for this.

4           THE COURT:  It's a 24-7 job.

5        (Laughter)

6           MR. WARD:  It's not supposed to be, though.

7           THE COURT:  No one told me about that, actually --

8        (Laughter)

9           MR. WARD:  Yeah, no.  I thought that's why you got

10   out of practice.

11          THE COURT:  -- coming into this, but, apparently,

12   it's a 24-7 job.

13          So, okay.  All right.  Well, then, based on that,

14   I will leave the parties to their negotiations regarding the

15   form of order and I guess we'll have to turn to the bar date

16   motion now.

17          MS. KATONA:  Your Honor, and I guess just for

18   clarification with respect to the sale order, we don't want

19   anybody to be here waiting.  I guess, can we provide chambers

20   with a heads-up of when it might be coming through?  Would

21   that be helpful?

22          THE COURT:  Sure.  So, you said you do not -- it's

23   not likely going to come today, so I would release my staff

24   if that's acceptable to all the parties and then we'll just

25   plan on if you can have it -- just send an email to my

1  chambers staff and we'll know to look for it on the 26th.

2              MS. KATONA:  Okay.

3              THE COURT:  Okay.

4              MS. KATONA:  Great.  Thank you, Your Honor.

5              THE COURT:  Thank you.

6              MS. KATONA:  Your Honor, with respect to the bar

7  date motion, the parties have consulted with the committee,

8  as well as with the Office of the United States Trustee.  I

9  think at this time, in light of the other issues that are

10 floating around, we are going to adjourn that motion.

11             Unless Your Honor has any questions or concerns, I

12 think we would like to tee that up for our next omnibus

13 hearing and then determine it once we have a better idea of

14 where everything lies.

15             THE COURT:  Okay.  That's acceptable to me.

16             MS. KATONA:  Your Honor, the only other item on

17 the agenda is Agenda Item Number 13, which is BlueCross

18 BlueShield's motion.  As we -- as Mr. Ward noted on the

19 record earlier, we have reached a tentative resolution with

20 BlueCross BlueShield.  We believe that we should likely have

21 more clarity on that before the end of the week --

22             THE COURT:  Okay.

23             MS. KATONA:  -- so, unless Your Honor has any

24 questions for us, I think we would also like to similarly

25 adjourn that just to keep that live.

1           THE COURT:  Okay.  We will go ahead and do that.

2           That's acceptable to BlueCross BlueShield?

3           MR. KLAUDER:  Yes, Your Honor.  David Klauder, on

4  behalf of BlueCross BlueShield.

5           I'm hopeful, though -- I think we're continuing it

6  until the next omnibus, which is in a few weeks -- but I'm

7  hopeful that we'll get to the resolution very soon.

8           THE COURT:  Okay.  And you can submit a proposed

9  form of order under certification of counsel, then.

10          Okay.  That's works for us if that works for you.

11          MR. KLAUDER:  Thank you, Your Honor.

12          THE COURT:  Thank you.

13          MS. KATONA:  So, with that, Your Honor, there's

14  nothing left on the debtors' agenda.

15          THE COURT:  Okay.  All right.

16          Well, thank you all very much.  I am glad that we

17  were able to come to a good sale resolution.

18          We'll stand adjourned.  Happy holidays.

19          COUNSEL:  Happy holidays.

20      (Proceedings concluded at 2:50 p.m.)

21

22

23

24

25

1

## CERTIFICATION

2          I certify that the foregoing is a correct

3 transcript from the electronic sound recording of the

4 proceedings in the above-entitled matter to the best of my

5 knowledge and ability.

6

7

8

9 /s/ William J. Garling                    December 24, 2019

10 William J. Garling, CET**D-543

11 Certified Court Transcriptionist

12 For Reliable

13

14

15

16

17

18

19

20

21

22

23

24

25