## EXHIBIT 1

**Purchase Agreement**

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**") is made as of December 12, 2019 (the "**Effective Date**"), by and among Liberty BSG Holdings Inc., ("**Buyer**"), a Delaware corporation, on the one hand, and Bayou Steel BD Holdings, LLC, a Delaware limited liability company ("**Parent Seller**"), BD Bayou Steel Investment, LLC, a Delaware limited liability company ("**Investment Seller**"), and BD LaPlace, LLC, a Delaware limited liability company ("**LaPlace Seller**" and together with Parent Seller and Investment Seller, collectively the "**Sellers**" or "**Debtors**" and individually, each a "**Seller**" or "**Debtor**"). Each of Buyer and Sellers may be referred to herein individually as a "**Party**" and collectively as the "**Parties**."

## BACKGROUND

A. As of the Effective Date, Sellers, directly or through their Affiliates, are engaged in the business of operating (i) a mini-mill with electric arc furnace steelmaking and continuous billet casting, (ii) a medium section rolling mill, (iii) a bar product rolling mill, in each case for the purpose of offering a full range of rolled steel products and (iv) the scrapping and recycling of automobiles and appliances (the activities referenced in clauses (i), (ii), (iii) and (iv) of this sentence, collectively with any other business any Seller is engaged in as of the Effective Date, the "**Business**");

B. Sellers and their Affiliates operate the Business from (i) facilities located in LaPlace, Louisiana (the "**Headquarters Facility**") and Harriman, Tennessee (the "**Harriman Production Facility**" and together with the Headquarters Facility, collectively the "**Production Facilities**" and individually, each a "**Production Facility**"), and (ii) distribution depots located near Tulsa, Oklahoma (the "**Tulsa Distribution Depot**"), Chicago, Illinois (the "**Chicago Distribution Depot**") and Pittsburgh, Pennsylvania (the "**Pennsylvania Distribution Depot**" and together with the Tulsa Distribution Depot and the Chicago Distribution Depot, collectively the "**Distribution Depots**" and individually, each a "**Distribution Depot**" and together with the Production Facilities, collectively the "**Facilities**" and individually, each a "**Facility**");

C. On October 1, 2019, Sellers filed for protection under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**") (In re: Bayou Steel BD Holdings, LLC, *et al.*, Case No. 19-12153 (KBO) (the "**Case**"));

D. On October 11, 2019, the Debtors filed their *Motion of Debtors for Entry (I) an Order (A) Approving Bid Procedures in Connection with the Potential Sale of Substantially All of the Debtors Assets, (B) Scheduling an Auction and Sale Hearing, (C) Approving the Form and Manner of Notice Thereof, (D) Authorizing the Debtors to Enter Into a Stalking Horse Agreement, (E) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (F) Granting Related Relief; and (II) an Order (A) Approving the Sale of Substantially All of the Debtors Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief* [Docket No. 73] (the "**Bid Procedures Motion**");

E. On November 8, 2019, the Court approved the relief requested in the Bid Procedures Motion [Docket No. 224] (the "**Bidding Procedures Order**");

F. Buyer desires to purchase the Acquired Assets (as defined in **Section 1.1**) from Sellers, and Sellers desire to, and cause their Affiliates to, sell, transfer, convey, assign and deliver to Buyer, the Acquired Assets, all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363, and 365 of the Bankruptcy Code and other applicable provisions thereof;

G. The Acquired Assets are assets of Sellers or their Affiliates that are to be purchased by Buyer pursuant to an order of the Court approving such sale pursuant to Sections 105, 363, and 365 of the Bankruptcy Code in the form attached as **Exhibit C** (the "**Sale Order**") and in the manner and subject to the terms and conditions set forth in this Agreement; and

H. The execution and delivery of this Agreement and each Party's ability to consummate the Transactions are subject, among other things, to the entry of the Sale Order.

I. Liberty Holdings Australia Pty. Ltd. has provided a guarantee attached as **Exhibit D**.

J. All capitalized terms used in this Agreement shall have the meaning given to such terms in **Exhibit A**.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and agreements herein contained, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I

## PURCHASE AND SALE OF ASSETS

1.1     Acquired Assets. Upon the terms and subject to the conditions set forth in this Agreement, Sellers shall, and shall cause their Affiliates to, sell, transfer, convey, assign and deliver to Buyer, and Buyer shall purchase and acquire from Sellers and such Affiliates, all Sellers' and such Affiliates' right, title and interest in, to and under all of the Acquired Assets (as hereinafter defined), free and clear of all Liens, at the Closing (as defined in **Section 5.1**) on the Closing Date. As used in this Agreement, the term "**Acquired Assets**" means all of Sellers' and Sellers' Affiliates' rights, title and interests in, to and for the Business, as well as the goodwill, operations as a going concern, assets, properties, interests and rights owned, leased, licensed or used by Sellers or their Affiliates of every kind and wherever situated as of the Closing in connection with the Business and whether now existing or hereafter acquired, whether the foregoing are real, personal, mixed, tangible or intangible, and whether or not any of the foregoing have any value for accounting purposes or are carried or reflected on or specifically referred to in Sellers' or Sellers' Affiliates' books or financial statements, excluding only the Excluded Assets, but otherwise including the assets, properties, rights, contracts and leases listed on **Schedule 1.1** and including the following, to the extent that such are connected with, or otherwise related to or required for the conduct of, the Business and do not constitute Excluded Assets:

1.1.1    all real property, leaseholds and other interests in real property owned (including the Owned Real Property, as defined below) or leased, subleased, licensed, or otherwise used pursuant to any other occupancy agreement (including the Leased Real Property, as defined below) by any Seller or Affiliate of a Seller, together with Sellers' and Sellers' Affiliates' right, title and interest in, to and under all structures, facilities or improvements located thereon (including the LaPlace Dock, as defined below), all fixtures, systems, equipment, trade fixtures, and other items of personal property attached or appurtenant thereto, including the mini-mill, the arc furnace and the loading facilities at the Headquarters Facility (collectively, "**Fixtures**") and all easements, rights-of-way, licenses, rights and appurtenances relating to the foregoing;

1.1.2    all tangible personal property, including all equipment, and machinery in all of its forms, wherever located, including all accessions, additions, appurtenances and improvements to, parts,

products and replacements of and documents and substitutes for the foregoing (collectively, the "**Equipment**");

1.1.3    all right, title and interest of Sellers and Sellers' Affiliates, in, to and under their respective executory contracts (including real estate leases, subleases, licenses, and other occupancy agreements, including Real Property Leases (as defined below) relating to the Leased Real Property) listed on (i) **Schedule 1.1.3(i)** (the "**Assumed Contracts/Leases**") and (ii) **Schedule 1.1.3(ii)** (the "**Additional Assumed Contracts/Leases**"), in each of clauses (i) and (ii) of this sentence, including rights of Sellers or Sellers' Affiliates, as applicable, to receive moneys due and to become due under or pursuant thereto;

1.1.4    all insurance benefits, including rights, experience ratings (to the extent transferable) and proceeds arising from or relating to the Acquired Assets or the Assumed Liabilities;

1.1.5    all of Sellers' Intellectual Property, whether or not subject to statutory registration;

1.1.6    all other rights, assets and goodwill of Sellers and Sellers' Affiliates, including all (i) Permits relating to the Business or the Acquired Assets, (ii) the right to carry on the Business, (iii) books of account, general, financial, Tax, accounting and personnel records, files, invoices, product pricing lists, product purchase orders, tooling purchase orders, literature, correspondence, customer quotes, and customer's and supplier's lists, (iv) causes of action, claims and demands of whatever nature (in each case, to the extent the transfer thereof is not prohibited by Law), (v) all rights of Sellers and Sellers' Affiliates under non-disclosure or confidentiality, non-compete, or non-solicitation agreements, and (vi) all warranties, indemnities and all similar rights against third parties;

1.1.7    the right to receive all goods or services to be provided to Sellers and Sellers' Affiliates in connection with the Business at the Facilities, including all deposits related thereto to open orders for goods and services with suppliers that remain unfulfilled as of the Closing Date; and

1.1.8    all telephone numbers and web-sites of Sellers and Sellers' Affiliates, which shall be assigned to Buyer as of the Closing Date.

1.2    Excluded Assets. Sellers and Sellers' Affiliates will retain (and the Acquired Assets will not include) the following (collectively, the "**Excluded Assets**"):

1.2.1    all of Sellers' and Sellers' Affiliates' rights under this Agreement and all instruments, agreements, documents and certificates to be executed and delivered by Sellers, Sellers' Affiliates or Buyer pursuant to this Agreement or in connection herewith, whether at the Effective Time or thereafter (collectively, the "**Transaction Documents**");

1.2.2    the Purchase Price payable to Sellers pursuant to **Section 2.1**;

1.2.3    the certificates of formation, minute books, membership records and other corporate records of Sellers and Sellers' Affiliates having exclusively to do with the corporate organization and capitalization of Sellers and Sellers' Affiliates;

1.2.4    all cash, security deposits, professional retainers, refunds, deposits, accounts receivable and prepaid expenses of Sellers and Sellers' Affiliates and all vendor rebate accounts and prospective rebates, whether soft dollar or hard dollar;

1.2.5    all securities in which any of Sellers or Sellers' Affiliates have an interest;

1.2.6    any interest in or right to any refund of Taxes relating to the Business, the Transferred Assets or the Assumed Liabilities (as defined in **Section 3.1**) for, or applicable to, any taxable period (or portion thereof) ending on or prior to the Closing Date;

1.2.7    all rights, claims and causes of action relating to any Excluded Asset or any Excluded Liability;

1.2.8    any assets of an Employee Benefit Plan;

1.2.9    all of Sellers' and Sellers' Affiliates bank accounts;

1.2.10  all Chapter 5 Avoidance Action(s) (as defined in the *Agreed Final Order (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 241];

1.2.11  any Contract other than the Assumed Contracts/Leases and the Additional Assumed Contracts/Leases; and

1.2.12  any state law fraudulent transfer and similar causes of action, claims, or demands against Sellers' and Sellers' Affiliates equity owners, officers, directors, members, employees, agents, representatives or professionals.

1.3    Conveyance of Acquired Assets. The sale, transfer, conveyance, assignment and delivery of the Acquired Assets provided for in this **Article I** shall be made by the documentation described on **Schedule 1.3**, which shall include all good and sufficient instruments of conveyance and transfer as shall be necessary to vest in Buyer as of the Closing Date title to the Acquired Assets being sold, transferred, conveyed, assigned and delivered hereunder.

1.4    Assumed Liabilities and Excluded Liabilities. Buyer will not assume or become liable for the payment, performance or discharge of any Liabilities of Sellers, except upon the terms and subject to the conditions of this Agreement. At the Closing, Buyer will execute and deliver to Sellers an Assumption Agreement as described on **Schedule 1.3**, pursuant to which Buyer will, effective as of the Closing, assume, satisfy and perform only the Assumed Liabilities. Notwithstanding any provision of this Agreement or any instrument relating hereto to the contrary, Buyer will not accept, acquire, assume or become liable to pay, perform or discharge, and the Assumed Liabilities will not include, the Excluded Liabilities.

1.5    Purchase Price Allocation. As soon as reasonably practicable after the Closing Date, the Buyer shall determine the allocation of the Purchase Price among the Acquired Assets and the agreements provided for herein, for all purposes (including financial, accounting and Tax) (the "**Allocation**"). The Buyer and Sellers shall each report the federal, state and local income and other Tax consequences of the Transactions in a manner consistent with the Allocation, including, if applicable, the preparation and filing of Forms 8594 under Section 1060 of the Code (or any successor form or successor provision of any future Tax Law) with their respective Tax returns for the taxable year which includes the Closing Date, and neither will take any position inconsistent with the Allocation unless otherwise required under applicable Law. Sellers shall provide the Buyer and the Buyer shall provide Sellers with a copy of any information required to be furnished to the Secretary of the Treasury under Code Section 1060.

# ARTICLE II

## PURCHASE PRICE

2.1    Purchase Price. The purchase price (the "**Purchase Price**") for the Acquired Assets shall be equal to (i) $28,000,000 (the "**Base Purchase Price**"), minus (ii) the amount of Taxes payable by Sellers to Buyer pursuant to Section 4.5.2, minus (iii) the Additional Cure Amounts, if any (the sum of the amounts set forth in clauses (i), (ii) and (iii) of this sentence, the "**Cash Purchase Price**"), plus (iv) the assumption of the Assumed Liabilities, plus (v) the payment of the cure amounts, as determined by the Court to be necessary to cure all defaults and to pay all actual or pecuniary losses that have resulted from such defaults under the Assumed Contracts/Leases, to the extent set forth on **Schedule 1.1.3** (collectively, the "**Cure Amounts**"), plus (vi) the amount of the Administrative Bridge.

2.2    Deposit.

2.2.1    Sellers acknowledge that Buyer has paid an earnest money deposit in the amount equal to $2,800,000 (together with interest earned thereon, the "**Deposit**") to the separate trust account set forth on **Schedule 2.2.1** (the "**Trust Account**") of Polsinelli PC (the "**Escrow Agent**"). The Deposit, pursuant to the Bidding Procedures Order, shall not become, or be considered, part of the bankruptcy estate of Sellers.

2.2.2    If (i) the conditions of Closing set forth in **Article X** are satisfied, (ii) Sellers have duly performed and complied with all of their obligations under the Transaction Documents, and (iii) the Transactions would otherwise have been consummated on or prior to January 31, 2020 but for the breach by Buyer of any of its material obligations under this Agreement, but the Closing is not consummated as a result of such breach hereunder, then, if Sellers terminate this Agreement pursuant to **Section 12.2**, the Deposit and the Administrative Bridge shall be forfeited and become property of Sellers' estates.

2.2.3    If (i) the Court does not enter the Sale Order by December 19, 2019, (ii) Sellers sell or agree to sell any of the Acquired Assets to any Person other than to Buyer, or (iii) the Closing is not consummated by January 31, 2020 as a result of Sellers' failure to perform any of their material obligations hereunder or due to the failure to satisfy any of the conditions precedent set forth in **Article X**, then, notwithstanding anything to the contrary in the Bidding Procedures Order, Sellers shall (i) cause the Escrow Agent to refund the Deposit to Buyer and pay to Buyer any amounts remaining in the Trust Account and (ii) pay to Buyer the difference between (A) the sum of the amounts of the Deposit and the Administrative Bridge and (B) the amount repaid pursuant to clause (i) of this sentence.

2.3    Payment of Purchase Price. The Purchase Price shall be payable as follows:

2.3.1    Cash Purchase Price. On the Closing Date, Buyer shall pay an amount equal to the difference between (i) the Cash Purchase Price and (ii) the Deposit, to Sellers by wire transfer of immediately available funds to the account designated by Sellers no later than five (5) Business Days prior to the Closing Date.

2.3.2    Assumed Liabilities. On the Closing Date, Buyer shall assume the Assumed Liabilities.

2.3.3    Cure Amounts. The Cure Amounts and the Additional Cure Amounts shall be paid by Buyer upon the consummation of the Closing, it being agreed that Sellers (and not Buyer) shall pay, and be liable for, any cure amounts that are not set forth on **Schedule 2.1**.

2.3.4    <u>Administrative Bridge</u>.  Within three (3) Business Days of the Court's entry of the Sale Order, Buyer shall pay (i) to Sellers by wire transfer of immediately available funds to an account designated by Sellers, the amount of $200,000, which shall be used by Sellers to fund administrative expenses of the Sellers' bankruptcy estates accruing through the Closing Date, and (ii) to the Trust Account the amount of $250,000, which shall be used by the Escrow Agent to fund insurance premiums actually paid by Sellers with respect to insurance policies covering the Acquired Assets, as described in the Insurance Motion, through the Closing Date (the amounts set forth in clauses (i) and (ii) of this sentence collectively the "**Administrative Bridge**").

2.4    <u>Withholding</u>. Buyer shall be entitled to deduct and withhold from any amount payable pursuant to this Agreement (including payments of the Purchase Price) such amounts as Buyer reasonably determines it is required to deduct and withhold with respect to the making of such payment under the Code or any other provision of applicable Law. If Buyer reasonably determines that it is required to withhold or deduct any amount it shall notify Sellers as promptly as practicable prior to the Closing Date and shall reasonably cooperate with Sellers to mitigate such withholding or deduction. To the extent that amounts are so withheld by Buyer, such withheld amounts will be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding were made.

## ARTICLE III

## ASSUMPTION OF CERTAIN LIABILITIES

3.1    <u>Assumption of Certain Liabilities</u>. Effective following the Closing, Buyer shall assume and hereby agrees to perform and discharge all Liabilities of Sellers arising following the Closing and relating exclusively to events or circumstances occurring after the Closing under (i) the Assumed Contracts/Leases and the Additional Assumed Contracts/Leases and (ii) any Permit constituting an Acquired Asset (the "**Assumed Liabilities**").

3.2    <u>No Assumption of Other Liabilities</u>. Except for the Assumed Liabilities, Buyer does not assume and shall not in any manner become responsible or liable for any and all Liabilities of any of Sellers or Sellers' Affiliates that are not Assumed Liabilities (the "**Excluded Liabilities**"). In furtherance, and not in limitation of the foregoing, the Excluded Liabilities include the following Liabilities of Sellers or Sellers' Affiliates:

3.2.1    indebtedness for borrowed money;

3.2.2    any and all Liabilities at any time arising from, relating to, or in connection with (i) any Employee Benefit Plan or any other employee benefit plan, program, policy, agreement or arrangement currently or previously sponsored, maintained, contributed to (or required to be contributed to) by any Seller or any of its Affiliates or ERISA Affiliates, or with respect to which any Seller or any of its Affiliates or ERISA Affiliates has any Liability, including any "defined benefit plan" within the meaning of Section 3(35) of ERISA, "multiemployer plan" within the meaning of Section 3(37) or 4001(a)(3) of ERISA, medical, health, disability, welfare benefit, fringe benefit, severance, retention, change-in-control, vacation, paid time off, bonus, incentive, retirement, pension, deferred compensation, equity or equity-based plan, program, policy, agreement or arrangement, and including Liabilities arising under Section 412, 430 or 4971 of the Code, Title IV of ERISA, COBRA or any other  employee benefit Laws; or (ii)  the employment (or termination of employment) of any current or former employee of any Seller or any of its Affiliates or ERISA Affiliates, or the services (or termination of services) of any Person who is or was a non-employee service provider to any Seller or any of its Affiliates, including Liabilities for salary, wages, fees, commissions,  or  other  compensation  or  benefits,  employment  taxes,  workers  compensation,

unemployment, or other government mandated benefits, and Liabilities arising under any employment or other individual services agreement, collective bargaining agreement, the WARN Act, or any other Laws regarding the employment of labor (including wage and hour, discrimination, occupational health and safety, and immigration Laws).  For the avoidance of doubt, Buyer is not assuming, and shall have no Liability for, any employment or employee benefits Liabilities which may arise or result from the Transactions, including any Liability under COBRA, the WARN Act or Title IV of ERISA, and any and all such Liabilities shall be Excluded Liabilities.

　　　　3.2.3    any and all Liabilities arising out of or related to the Excluded Assets, including Contracts that are not Assumed Contracts/Leases or Additional Assumed Contracts/Leases;

　　　　3.2.4    any and all Liabilities for Taxes of Sellers or their Affiliates;

　　　　3.2.5    any and all Liabilities for Taxes imposed on or relating to the Business, the Acquired Assets or the Assumed Liabilities for, or applicable to, any period (or portion thereof) ending on or before the Closing Date;

　　　　3.2.6    one half of any Transaction Taxes;

　　　　3.2.7    any and all Liabilities arising prior to the Petition Date that are subject to compromise under the Bankruptcy Code and any other Liability in respect of any claim (as such term is defined in Section 101(5) of the Bankruptcy Code) in the Case, whether such claim arose, was incurred or accrued before or after the Petition Date;

　　　　3.2.8    any and all Liabilities associated with brokers, finders or other consultants or advisors to Sellers or their Affiliates entitled to a fee or reimbursement of expenses with respect to this transaction;

　　　　3.2.9    any and all Liabilities relating to any Legal Proceeding arising out of or related to any occurrence or event that happened prior to the Closing Date, notwithstanding the date that any such Legal Proceeding is commenced;

　　　　3.2.10   any and all Liabilities relating to Sellers' ownership or operation of the Business or Acquired Assets that arise from events, facts or circumstances that occurred prior to the Closing;

　　　　3.2.11   any and all Liabilities for which outstanding checks and wire transfers have been mailed, transmitted or otherwise delivered with respect to the Business but that have not cleared the bank or other accounts of the Business as of the Closing; and

　　　　3.2.12   any and all Liabilities related to any cure amount that is in excess of the Cure Amounts as set forth on **Schedule 2.1**.

　　3.3    <u>Sellers to Perform Excluded Liabilities</u>. Sellers will remain responsible for all Excluded Liabilities, subject to Sellers' rights under the Bankruptcy Code and other available defenses.

## ARTICLE IV

## ADDITIONAL COVENANTS OF PARTIES

　　4.1    <u>Additional Assumed Contracts/Leases</u>.   Sellers shall withdraw with prejudice the First Omnibus Motion for Entry of an Order (I) Authorizing the Debtors to Reject Certain Executory Contracts

and Unexpired Leases Nunc Pro Tunc to the Applicable Rejection Date, and (II) Granting Certain Related Relief [Docket No. 283] solely as to the Additional Assumed Contracts/Leases on the Effective Date. All provisions in this Agreement as to Assumed Contracts/Leases shall apply to Additional Assumed Contracts/Leases except that (i) Sellers shall on the Effective Date provide reasonable notice of the Transactions as they relate to the Additional Assumed Contracts/Leases to the counterparties to the Additional Assumed Contracts/Leases in the form and manner such notice was provided for in the Bidding Procedures Order as to Assumed Contracts/Leases, (ii) Buyer may unilaterally withdraw prior to the Closing Date any Additional Assumed Contract/Lease from **Schedule 1.1.3(ii),** and such Additional Assumed Contract/Lease shall be deemed to not have been included on **Schedule 1.1.3(ii)**, upon the relevant counterparty's filing of any objection to the proposed assumption and assignment to Buyer of such Additional Assumed Contract/Lease, and (iii) any and all cure amounts for the Additional Assumed Contracts/Leases (the "**Additional Cure Amounts**") shall be deducted from the Base Purchase Price and Buyer shall have no further obligation for any Additional Cure Amount.

4.2     Access Period. From the Effective Date until the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with the provisions of **Article XII** (the "**Access Period**"), Sellers shall:

(a)     provide Buyer and its representatives, lawyers, lenders, and consultants with reasonable access upon reasonable notice during normal business hours to the Acquired Assets, to senior management, operations and plant employees, and to financial information, books, title commitments and policies, surveys, property condition reports, environmental audits, tests, notices related thereto, business records and other information relating to the Acquired Assets and the Assumed Liabilities, as well as reasonable access during regular business hours to all plants, offices, facilities, properties, books, Contracts, commitments and records (including accountant's work papers) of or relating to Sellers, Sellers' Affiliates, the Acquired Assets and the Business;

(b)     permit Buyer's property and environmental consultants to visit the Owned Real Property and Leased Real Property to conduct property condition reports, surveys, Phase I environmental audits and to the extent recommended by such environmental consultants, for the Owned Real Property and to the extent permitted under the Real Property Leases, the Leased Real Property, Phase II type testing of soil, groundwater, and vapor, to inspect, test and review the Acquired Assets; and

(c)     provide all necessary authorizations or consents reasonably required by Buyer to perform its governmental inquiries with respect to the Acquired Assets and the Assumed Liabilities.

4.3     Conduct of Business Pending Closing. Sellers agree that from the Effective Date through the earlier to occur of (i) the Closing, and (ii) the date on which this Agreement is terminated in accordance with the provisions of **Article XII**:

4.3.1     Conduct of Business; Operation of Acquired Assets. In each and every case subject to Sellers' rights and responsibilities as debtors-in-possession under the Bankruptcy Code, Sellers will;

(a)     not engage in any transactions with respect to the Acquired Assets other than maintaining the Acquired Assets in good operating condition and repair consistent with past practice, ordinary wear and tear excepted;

(b)     continue in full force and effect without modification any existing policies or binders of insurance currently maintained by Sellers;

(c)     not amend, modify or terminate, or waive any rights under, any Assumed Contract/Lease or enter into any Contract that would be an Assumed Contract/Lease if it had been entered into on or prior to the Effective Date;

(d)     not change or modify any of the following: (i) billing and collection policies, procedures and practices with respect to accounts receivable or unbilled charges that relate to the Business; (ii) policies, procedures and practices with respect to the provision of discounts, rebates or allowances that relate to the Business; or (iii) the accounting of the Business, except as required by GAAP or a change in Law;

(e)     not enter into any material transaction relating to the Business;

(f)     not (i) sell, assign, license, transfer, convey, lease or otherwise dispose of any of the Acquired Assets, (ii) dispose of, or trade in, any of the Equipment or Fixtures, or (iii) create, incur, assume, or suffer to exist any Lien upon or with respect to any of the Acquired Assets with the Prepetition Lenders or Liens rising in the Ordinary Course of Business of Sellers;

(g)     not, except in the Ordinary Course of Business, acquire any properties or assets that would be Acquired Assets;

(h)     use commercially reasonable efforts as they are able to exercise as a result of the commencement of the Case, and consistent with their rights, duties and obligations under the Bankruptcy Code and other applicable Law, to preserve their current relationships with their customers, suppliers, vendors and other entities with which they have significant and ongoing business relationships;

(i)     not file any Tax Return (other than consistent with past practice and applicable Law), make, change or rescind any Tax election, change their fiscal year or Tax accounting methods, policies or practices, settle any Tax audit or extend a period of limitations with respect to Taxes, except in each case as would not reasonably be expected to result in any Assumed Liability, or have any adverse effect on, the Buyer or the Acquired Assets; and

(j)     not agree to do, authorize, approve, commit to do or take any action in furtherance of anything prohibited by this **Section 4.3**.

4.3.2   <u>Representations and Warranties; Conditions</u>. Subject to Sellers' rights and responsibilities as debtors-in-possession under the Bankruptcy Code, Sellers will, consistent with their fiduciary duties under the Bankruptcy Code in connection with the Case, not engage in any practice, take any action, fail to take any action or enter into any transaction that would reasonably be expected to (i) cause any of the representations and warranties of Sellers contained in this Agreement or any documents related thereto to be untrue, inaccurate or incorrect at any time, or (ii) result in any of the conditions set forth in **Article X** and **Article XI** not being satisfied on or prior to the due termination of this Agreement;

4.4     <u>Termination of Employees</u>. Sellers shall terminate the employment of all of their employees prior to the Closing Date.

4.5     <u>Taxes Related to Purchase of Assets</u>.

4.5.1   All federal, state and local sales, transfer, excise, value-added or other similar taxes, including all state and local taxes in connection with the transfer of the Acquired Assets, and all recording and filing fees (collectively, "**Transaction Taxes**"), that may be imposed by reason of the sale, transfer,

assignment and delivery of the Acquired Assets, and are not exempt under Section 1146(a) of the Bankruptcy Code, and any obligation related thereto, shall be shared equally between Sellers, on the one hand, and Buyer, on the other hand; provided, however, that Taxes based on or measured by gain shall not be treated as Transaction Taxes and shall be borne solely by Sellers. Buyer and Sellers agree to cooperate (i) to determine the amount of Transaction Taxes payable in connection with the Transactions and (ii) to prepare and timely file any and all required returns for or with respect to such Transaction Taxes with any and all appropriate taxing authorities.

       4.5.2    All real property, personal property and similar ad valorem Taxes levied with respect to the Acquired Assets for a taxable period that includes (but does not end on) the Closing Date shall be apportioned between Sellers, on the one hand, and Buyer, on the other hand, as of the Closing Date based on the number of days of such taxable period included in the period ending with and including the Closing Date, and the number of days of such taxable period beginning after the Closing Date. At the Closing, Sellers shall pay to Buyer (via a reduction in the Cash Purchase Price) Sellers' portion of such Taxes.

## ARTICLE V

## CLOSING

       5.1    The Closing. Subject to the satisfaction of the conditions precedent set forth in **Article X** and **Article XI** or the waiver thereof, in accordance with **Section 13.1**, by the Party entitled to the benefit of the same (other than those conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction of such conditions or the waiver thereof, in accordance with **Section 13.1**, by the Party entitled to the benefit of the same), the consummation of the Transactions (the "**Closing**") shall take place at 10:00 a.m., local time on January 31, 2020 (the "**Closing Date**") in the offices of Sellers' counsel in Wilmington, Delaware, or on such other date or at such other location as is mutually agreed by the Parties, including electronically; provided, however, that in no event, unless otherwise agreed in writing by the Parties, will the Closing take place on a date which is after January 31, 2020.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF SELLERS

       Except as set forth in the schedules accompanying this **Article VI** (collectively, the "**Disclosure Schedules**"), to the extent permitted in accordance with **Section 13.14**, Sellers, jointly and severally, represent and warrant to Buyer as follows, which representations and warranties shall be true and correct as of the Effective Date and true and correct as of the Closing, with the same force and effect as though made at and as of the Closing, but which shall not survive the Closing:

       6.1    Organization and Standing of Sellers. Each Seller, and each Affiliate of a Seller that will be a party to any Transaction Document, is a limited liability company or other legal entity duly organized and validly existing and in good standing under the laws of the jurisdiction of its organization, with full limited liability company, corporate or similar power and authority to own, lease and operate its assets and to conduct its business. Each Seller, and each Affiliate of a Seller that will be a party to any Transaction Document, is duly qualified or authorized to do business and is in good standing under the laws of each jurisdiction in which it leases real property or in which the conduct of its business or the ownership of its property requires such qualification or authorization.

       6.2    Acquired Assets. At the Closing, Sellers shall, and shall cause their respective Affiliates to, transfer to Buyer good and marketable title to all of the Acquired Assets, free and clear of all Liens. Upon the expiration of any applicable appeal period following the entry of the Sale Order, Sellers and Seller's

respective Affiliates shall have the right to freely assign all of their rights and interests in the Acquired Assets (including the Assumed Contracts/Leases) to Buyer free and clear of all Liens, except for the rights of the owners of the personal property leased by any Seller pursuant to the Assumed Contracts and Leases from and after the Closing Date. Except for the Excluded Assets, the Acquired Assets constitute all the property and assets, real personal, mixed, tangible and intangible, including contract rights, pricing lists, product lists, bills of materials, that are (i) used or held for use in the operations of the Business and (ii) necessary for the conduct of the Business.

6.3     <u>Authorization; Binding Effect</u>. The execution and delivery by each Seller, or Affiliate of a Seller, as applicable, of each of the Transaction Documents to which such Seller or Affiliate of a Seller is or will be a party, the performance by such Seller or Affiliate of a Seller of its obligations under such Transaction Documents and the consummation of the Transactions by such Seller or Affiliate of a Seller have been duly authorized by all necessary action on the part of such Seller or Affiliate. No other limited liability company, corporate or similar proceedings on the part of any Seller or Affiliate of a Seller or its equityholders are necessary to approve and adopt the Transaction Documents or to approve the consummation of the Transactions. Each of the Transaction Documents to which any Seller or Affiliate of a Seller is or will be a party is, or, when executed and delivered in accordance with this Agreement will be, a legal, valid and binding obligation of such Seller or Affiliate of a Seller enforceable against such Seller or Affiliate of a Seller in accordance with its terms, except that such enforcement (i) may be limited by bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights generally and (ii) is subject to the availability of equitable remedies, as determined in the discretion of the court before which such a proceeding may be brought.

6.4     <u>Conflicts; Consents of Third Parties</u>.

6.4.1   None of the execution and delivery by each Seller, or Affiliate of a Seller, as applicable, of this Agreement or the Transaction Documents to which such Seller or Affiliate is or will be a party, the performance by each Seller or Affiliate of a Seller, as applicable, of its obligations hereunder or thereunder or the consummation by each Seller or Affiliate of a Seller of the Transactions does or will (i) conflict with or violate any provision of the certificate of incorporation, limited liability company agreement or similar organizational document of a Seller or such Affiliate of a Seller; (ii) subject to entry of the Sale Order, conflict with, result in a violation or breach of, constitute a default under, result in the acceleration of, give rise to any right to accelerate, terminate, modify or cancel, or require any notice, consent, authorization, approval or waiver under, or result in any other adverse consequence under, any Contract or Permit to which any Seller or such Affiliate of a Seller is a party or by which any Seller or such Affiliate of a Seller or any of its properties or assets is bound or otherwise subject; (iii) subject to entry of the Sale Order, violate or breach the terms of or cause any default under any Order of any Governmental Body applicable to any Seller or any such Affiliate of a Seller or any of the properties or assets of any Seller or any such Affiliate of a Seller; (iv) subject to entry of the Sale Order, violate or breach the terms of or cause any default under any applicable Law; (v) result in the imposition of any Lien upon any assets or properties of any Seller or any such Affiliate of a Seller; or (vi) with the passage of time, the giving of notice or the taking of any action by another Person, have any of the effects described in clauses (i) through (v) of this **Section 6.4.1**.

6.4.2   No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of any Seller or Affiliate of a Seller in connection with the execution and delivery by each Seller or Affiliate of a Seller, as applicable, of this Agreement and the other Transaction Documents to which such Seller or Affiliate is or will be a party, the performance by each Seller or Affiliate of a Seller of any of its obligations hereunder or

thereunder, or the consummation by each Seller or Affiliate of a Seller of the Transactions, except for the entry of the Sale Order.

6.5    Financial Statements.

6.5.1    Sellers have delivered to Buyer copies of the unaudited balance sheet of the LaPlace Seller as at July 31, 2019 and the related statements of income and cash flows of the LaPlace Seller for the seven (7) month period then ended and copies of the audited balance sheet of the LaPlace Seller as at December 31, 2018 and 2017 and the related statements of income and cash flows of the LaPlace Seller for the years then ended (such unaudited and audited statements, including the related notes and schedules thereto, are referred to herein as the "**Financial Statements**"). For the purposes hereof, the unaudited balance sheet of the LaPlace Seller as at July 31, 2019 is referred to as the "**Balance Sheet**" and July 31, 2019 is referred to as the "**Balance Sheet Date**".

6.5.2    The Financial Statements were prepared from and are consistent with the books and records of Sellers. The Financial Statements have been prepared in accordance with GAAP consistently applied and on that basis present fairly, in all material respects, the financial position, results of operations and cash flows of Sellers as of the applicable date and for the periods indicated. The Financial Statements indicate all adjustments, which consist of only normal recurring accruals (that are not, individually or in the aggregate, material) necessary for such fair presentations. The statements of income included in the Financial Statements do not contain any items of special or nonrecurring income except as expressly specified therein, and the balance sheets included in the Financial Statements do not reflect any write-up or revaluation increasing the book value of any assets.

6.5.3    The books of account and other financial records of each Seller: (i) reflect all items of income and expense and all assets and Liabilities of such Seller; and (ii) are in all material respects true, correct and complete.

6.6    No Undisclosed Liabilities. Sellers have not incurred any Liabilities since the Balance Sheet Date, other than Liabilities incurred in the Ordinary Course of Business, Liabilities under this Agreement and Excluded Liabilities.

6.7    Title to Acquired Assets; Sufficiency and Condition of Assets.   Sellers own the Acquired Assets, and will at the Closing sell to Buyer good, valid and marketable title to the Acquired Assets, free and clear of all Liens, except for the rights of the owners of the personal property leased by any Seller pursuant to the Assumed Contracts and Leases from and after the Closing Date. All of the Acquired Assets that are tangible assets of any kind or description are in operating condition and repair, ordinary wear and tear excepted, and suitable for their current use.

6.8    Taxes.

6.8.1    (i) Sellers have timely filed all Tax Returns required to be filed with the appropriate Tax authorities in all jurisdictions in which such Tax Returns are required to be filed (taking into account any extension of time to file granted or to be obtained on behalf of Seller); and (ii) all Taxes of Sellers (whether or not shown as due on such Tax Returns) have been paid.

6.8.2    No Seller is a foreign person within the meaning of Section 1445 of the Code.

6.8.3    Sellers have not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to the assessment of any Tax, or any deficiency with respect thereto, Sellers have not received any assessment for Taxes or claims that Taxes are due in a jurisdiction where Seller

receiving the claim does not file a Tax return, and there is no action, examination, investigation or other administrative proceeding or court proceeding, dispute, suit, claim or audit pending or ongoing with respect to material Taxes of any Seller payable with respect to the Business, the Assumed Liabilities or the Acquired Assets.

6.8.4    Sellers have properly withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any stockholder, member, owner, employee, creditor, independent contractor or other third party and has complied with all information reporting requirements in connection with such payments.

6.8.5    Sellers have collected and remitted all applicable material sales, use and value-added Taxes relating to the Business, the Assumed Liabilities or the Acquired Assets to the appropriate taxing authority, or have obtained in good faith any applicable sales or use Tax exemption certificates or otherwise qualify for an exemption if no exemption certificate is required.

6.8.6    Sellers (i) have never been a member of an affiliated group of corporations within the meaning of Section 1504 of the Code and (ii) have no Liability for Taxes of any Person (other than another Seller) under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign tax Law), as a transferee or successor, by contract or otherwise.

6.9    Real Property Matters.

6.9.1    Owned Real Property. **Schedule 6.9.1** sets forth a true and accurate address and legal description of each parcel of real property owned by Sellers, and a true and accurate description of the dock property and related structures owned by Sellers located at the Headquarters Facility (the "**LaPlace Dock**") (collectively, "**Owned Real Property**"). Sellers have good and marketable title to all Owned Real Property in fee simple, free and clear of all Liens other than Permitted Exceptions. Sellers have not received written notice from any Governmental Body that any of the Owned Real Property is not in compliance with all applicable Laws, except for such failures to comply, if any, which have been remedied. Other than this Agreement, there are no outstanding options or rights of first refusal to purchase any of the Owned Real Property or any interest therein. Sellers have provided to the Buyer true and accurate copies of each deed for each parcel of Owned Real Property and all title insurance commitments with underlying documents, title policies, surveys, property condition reports, zoning reports, mortgages, and deeds of trust relating to the Owned Real Property, in each case to the extent in Sellers' possession and control.

6.9.2    Leased Real Property. **Schedule 6.9.2** sets forth a true and accurate list of the locations of each parcel of real property, water bottoms and navigable waters leased, subleased, licensed or otherwise occupied by Sellers pursuant to any occupancy agreement (collectively the "**Leased Real Property**"), including a list of all leases, subleases, licenses, sublicenses and other occupancy agreements and all amendments, modifications, extensions, commencement date agreements, guaranties and subordination agreements relating thereto (collectively, the "**Real Property Leases**"). Sellers have provided true and correct copies all Real Property Leases to Buyer. The Owned Real Property and the Leased Real Property shall collectively be referred to as, the "**Real Property**".

6.9.3    Sellers have a valid leasehold estate in all Leased Real Property, free and clear of all Liens other than Permitted Exceptions. Sellers have not received written notice from any Governmental Body that any of the Leased Real Property is not in material compliance with all applicable Laws, except for such failures to comply, if any, which have been remedied. Each Real Property Lease is a legal, valid, binding and enforceable obligation of Sellers and to the Knowledge of Sellers, all other parties thereto, in each case, in accordance with its terms. Sellers are not in breach of or in default under any of the Real Property Leases and, to the Knowledge of Sellers, no other party is in breach or violation of or default under

13

any of the Real Property Leases. No event has occurred which, with notice or lapse of time, would constitute a breach or violation of, or default under, or permit termination, modification, or acceleration under any of the Real Property Leases. To the Knowledge of Sellers, no party to a Real Property Lease has repudiated any provision thereof. There are no disputes, oral agreements, or forbearance programs in effect as to any Real Property Lease. Sellers have not assigned, transferred, conveyed, mortgaged, deeded in trust, or encumbered any interest in any Real Property Lease.

6.9.4   The Real Property has received all material approvals of any Governmental Body (including Permits) required in connection with the operation thereof and Sellers have caused the Real Property to be operated and maintained in all material respects in accordance with applicable Laws, rules and regulations and as required by the Real Property Leases. The Real Property: (i) is adequate for the uses for which it is used by Sellers; and (ii) is not, to the Knowledge of Sellers, the subject of any pending condemnation, eminent domain or any other taking by public authority, nor has any such written notice of such a proposed condemnation or taking been received by any Seller. To the Knowledge of Sellers, there are no unrecorded agreements that could materially adversely affect Sellers' ability or right to own, use, operate or transfer Sellers' interest in the Real Property, subject to the terms and provisions of the Real Property Leases. There are no leases, subleases, concessions or other contracts granting to any Person (other than Sellers) the right to use or occupy the Real Property and no other Person (other than Sellers) is in possession of the Real Property, other than other tenants who have rights of usage in common areas. To the Knowledge of Sellers: (i) the improvements on the Real Property are structurally sound; and (ii) all plumbing, fire protection, alarm, heating, ventilating, air conditioning, electrical, public and private utility, sewer, septic and other waste, and other systems, and all fixtures and appliances included in the Real Property are in materially good working order. A valid certificate of occupancy or its jurisdictional equivalent is currently in force for each building, structure or other improvement located in or on the Real Property.

6.9.5   Sellers conduct the Business solely from the Real Property.

6.10   Equipment and Fixtures. Sellers have exclusive possession and control of all Equipment and Fixtures. All Equipment and Fixtures are in good operating condition order and repair (subject to normal wear and tear), and are suitable for the purposes for which it is used as of the Effective Date, in each case in all material respects.

6.11   Intellectual Property.

6.11.1   Sellers have no patents or any registered or unregistered copyrights or any pending applications for registration of copyrights. The conduct of the Business (including the products or services distributed, sold or offered by Sellers and all Intellectual Property) as currently conducted, does not infringe upon or misappropriate or violate the Intellectual Property rights or the confidential and proprietary information, including trade secrets, of any Person. None of Sellers' Intellectual Property has been the subject of a judicial finding or opinion, nor has any written notice or claim challenging the ownership, validity, registrability, enforceability, use or licensed right to use any Intellectual Property been received by Sellers. No claim or notice has been asserted against Sellers, or, with respect to the Business, Sellers' Affiliates, in writing or, to the Knowledge of Sellers, orally, that the conduct of the Business as currently conducted infringes in any material respect upon or misappropriates the Intellectual Property rights or the confidential and proprietary information, including trade secrets, of any third party, in each case, except with respect to claims or notices that have been fully resolved nor, to the Knowledge of Sellers, is there a basis for such a claim. Sellers and, with respect to the Business, Sellers' Affiliates, have timely paid all filing, examination, issuance, post registration and maintenance fees, annuities and the like associated with or required with respect to (i) all domain names of which Sellers, or Sellers' Affiliates, as applicable, are

the registrant or of which a third party is the registrant for the benefit of a Seller, or an Affiliate of a Seller, and (ii) all registered Marks and pending applications for registration of Marks owned by Sellers, or Sellers' Affiliates (collectively, the "**Registered IP**" and collectively the Registered IP with all other Intellectual Property owned by Sellers, and, with respect to the Business, Sellers' Affiliates, the "**Sellers' Intellectual Property**"), and (iii) all documents, recordations and certificates necessary to be filed by Sellers or Sellers' Affiliates to maintain the effectiveness of the Registered IP have been filed with the relevant patent, copyright, trademark or other authorities so that none of the Registered IP or Sellers' Marks, have lapsed, expired or been abandoned or canceled other than in the Ordinary Course of Business.

6.11.2  Sellers have exercised a degree of care that is, in light of the nature of the Business, appropriate in order to preserve the exclusive use of all trade secrets of Sellers.

6.11.3  There are no claims asserted or threatened by Sellers that a third party infringes, misappropriates or otherwise violates any of Sellers' Intellectual Property. Sellers' Intellectual Property, together with the rights granted to Sellers under any "shrink-wrap" or "click-wrap" license agreements relating to software desktop applications, are sufficient for the continued conduct of the Business in every jurisdiction where it is conducted, after the Closing Date in the same manner as it was conducted prior to the Closing Date in all material respects. Sellers have not collected any confidential information from their customers other than information that is necessary or incidental to the work performed for them, including the names and addresses of their customers' customers.

6.12   <u>Material Contracts</u>.

6.12.1 Other than the Assumed Contracts/Leases and the Additional Assumed Contracts/Leases, there is no Contract to which any Seller or Affiliate of a Seller is a party or by which any Seller or Affiliate of a Seller is bound and that pertains to the Business, or by which the Acquired Assets may be bound or affected and that is a:

(a)   Contract with any Affiliate or current or former officer or director of a Seller;

(b)   Contract for the sale of any of the Acquired Assets;

(c)   Contract relating to the acquisition by any Seller of any operating business or the capital stock of any other Person;

(d)   Contract for the employment of any individual;

(e)   Contract relating to incurrence of indebtedness or the making of any loans;

(f)   Contract which involves the expenditure of more than $500,000 in the aggregate or require performance by any party more than one (1) year from the date hereof that, in either case, is not terminable by a Seller without penalty on less than one hundred eighty (180) days' notice;

(g)   Contract with any customers of Sellers for the sale of inventory or the provision of services, in each case involving amounts in excess of $500,000 per year;

(h)   Contract granting any Person a Lien on any of the Acquired Assets;

(i)   Contract providing for the grant of any preferential rights to purchase or lease any of the Acquired Assets;

(j)      Contract that constitutes a confidentiality or non-disclosure agreement;

(k)      Contract (i) containing non-competition, non-solicitation or other limitations restricting the conduct of the Business, or the ability of Buyer, Sellers or any Affiliate of Sellers to compete with any Person or to solicit the employees or customers of any Person, (ii) granting to the other party or any third party "most favored nation" status or (iii) granting to the other party or any third party any exclusive right or rights or in which any third party grants Sellers any exclusive right or rights;

(l)      Contract that constitutes a partnership, joint venture and similar Contract; or

(m)      Contract providing for the sale, lease, license or control of, or otherwise relating to any Intellectual Property to or from Sellers, or Contract relating to nondisclosure or appropriation of Intellectual Property by Sellers' current or former employees.

6.12.2 True, correct and complete copies of all Assumed Contracts/Leases and all Additional Assumed Contracts/Leases, together with all modifications, amendments and supplements thereto, have been provided to Buyer prior to the Effective Date**.**

6.12.3 Other than relating to Sellers' inability to pay pre-petition amounts owed under certain Assumed Contracts/Leases and Additional Assumed Contracts/Leases due to the commencement of the Case and the implementation of the automatic stay under Section 362 of the Bankruptcy Code: (i) all of the Assumed Contracts/Leases and the Additional Assumed Contracts/Leases are in full force and effect and are valid and binding on and enforceable against the Seller(s) party thereto in accordance with their terms and, to the Knowledge of Sellers, on and against the other parties thereto, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity); (ii) no Seller is, and to the Knowledge of Sellers, no other party to any Assumed Contract/Lease or Additional Assumed Contract/Lease, is in breach of, or default under, any Assumed Contract/Lease or Additional Assumed Contract/Lease; (iii) no Seller has waived any right under any Assumed Contract/Lease or Additional Assumed Contract/Lease; (iv) no event has occurred that, with the giving of notice or the lapse of time or both, would constitute a breach of, or default under, any Assumed Contract/Lease or Additional Assumed Contract/Lease; (v) there are no unresolved disputes under any of the Assumed Contracts/Leases or Additional Assumed Contracts/Leases; and (vi) Sellers have not given to or received from any other Person, any notice or other written communication regarding any actual, alleged, possible or potential violation or breach or, or default under, any Assumed Contract/Lease or Additional Assumed Contract/Lease.

6.13    Employee Benefits.  Each Employee Benefit Plan is and has been operated and administered, in all material respects, in accordance with its terms, the terms of any applicable Collective Bargaining Agreement, and all applicable Laws. None of Sellers has any Liability with respect to any "multiemployer plan" within the meaning of Section 3(37) or 4001(a)(3) of ERISA (including any such plan of an ERISA Affiliate). Except as set forth on **Schedule 6.13**, none of Sellers has any Liability with respect to any "defined benefit plan" within the meaning of Section 3(35) of ERISA (including any such plan of an ERISA Affiliate).  No Employee Benefit Plan (i) provides health, life insurance or other welfare benefits to retirees or other terminated employees of Sellers, other than continuation coverage required by Section 4980B of the Code or Sections 601-608 of ERISA (**"COBRA"**), or (ii) is a "pension plan" within the meaning of Section 3(2) of ERISA, other than a plan intended to be qualified under Section 401(a) of the Code. There are no Legal Proceedings (other than routine claims for benefits in the Ordinary Course of Business)

16

pending with respect to any Employee Benefit Plan which could give rise to a material Liability, nor to the Knowledge of Sellers, threatened, and Sellers have no Knowledge of any facts which could give rise to any such Legal Proceedings (other than routine claims for benefits in the Ordinary Course of Business). No Employee Benefit Plan is currently under investigation or audit by any Governmental Body and, to the Knowledge of Sellers, no such investigation or audit is contemplated or under consideration. All contributions and premium payments required to have been paid under or with respect to any Employee Benefit Plan have been timely paid.

6.14    Labor.  **Schedule 6.14(a)** sets forth a list of each currently effective labor or collective bargaining agreement, works council or similar agreement to which any Seller is a party or by which any Seller or any of its properties or assets is bound or otherwise subject (the "**Collective Bargaining Agreements**"). Sellers have made available to Buyer a complete and correct copy of each such Collective Bargaining Agreement. Except as set forth on **Schedule 6.14(b)**, Sellers are and have been in compliance, in all material respects, with all applicable employment and labor Laws, including those relating to wages, hours, immigration, discrimination, layoffs, plant closings and collective bargaining. There are no strikes, work stoppages, work slowdowns or lockouts or other material labor disputes, involving employees of Sellers, nor to the Knowledge of Sellers is any such strike, work slowdown, work stoppage or other material labor dispute threatened. Except as set forth on **Schedule 6.14(c)**, Sellers are not involved in, nor, to the Knowledge Sellers, threatened with, any Legal Proceeding relating to any labor or employment matter.

6.15    Litigation. Except for the Case, there are (i) no Legal Proceedings in progress or, to the Knowledge of Sellers, pending or threatened against or relating to, or initiated by, Sellers or any of Sellers' Affiliates before any Governmental Body, and (ii) neither Sellers nor any of Sellers' Affiliates are subject to any Order, in each of clauses (i) and (ii), (a) with respect to the Business, the Acquired Assets, the Assumed Contracts/Leases or the Assumed Liabilities, or (b) that may, if adversely determined to Sellers or such Affiliates of Sellers, (y) enjoin, restrict or prohibit the transfer of all or any part of the Acquired Assets as contemplated by this Agreement or (z) prevent Sellers or such Affiliates from fulfilling all of their obligations set out in this Agreement or the Transaction Documents or arising hereunder or thereunder.

6.16    Compliance with Laws; Permits.  Sellers, and, with respect to the Business, Sellers' Affiliates, are, and for the last five (5) years have been, in compliance in all material respects with all Laws. Sellers, and, with respect to the Business, Sellers' Affiliates, have not received any written notice, to the Knowledge of Sellers, any other notice, of or been charged with the violation of any Laws.  Sellers have all Permits which are required to operate the Business and the Acquired Assets. Sellers are not, and have not in the past five (5) years been, in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit.

6.17    Environmental Matters.  Sellers, and, with respect to the Business, Sellers' Affiliates, are currently and have been in compliance in all material respects with all applicable Environmental Laws. No Seller nor, with respect to the Business, any of Sellers' Affiliates, has received from any Governmental Body or any Person: (i) an Environmental Notice or Environmental Claim, or (ii) request for information or other notification relating to any non-compliance with, or liability or potential liability under, Environmental Law which, in either case, is pending or remains unresolved, or is or will be the source of ongoing obligations or requirements or Remedial Action as of the Closing Date. Sellers, and, with respect to the Business, Sellers' Affiliates (i) have obtained all Environmental Permits required for the ownership, lease, operation or use of the Real Property and the Acquired Assets; and (ii) are, and to the Knowledge of Sellers have been, in compliance with all such Environmental Permits, and all such Environmental Permits are in full force and effect. None of Sellers, and, with respect to the Business, Sellers' Affiliates, has received any Environmental Notice regarding any change in the status or terms and conditions of any Environmental

Permits. There is no pending or, to the Knowledge of Sellers, threatened revocation, modification or limitation of any such Environmental Permit except as set forth in such Environmental Permit. Except for any Release that has been remediated and as to which there has been received a written "no further action" or similar closure determination from each Governmental Body with appropriate jurisdiction or would not be reasonably likely to result in ongoing obligations or requirements of Sellers, or would not be reasonably likely to result in a violation of an applicable Law, including any Environmental Law: (i) there has been no Release of Hazardous Materials on or under any Real Property; and (ii) to the Knowledge of Sellers, there has been no Release of Hazardous Materials on or under any real property formerly owned, operated or leased by Sellers. To the Knowledge of Sellers, none of the off-site Hazardous Materials treatment, storage or disposal facilities currently used by Sellers or formerly used by Sellers is listed on any of the following: the National Priorities List; the Comprehensive Environmental Response, Compensation and Liability Information System (CERCLIS) database; any similar state list of contaminated or hazardous waste sites; or any similar list of contaminated sites located in foreign jurisdictions. No Seller has retained or assumed, by contract, any liabilities or obligations of third parties under Environmental Law that have not been fully satisfied or performed. Sellers have provided true and accurate copies to Buyer of any and all environmental reports, studies, audits, sampling data, site assessments, risk assessments and other similar documents with respect to the Real Property or any real property formerly owned, operated or leased by Sellers which are in the possession or control of Sellers.

6.18    Suppliers and Customers. Sellers have not received any written notice, or, to the Knowledge of Sellers, oral notice (i) from any supplier that it intends to cease to provide products or services to, or to otherwise terminate or materially reduce its supply of goods and supplies to or materially adversely change its contractual relationship with Sellers, or (ii) from any customer that it has ceased to use Sellers' products or services or that it intends to cease to use such products or services or to otherwise terminate or materially reduce its purchase of goods and supplies from or materially adversely change its contractual relationship with Sellers.

6.19    Absence of Certain Changes. Except for the commencement of the Case, since the Balance Sheet Date, (i) Sellers have conducted the Business in the Ordinary Course of Business, (ii) no Seller has taken any action that it is prohibited from taking after the Effective Date pursuant to **Section 4.3** and (iii) there has not occurred any change, event or development that has had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

6.20    No Subsidiaries. No Seller has any equity interests in any other Person other than a Seller.

6.21    Financial Advisors. Except for Candlewood Partners, LLC, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for a Seller in connection with the Transactions, and no Person is entitled to any fee or commission or like payment from Buyer in respect thereof (it being understood that the fees and commissions due to Candlewood Partners, LLC are the responsibility of Sellers and not Buyer).

6.22    Insurance. **Schedule 6.22** lists as of the date of this Agreement all policies of title, property, fire, casualty, liability, business interruption, sprinkler and water damage, and other forms of insurance of any kind relating to the Business.  Prior to the date of this Agreement, Sellers have provided or made available to Buyer true, correct and complete copies of all such policies. All of such insurance policies are in full force and effect and provide coverage that is customary for similarly situated businesses. With respect to each such insurance policy, (i) neither a Seller or any Affiliate of a Seller is in breach or default (including any such breach or default with respect to the payment of premiums or the giving of notice of claims), and, to the knowledge of Sellers, no event has occurred which, with notice or the lapse of time or both, would constitute such a breach or default, or permit termination or modification, under any such policy and (ii) no

written notice of cancellation or termination has been received other than in connection with ordinary renewals.

6.23    No Other Representations. No Seller nor any other Person is making any representations, warranties, statements or promises, express or implied, save and except as are contained herein, with respect to the Acquired Assets and the Business, including as to title, description, fitness for purpose, merchantability, quantity, conditions or the quality of any matter or thing whatsoever, and, except in the case of fraud or intentional misrepresentation, any and all conditions and warranties expressed or implied by law do not apply to the sale of the Acquired Assets. For the avoidance of doubt, save as set forth herein and except in the case of fraud or intentional misrepresentation, no Seller will have or be subject to any liability to Buyer or any other Person resulting from Buyer or any Person's use of any information, documents, projections, forecasts or other material made available to Buyer or any other Person in any data room, management presentation or otherwise in expectation of the Transaction.

## ARTICLE VII

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers as follows, which representations and warranties shall be true and correct as of the Effective Date and true and correct as of the Closing and warrant to Buyer as follows, which representations and warranties shall be true and correct as of the Effective Date and true and correct as of the Closing, with the same force and effect as though made at and as of the Closing, but which shall not survive the Closing:

7.1    Organization and Standing of Buyer. Buyer is a duly organized and validly existing corporation in good standing under the laws of the State of Delaware. Buyer has the requisite corporate power and authority to own and lease the Acquired Assets as such Acquired Assets are now owned and leased and to conduct its business as it is now being conducted. As of the Closing Date, Buyer will be duly qualified as a foreign company in all jurisdictions where such qualification is required where the absence of such qualification would have an expected material adverse effect upon Buyer's ability to consummate the Transactions.

7.2    Authorization; Binding Effect. The execution and delivery by Buyer of each of the Transaction Documents to which Buyer is or will be a party, the performance by Buyer of its obligations under such Transaction Documents and the consummation of the Transactions by such Buyer have been duly authorized by all necessary corporate action on the part of Buyer. No other corporate proceedings on the part of Buyer or its equityholders are necessary to approve and adopt the Transaction Documents or to approve the consummation of the Transactions. Each of the Transaction Documents to which Buyer is or will be a party is, or, when executed and delivered in accordance with this Agreement will be, a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, except that such enforcement (i) may be limited by bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights generally and (ii) is subject to the availability of equitable remedies, as determined in the discretion of the court before which such a proceeding may be brought.

7.3    Financial Resources. Buyer will at the Closing Date have adequate financial resources to consummate the Transactions, including the payment of the Cash Purchase Price, and provide adequate assurance of future performance to Assumed Contract/Lease counterparties as shall be reasonably agreed by Buyer and said counterparties.

7.4    Litigation. As of the Effective Date, there is no Legal Proceeding in progress or, to the Knowledge of Buyer, pending or threatened against or relating to Buyer, which, if determined adversely to

Buyer, would (i) prevent Buyer from paying the Cash Purchase Price to Sellers; (ii) enjoin, restrict or prohibit the transfer of all or any part of the Acquired Assets as contemplated by this Agreement; (iii) or prevent Buyer from fulfilling all of its obligations set out in this Agreement or the Transaction Documents or arising hereunder or thereunder.

7.5    <u>Financial Advisors</u>. No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Buyer in connection with the Transactions, and no Person is entitled to any fee or commission or like payment from Sellers in respect thereof.

7.6    <u>Buyer Acknowledgment</u>. Buyer acknowledges that Sellers have made no representations, warranties, statements or promises save and except as are contained herein, including as to title, description, fitness for purpose, merchantability, quantity, conditions or the quality of any matter or thing whatsoever, and any and all conditions and warranties expressed or implied by law do not apply to the sale of the Acquired Assets and, except in the case of fraud or intentional misrepresentation, are hereby waived by Buyer. BUYER ACKNOWLEDGES THAT, EXCEPT AS QUALIFIED ABOVE, BUYER IS PURCHASING THE ACQUIRED ASSETS ON AN "AS IS, WHERE IS" AND "WITH ALL FAULTS" BASIS AS OF THE CLOSING DATE, AND THAT BUYER WILL ACCEPT THE ACQUIRED ASSETS IN THEIR PRESENT STATE, CONDITION AND LOCATION.

## ARTICLE VIII

## COVENANTS

8.1    <u>Further Actions</u>. Upon the terms and subject to the conditions hereof, each of the Parties hereto agrees to use its commercially reasonable efforts or take or cause to be taken all action and to do or cause to be done all things necessary, proper and advisable to consummate the Transactions contemplated by the Transaction Documents and other documents necessary to close this transaction, and shall use its commercially reasonable efforts to obtain all necessary waivers, consents and approvals and to effect all necessary registrations and filings, <u>provided</u>, <u>however</u>, that Buyer shall not be obligated to pay any consideration to third parties or to incur any Liability in complying with its obligations under this **Section 8.1**. Notwithstanding anything to the contrary contained in this Agreement, nothing in this Agreement will require or obligate Buyer or any of its Affiliates to (and in no event shall any representation, warranty, covenant or other agreement of Buyer contained in this Agreement be breached or deemed breached in the event Buyer shall fail to) (x) agree to or otherwise become subject to any limitations on (1) the right of Buyer or its Affiliates effectively to control or operate their respective businesses (including the Business) or assets (including the Acquired Assets), (2) the right of Buyer to acquire the Acquired Assets, or (3) the right of Buyer or its Affiliates to exercise full rights of ownership of their respective businesses (including the Business) or assets (including the Acquired Assets), (y) agree or be required to sell or otherwise dispose of, hold (through the establishment of a trust or otherwise), or divest itself of all or any portion of the business, assets or operations of Buyer or any of its Affiliates or the Business or any of the Acquired Assets. (z) otherwise take any steps to avoid or eliminate any impediment that may be asserted under any Law.

8.2    <u>Retention of Records</u>. Each of Sellers and Buyer hereby covenant that for a period of three (3) years following the Closing Date (or, if sooner, until such date as each Seller shall cease to maintain its corporate existence, and, in the event each Seller shall cease to maintain its corporate existence, neither Party shall have any obligations under this **Section 8.2**), to preserve and keep, or in the case of Sellers, arrange for the preservation and keeping of, at their or its own expense, the books, records, and electronically stored information held by them or it, respectively, or their Affiliates relating to the Acquired Assets and the Business with respect to the period prior to Closing. During such period, each Party will afford to the other Party as well as its counsel and accountants, on prior written notice and during normal

business hours, reasonable access to such books, records and other data, subject to an undertaking on the part of the receiving party to keep such books, records and other data confidential.

8.3    Cooperation for Tax Matters. The Parties agree to provide each other with such information and assistance as is reasonably necessary, including access to records, Tax returns, Tax work papers, and personnel, for the preparation of any Tax Returns or for the defense of any Tax claim or assessment, whether in connection with a Tax administrative or judicial proceeding or otherwise. Sellers agree to take or cause to be taken any steps necessary, in order to apply for and obtain any Tax refunds with respect to the Business or the Acquired Assets for any taxable year, provided, however, that the Buyer pays all reasonable expenses incurred in connection therewith.

8.4    Entergy Agreement.    Buyer will use commercially reasonable efforts to enter in an amendment with Entergy Louisiana Inc. ("**Entergy**") to amend the Electric Service Agreement, dated July 14, 1980, between Entergy and BD LaPlace LLC, as amended (the "**Entergy Agreement**"), such that Entergy will continue to pursue, to the reasonable satisfaction of Buyer, Entergy's claim against Westchester Fire Insurance Company from the surety bond (Bond No. K09340141) (the "**Surety Bond**") relating to the Entergy Agreement and that Buyer shall be responsible for any amount that Entergy would otherwise have been entitled to receive on the Closing Date as a cure amount pursuant to Section 365 of the Bankruptcy Code less any amounts recovered by Entergy under the Surety Bond.

8.5    Disclosure Schedules.

8.5.1    Updating of Schedules. Sellers agree that during the period from the Effective Date through the earlier to occur of (x) the Closing and (y) the date on which this Agreement is terminated in accordance with the provisions of **Article XII** hereof, Sellers will promptly notify Buyer of (i) any and all information, facts, events, circumstances, issues or other matters that existed as of the Effective Date that should have been set forth or described in the Schedules to this Agreement required or provided for under this Agreement as of the Effective Date, and (ii) any and all information, facts, events, circumstances, issues or other matters arising after the Effective Date which, if existing on the Effective Date, would have been required to be set forth or described in the schedules to this Agreement required or provided for under this Agreement, in each case, by delivery of appropriate updates to the Schedules attached to this Agreement setting forth such information, facts, events, circumstances, issues or other matters, in each case, no later than the later of two (2) Business Days prior to the scheduled Closing Date (any such updates to such Schedules, or Sellers' schedules of assets, liabilities and executory contracts and statement of financial affairs as they may file in the Case, being referred to herein as "**Schedule Updates**") or the next Business Day after becoming aware of such matter.

8.5.2    Effect of Schedule Updates. In the event that Sellers deliver any Schedule Updates to Buyer in accordance with the provisions of **Section 8.5.1** above, then such Schedule Updates shall not be (i) deemed to be attached to this Agreement or become a part of this Agreement, or (ii) given effect for any purposes under this Agreement, unless such Schedule Updates have been accepted in writing by Buyer in its sole discretion within two (2) Business Days of receipt thereof. In the event that any Schedule Update is timely accepted by Buyer, then upon such acceptance, (x) such Schedule Update shall be deemed to be attached to this Agreement and become a part of this Agreement, (y) all references to the Schedules in this Agreement shall refer to the Schedules as updated by such Schedule Update, and (z) such Schedule Update shall be given effect for all purposes under this Agreement, including, without limitation, for determining whether the conditions to Closing set forth in this Agreement have been satisfied. In the event Buyer does not timely accept any Schedule Update pursuant to this **Section 8.5.2**, then such Schedule Update shall not be given effect for any purpose under this Agreement or the Transaction Documents.

## ARTICLE IX

## CLOSING DELIVERIES

9.1    <u>Closing Deliveries</u>. At the Closing:

9.1.1    Sellers and Buyer, as applicable, shall, and Sellers shall cause their relevant Affiliates, to, as applicable, execute and deliver the conveyance documents described in **Section 1.3**.

9.1.2    Buyer shall pay the difference between (i) the Cash Purchase Price and (ii) the Deposit as set forth in **Section 2.3.2**.

9.1.3    Buyer shall pay the Cure Amounts and the Additional Cure Amounts as set forth in **Section 2.3.3**.

9.1.4    Sellers and Buyer shall, and Sellers shall cause their relevant Affiliates, to, as applicable, execute and deliver or cause to be executed and delivered, any and all other documents, agreements, instruments and other writings and have taken all actions necessary to carry out the Transactions or customary for a transaction of this nature, including, as to Sellers, all actions set forth in and required by **Article X**.

## ARTICLE X

## BUYER'S CONDITIONS

The obligation of Buyer to purchase and pay for the Acquired Assets and consummate the Transactions at Closing shall be subject to the satisfaction, prior to or concurrently with the Closing Date, of each of the following express conditions precedent, unless waived by Buyer in writing at or before the Closing, to the extent permitted by applicable Law:

10.1    <u>Bankruptcy Order</u>. The Sale Order shall have been entered by the Court and shall be in full force and effect as of the Closing Date without modification and shall not be subject to any stay, temporary restraining order or injunction. Notwithstanding the provisions of Bankruptcy Rules 6004(h), 6006(d) or 7062 or any applicable provisions of the Local Rules, the Sale Order shall be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply and the Sale Order shall constitute a Final Order upon which Sellers and Buyer are entitled to rely.

10.2    <u>Accuracy of Representations; Performance of Obligations; Compliance with Covenants</u>. The representations and warranties of Seller set forth in the first sentence of **Section 6.1** (Organization and Standing of Sellers), **Section 6.2** (Acquired Assets), **Section 6.3** (Authorization; Binding Effect), **Section 6.4** (Conflicts; Consents of Third Parties), **Section 6.7** (Title to Acquired Assets; Sufficiency and Condition of Assets), **Sections 6.9.1**, **6.9.2** and **6.9.3** (first sentence only) (Real Property Matters) and **Section 6.21** (Financial Advisors) shall have been true and correct when made and as of the Closing, with the same force and effect as though made at and as of the Closing (except to the extent any such representation and warranty is expressly made as of an earlier date, in which case such representation and warranty need only be so true and correct as of such earlier date). Each of the other representations and warranties of Sellers set forth in the Transaction Documents shall have been true and correct (without giving effect to any limitation or qualification on any representation or warranty indicated by the words "Material Adverse Effect" or "material") when made and at and as of the Closing with the same force and effect as though made at and as of the Closing (except to the extent that any representation and warranty is expressly made as of an earlier

22

date, in which case such representation and warranty need only be so true and correct as of such earlier date), except in each case where the failure of any such representations and warranties to be so true and correct, individually and in the aggregate, have not had and are not reasonably likely to have a Material Adverse Effect. Sellers shall have complied in all material respects with all of the covenants set forth in the Transaction Documents.

10.3    _Closing Documents Delivered_. Sellers shall have executed and delivered the documents, certificates, instruments and agreements and done all the acts required of Sellers in connection with the Closing as described in this Agreement, including the documents described in **Section 9.1**.

10.4    _Officers' Certificate_. Sellers shall have furnished to Buyer a certificate dated as of the Closing Date and signed by an executive officer of each Seller to the effect that (i) the conditions precedent set forth in **Section 10.2**, **Section 10.3** and **10.9** have been satisfied and (ii) all employees of Sellers have been terminated prior to the Closing (an "**Officers' Certificate**").

10.5    _No Claims; No Prohibition_. (i) No claim shall have been instituted before any arbitrator, court or other Governmental Body to restrain or prohibit, or to obtain damages in respect of, the consummation of the Transactions, (ii) none of the Parties or any of their Affiliates shall have received written notice from any Governmental Body or any other Person of (a) its intention to institute any Legal Proceeding to restrain, enjoin or nullify this Agreement or the Transactions or to commence any investigation of, or into the consummation of, the Transactions, or (b) the actual commencement of such a Legal Proceeding, (iii) there shall not be any pending or threatened Legal Proceeding by any Governmental Body or any other Person that could reasonably be expected to limit or adversely affect Buyer's ability effectively to exercise full rights of ownership of the Acquired Assets or the Business, and (iv) no action shall have been taken, and no order, statute, rule, regulation executive order, injunction, stay, decree or restraining order, shall have been enacted, entered, promulgated or enforced by any court of competent jurisdiction or Governmental Body, which would prevent or prohibit the consummation of the Transactions.

10.6    _Delivery of Possession and Ownership of Real Property_. Sellers shall have delivered: (i) possession of the Real Property including all keys, security codes, and other similar instruments; (ii) duly executed instruments of conveyance of the Real Property, including the LaPlace Dock, as set forth on **Schedule 1.3** sufficient to vest good and indefeasible title to the Real Property; and (iii) copies (and originals in Sellers' possession) of all Real Property Leases and ownership documents evidencing Sellers' interest in the Owned Real Property, any existing surveys, as built drawings, warranties, operating manuals, environmental reports or audits, building plans and specifications, certificates of occupancy, and Permits related to the Real Property.

10.7    _Delivery of Customary Documents_.  Sellers shall have delivered such customary documents (including any factually accurate affidavits, transfer tax forms, corporate resolutions, good standing certificates) as may be required by any title company or title insurance underwriter to enable Buyer to acquire, at Buyer's sole cost and expense, owner policies of title insurance issued by such title company covering all of the Owned Real Property included in the Acquired Assets in form and substance reasonably acceptable to the Buyer.

10.8    _Delivery of Tax Documents_. Each Seller shall have delivered a certification of such Seller's non-foreign status for purposes of Section 1445 of the Code, duly prepared and executed by such Seller in accordance with Treasury Regulations Section 1.1445-2(b).

10.9    _No Material Adverse Effect_. Between the Effective Date and the Closing, there shall not have occurred any change, event or development that has had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

## ARTICLE XI

### SELLERS' CONDITIONS

The obligation of Sellers to sell and convey the Acquired Assets at the Closing shall be subject to the satisfaction, prior to or concurrently with the Closing Date, of each of the following express conditions precedent, unless waived by Sellers in accordance with **Section 13.1**, to the extent permitted by applicable Law:

11.1    <u>Bankruptcy Order</u>. The Sale Order shall have been entered by the Court.

11.2    <u>Accuracy of Representations and Performance of Obligations</u>. The representations and warranties of Buyer set forth in **Section 7.1** (Organization and Standing of Buyer) and **Section 7.2** (Authorization; Binding Effect) shall have been true and correct when made and as of the Closing, with the same force and effect as though made at and as of the Closing (except to the extent any such representation and warranty is expressly made as of an earlier date, in which case such representation and warranty need only be so true and correct as of such earlier date). Each of the other representations and warranties of Buyer set forth in the Transaction Documents shall have been true and correct (without giving effect to any limitation or qualification on any representation or warranty indicated by the word "material") when made and at and as of the Closing with the same force and effect as though made at and as of the Closing (except to the extent that any representation and warranty is expressly made as of an earlier date, in which case such representation and warranty need only be so true and correct as of such earlier date), except in each case where the failure of any such representations and warranties to be so true and correct, individually and in the aggregate, have not had and are not reasonably likely to have a material adverse effect. Buyer shall have complied in all material respects with all of its covenants set forth in this Agreement.

11.3    <u>Closing Documents Delivered</u>. Buyer shall have executed and delivered the documents, certificates, instruments and agreements and done the acts required of Buyer in connection with the Closing, as described in this Agreement.

11.4    <u>No Prohibition</u>. No order, statute, rule, regulation, executive order, injunction, stay, decree or restraining order, shall have been enacted, entered, promulgated or enforced by any court of competent jurisdiction or Governmental Body which would prevent or prohibit the consummation of the Transactions.

## ARTICLE XII

### TERMINATION

12.1    <u>Termination by Buyer</u>. In the event that (i) the Closing does not occur by January 31, 2020, (ii) there shall be in effect a final nonappealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions, (iii) the Court enters an Order that precludes the consummation of the Transactions on the terms and conditions set forth in the Transaction Documents and/or the terms of a proposed Sale Order, or (iv) one or more of the conditions in **Article X** becomes incapable of being satisfied (any of the events set forth in clauses (i) to (iv), a "**Non-Fulfillment Event**"), Buyer may, upon written notice to Sellers at any time after the occurrence of a Non-Fulfillment Event, terminate this Agreement, and, notwithstanding anything to the contrary in the Bidding Procedures Order, Sellers shall (y) cause the Escrow Agent to refund the Deposit to Buyer and pay to Buyer any amounts remaining in the Trust Account and (z) pay to Buyer the difference between (A) the sum of the amounts of the Deposit and the Administrative Bridge and (B) the amount repaid pursuant to clause (y) of this sentence.

12.2    <u>Termination by Sellers</u>. In the event that the Closing does not occur by January 31, 2020 as a result of the non-fulfillment of one or more of the foregoing conditions in **Article XI**, Sellers may, upon written notice to Buyer at any time after January 31, 2020, terminate this Agreement, and, notwithstanding anything to the contrary in the Bidding Procedures Order, Sellers shall (y) cause the Escrow Agent to refund the Deposit to Buyer and pay to Buyer any amounts remaining in the Trust Account and (z) pay to Buyer the difference between (A) the sum of the amounts of the Deposit and the Administrative Bridge and (B) the amount repaid pursuant to clause (y) of this sentence.

12.3    <u>Liability for Breaches</u>. In the event that this Agreement is validly terminated as provided in this **Article XII**, then each of the Parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to Buyer or Sellers, <u>provided</u>, <u>however</u>, that nothing in this **Article XII** shall relieve Buyer or Sellers of any liability for a breach of this Agreement, or the inaccuracy of any representation or warranty contained herein, prior to the date of termination.

## ARTICLE XIII

## MISCELLANEOUS

13.1    <u>Waiver</u>. Any Party hereto may (a) agree to extend the time for the performance of any of the obligations or other acts of the other Party hereto, (b) waive any inaccuracies in the representations and warranties of the other Party contained herein or in any document delivered pursuant hereto or (c) waive compliance with any of the agreements of the other Party or conditions of the other Party for its benefit contained herein (it being agreed that the provisions of **Section 1.3** constitute conditions of Sellers for Buyer's benefit). Any agreement on the part of the Party hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the authorized representative of such Party. The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other provision of the Agreement or of any subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

13.2    <u>Remedies Cumulative</u>. In the event of a breach by a Party of its obligations under this Agreement, the other Party shall be entitled to all remedies provided herein, by law or in equity, including the right to seek to obtain an injunction to specifically enforce or prevent the violation of any provisions of this Agreement, in each case without the requirement of posting a bond and without the necessity of proving damages or that damages would not be a sufficient remedy. Except as herein expressly limited, the remedies provided herein shall be cumulative and shall not preclude the assertion by any Party hereto of any other rights or the seeking of any other remedies against the other hereto.

13.3    <u>Notices</u>. Any notices or other communications required or permitted hereunder or otherwise in connection herewith shall be in writing and shall be deemed to have been duly given (i) when delivered in person or transmitted by facsimile transmission, (ii) when sent by email, if prior to 5.00 p.m., local time of the receiving party on a Business Day, and otherwise, the next Business Day, (iii) or on receipt (or refusal to receipt) after dispatch by express, registered or certified mail, postage prepaid, or nationally recognized overnight delivery service, addressed as follows:

If to Sellers:

Charles S. Deutchman
Chief Restructuring Officer
Shared Management Resources, Ld.
28026 Gates Mills Blvd.
Pepper Pike, Ohio 44124-4730
(216) 978-6565
Cdeutchman@shrmgtres.com

with a copy, which shall not constitute notice, to:

Chrisopther A. Ward, Esq.
Shanti M. Katona, Esq.
Polsinelli PC
222 Delaware Ave., Suite 1101
Wilmington, Delaware 19801
(302) 252-0920
cward@polsinelli.com
skatona@polsinelli.com

If to Buyer:

Howard A. Law, Esq.
General Counsel
Liberty BSG Hodings Inc.
c/o GFG Alliance
750 Lexington Ave, 12th Floor
New York, New York 10021
howard.law@gfgalliance.com

with a copy, which shall not constitute notice to:

Anson B. Frelinghuysen, Esq.
Avner Bengera, Esq.
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
anson.frelinghuysen@hugheshubbard.com
avner.bengera@hugheshubbard.com

or such other address as the Person to whom notice is to be given has furnished in writing to the other Party.

13.4    Delivery of Notices. After the Closing Date, Sellers shall promptly deliver to Buyer any notices, correspondence and other documents relating to the Acquired Assets being conveyed hereunder or the Business, which are, from time to time, received by Sellers or any of Sellers' Affiliates.

13.5    Entire Agreement; Binding Effect. This Agreement (together with the Exhibits and Schedules hereto, the other Transaction Documents and the exhibits and schedules thereto) sets forth the entire integrated understanding and agreement of the Parties with respect to the subject matter hereof and

supersedes all prior agreements whether written or verbal. This Agreement may not be modified, amended or, other than pursuant to **Article XII**, terminated except in a writing signed by both of the Parties hereto.

13.6    <u>Assignment</u>. This Agreement and all provisions hereof shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns. No Party to this Agreement shall have the right to assign any of its rights and obligations hereunder (by operation of law or otherwise) without the prior written consent of the other Party hereto <u>provided</u>, <u>however</u>, that Buyer may assign this Agreement and its rights and obligations hereunder to any of its Affiliates. Upon any permitted assignment by Buyer, as assignor, the references in this Agreement to Buyer shall also apply to the assignee of Buyer's rights or obligations unless the context otherwise requires. No assignment permitted by the provisions of this <u>Section 13.6</u> shall relieve the assigning party of its obligations hereunder.

13.7    <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original instrument, but all such counterparts together shall constitute the same instrument.

13.8    <u>Governing Law and Rules of Construction</u>. This Agreement is being made in and shall be governed by and construed and enforced in accordance with the laws of the State of Delaware. Notwithstanding the foregoing, the Parties hereto agree that both Parties have equally participated in the drafting of this Agreement and that if any term, condition or provision of this Agreement is deemed or construed to be ambiguous or vague, such ambiguity or vagueness shall not be construed in favor of or against any Party to this Agreement.

13.9    <u>Jurisdiction</u>. The Parties agree that the Court shall have exclusive jurisdiction and venue over any disputes regarding this Agreement until the Case shall have been dismissed or closed. After the Case has been dismissed or closed, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the District of Delaware sitting in New Castle County or the courts of the State of Delaware sitting in New Castle County and any appellate court from any thereof, for the resolution of any such claim or dispute. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

13.10    <u>Severability</u>. Should any terms, provision or clause hereof or of any other agreement or document which is required by this Agreement, be held to be invalid, such invalidity shall not affect or render invalid any other provisions or clauses hereof or thereof the consideration or mutuality of which can be given effect without such invalid provision, and all of which shall remain in full force and effect. If any provision of this Agreement is so broad as to be unenforceable, such provision shall be interpreted to be only so broad as is enforceable under applicable law.

13.11    <u>Headings</u>. The division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and are not intended to define or limit the substance of any section and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Article" or "Section" are to the corresponding Article or Section of this Agreement unless otherwise specified.

13.12    <u>Gender; Singular and Plural</u>. Any reference in this Agreement to gender shall include all genders. Singular terms in this Agreement may be deemed to include plural, and plural terms to include the singular.

13.13    <u>Exhibits and Schedules</u>. The Exhibits and Schedules referenced in this Agreement and attached hereto shall be deemed to be a part of this Agreement and are incorporated herein by this reference as if set forth in full herein. When a reference is made in this Agreement to a Section or Article, such reference shall be to a Section or Article of this Agreement unless otherwise indicated.

13.14    <u>Disclosure Schedules</u>. The Disclosure Schedules have been arranged for purposes of convenience in separate sections corresponding to the sections of **Article VI**; however, information disclosed on one section of the Disclosure Schedules shall be deemed to be disclosed on another section of the Disclosure Schedules or be deemed to be an exception to another representation and warranty in **Article VI**, in each case, if the relevance of such information to such other section of the Disclosure Schedules is apparent on its face and based on the nature and context thereof that the information is required to be included, and no matter or fact shall be deemed to be disclosed in the Disclosure Schedules unless disclosure is done in such a way that it would enable a reasonable buyer, given the nature and the context of the disclosure, to (i) identify that such matter or fact constitutes a breach of a representation or warranty, and (ii) reasonably assess the relevance and the possible implication(s) thereof. Capitalized terms used in the Disclosure Schedules and not otherwise defined therein have the meanings given to them in this Agreement.

13.15    <u>No Third Party Rights</u>. This Agreement and the other agreements entered into at the Closing are solely for the benefit of the Parties hereto. No third person shall acquire any rights or claims by reason of or under this Agreement.

13.16    <u>Amendment</u>. This Agreement may be amended only by a writing executed by the authorized representatives of Buyer and Sellers.

13.17    <u>Expenses</u>. Except as otherwise expressly set forth herein, each of the Parties hereto shall bear their own costs and expenses in connection with the Transactions.

13.18    <u>Interpretation</u>.

13.18.1 Unless the context otherwise requires: (i) the words "hereof," "hereto," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, (ii) the words "Dollars" and "$" mean U.S. dollars, (iii) wherever the word "include," "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words "without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it, (iv) the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if"; (v) with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; and (vi) the word "or" shall be disjunctive but not exclusive.

13.18.2 When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

*(balance of page intentionally left blank; signatures follow)*

IN WITNESS WHEREOF, the Parties hereto have executed this Asset Purchase Agreement as of the date first above written.

**BAYOU STEEL BD HOLDINGS, LLC**

By: _____

Title:

**BD BAYOU STEEL INVESTMENT, LLC**

By: _____

Title:

**BD LAPLACE, LLC**

By: _____

Title:

**LIBERTY BSG HOLDINGS INC.**

By: _____Grant Quasha_____

Title:     Authorized Signatory

# EXHIBIT A

# DEFINED TERMS

For purposes of this Agreement, the following terms shall have the meanings specified in this **Exhibit A**:

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"**Bankruptcy Rules**" means, as amended, the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under Section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Case and the general, local and chambers rules of the Bankruptcy Court, as may be modified by orders of the Court.

"**Business Day**" means any day of the year on which national banking institutions in Delaware and Sydney, Australia are open to the public for conducting business and are not required or authorized to close.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Contract**" means whether written or oral, any legally binding note, bond, mortgage, indenture, contract, agreement, instrument, deed, permit, license, lease, sublease, purchase order, sales order, arrangement or other commitment of any nature whatsoever to which a Person is a party or by which a Person or its assets or properties are bound.

"**Creditors' Committee**" means the official committee of unsecured creditors appointed in Sellers' Chapter 11 Cases pursuant to Section 1102(a) of the Bankruptcy Code pursuant to that certain *Notice of Appointment of Committee of Unsecured Creditors*, filed by the U.S. Trustee on October 10, 2019.

"**Environment**" means any environmental medium or natural resource, including soil, soil vapor, ambient air, outdoor air, indoor air, surface water, groundwater, drinking water, land, stream, sediment, surface and subsurface strata and plant and animal life including biota, fish and wildlife.

"**Employee Benefit Plan**" means (a) any "employee benefit plan" within the meaning of Section 3(3) of ERISA; (b) any other employee benefit plan, program, policy, agreement or arrangement, including any equity or equity-based compensation, deferred compensation, pension, retirement, savings, profit sharing, incentive compensation, retention, change-in-control, bonus, medical, dental, vision, prescription drug, life insurance, cafeteria, flexible spending, dependent care, fringe benefit, vacation pay, holiday pay, disability, sick pay, severance, employee loan or educational assistance plan, program, policy, agreement or arrangement ; and (c) any employment, consulting, severance or change-in-control agreement, which in the case of each of clauses (a), (b) and (c), is sponsored or maintained by any of Sellers or any of their Affiliates, or to which any of Sellers or any of their Affiliates contributes, is required to contribute or has any Liabilitywith respect to current or former employees, independent contractors or directors of Sellers or their beneficiaries or dependents, whether or not written.

"**Environmental Claim**" means any civil, criminal or administrative action, suit, hearing, lien, demand, claim, order, decree, judgment, investigation, notice of liability or potential liability, notice of violation, injunctive relief, complaint, lawsuit or other legal or administrative proceeding by any Person alleging, or any obligation involving, liability (including liability or responsibility for the costs of enforcement

proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from ownership, lease, operation or use of the Acquired Assets or relating to any real property currently or formerly owned, leased, operated or used by any Seller, including the presence, Release of, any Hazardous Materials; or any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"**Environmental Laws**" means any applicable law, any published guidance by any Governmental Body and any order or binding agreement with any Governmental Body: (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, or the Environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal, remediation of, response to, or investigation of actual or suspected, Hazardous Materials or property damage, natural resources damage caused by any Hazardous Materials. The term "Environmental Law" includes the following (including their implementing regulations and any foreign, state, province, municipal or local analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601 et seq. ("**CERCLA**"); the Solid Waste Disposal Act, as amended, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended, 42 U.S.C. §§ 7401 et seq.; the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq. ("**OSHA**"); the Resource Conservation and Recovery Act, as amended, 42 U.S.C. §§ 6901 et seq. ("**RCRA**"); the Safe Drinking Water Act, as amended, 42 U.S.C. §§ 300f et seq.; the Hazardous Materials Transportation Act, as amended 49 U.S.C. §§ 1801 et seq.; the Atomic Energy Act, as amended, 42 U.S.C. §§ 2011 et seq.; and the Federal Insecticide, Fungicide and Rodenticide Act, as amended, 7 U.S.C. §§ 136 et seq.

"**Environmental Notice**" means any directive, notice of violation, infraction, notice, warning letter or notice, information request or other communication respecting any Environmental Claim, any Hazardous Materials Release or compliance or non-compliance with, or liability or potential liability under, or compliance or non-compliance with any Environmental Law or any term or condition of any Environmental Permit.

"**Environmental Permit**" means any Permit required under Environmental Laws to operate the Acquired Assets in the manner they are currently operated.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any Person which is treated as a single employer with a Seller under Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

"**Excluded Matter**" means any one or more of the following: (a) the effect of any change in the United States or foreign economies or securities or financial markets in general; (b) the effect of any change that generally affects any industry in which Sellers operate; or (c) the effect of any changes in applicable Laws or accounting rules; provided, however, that the Excluded Matters contained in the foregoing clauses (a), (b) and (c) shall not apply to the extent that such effect has a disproportionate adverse effect on Sellers as compared to the adverse impact such circumstance, state of facts or matters, change, event, occurrence, action or omission has on other companies operating in the industries or markets in which Sellers operate.

"**Final Order**" means a judgment or Order of the Court (or any other court of competent jurisdiction) entered by the clerk of the Court (or such other court) on the docket in the Case (or the docket of such other court), which is in full force and effect, which has not been modified, amended, reversed, vacated or stayed (other than such modifications or amendments that are consented to by Buyer) and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending; or (b) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such Order or judgment of the Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of which such Order shall have become final in accordance with Bankruptcy Rule 8002; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Bankruptcy Rules, may be filed relating to such Order, shall not cause an Order not to be a Final Order.

"**GAAP**" means generally accepted accounting principles in the United States.

"**Governmental Body**" means any government or governmental or regulatory body including any agency, bureau, commission, dependent or similar body, or any political subdivision thereof, whether foreign, federal, state, or local, or any instrumentality or authority thereof, or any court or arbitrator (public or private).

"**Hazardous Material**" means any "hazardous substance" as that term is defined under CERCLA and its implementing regulations, 42 U.S.C. §§ 9601 et seq.; any "hazardous material," as that term is defined under OSHA and its implementing regulations; any "hazardous waste" as that term is defined under RCRA and its implementing regulations; any "solid waste" as that term is defined under RCRA and its implementing regulations; any "toxic substance" as that term is defined under the Toxic Substances Control Act of 1976, as amended, and its implementing regulations, 15 U.S.C. §§ 2601 et seq.; any "pollutant" as that term is defined under the Clean Water Act, as amended, and its implementing regulations, 33 U.S.C. §§ 1362 et seq.; and any other chemical, substance or material, whether solid, liquid, or gas, subject to regulation under Environmental Law because of its detrimental effect on worker safety, human health or the Environment, including oil, petroleum products, radon, radioactive materials or wastes, asbestos, asbestos-containing materials, lead or lead-containing materials, hazardous wastes, natural gas, natural gas liquids, liquefied natural gas, mold, hazardous waste constituents, urea formaldehyde insulation and polychlorinated biphenyls.

"**Insurance Motion**" means the Motion of Debtors for Order (I) Authorizing Continuation of, and Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection With, Various Insurance Policies, (II) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto, (III) Preventing Insurance Companies from Giving Any Notice of Termination or Otherwise Modifying Any Insurance Policy Without Obtaining Relief from the Automatic Stay, and (IV) Authorizing the Debtors to Continue to Honor Premium Financing Obligations [Docket No. 4].

"**Intellectual Property**" means all intellectual property rights, including the following: (a) all patents and applications therefor, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon; (b) all registered and unregistered trademarks, service marks, trade names, service names, brand names, trade dress rights, logos, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof (collectively, "**Marks**"); (c) all copyrights and registrations and applications therefor, works of authorship, and mask work rights, and all registrations, applications, renewals, extensions and reversions thereof; (d) all trade secrets, including confidential and

proprietary information and know-how; (e) all software; and (f) all moral rights, rights of publicity and other intellectual property and proprietary rights of a similar nature.

"**IRS**" means the Internal Revenue Service.

"**Knowledge of Buyer**" means the actual knowledge of the individuals identified on **Exhibit A-1** after inquiring of their direct reports.

"**Knowledge of Sellers**" means the actual knowledge of the individuals identified on **Exhibit A-2** after inquiring of their direct reports.

"**Law**" means any federal, state, local or foreign law, statute, code, ordinance, rule, regulation, municipal by-laws, judicial or arbitral or administrative or ministerial or departmental or regulatory judgments, orders, decisions, injunctions, rulings or awards, including general principles of common and civil law and equity.

"**Legal Proceeding**" means any actual or threatened judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings or investigations by or before a Governmental Body.

"**Liability**" means any debt, liability, commitment or other obligation of any kind or nature (whether known or unknown, direct or indirect, known or unknown, matured or unmatured, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all costs and expenses relating thereto.

"**Lien**" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim (including as such term is defined in Section 101(5) of the Bankruptcy Code), lease, charge, option, pledge, right of first offer or refusal, conditional sale agreement or other title retention agreement, hypothecations, restrictions, licenses, easements, rights-of-way, matrimonial or community interest, tenancy by the entirety claim, any other title defect, servitude, proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement or encumbrance.

"**Local Rules**" means Local Rules for the United States Bankruptcy Court for the District of Delaware.

"**Material Adverse Effect**" means any circumstance, state of facts or matters, change, event, occurrence, action or omission that has, or would be reasonably likely to have, a material adverse effect on (a) the business, assets and liabilities, properties, results of operations, financial condition or cash flows of Sellers, Sellers' Affiliates, the Business, the Acquired Assets, the Acquired Contracts/Leases, the Additional Acquired Contracts/Leases or the Assumed Liabilities other than an effect resulting from an Excluded Matter; or (b) the ability of Sellers or Sellers' Affiliates to consummate the Transactions or perform their obligations under this Agreement or any of the other Transaction Documents to which Sellers are or will be parties.

"**Order**" means any order, injunction, judgment, decree, ruling, writ, verdict, determination, settlement, assessment, award or other decision issued, promulgated or entered by or with a Governmental Body.

"**Ordinary Course of Business**" means an action: (a) in the ordinary and usual course of normal day-to-day operations of the Business through the Effective Date consistent with past practice; (b) not required to be authorized by the board of directors of any Seller; and (c) consistent with the representations and warranties in **Section 6.16**.

"**Permits**" means any franchises, approvals, authorizations, consents, qualifications, orders, registrations, variances, licenses, permits or certificates of, or similar rights granted by, a Governmental Body.

"**Permitted Exceptions**" means: (a) Liens for current Taxes, assessments or other governmental charges not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings to the extent an accrual for such Taxes, assessments or other governmental charges but only to the extent that such Taxes, assessments or other charges constitute Assumed Liabilities; (b) mechanics', carriers', workers', warehousemens', repairers' and similar statutory Liens arising or incurred in the Ordinary Course of Business but only to the extent they relate to Assumed Liabilities; (c) zoning, entitlement and other land use and environmental regulations by any Governmental Body provided, however, that such regulations have not been violated; and (d) title of a lessor under a capital or operating lease.

"**Petition Date**" means October 1, 2019.

"**Person**" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"**Prepetition Lenders**" means Bank of America, N.A. and SunTrust Robinson Humphrey, Inc.

"**Release**" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, disposing or dumping of a Hazardous Materials into or through.

"**Remedial Action**" means all actions to (a) clean up, remove, treat or in any other way address any Release of a Hazardous Material into the environment; (b) prevent or minimize the Release of any Hazardous Material so it does not migrate to cause danger to public health or welfare or the indoor or outdoor environment, or (c) perform pre-remedial studies and investigations or post-remedial monitoring and care.

"**Schedules**" means the Schedules prepared in connection with this Agreement including the Disclosure Schedules.

"**Tax Return**" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes.

"**Taxes**" means (a) all federal, state, local or foreign taxes, charges or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes; and all interest, penalties, fines, additions to tax or additional amounts imposed in connection with or with respect to any of the foregoing items; (b) any Liability for the payment of any amount of a type described in clause (a) arising as a result of being or having been a member of any consolidated, combined, unitary or other group or being or having been included or required to be included in any Tax return related thereto; and (c) any Liability for the payment of any amount of a type described in clause (a) or clause (b) as a transferee or successor, or by Contract or otherwise.

"**Transactions**" means the transactions contemplated by this Agreement and by the Transaction Documents.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any similar law.

<u>Terms Defined Elsewhere in this Agreement</u>. For purposes of this Agreement, the following terms have meanings set forth in the Sections indicated:

Access Period ..................................................................................................................4.1
Acquired Assets ................................................................................................................1.1
Additional Assumed Contracts/Leases ..........................................................................1.1.3
Additional Cure Amounts .................................................................................................4.1
Administrative Bridge ....................................................................................................2.3.4
Agreement ................................................................................................................ Preamble
Allocation .........................................................................................................................1.5
Assumed Contracts/Leases ............................................................................................1.1.3
Assumed Liabilities ..........................................................................................................3.1
Balance Sheet .................................................................................................................6.5.1
Balance Sheet Date ........................................................................................................6.5.1
Bankruptcy Code ......................................................................................................... Recital
Base Purchase Price ..........................................................................................................2.1
Bid Procedures Motion ................................................................................................ Recital
Bidding Procedures Order ........................................................................................... Recital
Business ....................................................................................................................... Recital
Buyer ....................................................................................................................... Preamble
Case ............................................................................................................................ Recital
Cash Purchase Price ..........................................................................................................2.1
CERCLA ..................................................................................................................Exhibit A
Chicago Distribution Depot ........................................................................................ Recital
Closing .............................................................................................................................5.1
Closing Date ......................................................................................................................5.1
COBRA ...........................................................................................................................6.13
Collective Bargaining Agreements ................................................................................6.14
Court............................................................................................................................. Recital
Cure Amounts ...................................................................................................................2.1
Debtor ...................................................................................................................... Preamble
Debtors ..................................................................................................................... Preamble
Deposit ...........................................................................................................................2.2.1
Distribution Depot....................................................................................................... Recital
Distribution Depots ..................................................................................................... Recital
Effective Date.......................................................................................................... Preamble
Entergy .............................................................................................................................8.4
Entergy Agreement ..........................................................................................................8.4
Equipment .....................................................................................................................1.1.2
Escrow Agent .................................................................................................................2.3.4
Excluded Assets ...............................................................................................................1.2
Excluded Liabilities ........................................................................................................3.2
Facilities ..................................................................................................................... Recital
Facility ........................................................................................................................ Recital
Financial Statements .....................................................................................................6.5.1
Fixtures.........................................................................................................................1.1.1
Harriman Production Facility....................................................................................... Recital
Headquarters Facility .................................................................................................. Recital
Investment Seller..................................................................................................... Preamble

LaPlace Dock ...................................................................................................................6.9.1
LaPlace Seller..............................................................................................................Preamble
Leased Real Property ........................................................................................................6.9.2
Marks ......................................................................................................................Exhibit A
Non-Fulfillment Event ........................................................................................................12.1
Officers' Certificate ............................................................................................................10.4
OSHA.......................................................................................................................Exhibit A
Owned Real Property ........................................................................................................6.9.1
Parent Seller ..............................................................................................................Preamble
Parties .......................................................................................................................Preamble
Party .........................................................................................................................Preamble
Pennsylvania Distribution Depot .......................................................................................Recital
Production Facilities ........................................................................................................Recital
Production Facility ..........................................................................................................Recital
Purchase Price ....................................................................................................................2.1
RCRA......................................................................................................................Exhibit A
Real Property.....................................................................................................................6.9.2
Real Property Leases .........................................................................................................6.9.2
Registered IP ..................................................................................................................6.11.1
Sale Order......................................................................................................................Recital
Seller .........................................................................................................................Preamble
Sellers .......................................................................................................................Preamble
Sellers' Intellectual Property..........................................................................................6.11.1
Surety Bond....................................................................................................................8.4
Transaction Documents.....................................................................................................1.2.1
Transaction Taxes ..............................................................................................................4.5.1
Trust Account....................................................................................................................2.2.1
Tulsa Distribution Depot.................................................................................................Recital

**EXHIBIT A-1**

**KNOWLEDGE OF BUYER**

- Sanjeev Gupta, Chairman – GFG Alliance
- Grant Quasha, Chief Investment Officer – North America
- James Baulderstone, Strategic Project Director
- Steve McConville, Business Development Analyst

**EXHIBIT A-2**

**KNOWLEDGE OF SELLERS**

- Alton Davis, Chief Operating Officer
- Kevin Torres, VP Recycling & Supply Chain
- Dan Lay, VP Sales & Marketing
- Kevin Kirkland, VP Finance
- Kristen Barney, HR Director

**EXHIBIT B**

**TABLE OF EXHIBITS AND SCHEDULES**

| Exhibit or Schedule | Name |
|---|---|
| Exhibit A | Defined Terms |
| Exhibit A-1 | Knowledge of Buyer |
| Exhibit A-2 | Knowledge of Sellers |
| Exhibit B | Table of Exhibits and Schedules |
| Exhibit C | Form of Sale Order |
| Exhibit D | Guaranty |
| Schedule 1.1 | Certain Acquired Assets |
| Schedule 1.1.3(i) | Assumed Contracts/Leases |
| Schedule 1.1.3(ii) | Additional Assumed Contracts/Leases |
| Schedule 1.3 | Conveyance Of Acquired Assets |
| Schedule 1.3A | Form of Bill of Sale, Assignment and Assumption Agreement |
| Schedule 1.3B | Form of Intellectual Property Assignment Agreement |
| Schedule 1.3C | Form of Real Property Lease Assignment and Assumption Agreement |
| Schedule 1.3D | Form of Special Warranty Deeds |
| Schedule 2.2.1 | Trust Account |
| Schedule 6.9.1 | Owned Real Property |
| Schedule 6.9.2 | Leased Real Property |
| Schedule 6.13 | Defined Benefit Plan Liabilities |
| Schedule 6.14 | Labor |
| Schedule 6.22 | Insurance |

**EXHIBIT C**

**FORM OF SALE ORDER**

[attached]

**EXHIBIT D**

**GUARANTY**

[attached]

GUARANTEE

OF

LIBERTY HOUSE GROUP PTE. LTD.

This Guarantee, dated as of December 12, 2019 (this "**Guarantee**"), is made by Liberty House Group Pte. Ltd., a limited company organized under the Laws of Singapore (the "**Guarantor**"), in favor of Bayou Steel BD Holdings, LLC, a Delaware limited liability company ("**Parent Seller**"), BD Bayou Steel Investment, LLC, a Delaware limited liability company ("**Investment Seller**"), and BD LaPlace, LLC, a Delaware limited liability company ("**LaPlace Seller**" and together with Parent Seller and Investment Seller, collectively the "**Guaranteed Parties**").

The Guarantor and the Guaranteed Parties are each sometimes referred to herein as a "**Party**" or collectively as the "**Parties**". Capitalized terms used but not defined herein shall have the meanings assigned to them in the Asset Purchase Agreement, dated as of the date hereof (the "**APA**"), by and between the Guaranteed Parties and Liberty BSG Holdings Inc., Delaware company ("**Buyer**"), attached hereto as <u>Exhibit A</u>.

The Guarantor and the Guaranteed Parties agree as follows:

1.    <u>Guarantee</u>.    To induce the Guaranteed Parties to enter into the APA, the Guarantor hereby irrevocably and unconditionally guarantees, subject to the provisions of <u>Section 5</u> below, Buyer's liabilities and obligations to make the payments described in <u>Article II</u> (Purchase Price) of the APA.   The obligations described in this <u>Section 1</u> are collectively referred to herein as the "**Obligations**." Notwithstanding anything to the contrary, the Guarantor's aggregate liability under this Guarantee shall not exceed the sum of the Cash Purchase Price (minus the Deposit) and the Cure Amounts (the "**APA Cap**"). The Guarantor agrees and, by its acceptance of this Guarantee, each Guaranteed Party agrees that this Guarantee may not be enforced without giving effect to the APA Cap.   For the avoidance of doubt, the Guarantor is not guaranteeing the obligations of any Person other than Buyer.

2.    <u>Nature of Guarantee</u>.

(a)    This is a guarantee of payment and not of collection, and a separate action or actions may be brought and prosecuted against the Guarantor to enforce this Guarantee, irrespective of whether any action is brought against Buyer or whether Buyer is joined in any such action or actions.

(b)    Except as otherwise provided herein and without amending or limiting the other provisions of this Guarantee, the liability of the Guarantor under this Guarantee shall, to the fullest extent permitted under applicable Law, be absolute and irrevocable irrespective of:  (i) any change in the corporate existence, structure or ownership of Buyer or the Guarantor, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting Buyer or the Guarantor or any of their respective assets; (ii) any waiver, amendment or modification of the APA in accordance with its terms, or change in the time, manner, place or terms of payment or performance, or any change or extension of the time of payment or performance, renewal or alteration, of any Obligation, any liability incurred directly or indirectly in respect thereof, or any agreement entered into by a Guaranteed Party, on the one

hand, and Buyer, on the other hand, in connection therewith; (iii) the existence of any claim or other right that the Guarantor may have at any time against Buyer or a Guaranteed Party or any other Person primarily or secondarily liable, whether in connection with any Obligation or otherwise; (iv) the adequacy of any other means the Guaranteed Parties may have of obtaining payment of the Obligations; (v) the addition, substitution or release of any Person now or hereafter liable with respect to the Obligations or otherwise interested in the Transactions; or (vi) any other act or omission that might in any manner or to any extent vary the risk of the Guarantor or otherwise operate as a discharge of the Guarantor as a matter of law or equity.

(c)    The Guarantor hereby waives any and all notice of the creation, renewal, extension or accrual of the Obligations and notice of or proof of reliance by the Guaranteed Parties upon this Guarantee or acceptance of this Guarantee.  The Obligations shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between Buyer and the Guaranteed Parties shall be conclusively presumed to have been had or consummated in reliance upon this Guarantee.

(d)    When pursuing its rights and remedies hereunder against the Guarantor, no Guaranteed Party shall be under any obligation to pursue such rights and remedies it may have against any other Person for the Obligations or any right of offset with respect thereto, and any failure by a Guaranteed Party to pursue such other rights or remedies or to collect any payments from Buyer or any such other Person or to realize upon or to exercise any such right of offset shall not relieve the Guarantor of any liability hereunder.  No Guaranteed Party shall not be obligated to file any claim relating to any Obligation in the event that Buyer becomes subject to a bankruptcy, reorganization or similar proceeding, and the failure of a Guaranteed Party to so file shall not affect the Guarantor's obligations hereunder.  In the event that any payment to a Guaranteed Party in respect of any Obligation is rescinded, the Guarantor shall remain liable hereunder with respect to the Obligations as if such payment had not been made, irrespective of any termination of this Guarantee.

3.    <u>Certain Waivers.</u>  The Guarantor hereby expressly waives (a) any and all rights or defenses arising by reason of any Law which would otherwise require any election of remedies by the Guaranteed Parties and (b) promptness, diligence, the acceptance of this Guarantee, presentment, demand, notice of non-performance, default, dishonor and protest, notice that the Obligations have been incurred and all other notices of any kind (except for notices to be provided to Buyer and its counsel in accordance with the APA), all defenses which may be available by virtue of any valuation, stay, moratorium law or other similar law now or hereafter in effect, any right to require the marshalling of assets of Buyer or any other Person interested by the Transactions, and all suretyship defenses (other than fraud by a Guaranteed Party or any of its Affiliates in respect of the Transactions and defenses to the payment of the Obligations that are available to Buyer under the APA, or defenses in respect of a breach by a Guaranteed Party of this Guarantee).  The Guarantor acknowledges that it will receive substantial direct and indirect benefits from the Transactions and that the waivers set forth in this Guarantee are knowingly made in contemplation of such benefits.  The Guarantor hereby unconditionally and irrevocably agrees not to exercise any rights that it may now have or hereafter acquire against Buyer or any other Person that arise from the existence, payment, performance, or enforcement of the Obligations under or in respect of this Guarantee or any other agreement in connection therewith, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any

2

right to participate in any claim or remedy of a Guaranteed Party against Buyer, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from Buyer, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right, unless and until the Obligations and all other amounts payable under this Guarantee shall have been paid in full.  Notwithstanding anything to the contrary contained in this Guarantee, the Guaranteed Parties hereby agree that to the extent Buyer is relieved of any portion of its obligations under the APA, the Guarantor shall be similarly relieved of such portion of its respective obligations under this Guarantee.

4.    <u>Representations and Warranties</u>. The Guarantor hereby represents and warrants to the Guaranteed Parties that:

(a)    the Guarantor is a limited company duly organized and validly existing under the Laws of Singapore and has the corporate power to execute and deliver, and to perform its obligations under, this Guarantee;

(b)    the execution, delivery and performance by the Guarantor of this Guarantee have been duly and validly authorized by the Guarantor;

(c)    the execution, delivery and performance by the Guarantor of this Guarantee do not violate any Law of any Governmental Body nor do they require any consents, approvals, notices or filings with any Governmental Body; and

(d)    this Guarantee constitutes a legal, valid and binding obligation of the Guarantor enforceable against the Guarantor in accordance with its terms, subject to bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights generally.

5.    <u>Continuing Guarantee</u>.  This Guarantee is a continuing one and may not be revoked or terminated and shall remain in full force and effect and shall be binding on the Guarantor, its successors and assigns (and shall inure to the benefit of the Guaranteed Parties and their respective successors and assigns, and be enforceable by the Guaranteed Parties and their respective successors and assigns against the Guarantor and the Guarantor's successors and assigns) until the Obligations and all amounts payable under this Guarantee have been indefeasibly paid, observed, performed or satisfied in full.  Notwithstanding the foregoing, this Guarantee shall terminate and the Guarantor shall have no further obligations under this Guarantee as of the earliest to occur of (a) the payment, delivery, deposit or the like of all amounts required to be paid, delivered, deposited or the like (or caused to be paid, delivered, deposited or the like) in respect of the Obligations, and (b) the termination of the APA pursuant to <u>Article XII</u> (Termination) thereof under circumstances that do not give rise to any liabilities or obligations of Buyer pursuant to the terms of the APA.  Except as otherwise expressly provided herein, in the event that a Guaranteed Party or any of its Affiliates asserts in any suit, action or proceeding relating to this Guarantee that the provisions of <u>Section 1</u> hereof limiting the Guarantor's liability to the APA Cap or the provisions of this <u>Section 5</u> or <u>Section 6</u> hereof are illegal, invalid or unenforceable in whole or in part, or asserts any theory of liability against the Guarantor or any Guarantor or Buyer Affiliates (as defined below) with respect to the Transactions, other than liability of the Guarantor under this Guarantee (as set forth in <u>Section 1</u>), then (i) the obligations of the Guarantor under this Guarantee shall terminate *ab initio* and be null and void, and (ii) if the Guarantor has previously made any

3

payments under this Guarantee, it shall be entitled to recover such payments, and (iii) neither the Guarantor nor any Guarantor or Buyer Affiliate (as defined below) shall have any liability to a Guaranteed Party with respect to the Transactions, under this Guarantee or otherwise.

6.    No Recourse; Sole Remedy.  Each Guaranteed Party, by its acceptance of this Guarantee, acknowledges that no funds are expected to be contributed by the Guarantor to Buyer.  Notwithstanding anything that may be expressed or implied in this Guarantee or any document or instrument delivered contemporaneously herewith, by its acceptance of this Guarantee, each Guaranteed Party acknowledges and agrees that it has no right of recovery against the Guarantor or any of its Affiliates or the former, current or future shareholders, directors, officers, employees, agents, members, general or limited partners or assignees of any of the foregoing (collectively, but not including Buyer, each a "Guarantor or Buyer Affiliate"), whether by or through attempted piercing of the corporate veil, by or through a claim by or on behalf of Buyer against any Guarantor or Buyer Affiliate, or otherwise, except for its rights against the Guarantor under this Guarantee.  Recourse against the Guarantor under this Guarantee shall be the sole and exclusive remedy of the Guaranteed Parties and all of their respective Affiliates against the Guarantor or any Guarantor or Buyer Affiliates in respect of any liabilities or obligations arising under, or in connection with, this Guarantee, the APA or the transactions contemplated hereby or thereby.  Each Guaranteed Party, by its acceptance of this Guarantee, hereby covenants and agrees that it shall not institute, and shall cause its respective Affiliates not to institute, any suit, action or proceeding arising under, or in connection with, this Guarantee, the APA or the transactions contemplated hereby or thereby, against any Guarantor or Buyer Affiliates, except for claims by such Guaranteed Party against the Guarantor under this Guarantee.  Any claim or cause of action based upon, arising out of, or related to this Guarantee may only be brought against the Guarantor, and then only with respect to the specific obligations set forth herein.  No Guarantor or Buyer Affiliate shall have any liability or obligation for any of the representations, warranties, agreements, obligations or liabilities of the Guarantor under this Guarantee or of or for any suit, action or proceeding based on, in respect of, or by reason of, the transactions contemplated hereby (including the breach, termination or failure to consummate such transactions), in each case whether based on Contract, tort, strict liability, other applicable Laws or otherwise and whether by piercing the corporate veil, by a claim by or on behalf of a Guaranteed Party or another Person or otherwise.  Notwithstanding anything herein to the contrary, nothing set forth in this Guarantee shall affect or be construed to affect any liability of Buyer to a Guaranteed Party or shall confer or give, or shall be construed to confer or give, to any Person (including any Person acting in a representative capacity), including a Guaranteed Party, any rights or remedies against any Person, except against the Guarantor to the extent expressly set forth herein.  For the avoidance of doubt, notwithstanding anything to the contrary herein, nothing herein shall limit the ability of the Guaranteed Parties to bring any claim or cause of action against Buyer based upon, arising out of, or related to the APA or the other agreements and documents contemplated thereby.

7.    No Assignment.  Neither the Guarantor nor a Guaranteed Party may assign their respective rights, interests or obligations hereunder to any other Person (except by operation of Law) without the prior written consent of the other Parties.  Any purported assignment not permitted under this Section shall be null and void.

8.    Notices.  Any notices or other communications required or permitted hereunder or otherwise in connection herewith shall be in writing and shall be deemed to have

4

been duly given (a) when delivered in person or transmitted by facsimile transmission, (b) when sent by email, if prior to 5.00 p.m., local time of the receiving party on a Business Day, and otherwise, the next Business Day, (c) or on receipt (or refusal to receipt) after dispatch by express, registered or certified mail, postage prepaid, or nationally recognized overnight delivery service, addressed as follows:

Notices to Guarantor:

Liberty House Group Pte. Ltd.
7 Hertford Street
London
United Kingdon, W1J7RH
Attn: Howard Law
E-mail: howard.law@gfgalliance.com

with a copy (which shall not constitute notice) to:

Howard A. Law, Esq.
General Counsel
Liberty BSG Hodings Inc.
c/o GFG Alliance
750 Lexington Ave, 12th Floor
New York, New York 10021
howard.law@gfgalliance.com

with a copy (which shall not constitute notice) to:

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY  10004
Anson B. Frelinghuysen, Esq.
Avner Bengera, Esq.
anson.frelinghuysen@hugheshubbard.com
avner.bengera@hugheshubbard.com

Notices to the Guaranteed Parties:

Charles S. Deutchman
Chief Restructuring Officer
Shared Management Resources, Ld.
28026 Gates Mills Blvd.
Pepper Pike, Ohio 44124-4730
(216) 978-6565
Cdeutchman@shrmgtres.com

with a copy (which shall not constitute notice) to:

Chrisopther A. Ward, Esq.
Shanti M. Katona, Esq.

5

Polsinelli PC
222 Delaware Ave., Suite 1101
Wilmington, Delaware 19801
(302) 252-0920
cward@polsinelli.com
skatona@polsinelli.com

or such other address as the Person to whom notice is to be given has furnished in writing to the other Party.

9.    General Provisions. Sections 13.1 (Waiver), 13.5 (Entire Agreement; Binding Effect), 13.6 (Amendment), 13.7 (Counterparts), 13.8 (Governing Law and Rules of Construction), 13.9 (Jurisdiction), 13.10 (Severability), 13.18 (Interpretation) of the APA shall apply to this Guarantee *mutatis mutandis*.

*[Signature Page Follows]*

6

IN WITNESS WHEREOF, the Guarantor has caused this Guarantee to be executed and delivered as of the date first written above.

**LIBERTY HOUSE GROUP PTE. LTD.**

By: _____
    Name: Sanjeev Gupta
    Title: Director

Acknowledged and Agreed:


**BAYOU STEEL BD HOLDINGS, LLC**

By: _____
    Name:
    Title:


**BD BAYOU STEEL INVESTMENT, LLC**


By: _____
    Name:
    Title:


**BD LAPLACE, LLC**

By: _____
    Name:
    Title:

## Exhibit A

**Asset Purchase agreement**

## SCHEDULE 1.1

### CERTAIN ACQUIRED ASSETS

- Melt shop, rolling mill, scrap operations and dock operations located in LaPlace, LA;
- The LaPlace Dock;
- Rolling mill located in Harriman, TN;
- Scrap collection site located in Harvey, LA;
- Depot locations in Chicago, Oklahoma and Pittsburgh; and
- Undeveloped land next to Sellers' current operations located in LaPlace, LA.

## SCHEDULE 1.1.3(i)

### ASSUMED CONTRACTS/LEASES AND CURE AMOUNTS

| # | Contract Description | Cure Amount in USD |
|---|---|---|
| **1.** | Product Purchase Agreement, dated June 30, 2015, between Air Products and Chemicals, Inc. and BD LaPlace LLC (formerly Arcelormittal LaPlace, LLC), as amended, regarding the supply of the industrial gas Argon; | 40,225 |
| **2.** | Electric Service Agreement, dated July 14, 1980, between Entergy Louisiana Inc. (formerly Louisiana Power & Light Company) and BD LaPlace LLC (formerly Bayou Steel Corporation), as amended; | 0[1] |
| **3.** | Lease Agreement between Leetsdale Industrial II, L.P., as landlord, and Bayou Steel BD Holdings, L.L.C. (by assignment from BD LaPlace LLC, formerly Arcelormittal LaPlace, LLC), as tenant see, dated December 1, 2003, as amended; and | 146,305 |
| **4.** | Lease Agreement between The City of Tulsa-Rogers County Port Authority as landlord, and BD LaPlace LLC (formerly ArcelorMittal LaPlace, LLC), as tenant, dated July 1, 2010, as amended. | 32,982 |

---

1 See **Section 8.4**.

## <u>SCHEDULE 1.1.3(ii)</u>

### ADDITIONAL ASSUMED CONTRACTS/LEASES

- Equipment Rental Agreement between Taylor Leasing Corporation and Bayou Steel, dated November 30, 2018, regarding lease for a forklift (XH350L/P42554);

- Railroad Lease Agreement between Trinity Industries Leasing Company and Bayou Steel BD Holdings, L.L.C., dated August 22, 2016, as amended, regarding lease of 10 gondola rail cars and 80 billet steel flat rail cars; and

- Product Agreement between The BOC Group, Inc. and Bayou Steel, dated September 1, 2000, as amended, regarding the supply of oxygen.

## SCHEDULE 1.3

### CONVEYANCE OF ACQUIRED ASSETS

Buyer shall have received the following, duly executed by Sellers or Sellers Affiliates, as applicable, each dated as of the Closing Date and in full force and effect as of the Closing Date:

(a)      A Bill of Sale, Assignment and Assumption Agreement, substantially in the form attached hereto as **Schedule 1.3A**.

(b)      An Intellectual Property Assignment, substantially in the form attached hereto as **Schedule 1.3B**.

(c)      The Officers' Certificate.

(d)      Real Property Lease Assignment and Assumption Agreements for each Real Property Lease, substantially in the form attached hereto as **Schedule 1.3C**;

(e)      Statutory forms of Special Warranty Deeds or their jurisdictional equivalent in recordable form, substantially in the form attached hereto as **Schedule 1.3D**;

(f)      Releases and terminations in recordable form, sufficient for Buyer to receive the Owned Real Property free and clear of all Liens except for Permitted Exceptions;

(g)      A customary instrument of conveyance of the LaPlace Dock, in recordable form, sufficient for Buyer to own the LaPlace Dock free and clear of all Liens except for Permitted Exceptions;

(h)      All other instruments of transfer as shall be reasonably necessary or appropriate, in the reasonable opinion of Buyer's counsel, to vest in Buyer good and indefeasible title to the Acquired Assets and to permit Buyer to conduct the Business without interruption.

<u>**SCHEDULE 1.3A**</u>

**FORM OF BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT**

<u>**BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT**</u>

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT (this "**Agreement**") is made and entered into as of January 31, 2020, by and among each of Bayou Steel BD Holdings, LLC, a Delaware limited liability company ("**Parent Seller**"), BD Bayou Steel Investment, LLC, a Delaware limited liability company ("**Investment Seller**"), and BD LaPlace, LLC, a Delaware limited liability company ("**LaPlace Seller**" and together with Parent Seller and Investment Seller, collectively the "**Assignors**" and individually, each an "**Assignor**"), and Liberty BSG Holdings Inc., a Delaware corporation ("**Assignee**").

WHEREAS, Assignors and Assignee are parties to that certain Asset Purchase Agreement dated as of December 12, 2019 (the "**Purchase Agreement**"), pursuant to which Assignee has purchased the Acquired Assets; and

WHEREAS, pursuant to the Purchase Agreement, the Assignors have agreed to assign the Acquired Assets to Assignee, and Assignee has agreed to assume the Assumed Liabilities from Assignor, as set forth herein, and this Agreement is contemplated by Sections 1.3 and 1.4 of the Purchase Agreement;

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants contained herein, and for other good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

1. <u>Capitalized Terms.</u> Capitalized terms used but not defined herein shall have the meanings for such terms that are set forth in the Purchase Agreement.

2. <u>Assignment and Assumption.</u> Effective as of the Closing, (i) the Assignors hereby sell, transfer, assign, convey and deliver to Assignee the Acquired Assets, free and clear of all Liens, and assign to Assignee the Assumed Liabilities, and (ii) Assignee hereby purchases, acquires and accepts the Acquired Assets, and assumes the Assumed Liabilities.

3. <u>Terms of the Purchase Agreement.</u> This Agreement is subject in all respects to the terms and conditions of the Purchase Agreement, including the Assignors' representations, warranties and covenants relating to the Acquired Assets and the Assumed Liabilities, and is given to further evidence (and give immediate effect to) the transfers and assignments contemplated by the Purchase Agreement upon the terms and conditions specified therein. Nothing contained in this Agreement shall be deemed to in any way supersede, modify, replace, amend, change, rescind, waive, exceed, expand, reduce, enlarge or in any way affect the provisions, including warranties, covenants, agreements, conditions, representations or, in general, any of the rights and remedies, and any of the obligations, of the Assignors or Assignee set forth in the Purchase Agreement. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms of this Agreement, the terms of the Purchase Agreement shall govern.

4.      Further Actions. Each of the parties hereto covenants and agrees, at its own expense, to execute and deliver, at the request of the other party hereto, such further instruments of transfer and assignment and to take such other action as such other party may reasonably request to more effectively transfer and assign to and vest in Assignee the Acquired Assets and Assumed Liabilities.

5.      Miscellaneous. The provisions of Article XIII of the Purchase Agreement shall apply to this Agreement, *mutatis mutandis*.

[*Signature page follows*]

IN WITNESS WHEREOF, the parties have executed this Bill of Sale, Assignment and Assumption Agreement as of the date first above written.

ASSIGNOR

**Bayou Steel BD Holdings, LLC**

By: _____

Its: _____

ASSIGNOR

**BD Bayou Steel Investment, LLC**

By: _____

Its: _____

ASSIGNOR

**BD LaPlace, LLC**

By: _____

Its: _____

ASSIGNEE

**Liberty BSG Holdings Inc.**

By: _____

Its: _____

<u>**SCHEDULE 1.3B**</u>

**FORM OF INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT**

**INTELLECTUAL PROPERTY ASSIGNMENT**

THIS INTELLECTUAL PROPERTY ASSIGNMENT (this "**Intellectual Property Assignment**"), dated as of January 31, 2020, is made and entered into by and among each of Bayou Steel BD Holdings, LLC, a Delaware limited liability company ("**Parent Seller**"), BD Bayou Steel Investment, LLC, a Delaware limited liability company ("**Investment Seller**"), and BD LaPlace, LLC, a Delaware limited liability company ("**LaPlace Seller**" and together with Parent Seller and Investment Seller, collectively the "**Assignors**" and individually, each an "**Assignor**"), and Liberty BSG Holdings Inc., a Delaware corporation ("**Assignee**"). Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement (as defined below).

WHEREAS, the Assignors and Assignee have entered into that certain Asset Purchase Agreement (the "**Purchase Agreement**"), dated as of December 12, 2019 among the Assignors and Assignee, pursuant to which the Assignors have agreed to contribute, sell, convey, transfer, assign and deliver to Assignee all right, title and interest in, to and under, among other things, the Sellers' Intellectual Property, including the Assigned Domain Names (as defined below); and

WHEREAS, the Assignors and Assignee desire to execute this Intellectual Property Assignment for purposes of recording the assignment of the Assigned Domain Names and filing this Intellectual Property Assignment with the applicable domain name registrar and any other applicable intellectual property offices or similar agencies outside of the United States, as may be necessary to effectuate the assignment of the Assigned Domain Names.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

    1. <u>Assignment</u>. The Assignors hereby irrevocably and unconditionally contribute, sell, convey, transfer, assign and deliver to Assignee all right, title and interest throughout the world in, to and under (a) the Sellers' Intellectual Property, including the domain names and URLs listed on <u>Attachment 1</u> attached hereto (and the registrations and applications therefor) and all goodwill corresponding thereto, associated therewith or symbolized thereby (collectively, the "**Assigned Domain Names**") and (b) (i) all rights pertaining to the Sellers' Intellectual Property arising under international treaties and convention rights; (ii) the right and power to assert, defend and recover title to the Sellers' Intellectual Property; (iii) all rights to assert, defend, sue, and recover damages for any past, present and future infringement, dilution, misuse, misappropriation, impairment, unauthorized use or other violation of any rights in or to the Sellers' Intellectual Property and any rights or other interests therein or thereto; (iv) all proceeds, income, royalties, damages and payments now and hereafter due and payable under or in respect of the Sellers' Intellectual Property and (v) all administrative rights arising from the Sellers' Intellectual Property,  including the right to prosecute applications and oppose, interfere

95552475_17

with or challenge the applications of others, the rights to obtain renewals, continuations, divisions, and extensions of legal protection pertaining to the Sellers' Intellectual Property.

2. <u>Action to Record</u>. In conjunction with the transfer of the Assigned Domain Names, the Assignors shall carry out the formal transfer of the Assigned Domain Names to Assignee in accordance with the applicable domain name transfer procedure for the Assigned Domain Names ("**Transfer Procedure**") and provide authorization to the applicable domain name registrar (e.g., GoDaddy.COM, LLC, Network Solutions, Inc., etc.), its designees and any other applicable entity to transfer ownership, title and registration to the Assigned Domain Names to Assignee. The Assignors agree that it shall execute any and all documents and provide any and all authorizations that may be necessary to perfect and vest Assignee's rights in and to the Assigned Domain Names, including any documents and authorizations as are necessary to effect the formal transfer of the Assigned Domain Names to Assignee in accordance with the Transfer Procedure.

3. <u>Terms of the Purchase Agreement</u>. This Intellectual Property Assignment is subject in all respects to the terms and conditions of the Purchase Agreement, including the Assignors' representations, warranties and covenants relating to the Sellers' Intellectual Property, and is given to further evidence (and give immediate effect to) the transfers and assignments contemplated by the Purchase Agreement upon the terms and conditions specified therein. Nothing contained in this Intellectual Property Assignment shall be deemed to in any way supersede, modify, replace, amend, change, rescind, waive, exceed, expand, reduce, enlarge or in any way affect the provisions, including warranties, covenants, agreements, conditions, representations or, in general, any of the rights and remedies, and any of the obligations, of the Assignors or Assignee set forth in the Purchase Agreement. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms of this Intellectual Property Assignment, the terms of the Purchase Agreement shall govern.

4. <u>Miscellaneous</u>. The provisions of Article XIII of the Purchase Agreement shall apply to this Intellectual Property Assignment, *mutatis mutandis*.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

95552475_17

IN WITNESS WHEREOF, the undersigned have caused this Intellectual Property Assignment to be duly executed and delivered as of the date first set forth above.

ASSIGNOR

**Bayou Steel BD Holdings, LLC**

By: _____

Its: _____

ASSIGNOR

**BD LaPlace, LLC**

By: _____

Its: _____

ASSIGNOR

**BD Bayou Steel Investment, LLC**

By: _____

Its: _____

ASSIGNEE

**Liberty BSG Holdings Inc.**

By: _____

Its: _____

## **Attachment 1**

### **Sellers' Intellectual Property**

[Buyer to provide]

## SCHEDULE 1.3(C)

### FORMS OF LEASE ASSIGNMENTS

[attached]

## REAL PROPERTY LEASE ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION OF LEASE (this "Assignment"), dated as of_____, 20__ (the "Effective Date"), is made among_____ _____, a _____ ("Assignor"), and_____, a _____ _____("Assignee").

WHEREAS, Assignor is a party to the lease identified on Exhibit A (as heretofore or hereafter amended, supplemented or otherwise modified from time to time, the "Lease"), relating to certain premises located at the premises (as defined in the Lease), which premises are more particularly described in the Lease; and

WHEREAS, Assignor desires to assign the Lease to Assignee and Assignee desires to assume the Lease from Assignor upon the terms and conditions hereinafter set forth.

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.  Assignor hereby assigns, transfers, conveys and sets over to Assignee and its successors and assigns, all of Assignor's right, title and interest in, to and under the Lease, as of the Effective Date, to have and to hold the same unto Assignee, subject to the terms, covenants and conditions contained herein and in the Lease.

2.  Assignee hereby assumes, and agrees to satisfy and discharge when due, all liabilities and obligations of Assignor accruing under the Lease as of the Effective Date and shall undertake and perform all liabilities and obligations of Assignor accruing under the Lease as of the Effective Date.

3.  Assignor hereby indemnifies and agrees to hold harmless and defend the Assignee from any liability or obligation related to the Lease and first accruing under the Lease prior to the Effective Date. Assignee hereby indemnifies and agrees to hold harmless and defend the Assignor from any liability or obligation related to the Lease first accruing under the Lease on and after the Effective Date.

4.  Except as expressly set forth herein, nothing herein contained shall be construed to modify, impair or affect any of the covenants, agreements, terms, provisions or conditions in the Lease, or to waive any breach thereof, or any rights of the landlord under the Lease against any person, firm, or corporation liable or responsible for the performance thereof, and all covenants, agreements, terms, provisions and conditions of the Lease are hereby mutually declared to be in full force and effect.

5.  This Assignment inures to the benefit of the parties hereto and their respective successors and permitted assigns.

6.  This Assignment may be executed in one or more counterparts, each of which when so executed and delivered shall be deemed an original, but all of which taken together shall

constitute but one and the same instrument. Signatures to this Assignment transmitted by telecopy or other electronic means shall be valid and effective to bind the party so signing.

7.    The recitals to this Assignment are hereby incorporated herein by this reference and form a part of this Assignment.

8.    This Assignment may not be amended or modified except (a) by an instrument in writing signed by, or on behalf of, the parties to be bound thereby or (b) by a waiver, signed by, or on behalf of, the party or parties to be bound thereby.

[*Remainder of page intentionally left blank; Signature page follows*]

2

IN WITNESS WHEREOF, Assignor and Assignee have caused this Assignment and Assumption of Lease to be executed as of the day and year first above written.

ASSIGNOR:

_____,
a _____

By:_____
Name:
Title:

ASSIGNEE:

_____,
a _____


By:_____
Name:
Title:

EXHIBIT A
COMPLETE LEASE ATTACHED

## SCHEDULE 1.3(D)

### FORMS OF FORMS OF SPECIAL WARRANTY DEEDS

[attached][2]

---

2 **Note to draft**: To be supplied once Buyer receives title commitments.

95552475_17

**STATE OF LOUISIANA**

**COUNTY OF_____**

## SPECIAL WARRANTY DEED

**BEFORE US,** the undersigned authorities, and in the presence of the undersigned competent witnesses, personally came and appeared:

_____**, EIN: _____), a** _____company authorized to business in the State of Louisiana, with a mailing address of _____, appearing herein through its duly authorized representative, authorized by act dated _____, a copy of which is attached hereto **("Seller"),**

who declared that Seller does by these presents, GRANT, BARGAIN, SELL, CONVEY AND DELIVER, without any guarantee or warranty of title except as to Seller's own acts, or those lawfully claiming by, through or under Seller, but with complete transfer and subrogation of all rights and actions of warranty against all former proprietors of the property herein conveyed, together with all rights of prescription, whether acquisitive or liberative, to which Seller may be entitled, unto:

_____**, (EIN:_____), a** _____company authorized to business in the State of Louisiana, with a mailing address of _____, appearing herein through its duly authorized representative, authorized by act dated _____, a copy of which is attached hereto **("Buyer"),**

an undivided interest in and to the following described property, to-wit:

See Exhibit "A" attached hereto and incorporated herein by this reference.

(the "Property")

Subject only to those matters set forth on Exhibit "B" attached hereto and incorporated by this reference ("Permitted Exceptions").

TO HAVE AND TO HOLD unto Buyer and Buyer's heirs, successors and assigns forever.

This sale is made for the consideration of the sum of _____ Dollars ($_____) cash in hand paid, plus other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

*Signatures and Exhibits to follow*

THUS DONE AND SIGNED in the presence of the undersigned competent witnesses and me, Notary, on this _____ day of _____, 20_____.

WITNESSES:

SELLER: _____

_____    By: _____
                                       Name: _____
Printed Name_____    Title: _____


_____

Printed Name_____


_____
                Notary Public

Name: _____ ID#_____


_____

My Commission Expire: _____.

**\*Louisiana law requires that this instrument be executed before a Notary Public and two witnesses.  The Notary cannot act as one of the witnesses.  The notary should sign on the line provided, do not attach a separate notarial acknowledgment.**

STATE OF _____

COUNTY OF _____

     THUS DONE AND PASSED in the presence of the undersigned competent witnesses and me, Notary, on this **_____** day of _____, 20____**,** but effective as set forth hereinabove.

WITNESSES:                     BUYER: _____

_____    By: _____
                                    Name:_____
Printed Name_____  Title:_____

_____

Printed Name_____

_____
                   Notary Public
     Name: _____ ID#_____

_____

     My Commission Expires_____

**\*NOTE:  Louisiana law requires two witnesses in addition to the Notary Public.  The Notary cannot act as one of the witnesses.  The two witnesses should print their names beneath their signatures.   The Notary must sign on the line provided even if  an acknowledgment is attached.**

**Exhibit "A'**
**Property**

**Exhibit "B"**
**Permitted Exceptions**

**TN Deed-Warranty (Special)**

**THIS INSTRUMENT PREPARED BY:**

_____

**AFTER RECORDING RETURN TO:**

_____

Address New Owner(s)

Send Tax Bills To:

Map & Parcel Nos.:

**SPECIAL WARRANTY DEED**

**FOR AND IN CONSIDERATION** of the sum of Ten and No/100 Dollars ($10.00), cash in hand paid, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, _____ (herein referred to as "Grantor") has/have this day bargained and sold and, by these presents, does/do hereby transfer and convey unto _____ (herein referred to as "Grantee"), its heirs and assigns, forever, the following described tract or parcel of land located in _____ County, Tennessee, to wit:

(description)

TO HAVE AND TO HOLD said tract or parcel of land together with all the improvements thereon and the appurtenances thereunto belonging unto the said Grantee, its heirs and assigns, in fee simple, forever.

GRANTOR COVENANTS with the said Grantee that it is lawfully seized and possessed of said property, that _____ has/have a good and lawful right to sell and convey the same, and that _____ is/are free from any lien or encumbrance whatsoever, except for applicable zoning and building regulations, all visible easements, restrictions and limitations of record, and 20___ real estate taxes, which are to be prorated.

GRANTOR FURTHER COVENANTS with the said Grantee and binds itself, its heirs/successors and assigns, to warrant and forever defend the title thereto of said tract or parcel of land to the said Grantee, its heirs and assigns, against the lawful claims and demands of all persons whomsoever.

ALL warranties of Grantor herein contained are expressly limited to those persons or parties claiming by, through or under Grantor.

WITNESS this the _____ day of _____, 20_____.

GRANTOR:_____

STATE OF TENNESSEE)

COUNTY OF _____)

The actual consideration for this transfer is $ _____.

_____

AFFIANT

Subscribed and sworn to before me, this _____ day of _____, 20_____.

_____

NOTARY PUBLIC

My Commission Expires:

_____

STATE OF TENNESSEE)

COUNTY OF _____)

Personally appeared before me, _____, a Notary Public for the state and county aforesaid, _____, with whom I am personally acquainted, and who acknowledged that he executed the within instrument for the purposes therein contained, and who further acknowledged that he is the _____ of _____, the maker, and is authorized by the maker to execute this instrument on behalf of the maker.

WITNESS my hand and seal at office this _____ day of _____, 20_____.


_____

NOTARY PUBLIC

My Commission Expires:

_____

<table>
<tr><td>

**This Instrument Prepared by:**
[PREPARER NAME]
[STREET ADDRESS]
[CITY], [STATE] [ZIP CODE]
**After Recording Return to:**
[NAME OF PERSON DEED IS TO BE RETURNED TO]
[STREET ADDRESS]
[CITY], [STATE] [ZIP CODE]

</td><td></td></tr>
<tr><td></td><td>(For Recorder's Use Only)</td></tr>
</table>

**SPECIAL WARRANTY DEED**

[GRANTOR NAME], [a[n] [STATE OF ORGANIZATION] [ENTITY TYPE]], whose address is [GRANTOR ADDRESS] (the "**Grantor**"), for and in consideration of Ten and No/100 Dollars ($10.00) and other good and valuable consideration paid to the Grantor by [GRANTEE NAME], [a[n] [STATE OF ORGANIZATION] [ENTITY TYPE]], whose address is [GRANTEE ADDRESS] (the "**Grantee**"), the receipt and sufficiency of such consideration being hereby acknowledged, does hereby GRANT, BARGAIN, SELL, REMISE, RELEASE, and CONVEY to Grantee, its successors and assigns, in fee simple, that certain real property being more particularly described on Exhibit [LETTER] attached hereto and made a part hereof, together with all appurtenances thereto and all improvements situated thereon (collectively, the "**Property**"); subject, however, to those matters described in Exhibit [LETTER] attached hereto and made a part hereof.

TO HAVE AND TO HOLD the Property to Grantee, its successors and assigns, forever.

Grantor hereby agrees to warrant and defend the Property, the whole or any part thereof, to Grantee, its successors and assigns, against all claims and demands whatsoever, brought by any person or persons lawfully claiming, by, through, or under Grantor but not otherwise.

[Hereby releasing and waiving all rights under and by virtue of the Homestead Exemption Laws of the State of Illinois.]

IN WITNESS WHEREOF, the Grantor has executed this Special Warranty Deed as of the _____ day of _____, 20__.

**GRANTOR:**

[[GRANTOR NAME], a[n] [STATE OF ORGANIZATION] [ENTITY TYPE]

By:_____

Name:[PRINTED NAME OF SIGNOR]

Title: [SIGNOR TITLE]



OR

_____
_
[PRINTED NAME OF GRANTOR], individually]

[_____
_
[PRINTED NAME OF GRANTOR'S SPOUSE], individually, who is executing this deed solely to waive any homestead rights [he/she] has in the Property]

[STATE OF [STATE]                                                                                     )

                                                                                                     )        SS

COUNTY OF [COUNTY]                                                                                   )


The foregoing instrument was acknowledged before me this [DAY] day of [MONTH], [YEAR], by [NAME OF INDIVIDUAL SIGNING THE STANDARD DOCUMENT], as the [TITLE OF PERSON SIGNING DOCUMENT] of [ENTITY NAME], a(n) [STATE OF ORGANIZATION/ ENTITY TYPE], is personally known to me to be the same person whose name is subscribed to the foregoing instrument as such [TITLE OF PERSON SIGNING DOCUMENT] appeared before me this day in person and acknowledged that [he/she] signed and delivered the said instrument as [his/her] own free and voluntary act, and as the free and voluntary act of said [ENTITY TYPE], for the uses and purposes therein set forth. GIVEN under my hand and Notarial Seal this [DAY OF MONTH EXECUTED] day of [MONTH EXECUTED], 20[YEAR EXECUTED].

_____
Notary Public
My commission expires: [NOTARY
COMMISSION EXPIRATION DATE]

                                                [NOTARY SEAL OR STAMP]


**OR**
STATE OF [STATE]                                                                                     )

                                                                                                     )        SS

COUNTY OF [COUNTY]                                                                                   )


The foregoing instrument was acknowledged before me this [DAY] day of [MONTH], [YEAR], by [SIGNER NAME] who appeared before me this day in person and acknowledged that [he/she] signed and delivered the said instrument as [his/her] own free and voluntary act, for the uses and purposes therein set forth.

_____
Notary Public
My commission expires: [NOTARY
COMMISSION EXPIRATION DATE]

                                                [NOTARY SEAL OR
                                                STAMP]


STATE OF [STATE]      )

                      )                         SS

COUNTY OF             )
[COUNTY]


The foregoing instrument was acknowledged before me this [DAY] day of [MONTH], [YEAR], by [SIGNER NAME] who appeared before me this day in person and acknowledged that [he/she] signed and delivered the said instrument as [his/her] own free and voluntary act, for the uses and purposes therein set forth.

_____
Notary Public
My commission expires: [NOTARY
COMMISSION EXPIRATION DATE]

[NOTARY SEAL OR STAMP]]

---

**EXHIBIT**

[LEGAL DESCRIPTION OF PROPERTY].

Real Estate Address:

Real Estate Tax Parcel Numbers:

---

**EXHIBIT [LETTER]**

[REAL ESTATE TAXES NOT YET DUE AND PAYABLE.]

---

## <u>SCHEDULE 2.2.1</u>

**TRUST ACCOUNT**

Account Name: Polsinelli PC
Bank Name & Address:
US Bank
1201 Wyandotte, Suite 1000
Kansas City, MO 64106
ABA # 101000187
Account # 4344252335 (Missouri IOLTA Trust)

## **SCHEDULE 6.9.1**

### **OWNED REAL PROPERTY**

[attached]

138 Highway 3217, La Place, LA 70068 (Headquarters Facility)
and
East 5th Street, La Place, LA 70068 (vacant undeveloped industrial land)

## PARCEL 1 (ST. JOHN THE BAPTIST PARISH)

A CERTAIN TRACT OF LAND, situated in Section 39, Townships 11 and 12 South, Range 7 East, and Section 52 of Township 12 South, Range 7 East, St. John the Baptist Parish, Louisiana, together with all the buildings and improvements thereon.

In accordance with the survey prepared by Lucien C. Gassen, Surveyor, dated August 20, 1986 (the "Survey") the Property is described as follows:

From the corner common to Sections 37, 39, 52 and 53, Township 11 South, Range 7 East, proceed South 19 degrees 08 minutes 00 seconds West, a distance of 39.28 feet to the point of beginning, thence South 19 degrees 08 minutes 00 seconds West, a distance of 169.78 feet, thence South 19 degrees 02 minutes 39 seconds West, a distance 619.72 feet, thence North 85 degrees 46 minutes 40 seconds East, a distance of 2,982.09 feet to the southwesterly right-of-way of the Louisiana & Arkansas Railroad, thence South 48 degrees 50 minutes 44 seconds East along said railroad right-of-way a distance of 269.76 feet, thence South 85 degrees 46 minutes 40 seconds West, a distance of 3,254.15 feet to a point on the 40 Arpent line, thence South 19 degrees 05 minutes 47 seconds West along said 40 Arpent line a distance of 209.05 feet, thence North 85 degrees 46 minutes 40 seconds East, a distance of 3,448.68 feet to a point on the line dividing Ranges 7 and 8 East, thence South 00 degrees 18 minutes 09 seconds East along said range line a distance of 485.94 feet to a point on the section line dividing St. John The Baptist Parish and St. Charles Parish, said corner being common to Sections 52 and 53, Township 12 South, Range 8 East and Sections 17 and 52, Township 12 South, Range 7 East, thence South 36 degrees 50 minutes 22 seconds West along the St. John The Baptist/St. Charles Parish line a distance of 120.83 feet, thence South 85 degrees 46 minutes 40 seconds West, a distance of 7,473.83 feet to the mean low water line on the east bank of the Mississippi River, thence North 10 degrees 21 minutes 36 seconds West along said mean low water line a distance of 1,762.24 feet, thence North 86 degrees 08 minutes 47 seconds East, a distance of 1,033.00 feet, thence South 33 degrees 12 minutes 32 seconds East, a distance of 183.51 feet to the right-of-way of Louisiana State Highway No. 3217, thence North 11 degrees 51 minutes 36 seconds East, a distance of 90.90 feet to a point on the arc of a non-tangent curve, thence easterly along the arc of said curve, to the right, having a radius of 698.95 feet for an arc distance of 248.84 feet to a non-tangent line, thence South 86 degrees 15 minutes 25 seconds East, a distance of 79.72 feet, thence North 86 degrees 09 minutes 40 seconds East, a distance of 205.33 feet, thence North 80 degrees 27 minutes 02 seconds East, a distance of 100.50 feet, thence North 86 degrees 09 minutes 40 seconds East, a distance of 864.86 feet to the southwesterly right-of-way line of the Illinois Central Gulf Railroad, thence South 30 degrees 58 minutes 10 seconds East along said railroad right-of-way a distance of 865.70 feet, thence North 85 degrees 46 minutes 40 seconds East, a distance of 111.98 feet to the northeasterly right-of-way line of the Illinois Central Gulf Railroad, thence North 30 degrees 58 minutes 10 seconds West along said railroad right-of-way a distance of 864.86 feet to the southerly right-of-way line of the Louisiana State Highway No. 3217, thence North 86 degrees 09 minutes 40 seconds East, a distance of 1,722.61 feet, thence South 74 degrees 32 minutes 56 seconds East, a distance of 105.95 feet, thence North 86 degrees 09 minutes

40 seconds East, a distance of 96.63 feet to a point of curvature of a tangent curve, thence easterly along the arc of said curve, to the left, having a radius of 5,829.58 feet for an arc distance of 138.43 feet to the point of beginning, containing 231.477 acres.

TOGETHER WITH a triangular portion of ground located in Section 52, Township 12 South, Range 7 East, to the East of the Louisiana & Arkansas Railroad right-of-way and more particularly described in accordance with the Survey, to wit:

From the corner common to Sections 37, 39, 52 and 53, Township 11 South, Range 7 East, proceed South 19 degrees 08 minutes 00 seconds, a distance of 39.28 feet plus 169.78 feet, thence South 19 degrees 02 minutes 39 seconds West, a distance of 619.72 feet, thence North 85 degrees 46 minutes 40 seconds East, a distance of 2,982.09 feet to the southwesterly right-of-way of the Louisiana & Arkansas Railroad, thence continue North 85 degrees 46 minutes 40 seconds East, a distance of 140.50 feet to the northeasterly right-of-way line of the Louisiana & Arkansas Railroad, the point of beginning, thence continue North 85 degrees 46 minutes 40 seconds East, a distance of 186.82 feet to a point on the line between Range 7 East and Range 8 East, thence South 00 degrees 20 minutes 33 seconds East along said range line a distance of 177.53 feet to a point on the northeasterly right-of-way line of the Louisiana Arkansas Railroad right-of-way, thence North 48 degrees 50 minutes 44 seconds West along said railroad right-of-way a distance of 248.86 feet to the point of beginning, containing 0.380 acres.

## PARCEL 2 (ST. JOHN THE BAPTIST PARISH)

### A.  PORTION OF LOT 6 (SOUTH TRACT)

A CERTAIN TRACT OF LAND, situated in Section 52, Township 12 South, Range 7 East, St. John the Baptist Parish, Louisiana, together with all the buildings and improvements thereon, and being more particularly described as follows:

Commencing from the corner common to Section 52, Township 12 South, Range 7 East, Section 52, Township 12 South, Range 8 East, Section 53, Township 12 South, Range 8 East, and Section 17, Township 12 South, Range 7 East, proceed North 00 degrees 18 minutes 09 seconds West, a distance of 101.10 feet, plus 192.42 feet, plus 192.42 feet, for a total of 485.94 feet to the point of beginning, thence South 85 degrees 46 minutes 40 seconds West, a distance of 3,448.68 feet, to a point on the Forty Arpent Line, thence North 19 degrees 05 minutes 47 seconds East, along said Forty Arpent Line, a distance of 209.05 feet, thence North 85 degrees 46 minutes 40 seconds East, a distance of 3,254.15 feet to a point on the Louisiana & Arkansas Railroad right of way, thence South 48 degrees 50 minutes 44 seconds East along said Louisiana & Arkansas Railroad right of way a distance of 166.25 feet, thence South 00 degrees 20 minutes 33 seconds East, a distance of 71.13 feet, thence South 00 degrees 18 minutes 09 seconds East, a distance of 2.69 feet to the point of beginning.

### B.  NORTH TRACT

A CERTAIN TRACT OF LAND, situated in Section 52, Township 11 South, Range 7 East and Section 52, Township 12 South, Range 7 East, St. John the Baptist Parish, Louisiana, together with all the buildings and improvements thereon, and being more particularly described as follows:

Commencing from the corner common to Section 52, Township 12 South, Range 7 East, Section 52, Township 12 South, Range 8 East, Section 53, Township 12 South, Range 8 East, and Section 17, Township 12 South, Range 7 East, proceed North 00 degrees 18 minutes 09 seconds West, a distance of 101.10 feet, plus 192.42 feet, plus 192.42 feet, plus 2.69 feet, for a total of 488.63 feet,

thence North 00 degrees 20 minutes 33 seconds West, a distance of 71.13 feet, plus 118.60 feet, plus 14.91 feet, plus 177.53 feet, for a total of 382.17 feet, to the point of beginning, thence South 85 degrees 46 minutes 40 seconds West, a distance of 186.82 feet, plus 140.50 feet, plus 2,982.09 feet, for a total of 3,309.41 feet, to a point on the Forty Arpent Line, thence North 19 degrees 02 minutes 39 seconds East along said Forty Arpent Line, a distance of 619.72 feet, to a point marked with an axle, thence North 86 degrees 08 minutes 48 seconds East, a distance of 2,189.37 feet, plus 141.40 feet, plus 771.17 feet, for a total of 3,101.94 feet, to a pipe on the Range Line, thence South 00 degrees 20 minutes 33 seconds East, a distance of 550.62 feet to the point of beginning.

All according to a survey of Lucien C. Gassen, Land Surveyor, dated December 8, 1989.

## PARCEL 3 (TRACT Z-4-B, ST. JOHN THE BAPTIST PARISH)

A CERTAIN TRACT OR PARCEL OF LAND situated in sections 39 & 52, T-12-S, R-7-E, Southeastern Land District, LaPlace, St. John the Baptist Parish, Louisiana containing 134.8100 acres, and being designated as Tract "Z-4-B" and being more fully described as follows:

Commence at the northernmost northeast corner of section 17, T-12-S, R-7-E thence proceed S36°43'45"W a distance of 117.82' to a point; the point of beginning

thence proceed S36°43'45"W a distance of 1894.57' to a point;
thence proceed S85°51'07"W a distance of 2083.71' to a point;
thence proceed N32°01'53"W a distance of 902.78' to a point;
thence proceed S84°27'30"W a distance of 112.26' to a point;
thence proceed S84°27'30''W a distance of 2781.81' to a point;
thence proceed N03°09'09"E a distance of 70.00' to a point;
thence proceed S84°27'37"W a distance of 130.00' to a point;
thence proceed N03°09'07"E a distance of 40.07' to a point;
thence proceed N05°52'12"E a distance of 308.21' to a point;
thence proceed N17°44'22"E a distance of 208.09' to a point;
thence proceed N85°00'18"E a distance of 6,628.40' to a point;
the point of beginning.

## PARCEL 4 (TRACT Z-5, ST. JOHN THE BAPTIST PARISH)

A CERTAIN TRACT OR PARCEL OF LAND situated in Section 39, T-12-S, R-7-E, Southeastern Land District, LaPlace, St. John the Baptist Parish, Louisiana containing 7.8149 acres, and being designated as tract "Z-5" and being more fully described as follows:

Commence at the northernmost northeast corner of Section 17, T-12-S, R-7-E thence proceed S36°43'45"W a distance of 117.82' to a point;

thence proceed S85°00'18"W a distance of 6,682.45' to a point;
the point of beginning
thence proceed S17°44'22"W a distance of 207.92'(p) 192.34 (a) to a point;
thence proceed S05°52'12"W a distance of 298.64'(p) 314.59'(a) to a point;
thence proceed S03°09'07"W a distance of 120.12'(p) 118.91'(a) to a point;
thence proceed S84°27'30"W a distance of 507.52' to a point;
thence proceed N04°07'21"W a distance of 613.89'(p) 608.89'(a) to a point;
thence proceed N85°00'18"E a distance of 651.87'(p) 648.71(a) to a point;
the point of beginning.

TRACT Z-5 also includes all land between the river side boundary of the land described above and the mean low water mark of the Mississippi River all as shown on that ALTA/ASCM Land Title Survey of Tract Z-4-B & Tract Z-5, situated in Sections 39 & 52, T-12-S, R-7-E, Southeastern Land District, LaPlace, St. John the Baptist Parish, Louisiana by Riverlands Surveying Company, dated December 20, 2007, revised January 15, 2008, revised March 4, 2008.

## PARCEL 5 (TRACT Z-4-A, ST. JOHN THE BAPTIST PARISH)

A CERTAIN TRACT OR PARCEL OF GROUND, situated in the Parish of St. John the Baptist, State of Louisiana, located in Section 39, Township 12 South, Range 7 East, Southeastern District, East of the Mississippi River, containing 0.21 acres, more or less, and being designated as TRACT "Z-4-A" on a map entitled "Survey Map Showing the Removal of Tract 'Z-4-A' (0.21 Ac) From Tract 'Z-4' (134.96 Ac) Located in Sec. 39, T12S, R7E, SED, East of the Mississippi River, St. John the Baptist Parish, LA for Bonnet Carre' Power, LLC", said map on file and of record in the official records of the Parish of St. John the Baptist, Louisiana, and said TRACT "Z-4-A" being more fully described as follows:

Commencing at the northernmost northeast corner of Section 17, T12S, R7E, proceed South 37 degrees 02 minutes 07 seconds West a distance of 117.82 feet along the Section line common to Sections 17 and 52 to a point and corner; thence proceed South 85 degrees 00 minutes 18 seconds West a distance of 6,636.26 feet to a point and corner on the East ORW line of LA Hwy 628; thence proceed South 17 degrees 44 minutes 22 seconds West a distance of 208.09 feet along said ROW line to a point and corner; thence proceed South 05 degrees 52 minutes 12 seconds West a distance of 308.21 feet along said ROW line to a point and corner; thence proceed South 03 degrees 09 minutes 07 seconds West a distance of 40.07 feet along said ROW line to a point and corner being the Point of Beginning (POB); Thence proceed North 84 degrees 27 minutes 37 seconds East a distance of 130.00 feet to a ½-inch iron pipe; thence proceed South 03 degrees 09 minutes 09 seconds West a distance of 70.00 feet to a ½-inch iron pipe; thence proceed South 84 degrees 27 minutes 30 seconds West a distance of 130.00 feet to a ½-inch iron pipe; thence proceed South 03 degrees 09 minutes 07 seconds East a distance of 70.00 feet to the Point of Beginning (POB).

## PARCEL 6 (LOT 77A, ST. CHARLES PARISH)

Lot 77A, Square 1, Unit 6, Evangeline City Subdivision, St. Charles Parish, Louisiana, situated in Section 17, Township 12 South, Range 7 East, St. Charles Parish, Louisiana, in that part thereof known as EVANGELINE CITY SUBDIVISION, IN UNIT 6 of SQUARE 1 all as per a plan of resubdivision by Stephen P. Flynn, P.L.S., (Riverlands Surveying Company), dated May 27, 2003, last revised November 27, 2007, approved by St. Charles Parish Council Ordinance No. 08-1-6, registered as instrument or Act No. 339396, Conveyance records of St. Charles Parish, Louisiana.

**THE ABOVE DESCRIBED PARCELS ARE FURTHER IN ACCORDANCE WITH THAT CERTAIN ALTA/NSPS LAND TITLE SURVEY BY DADING, MARQUES & ASSOCIATES, LLC DATED NOVEMBER 29, 2017, ALL OF THE ABOVE REAL PROPERTY IS FURTHER DESCRIBED AS FOLLOWS:**

**PARCEL 1 (ST. JOHN THE BAPTIST PARISH)**

A certain tract of land situated in Section 39, T11 and 12S-R7E, St. John the Baptist Parish, Louisiana, together with all the buildings and improvements thereon.

In strict accordance with the survey prepared by Lucien Gassen, PLS dated August 20, 1986 and March 5, 1990, updated February 18, 1994 and May 20, 1998.

And more fully shown on an ALTA/NSPS Land Title Survey by Dading, marques & Associates, LLC dated November 29, 2017 and being more fully described as follows:

From the corner common to Sections 37, 39, 52 and 53, T11S-R7E proceed S 19° 08' 00" W (T) S 17° 55' 32" W (A) a distance of 39.28' to the point of beginning; thence along the 40 arpent line measure S 19° 08' 00" W (T) S 17° 55' 32" W (A) a distance of 169.78' to a point; thence continue S 19° 02' 39" W (T) S 17° 55' 32" W (A) a distance of 619.72' (T) 620.12' (A); thence measure N 85° 46' 40" E (T) N 84° 32' 46" E (A) a distance of 2982.09' (T) 2983.60' (A) to the southwesterly right of way line of the Louisiana and Arkansas Railroad; thence S 48° 50' 44" E (T) S 50° 04' 50" E (A) a distance of 269.76'; thence measure S 85° 46' 40" W (T) S 84° 32' 46" W (A) a distance of 3254.15' (T) 3256.11' (A) to a point on the 40 arpent line; thence measure S 19° 05' 47" W (T) S 17° 55' 32" W (A) along said 40 arpent line a distance of 209.05' (T) 209.16' (A); thence measure N 85° 46' 40" E (T) N 84° 32' 46" E (A) a distance of 3448.68' (T) 3449.10' (A) to a point on the range line between ranges 7 and 8 East; thence measure S 00° 18' 09" E (T) S 01° 31' 43" E (A) along said range line a distance of 485.94' (T) 488.94' (A) to a point on the section line dividing St. John the Baptist Parish and St. Charles Parish, said corner being common to Sections 52 and 53, T12S-R8E and Sections 17 and 52, T12S-R7E; thence measure S 36° 50' 22" W (T) S 36° 39' 16" W (A) along said St. John the Baptist/St. Charles Parish line a distance of 120.83' (T) 119.72' (A); thence measure S 85° 46' 40" W (T) S 84° 32' 46" W (A) a distance of 7473.83' (T) 7474.11' (A) to the mean low water line on the east bank of the Mississippi River; thence measure N 10° 21' 36" W (T) N 11° 30' 03" W (A) along said mean low water line a distance of 1762.24' (T) 1761.05' (A); thence measure N 86° 08' 47" E (T) N 84° 58' 04" E (A) a distance of 1033' (T) 1033' (A); thence measure S 33° 12' 32" E (T) S 34° 11' 46" E (A) a distance of 183.51' (T) 181.0' (A) to the south right of way line of Louisiana State Highway No. 3217; thence along said South right of way line measure N 11° 51' 36" E (T) N 10° 40' 00" E (A) a distance of 90.90' (T) 90.90' (A) to a point; thence along a curve to the right having a radius of 698.95' an arc length of 248.84', the chord bearing N 68° 17' 11" E a distance of 247.55'; thence measure S 86° 51' 25" E (T) S 87° 27' 01" E (A) a distance of 79.72' (T) 79.72' (A); thence measure N 86° 09' 40" E (T) N 84° 58' 04" E (A) a distance of 205.33' (T) 205.33' (A); thence measure N 80° 27' 02" E (T) N 79° 15' 26" E (A) a distance of 100.50' (T) 100.50' (A); thence measure N 86° 09' 40" E (T) N 84° 58' 04" E (A) a distance of 864.86' (T) 864.86' (A) to the southwesterly right of way line of the Canadian National Illinois Central Railroad; thence S 30° 58' 10" E (T) S 32° 11' 16" E (A) along said southwesterly right of way line a distance of 865.70' (T) 866.97' (A); thence measure N 85° 46' 40" E (T) N 84° 32' 46" E (A) a distance of 111.98' (T) 111.97' (A) to the northeasterly right of way line of said Canadian National Illinois Central Railroad right of way line; thence measure N 30° 58' 10" W (T) N 32° 11'16" W (A) along said right of way line a distance of 864.86' (T) 866.04' (A) to a point on the southerly right of way line of Louisiana State Highway No. 3217; thence measure along said southerly right of way line N 86° 09' 40" E (T) N 84° 58' 04" E (A) a distance of 1722.61' (T) 1723.39' (A); thence measure S

74° 32' 56" (T) S 75° 45' 24" E (A) a distance of 105.95' (T) 105.95' (A); thence measure N 86° 09' 40" E (T) N 84° 58' 04" E (A) a distance of 96.63' (T) 96.63' (A); thence along a curve to the left having a radius of 5829.58' an arc length of 138.43', the chord bearing N 84° 16' 23" E a distance of 138.42' to the point of beginning and containing 231.37 acres.

Together with a triangular portion of ground located in Section 52, T12S-R7E, to the east of the Louisiana Arkansas Railroad right of way and more particularly described in accordance with ALTA/NSPS Survey by Dading, Marques & Associates, LLC dated November 29, 2017, to wit:

From the corner common to Sections 37, 39, 52 and 53, T11S-R7E proceed S 19° 08' 00" W (T) S 17° 55' 32" W (A) a distance of 39.28' (T) 39.28' (A) along 40 arpent line; thence continue along said arpent line S 19° 08' 00" W (T) S 17° 55' 32" W (A) a distance of 169.78' (T) 169.78' (A); thence

S 19° 02' 39" W (T) S 17° 55' 32" W (A) a distance of 619.72' (T) 620.12' (A); thence measure N 85° 46' 40" E (T) N 84° 32' 46" E (A) a distance of 2982.09' (T) 2983.60' (A) to the southwesterly right of way line of the Louisiana Arkansas Railroad; thence continue N 85° 46' 40" E (T) N 84° 32' 46" E (A) a distance of 140.50' (T) 140.51' (A) to the northeasterly right of way line of the Louisiana Arkansas Railroad and the point of beginning; thence continue N 85° 46' 40" E (T) N 84° 32' 46" E (A) a distance of 186.82' (T) 186.24' (A) to a point on the range line between Ranges 7 and 8 East; thence measure S 00° 20' 33" E (T) S 01° 31' 42" E (A) a distance of 177.53' (T) 176.83' (A) to a point on the Northeasterly right of way line of the Louisiana Arkansas Railroad; thence measure N 48° 50' 44" W (T) N 50° 04' 50" W (A) along said railroad right of way a distance of 248.86' (T) 247.88' (A) to the point of beginning and containing 0.377 acres.

## PARCEL 2 (ST. JOHN THE BAPTIST PARISH)

Portion of Lot 6 (south tract)

A certain tract of land situated in Section 52, T12S-R7E, St. John the Baptist Parish, Louisiana, together with all the buildings and improvements thereon and being more particularly described as follows:

Commencing from the corner common to Section 52, T12S-R7E, Section 52, T12S-R8E, Section 53, T12S-R8E and Section 17, T12S-R7E proceed N 00° 18' 09" W (T) N 01° 31' 43" W (A) a distance of 485.94' (T) 488.41' (A) to the point of beginning; thence measure S 85° 46' 40" W (T) S 84° 32' 46" W (A) a distance of 3448.68' (T) 3449.10' (A) to a point on the 40 arpent line; thence along said 40 arpent line measure N 19° 05' 47" E (T) N 17° 55' 32" E (A) a distance of 209.05' (T) 206.46' (A); thence measure N 85° 46' 40" E (T) N 84° 32' 46" E (A) a distance of 3254.15' (T) 3256.11' (A) to a point on the South westerly right of way line of the Louisiana Arkansas Railroad; thence along said right of way line measure S 48° 50' 44" E (T) S 50° 04' 50" E (A) a distance of 166.25' (T) 165.14' (A) to a point on the Range line between Ranges 8 East and 7 East; thence along said Range line measure S 00° 20' 33" E (T) S 01° 31' 42" E (A) a distance of 71.13' (T) 72.16' (A) to the point of beginning and containing 14.69 acres.

North Tract

A certain tract of land situated in Section 52, T11S-R7E and Section 52, T12S-R7E, St. John the Baptist Parish, Louisiana together with all the buildings and improvements thereon, and being more particularly described as follows:

Commencing from the corner common to Section 52, T12S-R7E, Section 52, T12S-R8E, Section 53, T12S-R8E and Section 17 T12S-R7E proceed  N 00° 18' 09" W (T) N 01° 31' 43" W (A) a distance of 488.63' (T) 488.41' (A); thence measure N 00° 20' 33" W (T) N 01° 31' 43" W (A) a distance of 382.17' (T) 382.40' (A) to the point of beginning; thence measure S 85° 46' 40" W (T) S 84° 32' 46" W (A) a distance of 3309.41' (T) 3310.35' (A) to the 40 arpent line; thence measure along said 40 arpent line N 19° 02' 39" E (T) N 17° 55' 32" E (A) a distance of 619.72' (T) 620.12' (A); thence measure N 86° 08' 48" E (T) N 84° 54' 48" E (A) a distance of 2189.37' (T) 2189.59' (A) to a point on the southwesterly right of way line of the Louisiana Arkansas Railroad; thence continue  N 86° 08' 48" E (T) N 84° 54' 48" E (A) a distance of 141.40' (T) 141.41' (A) to the northeasterly right of way line of said Louisiana Arkansas Railroad; thence measure N 86° 08' 48" E (T) N 84° 54' 48" E (A) a distance of 771.17' (T) 771.04' (A) to a point on said Range line between Ranges 8 East and 7 East; thence along said Range line measure S 00° 20' 33" E (T) S 01° 31' 43" E (A) a distance of 550.62' (T) 550.62' (A) to the point of beginning and containing 41.196 acres.

All in accordance with Survey by Lucien C. Gassen dated March 5, 1990, updated February 18, 1994 and May 20, 1998 and more fully shown on an ALTA/NSPS Land Title Survey by Dading, Marques & Associates, LLC dated November 29, 2017.

## PARCEL 3 (TRACT Z-4-B, ST. JOHN THE BAPTIST PARISH)

A certain tract or parcel of land situated in Sections 39 and 52, T12S-R7E, Southeastern Land District, Laplace, St. John the Baptist Parish, Louisiana and being designated as Tract Z-4-B on an ALTA/ACSM Land Title Survey of Tracts Z-4-A, Z-4-B, Z-3-A and Z-5 by C-K Associates, Inc. dated 10-24-01, last revision date of 1-26-04.

All as more fully shown on an ALTA/NSPS Land Title Survey of Parcels 1, 2, Tracts Z-4-A, Z-4-B and

Z-5 by Dading, Marques & Associates, LLC dated November 29, 2017 and being more fully described as follows:

Commence at the northern most northeast corner of Section 17, T12S-R7E thence measure along line dividing St. John the Baptist and St. Charles Parishes S 36° 39' 16" W a distance of 119.72' to the point of beginning; thence continue on said Parish line S 36° 39' 16" W a distance of 1896.90'; thence continue along said Parish line S 86° 11' 40" W a distance of 2093.68' to a point on the easterly right of way line of the Canadian National Illinois Central Railroad; thence measure along said right of way line N 32° 11' 16" W a distance of 863.61'; thence leaving said right of way line measure S 84° 39' 51" W a distance of 2899.48' to the southeast corner of Tract Z-4-A; thence measure N 02° 37' 41" E a distance of 70.0'; thence measure S 84° 39' 51" W along the north line of Tract Z-4-A a distance of 130' to a point on the east right of way line of Louisiana State Highway No. 628 (River Road); thence along said east right of way line measure N 05° 20'

46" E a distance of 308.21'; thence measure N 14° 19' 42" E a distance of 209.84'; thence leaving said east right of way line measure along south line of Parcel 1 N 84° 32' 46" E a distance of 6644.11' to the point of beginning and containing 134.158 acres.

## PARCEL 4 (TRACT Z-5, ST. JOHN THE BAPTIST PARISH)

A certain tract or parcel of land situated in Sections 39, T12S-R7E Southeastern Land District, Laplace, St. John the Baptist Parish, Louisiana and being designated as Tract Z-5 on an ALTA/ACSM Land Title Survey of Tracts Z-4-A, Z-4-B, Z-3-A and Z-5 by C-K Associates, Inc. dated 10-24-01, last revision date of 1-26-04.

All as more fully shown on an ALTA/NSPS Land Title Survey of Parcels 1, 2, Tracts Z-4-A, Z-4-B and Z-5 by Dading, Marques & Associates, LLC dated November 29, 2017 and being more fully described as follows:

Commence at the northern most northeast corner of Section 17, T12S-R7E thence measure along line dividing St. John the Baptist and St. Charles Parishes S 36° 39' 16" W a distance of 119.72'; thence measure S 84° 32' 46" W a distance of 6647.06' to the easterly right of way line of LA State Highway No. 628 (River Road); thence continue S 84° 32' 46" W a distance of 53.14' to the westerly right of way line of said highway and the Point of Beginning; thence along said westerly right of way line measure S 14° 19' 42" W a distance of 195.78'; thence measure S 05° 20' 46" W a distance of 313.35'; thence measure S 02° 37' 41" W a distance of 78.16'; thence leaving said westerly right of way line measure S 84° 39' 51" W a distance of 507.52' to a point; thence measure N 06° 17' 57" W a distance of 568.43' to a point; thence measure N 84° 32' 46" E a distance of 651.87' to the Point of Beginning and containing 7.413 acres or 322,891.98 square feet.

Tract Z-5 also includes all land between the river side boundary of the described above and the mean low water line as mapped and shown on said survey by Dading, Marques & Associates, LLC dated November 29, 2017.

## PARCEL 5 (TRACT Z-4-A ST JOHN THE BAPTIST PARISH)

A certain Tract or Parcel of ground situated in the Parish of St. John the Baptist, State of Louisiana located in Section 39, T12S-R7E, and being designated as Z-4-A on an ALTA/ACSM Land Title Survey of Tracts Z-4-A, Z-4-B, Z-3-A and Z-5 by C-K Associates, Inc. dated 10-24-01, last revision date 1-26-04.

All as more fully shown on an ALTA/NSPS Land Title Survey of Parcels 1, 2, Tracts Z-4-A, Z-4-B and Z-5 by Dading, Marques & Associates, LLC dated November 29, 2017 and being more fully described as follows:

Commencing at the northern most northeast corner of Section 17, T12S-R7E measure along line dividing St. John the Baptist and St. Charles Parishes S 36° 39' 16" E a distance of 119.72'; thence leaving said parish line measure S 84° 32' 46" W a distance of 6644.11' to a point on the easterly right of way line of Louisiana State Highway No. 628 (River Road); thence along said easterly right of way line measure S 14° 19' 42" W a distance of 209.84'; thence measure S 05° 20' 46" W a distance of 308.21' to the point of beginning; thence measure N 84° 39' 51" E a distance of 130.0'; thence measure S 02° 37' 41" W a distance of 70.0'; thence measure S 84° 39' 51" W a

distance of 130.0'; thence measure N 02° 37' 41" E a distance of 70.0' to the point of beginning and containing 0.207 acres or 9012.24 square feet.

## PARCEL 6 (LOT 77A, ST. CHARLES PARISH)

LOT 77A SQUARE 1, UNIT 6, EVANGELINE CITY SUBDIVISION, ST. CHARLES PARISH, LOUISIANA, SITUATED IN SECTION 17, TOWNSHIP 12 SOUTH, RANGE 7, EAST ST. CHARLES PARISH, LOUISIANA, IN THAT PART THEREOF KNOWN AS EVANGELINE CITY SUBDIVISION, IN UNIT 6 OF SQUARE 1 ALL AS PER PLAN OF RESUBDIVISION BY STEPHEN P. FLYNN, P.L.S., (RIVERLANDS SURVEYING COMPANY), DATED MAY 27, 2003, LAST REVISED NOVEMBER 27, 2007, APPROVED BY ST. CHARLES PARISH COUNCIL ORDINANCE NO. 08-1-6, REGISTERED AS INSTRUMENT OR ACT NO. 339396, CONVEYANCE RECORDS OF ST. CHARLES PARISH.

IN ACCORDANCE WITH AN ALTA/NSPS LAND TITLE SURVEY PREPARED BY DADING MARQUES AND ASSOCIATES, L.L.C. DATED NOVEMBER 29, 2017, LOT 77A IS DESCRIBED AS FOLLOWS: COMMENCING AT A ¾" PIPE MARKING THE POINT OF INTERSECTION OF THE LINE COMMON TO ST. JOHN THE BAPTIST AND ST. CHARLES PARISH, AND THE TOWNSHIP LINE 12 SOUTH, RANGE 7 EAST AND BEING ON THE REAR LINE OF SAID EVANGELINE CITY SUBDIVISION, MEASURE S36°39'16" E, A DISTANCE OF 1599.66 FEET TO THE POINT OF BEGINNING.  THENCE LEAVING SAID COMMON PARISH LINE MEASURE S53°29'50" E, A DISTANCE OF 716.75 FEET TO THE NORTHERLY LINE OF EVANGELINE ROAD.  THENCE ALONG SAID EVANGELINE ROAD MEASURE S36°30'10" W, A DISTANCE OF 150.0 FEET. THENCE MEASURE N53°29'50" W, A DISTANCE OF 717.30 FEET TO THE COMMON PARISH LINE.  THENCE ALONG SAID COMMON PARISH LINE A DISTANCE OF 150.0 FEET TO THE POINT OF BEGINNING AND CONTAINING 107,565.0 FEET.

**2404 S. Roane Street, Harriman, TN 37748 (Production Facility)**

SITUATED IN DISTRICT NO. FIVE (5) OF ROANE COUNTY, TENNESSEE, AND BEING MORE FULLY
DESCRIBED AS FOLLOWS:

TRACT I:

BEING WITHIN THE CORPORATE LIMITS OF THE CITY OF HARRIMAN, TENNESSEE, AND BEGINNING AT
A REBAR FOUND IN THE NORTH RIGHT-OF-WAY LINE OF STATE ROUTE 61, SAID POINT BEING THE
COMMON CORNER BETWEEN THIS TRACT AND THE PROPERTY OF AHLER TRUST DESCRIBED IN DEED
BOOK U-18, PAGE 11; THENCE FROM SAID POINT OF BEGINNING WITH THE NORTH RIGHT-OF-WAY
LINE OF STATE ROUTE 61, SOUTH 71 DEG. 25 MIN. 08 SEC. WEST, 112.00 FEET TO A POINT CORNER
TO DUNN DIVERSIFIED INDUSTRIES DESCRIBED IN DEED BOOK Y-16, PAGE 540; THENCE WITH DUNN
DIVERSIFIED INDUSTRIES, NORTH 20 DEG. 30 MIN. 00 SEC. WEST, 309.66 FEET TO A POINT IN THE
SOUTH RIGHT-OF-WAY LINE OF NORFOLK SOUTHERN RAILWAY; THENCE WITH THE SOUTH RIGHT-
OF-WAY LINE OF NORFOLK SOUTHERN RAILWAY, NORTH 86 DEG. 07 MIN. 04 SEC. EAST, 116.82 FEET
TO A POINT CORNER TO THE AHLER TRUST PROPERTY; THENCE WITH THE AHLER TRUST PROPERTY,
SOUTH 20 DEG. 30 MIN. 00 SEC. EAST, 280.00 FEET TO THE POINT OF BEGINNING.

TRACT II:

BEING WITHIN THE CORPORATE LIMITS OF THE CITY OF ROCKWOOD, TENNESSEE, AND BEGINNING
AT THE POINT WHERE THE SOUTHERN RIGHT-OF-WAY OF TENNESSEE CENTRAL RAILWAY
INTERSECTS THE NORTHERN RIGHT-OF-WAY LINE OF NORFOLK-SOUTHERN RAILWAY; THENCE FROM
SAID POINT OF BEGINNING AND WITH THE SOUTH LINE OF THE TENNESSEE CENTRAL RAILWAY
RIGHT-OF-WAY, SOUTH 85 DEG. 19 MIN. 57 SEC. WEST, 368.69 FEET TO AN IRON PIN; THENCE WITH
THE ARC OF A CURVE TO THE LEFT, HAVING A RADIUS OF 2965.80, A CHORD BEARING AND DISTANCE
OF SOUTH 78 DEG. 06 MIN. 29 SEC. WEST, 745.95 FEET, AND AN ARC DISTANCE OF 747.93 FEET TO A
POINT; THENCE SOUTH 70 DEG. 35 MIN. 00 SEC. WEST, 318.16 FEET TO A REBAR FOUND CORNER TO
THE PROPERTY OF ROANE COUNTY DESCRIBED IN DEED BOOK U-14, PAGE 230; THENCE WITH THE
PROPERTY OF ROANE COUNTY, SOUTH 19 DEG. 00 MIN. 00 SEC. EAST, 158.95 FEET TO A POINT IN
THE NORTH LINE OF NORFOLK SOUTHERN RAILWAY; THENCE WITH THE NORTH LINE OF NORFOLK
SOUTHERN RAILWAY, NORTH 71 DEG. 10 MIN. 16 SEC. EAST, 968.69 FEET TO A POINT; THENCE
CONTINUING WITH THE NORTH LINE OF NORFOLK SOUTHERN RAILWAY, NORTH 71 DEG. 46 MIN. 43
SEC. EAST, 224.57 FEET TO A POINT; THENCE CONTINUING WITH THE NORTH RIGHT-OF-WAY LINE
OF NORFOLK SOUTHERN RAILWAY, ALONG THE ARC OF A CURVE TO THE RIGHT, HAVING A RADIUS
OF 2235.39 FEET, A CHORD BEARING AND DISTANCE OF NORTH 75 DEG. 12 MIN. 32 SEC. EAST,
222.95 FEET, AND AN ARC DISTANCE OF 223.04 FEET TO THE POINT OF BEGINNING.

TRACT III:

BEGINNING AT A REBAR FOUND IN THE NORTH LINE OF TENNESSEE CENTRAL RAILWAY, SAID
BEGINNING POINT MARKING THE COMMON CORNER BETWEEN THIS TRACT AND THE PROPERTY OF
ROANE COUNTY DESCRIBED IN DEED BOOK U-14, PAGE 230; THENCE FROM SAID POINT OF
BEGINNING WITH THE PROPERTY OF ROANE COUNTY, NORTH 19 DEG. 00 MIN. 03 SEC. WEST, 360.83
FEET TO A PIPE FOUND AT A SPRING; THENCE CONTINUING WITH THE PROPERTY OF ROANE
COUNTY, NORTH 17 DEG. 11 MIN. 23 SEC. WEST, 958.87 FEET TO A POINT ON THE NORTH LINE OF A
TVA POWER LINE EASEMENT; THENCE WITH THE NORTH LINE OF SAID TVA POWER LINE EASEMENT,
NORTH 61 DEG. 09 MIN. 11 SEC. EAST, 352.79 FEET TO A POINT CORNER TO PROPERTY CONVEYED
TO SOUTHERN ALLOYS AND METALS CORP. BY DEED OF RECORD IN DEED BOOK C, SERIES 19, PAGE
677; THENCE WITH THE LINE OF SOUTHERN ALLOYS AND METALS CORP., THE FOLLOWING CALLS

AND DISTANCES: SOUTH 21 DEG. 35 MIN. 00 SEC. EAST, 499.48 FEET TO A REBAR FOUND; THENCE NORTH 78 DEG. 08 MIN. 00 SEC. EAST, 856.68 FEET TO A POINT; THENCE NORTH 11 DEG. 52 MIN. 00 SEC. WEST, 30.00 FEET TO A POINT; THENCE NORTH 74 DEG. 49 MIN. 20 SEC. EAST, 281.57 FEET TO A ONE-HALF INCH REBAR SET; THENCE NORTH 10 DEG. 32 MIN. 54 SEC. EAST, 1013.87 FEET TO A ONE-HALF INCH DIAMETER REBAR SET IN THE NORTH LINE OF THE AFORESAID TVA RIGHT-OF-WAY LINE; THENCE WITH THE NORTH LINE OF THE TVA RIGHT-OF-WAY AND LEAVING THE PROPERTY OF SOUTH ALLOYS AND METALS CORP., NORTH 61 DEG. 09 MIN. 11 SEC. EAST, 156.28 FEET TO A POINT CORNER TO THE AHLER TRUST PROPERTY; THENCE WITH THE LINE OF THE AHLER TRUST PROPERTY, SOUTH 11 DEG. 44 MIN. 16 SEC. WEST, 443.86 FEET TO A POINT; THENCE SOUTH 70 DEG. 13 MIN. 12 SEC. WEST, 74.74 FEET TO A POINT; THENCE SOUTH 09 DEG. 49 MIN. 00 SEC. EAST, 200.00 FEET TO A POINT; THENCE NORTH 47 DEG. 19 MIN. 00 SEC. EAST, 120.75 FEET TO A POINT; THENCE SOUTH 20 DEG. 30 MIN. 00 SEC. EAST, 1491.69 FEET TO A REBAR FOUND IN THE NORTH LINE OF THE TENNESSEE CENTRAL RAILWAY; THENCE WITH THE NORTH LINE OF THE TENNESSEE CENTRAL RAILWAY, SOUTH 85 DEG. 19 MIN. 57 SEC. WEST, 951.70 FEET TO A REBAR FOUND; THENCE CONTINUING WITH THE NORTH LINE OF TENNESSEE CENTRAL RAILWAY, WITH THE ARC OF A CURVE TO THE LEFT, HAVING A RADIUS OF 3065.80 FEET, A CHORD BEARING AND DISTANCE OF SOUTH 78 DEG. 06 MIN. 29 SEC. WEST, 771.10 FEET, AND AN ARC DISTANCE OF 773.15 FEET TO A REBAR FOUND; THENCE CONTINUING WITH THE NORTH RIGHT-OF-WAY OF TENNESSEE CENTRAL RAILWAY, SOUTH 70 DEG. 35 MIN. 00 SEC. WEST, 317.96 FEET TO THE POINT OF BEGINNING.

TRACT IV:

TO FIND THE POINT OF BEGINNING COMMENCE AT A REBAR FOUND ON THE NORTH LINE OF TENNESSEE CENTRAL RAILWAY AT A CORNER OF THE PROPERTY DESCRIBED AS TRACT III AND THE PROPERTY OF ROANE COUNTY; THENCE WITH THE LINE OF ROANE COUNTY, NORTH 19 DEG. 00 MIN. 03 SEC. WEST, 360.83 FEET TO A PIPE FOUND AT A SPRING; THENCE NORTH 17 DEG. 11 MIN. 23 SEC. WEST, 958.87 FEET TO A POINT LOCATED ON THE NORTH LINE OF A TVA POWER LINE EASEMENT, THE POINT OF BEGINNING; THENCE FROM SAID POINT OF BEGINNING, CONTINUING WITH THE LINE OF ROANE COUNTY, NORTH 17 DEG. 11 MIN. 23 SEC. WEST, 199.93 FEET TO A REBAR FOUND IN THE LINE OF CARTER; THENCE WITH THE LINE OF CARTER, NORTH 69 DEG. 52 MIN. 40 SEC. EAST, 11.89 FEET TO A FOUND PLASTIC STAKE; THENCE CONTINUING WITH CARTER, NORTH 22 DEG. 00 MIN. 00 SEC. WEST, 986.00 FEET TO A POINT IN THE SOUTH RIGHT-OF-WAY LINE OF INTERSTATE 40; THENCE WITH THE SOUTH RIGHT-OF-WAY LINE OF INTERSTATE 40, THREE CALLS AND DISTANCES AS FOLLOWS: NORTH 50 DEG. 53 MIN. 00 SEC. EAST, 564.26 FEET TO A POINT; THENCE NORTH 65 DEG. 32 MIN. 00 SEC. EAST, 338.62 FEET TO A CONCRETE MONUMENT; THENCE NORTH 84 DEG. 40 MIN. 04 SEC. EAST, 617.03 FEET TO A CONCRETE MONUMENT AT THE CORNER OF THE PROPERTY OF MURRAY; THENCE WITH THE LINE OF MURRAY, SOUTH 62 DEG. 31 MIN. 50 SEC. EAST, 1120.91 FEET TO AN IRON PIN CORNER TO AHLER TRUST; THENCE WITH THE LINE OF AHLER TRUST, SOUTH 11 DEG. 44 MIN. 16 SEC. WEST, 90.58 FEET TO A POINT ON THE NORTH LINE OF A TVA POWER LINE EASEMENT; THENCE WITH THE NORTH LINE OF THE TVA POWER LINE EASEMENT, SOUTH 61 DEG. 09 MIN. 11 SEC. WEST, 2191.08 FEET TO THE POINT OF BEGINNING.

TRACT V:

TO FIND THE POINT OF BEGINNING COMMENCE AT A REBAR FOUND ON THE NORTH RIGHT-OF-WAY LINE OF TENNESSEE CENTRAL RAILWAY AT A COMMON CORNER BETWEEN TRACT III ABOVE AND THE PROPERTY OF ROANE COUNTY; THENCE WITH THE LINE OF ROANE COUNTY, NORTH 19 DEG. 00 MIN. 03 SEC. WEST, 360.83 FEET TO A PIPE FOUND AT A SPRING; THENCE CONTINUING WITH ROANE COUNTY, NORTH 17 DEG. 11 MIN. 23 SEC. WEST, 1158.80 FEET TO A REBAR FOUND IN THE LINE OF CARTER; THENCE WITH THE LINE OF CARTER, NORTH 69 DEG. 52MIN. 40 SEC. EAST, 11.89 FEET TO A PLASTIC STAKE FOUND; THENCE CONTINUING WITH CARTER, NORTH 22 DEG. 00 MIN. 00 SEC. WEST, 986.00 FEET TO A POINT IN THE SOUTH RIGHT-OF-WAY LINE OF INTERSTATE 40; THENCE CROSSING INTERSTATE 40, NORTH 22 DEG. 00 MIN. 00 SEC. WEST, 1065.00 FEET TO A POINT ON THE NORTH RIGHT-OF-WAY OF INTERSTATE 40, MARKING THE POINT OF BEGINNING, SAID POINT ALSO BEING THE COMMON CORNER BETWEEN THIS TRACT AND THE PROPERTY OF CARTER; THENCE WITH THE LINE OF CARTER, NORTH 22 DEG. 00 MIN. 00 SEC. WEST, 1134.00 FEET TO A POINT ON TOP OF WALDEN'S RIDGE; THENCE WITH THE TOP OF WALDEN'S RIDGE, NORTH 57 DEG. 30 MIN. 00 SEC. EAST, 1119.00 FEET TO A POINT; THENCE NORTH 51 DEG. 45 MIN. 00 SEC. EAST, 426.00 FEET TO A POINT; THENCE NORTH 68 DEG. 00 MIN. 00 SEC. EAST, 648.00 FEET TO A POINT CORNER TO MARTIN

DESCRIBED IN DEED BOOK K, SERIES 12, PAGE 289; THENCE WITH THE LINE OF MARTIN, SOUTH 29 DEG. 30 MIN. 00 SEC. EAST, 1490.29 FEET TO A POINT IN THE NORTH RIGHT-OF-WAY LINE OF INTERSTATE 40; THENCE WITH THE NORTH RIGHT-OF-WAY LINE OF INTERSTATE 40, THE FOLLOWING CALLS AND DISTANCES: SOUTH 55 DEG. 00 MIN. 00 SEC. WEST, 31.32 FEET TO A POINT; THENCE SOUTH 67 DEG. 29 MIN. 00 SEC. WEST, 572.14 FEET TO A POINT; THENCE SOUTH 79 DEG. 48 MIN. 00 SEC. WEST, 759.17 FEET TO A POINT; THENCE SOUTH 61 DEG. 03 MIN. 00 SEC. WEST, 1013.45 FEET TO THE POINT OF BEGINNING.

TRACT VI:

TO FIND THE POINT OF BEGINNING, BEGIN ON A REBAR IN THE NORTHEAST CORNER OF ROANE COUNTY PROPERTY (DEED BOOK U, SERIES 14, PAGE 230), ROANE COUNTY INDUSTRIAL PARK, A COMMON CORNER OF TENNESSEE VALLEY STEEL; THENCE WITH THE COMMON LINE OF ROANE COUNTY, SOUTH 17 DEG. 11 MIN. 23 SEC. EAST, 199.93 FEET TO A POINT IN THE NORTHERN LINE OF A 100 FEET TVA POWERLINE EASEMENT; THENCE WITH THE NORTHERN LINE OF SAID EASEMENT, NORTH 61 DEG. 09 MIN. 11 SEC. EAST, 352.79 FEET TO A POINT; THENCE SOUTH 21 DEG. 35 MIN. 00 SEC. EAST, 499.48 FEET TO A REBAR FOUND, SAID REBAR BEING THE SOUTHWEST CORNER OF TRACT 4 OF SURVEY BY FREEMAN ENGINEERING AND SURVEYING, NOVEMBER 23, 1992, BEING THE POINT OF BEGINNING; THENCE NORTH 78 DEG. 08 MIN. 00 SEC. EAST, 856.68 FEET TO AN IRON PIN; THENCE NORTH 11 DEG. 52 MIN. 00 SEC. WEST, 30.00 FEET TO A REBAR, SAID REBAR BEING SOUTH 74 DEG. 49 MIN. 20 SEC. WEST, 56.41 FEET FROM THE TERMINATION POINT OF THE 50 FOOT WIDE INGRESS/EGRESS EASEMENT LEADING FROM STATE ROUTE 61 TO TRACT 4 AS SHOWN ON THE ABOVE MENTIONED SURVEY; THENCE NORTH 34 DEG. 37 MIN. 17 SEC. WEST, 147.64 FEET TO A 1/2 INCH DIAMETER REBAR SET; THENCE SOUTH 66 DEG. 23 MIN. 41 SEC. WEST, 816.66 FEET TO THE POINT OF BEGINNING, CONTAINING 1.65 ACRES AS SURVEYED BY FREEMAN ENGINEERING AND SURVEYING, RLS #1427, DATED MAY 20, 1993.

THE FOREGOING DESCRIPTIONS WERE PREPARED FROM THE SURVEY OF CHARLES M. FREEMAN, RLS NO. 1427, DATED NOVEMBER 23, 1991, LAST REVISED APRIL 26, 1995. THE SURVEYOR'S ADDRESS IS RT. 3, BOX 128, ROCKWOOD, TN 37854.

BEING THE SAME PROPERTY CONVEYED TO BAYOU STEEL CORPORATION (TENNESSEE) BY DEED OF RECORD IN DEED BOOK X-19, PAGE 471, REGISTER'S OFFICE FOR ROANE COUNTY, TENNESSEE. THE SAID BAYOU STEEL CORPORATION (TENNESSEE) HAVING SINCE MERGED INTO AND BECOME KNOWN AS BAYOU STEEL CORPORATION, AS EVIDENCED BY MERGER DOCUMENTS OF RECORD IN BOOK 1046, PAGE 517, SAID REGISTER'S OFFICE, AND FURTHER MERGED INTO AND BECOME KNOWN AS BAYOU STEEL, LLC, AS EVIDENCED BY MERGER DOCUMENTS OF RECORD IN BOOK 1561, PAGE 774, SAID REGISTER'S OFFICE, AND FURTHER MERGED INTO AND BECOME KNOWN AS ARCELORMITTAL LAPLACE, LLC, AS EVIDENCED BY MERGER DOCUMENTS OF RECORD IN BOOK 1561, PAGE 778, SAID REGISTER'S OFFICE, AND FURTHER.

**3133 E. 106th Street, Chicago, IL (Distribution Depot)**

Real property in the City of Chicago, County of Cook, State of Illinois, described as follows:

PARCEL 1:

A TRACT OF LAND SITUATED IN THE CITY OF CHICAGO, COUNTY OF COOK, AND THE STATE OF ILLINOIS, DESCRIBED AS FOLLOWS; COMMENCING AT THE SOUTHWEST CORNER OF THE NORTHWEST 1/4 OF THE NORTHEAST 1/4 OF SECTION 18, TOWNSHIP 37 NORTH, RANGE 15 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS; THENCE NORTH 00 DEGREES, 14 MINUTES, 58 SECONDS WEST (SAID BEARINGS BASED ON THE BEARING OF THE CALUMET RIVER DOCK LINE BEING NORTH 62 DEGREES, 30 MINUTES, 29 SECONDS EAST AND THE SUBSEQUENT BEARINGS IN THIS DESCRIPTION ARE RELATIVE THERETO), A DISTANCE OF 8.58 FEET ALONG THE WEST LINE OF SAID NORTHWEST QUARTER OF SAID NORTHEAST 1/4 OF SECTION 18 TO THE POINT OF BEGINNING OF THIS TRACT; THENCE CONTINUING NORTH 00 DEGREES, 14 MINUTES, 58 SECONDS WEST ALONG SAID WEST LINE 209.82 FEET TO THE DOCK LINE OF THE CALUMET RIVER; THENCE NORTH 62 DEGREES, 30 MINUTES, 29 SECONDS EAST 808.93 FEET ALONG SAID DOCK LINE; THENCE SOUTH 89 DEGREES, 54 MINUTES, 47 SECONDS EAST 213.33 FEET ALONG A LINE PARALLEL WITH THE SOUTH LINE OF 106TH STREET; THENCE NORTH 62 DEGREES, 24 MINUTES EAST, 203.78 FEET; THENCE SOUTH 53 DEGREES, 00 MINUTES EAST 85.00 FEET; THENCE SOUTH 45 DEGREES, 33 MINUTES, 18 SECONDS WEST, 412.94 FEET; THENCE SOUTH 62 DEGREES 24 MINUTES WEST, 100.00 FEET; THENCE SOUTH 27 DEGREES 36 MINUTES EAST, 28.0 FEET; THENCE SOUTH 62 DEGREES 24 MINUTES WEST, 26.0 FEET; THENCE NORTH 27 DEGREES, 36 MINUTES WEST, 28.0 FEET; THENCE SOUTH 62 DEGREES 24 MINUTES WEST, 325.71 FEET; THENCE NORTH 27 DEGREES 36 MINUTES WEST, 70.0 FEET; THENCE SOUTH 62 DEGREES, 24 MINUTES WEST, 406.29 FEET; THENCE NORTH 27 DEGREES, 36 MINUTES WEST, 15.0 FEET; THENCE SOUTH 71 DEGREES, 03 MINUTES, 08 SECONDS WEST, 44.13 FEET; THENCE SOUTH 89 DEGREES, 18 MINUTES, 29 SECONDS WEST, 42.18 FEET TO THE POINT OF BEGINNING, IN COOK COUNTY, ILLINOIS.

PARCEL 2:

A TRACT OF LAND IN THE NORTHWEST 1/4 OF SECTION 18, TOWNSHIP 37 NORTH, RANGE 15 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN THE CITY OF CHICAGO, COUNTY OF COOK, STATE OF ILLINOIS, DESCRIBED AS FOLLOWS; COMMENCING AT THE SOUTHEAST CORNER OF THE NORTHEAST 1/4 OF SAID NORTHWEST 1/4; THENCE NORTH 00 DEGREES, 14 MINUTES, 58 SECONDS WEST (SAID BEARING BASED ON THE BEARING OF THE CALUMET RIVER DOCK LINE BEING NORTH 62 DEGREES, 30 MINUTES, 29 SECONDS EAST AND THE SUBSEQUENT BEARINGS IN THIS DESCRIPTION ARE RELATIVE THERETO), A DISTANCE OF 8.58 FEET ALONG THE EAST LINE OF SAID NORTHEAST 1/4 OF THE NORTHWEST 1/4 OF SAID SECTION 18, TO THE POINT OF BEGINNING OF THIS TRACT; THENCE CONTINUING NORTH 00 DEGREES, 14 MINUTES, 58 SECONDS WEST ALONG SAID EAST LINE 209.82 FEET TO THE DOCK LINE OF THE CALUMET RIVER; THENCE SOUTH 62 DEGREES 30 MINUTES 29 SECONDS WEST ALONG SAID DOCK LINE 116.40 FEET; THENCE SOUTH 27 DEGREES, 36 MINUTES, 11 SECONDS EAST, 144.86 FEET; THENCE SOUTH 53 DEGREES 11 MINUTES 56 SECONDS EAST, 46.27 FEET TO THE POINT OF BEGINNING, IN COOK COUNTY, ILLINOIS.

PARCEL 3:

NON-EXCLUSIVE EASEMENT FOR THE BENEFIT OF PARCELS 1 AND 2 AS CREATED BY AGREEMENT MADE BY SPECIALTY STEEL PRODUCTS, INC. TO RIVER ROAD REALTY CORPORATION DATED JULY 9, 1990 AND RECORDED JULY 18, 1990 AS DOCUMENT 90343634 FOR INGRESS AND EGRESS OVER THE FOLLOWING DESCRIBED LAND:

ALL THAT PART OF THE NORTHEAST 1/4 OF SECTION 18, TOWNSHIP 37 NORTH, RANGE 15 EAST OF THE THIRD PRINCIPAL MERIDIAN, CITY OF CHICAGO, COOK COUNTY, ILLINOIS, LYING SOUTHEASTERLY OF THE CALUMET RIVER, DESCRIBED AS FOLLOWS: BEGINNING AT A POINT OF INTERSECTION OF THE NORTHWESTERLY RIGHT-OF-WAY LINE OF THE CALUMET RIVER RAILROAD COMPANY, WITH THE SOUTH LINE OF 106TH STREET AS LAID OUT 40.00 FEET SOUTH OF THE NORTH LINE OF SAID SECTION 18; THENCE NORTH 89 DEGREES 58 MINUTES WEST (MEASURE) ALONG SAID SOUTH LINE OF 106TH STREET, (SAID BEARING BASED ON THE BEARING OF THE CALUMET RIVER DOCK LINE BEING NORTH 62 DEGREES, 30 MINUTES, 29 SECONDS EAST AND THE SUBSEQUENT BEARINGS IN THIS DESCRIPTION ARE RELATIVE THERETO) 26.90 FEET; THENCE SOUTH 42 DEGREES 00 MINUTES WEST, 164.54 FEET TO A POINT THAT IS 58.00 FEET NORTHWESTERLY OF SAID NORTHWESTERLY RIGHT-OF-WAY LINE OF RAILROAD; THENCE SOUTH 29 DEGREES, 50 MINUTES, 18 SECONDS WEST, PARALLEL WITH SAID RAILROAD, 266.58 FEET; THENCE SOUTH 24 DEGREES 00 MINUTES WEST, 124.01 FEET; THENCE SOUTH 41 DEGREES 00 MINUTES WEST, 201.99 FEET TO A POINT ON THE MOST EASTERLY LINE OF PARCEL 1; THENCE SOUTH 53 DEGREES 00 MINUTES EAST, 20.05 FEET; THENCE NORTH 41 DEGREES 00 MINUTES EAST, 203.58 FEET; THENCE NORTH 24 DEGREES 00 MINUTES EAST, 125.99 FEET; THENCE NORTH 29 DEGREES, 50 MINUTES, 18 SECONDS EAST, 263.42 FEET; THENCE NORTH 42 DEGREES 00 MINUTES EAST, 180.40 FEET TO THE POINT OF BEGINNING, IN COOK COUNTY, ILLINOIS

PARCEL 4:

NON-EXCLUSIVE EASEMENT FOR THE BENEFIT OF PARCELS 1 AND 2 AS CREATED BY GRANT OF EASEMENT FROM ACME STEEL COMPANY, A DELAWARE CORPORATION, TO MICRODOT INC., A DELAWARE CORPORATION, RECORDED FEBRUARY 25, 1988 AS DOCUMENT 88081402 DESCRIBED AS FOLLOWS:

AN EASEMENT OVER A STRIP OF LAND FOR THE PURPOSE OF USING, MAINTAINING, REPAIRING AND REPLACING AN EXISTING UNDERGROUND ELECTRICAL SERVICE DUCT, SAID STRIP BEING 15 FEET IN WIDTH, THE CENTER LINE OF WHICH IS DESCRIBED AS FOLLOWS:: COMMENCING AT THE SOUTHWEST CORNER OF THE NORTHWEST 1/4 OF THE NORTHEAST 1/4 OF SECTION 18, TOWNSHIP 37 NORTH, RANGE 15 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN THE CITY OF CHICAGO, COUNTY OF COOK, STATE OF ILLINOIS; THENCE NORTH 0 DEGREES 14 MINUTES 58 SECONDS WEST (SAID BEARING BASED ON THE BEARING OF THE CALUMET RIVER DOCK LINE BEING NORTH 62 DEGREES 30 MINUTES 29 SECONDS EAST AND

THE SUBSEQUENT BEARINGS IN THIS DESCRIPTION ARE RELATIVE THERETO), A DISTANC
8.58 FEET ALONG THE NEST LINE OF SAID NORTHEAST 1/4 TO A POINT; THENCE NORTH
DEGREES 18 MINUTES 29 SECONDS EAST, 42.18 FEET; THENCE NORTH 88 DEGREES 49
MINUTES 03 SECONDS EAST, 48.64 FEET; THENCE SOUTH 27 DEGREES 19 MINUTES 47
SECONDS EAST, 86.90 FEET TO THE POINT OF BEGINNING OF THIS EASEMENT; THENCE
SOUTH 89 DEGREES 06 MINUTES 00 SECONDS WEST, 150.48 FEET; THENCE NORTH 26
DEGREES 40 MINUTES 53 SECONDS WEST, 101.24 FEET; THENCE NORTH 40 DEGREES 33
MINUTES 06 SECONDS EAST, 34.52 FEET TO THE POINT OF ENDING OF THIS EASEMENT,
COOK COUNTY, ILLINOIS.

The LaPlace Dock

That certain deep water dock situated on the water bottom of the Mississippi River and attached to the river bank at Mile 132.4 A.H.P. between LaPlace, Louisiana and Little Gypsy, Louisiana and the ramp attached thereto and leading from the dock to River Road as outlined on the attached survey of certain property owned by Bayou Steel Corporation by Lucien C. Gassen, Land Surveyor, dated March 5, 1990, updated February 18, 1994 and updated May 20, 1998, which real property is currently owned by BD LaPlace, LLC, a Delaware limited liability company, as set forth in that certain First American Title Insurance Company of Louisiana title insurance policy number 5211422-008224e dated December 8, 2017, together with the land located directly underneath the ramp, a non-exclusive right of use for access and maintenance for a distance of ten (10') feet on either side of the ramp, including the dock area in yellow highlight as attached, as the same has been improved, repaired or modified since June 7, 2010.

2



## SCHEDULE 6.9.2

## LEASED REAL PROPERTY

- 790 Fort Gibson Road, Catoosa, Oklahoma, 74015.

  Lease Agreement between The City of Tulsa-Rogers County Port Authority and ArcelorMittal LaPlace, LLC, dated July 1, 2010, regarding certain land, with applicable utility easements, located at and within the Tulsa Port of Catoosa.

- 400 and 410 Riverport Drive, Leetsdale, Pennsylvania, 15056

  Amended and Restated Lease Agreement between Leetsdale Industrial II, L.P. and the Bayou Steel Group, dated December 1, 2003, regarding certain premises located at 400 Riverport Drive, Leetsdale, PA, as amended by that certain First Amendment to Lease Agreement between Leetsdale Industrial II, L.P. and ArcelorMittal LaPlace, LLC dated as of May 30, 2012, as further amended by that certain Second Amendment to Lease Agreement between Leetsdale Industrial II, L.P and Bayou Steel BD Holdings LLC dated as of July 21, 2017.

- Water Bottom in the Mississippi River located below the LaPlace Dock

  Waterbottom Lease Contract No. 160 between the State of Louisiana and ArcelorMittal LaPlace, LLC, regarding the water bottom and navigable waterways below the low water mark situated below the LaPlace Dock.

## **SCHEDULE 6.13**

## **DEFINED BENEFIT PLAN LIABILITIES**

- BD LaPlace, LLC Employee Retirement Plan; and

- Arcelormittal LaPlace LLC Pension Plan for Bargained Employees

## <u>SCHEDULE 6.14</u>

## COLLECTIVE BARGAINING AGREEMENTS

**#**     **(a) - Plan**

**1.**    Agreement between BD LaPlace, LLC and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union Local 9121, September 1, 2019 (Facility in LaPlace, Louisiana).

**2.**    Agreement between BD LaPlace, LLC and United Streel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC on behalf of Local Union 1211, July 1, 2017 (Leedsdale Depot, Leedsdale, Pennsylvania).

**3.**    Agreement between BD LaPlace, LLC, Harriman Plant, and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (USW), AFL-CIO/CLC on behalf of Local 9410, December 1, 2017 (Facility in Harriman, Tennessee).

## INCIDENTS OF NON-COMPLIANCE WITH LABOR LAWS

**#**     **(b) - Incident**

**1.**    *Fleming et al. v. Bayou Steel BD Holdings, L.L.C dba Bayou Steel et al. (In re Bayou Steel BD Holdings, L.L.C.)*, Adv. Pro. No. 19-50392 (KBO) (Bankr. D. Del. 2019)

## LEGAL PROCEEDINGS WITH RESPECT TO EMPLOYMENT

**#**     **(c) - Incident**

**1.**    *Fleming et al. v. Bayou Steel BD Holdings, L.L.C dba Bayou Steel et al. (In re Bayou Steel BD Holdings, L.L.C.)*, Adv. Pro. No. 19-50392 (KBO) (Bankr. D. Del. 2019)

## SCHEDULE 6.22

### INSURANCE POLICIES

| # | Insuring Company | Type of Insurance |
|---|---|---|
| 1. | Endurance American Specialty Insurance | Rolling Stock (Inland Marine) |
| 2. | Federal Insurance Company (Chubb) | Executive Package |
| 3. | Insurance Company of State of PA (AIG) | International Package |
| 4. | Lexington Insurance Company Risk Specialists Companies | Property |
| 5. | Lloyd's Syndicates 623/2623 (Beazley) | Pollution |
| 6. | Travelers Property Casualty Company of America | Automobile |
| 7. | Travelers Property Casualty Company of America | Automobile |
| 8. | Travelers Property Casualty Company of America | Employee Benefits |
| 9. | Travelers Property Casualty Company of America | General |
| 10. | Travelers Property Casualty Company of America | Marine |
| 11. | Travelers Property Casualty Company of America | Marine Excess |
| 12. | Travelers Property Casualty Company of America | Workers Compensation |
| 13. | XL Insurance America, Inc. | General Excess |