**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BAYOU STEEL BD HOLDINGS, L.L.C., *et al.*,[1] | Case No. 19-12153 (KBO) |
| Debtors. | (Jointly Administered) |
| | Hearing Date: February 13, 2020 at 10:00 am<br>Objection Deadline: February 4, 2020 at 4:00 pm |

**MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS FOR ENTRY OF AN ORDER CONVERTING THE DEBTORS'
CHAPTER 11 CASES TO CASES UNDER CHAPTER 7 OF THE BANKRUPTCY CODE**

The Official Committee of Unsecured Creditors (the "Committee") of Bayou Steel BD Holdings, L.L.C., *et al.,* the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through its undersigned counsel, submits this motion (the "Motion") pursuant to sections 1112(b) of the Bankruptcy Code for entry of an order converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code. In support of this Motion, the Committee respectfully states as follows:

**PRELIMINARY STATEMENT**

1. The Debtors commenced these cases in October 2019 with a plan to liquidate on-hand inventory and pursue a sale of their idle business operations using the lenders' cash collateral. At the outset, the Committee raised concerns with the Debtors' cash collateral request, arguing that it threatened to leave the estates administratively insolvent while providing both the ABL Lenders (as defined herein) and Black Diamond with sweeping protections. The negotiated final cash collateral order reserved certain protections, including advance 506(c) and

---

[1] The Debtors in these cases are: Bayou Steel BD Holdings, L.L.C.; BD Bayou Steel Investment, LLC; and BD LaPlace, LLC.

552(b) waivers, in the hope that the sale would generate sufficient value to obviate the Committee's concerns. Unfortunately, the $28 million sale to Liberty BSG Holdings ("Liberty") does not achieve this goal. While the Committee remains supportive of the Liberty sale, unless Black Diamond agrees to fund the costs associated with these cases, the estates simply cannot support the expense associated with remaining in chapter 11. Cause, therefore, exists to convert these cases to chapter 7 of the Bankruptcy Code.

        2.      Following the sale closing, the Debtors' only remaining assets will be outstanding receivables and estate causes of action, including potential claims against Black Diamond. The Debtors, however, represented to the court that they are administratively insolvent by more than $4 million as of December 23, with expenses continuing to accrue. Despite the benefits provided to the lenders from liquidating their collateral and conducting a sale process within the confines of chapter 11, neither the ABL Lenders nor Black Diamond is willing to fund these costs. Remaining in chapter 11, therefore, will serve only to further diminish the value of the estates for the Debtors' creditors.

        3.      The Debtors are also unable to confirm a chapter 11 plan. The Debtors are hopelessly insolvent with no continuing operations and no agreement from their lenders to fund these cases. The Debtors are similarly unable to wind down these cases in a way that would satisfy known administrative claims.

        4.      Given the status of the Debtors' cases, there is no justifiable reason to remain in chapter 11. As it stands, the only party to gain from remaining in chapter 11 is Black Diamond, which will attempt to receive the approximately $24 million of net proceeds from the Liberty sale while leaving an administrative shortfall in excess of $4 million. Conversion of

these cases to chapter 7 would end the mounting administrative burn and allow a chapter 7 trustee to continue investigating potential estate causes of action for the benefit of all creditors.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue of this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157.

6. Pursuant to Local Rule 9013-1(f), the Committee consents to the entry of a final judgment or order with respect to this Motion, if it is determined the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## BASIS FOR RELIEF REQUESTED

7. The predicates for the relief sought herein are section 1112(b) of the Bankruptcy Code and Rules 1017 and 9014 of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND

### I. Procedural Background

8. On October 1, 2019 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court. Since the Petition Date, the Debtors have remained in possession of their assets.

9. On October 10, 2019, the Office of the United States Trustee for Region 3 appointed a five-member Committee consisting of: (i) Tokai Carbon GE LLC; (ii) Tri Coastal Trading, L.L.C.; (iii) Louisiana Scrap Metal Recycling of Baton Rouge, Inc.; (iv) American State Equipment Co., Inc.; and (v) the United Steelworkers.[2] The Committee selected Kelley Drye &

---

[2] Docket No. 67.

Warren LLP as its lead counsel and Cole Schotz P.C. as Delaware counsel. The Committee also selected Alvarez & Marsal North America, LLC to serve as its financial advisor.

**II.    The Debtors' Corporate History And Capital Structure**

10.    Founded in 1979, the Debtors' historical business consisted of recycling scrap to produce a variety of structural steel, merchant bar and specialty products, which were distributed through depots in Tulsa, Chicago and Pittsburgh.[3]

11.    The Debtors are owned by Black Diamond, which acquired the company from ArcelorMittal for $96 million in April 2016.[4] To fund a portion of the acquisition, the Debtors entered into a $75 million revolving loan with Bank of America, N.A. and SunTrust Bank (collectively, the "ABL Lenders"), pursuant to a Loan and Security Agreement dated as of April 4, 2016 (the "ABL Credit Agreement").[5] As of the Petition Date, $41.25 million was due under the ABL Credit Agreement.[6]

12.    Following Black Diamond's acquisition, the Debtors continuously operated at a loss. For 2016, the Debtors recorded an operating loss of $16.4 million.[7]

13.    Notwithstanding this loss, on March 16, 2017, the Debtors and the ABL Lenders amended the ABL Credit Agreement to, among other things, authorize a $30 million equity distribution to Black Diamond.[8]

---

[3]    *See Declaration of Alton Davis, President and Chief Operating Officer of Bayou Steel BD Holdings, L.L.C. in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "Davis Declaration"), ¶¶ 9, 12.

[4]    *See* KPMG, BAYOU STEEL BD HOLDINGS, L.L.C. AND SUBSIDIARIES CONSOLIDATED FINANCIAL STATEMENTS (WITH INDEPENDENT AUDITORS REPORT THEREON) 12 (December 31, 2016) (the "2016 Financial Statements").

[5]    *Id.* at 14.

[6]    Davis Declaration, ¶ 25.

[7]    2016 Financial Statements, at 4.

[8]    *See* KPMG, BD LAPLACE, LLC FINANCIAL STATEMENTS (WITH INDEPENDENT AUDITORS REPORT THEREON) 12, 14 (December 31, 2017) (the "2017 Financial Statements").

14. By December 2017, the balance under the ABL Credit Agreement increased to over $38 million. The Debtors again recorded an operating loss for 2017, this time $18.7 million.[9]

15. On December 21, 2017, the Debtors entered into a $15 million subordinated term loan from Black Diamond Commercial Finance, L.L.C. (the "<u>Subordinated Credit Agreement</u>").[10]

16. Notwithstanding this new liquidity, the Debtors continued to deteriorate financially. By the end of 2018, the Debtors recording a $10.5 million operating loss, the ABL borrowings increased to $44 million, and the $15 million term loan under the Subordinated Credit Agreement was fully drawn.[11]

17. To increase liquidity, the Subordinated Credit Agreement was amended in January 2019 and again in May 2019 to increase the term loan borrowings to $30 million and $40 million, respectively.

18. As of the Petition Date, $36.5 million was due under the Subordinated Credit Agreement, including PIK interest.[12]

### III. The Bankruptcy Cases

19. The Debtors maintain that they suffered under their debt load, which led to severe liquidity issues and eventually a default under their revolving loan.[13] Although the Debtors engaged in negotiations with the ABL Lenders and Black Diamond regarding

---

[9]   *Id.* at 3.

[10]  Davis Declaration. ¶ 22.

[11]  *See* KPMG, BD LAPLACE, LLC FINANCIAL STATEMENTS (WITH INDEPENDENT AUDITORS REPORT THEREON) 2-3 (December 31, 2018 and 2017).

[12]  Davis Declaration. ¶ 25.

[13]  *Id.* ¶ 28.

forbearance, an agreement could not be reached.[14] In the months prior to the Petition Date, the ABL Lenders began daily cash sweeps, further deteriorating the Debtors' liquidity.[15]

20. Given the ABL Lenders' and Black Diamond's refusal to provide any additional support, the Debtors determined to substantially idle operations, begin liquidating inventory, and terminate 300 employees one day prior to the Petition Date.[16] On October 1, the Debtors filed bankruptcy with a plan to liquidate their on-hand inventory and pursue a going-concern sale for their now-idle operations.[17]

A. The Cash Collateral Motion

21. To fund the bankruptcy cases, the Debtors filed a motion for authority to use the ABL Lenders' cash collateral subject to an approved budget, which motion was approved by interim order (the "Interim Order") on October 3, 2019.[18]

22. The Interim Order provided the ABL Lenders with adequate protection for any potential diminution in the value of their collateral, including: (i) weekly principal payments; (ii) monthly payment of default interest; (iii) replacement liens and superpriority claims; and (iv) payment of the ABL Lenders' professional fees and expenses.[19]

23. Black Diamond was also granted adequate protection in the form of replacement liens and superpriority claims, junior to the liens and claims of the ABL Lenders.[20]

---

[14] *Id.*

[15] *Id.*

[16] *Id.* ¶¶ 29 - 30.

[17] *Id.* ¶ 30.

[18] *See Agreed Interim Order (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV) Setting a Final Hearing, and (V) Granting Related Relief,* Exhibit 1 – Budget. Docket No. 42.

[19] Interim Order, ¶ 25.

[20] *Id.* ¶ 27.

Although the Interim Order did not specifically authorize any principal payments to Black Diamond, the initial budget contemplated: (i) the payment of $6.7 million to Black Diamond following the payment in full of the ABL Lenders; and (ii) the continuation of PIK interest.[21]

24. Although the budget included $3.6 million to satisfy 503(b)(9) claims and a $500,000 wind down reserve, the ABL Lenders were unwilling to authorize the payment of such amounts from their collateral, with such expenses proposed to be paid after the ABL Lenders were paid in full. Black Diamond, however, was similarly unwilling to provide for the payment of such amounts from its collateral once the ABL Lenders were paid.

25. Following its appointment, the Committee raised concerns with respect to the Interim Order. The Committee maintained that the adequate protection proposed for the ABL Lenders and Black Diamond was inappropriate absent a consensual budget that ensured the administrative solvency of the estates. To the extent the ABL Lenders and Black Diamond wished to obtain the benefits and protections of chapter 11, the Committee asserted that the lenders were required to pay the administrative costs associated with these cases.

26. Following extensive, good faith negotiations, the parties reached a settlement that resolved the Committee's concerns in the short term in the form of a final cash collateral order (the "Cash Collateral Order") and approved budget (the "Approved Budget").[22] Among other things, the Cash Collateral Order: (i) reserved the ABL Lenders' request for advance 506(c) and 552(b) waivers pending a further order of the Court; and (ii) excluded any protections, including adequate protection, for Black Diamond.[23]

---

[21] *See* Interim Order, Exhibit 1 - Initial Budget.

[22] *See Agreed Final Order (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief.* Docket No. 241.

[23] *See* Cash Collateral Order, ¶¶ 55-56.

B.  The Inventory Liquidations

27. Since the Petition Date, the Debtors have been liquidating their 90,000 tons of on-hand inventory. As of the filing of this Motion, the Debtors have shipped approximately 84,000 tons and collected approximately $36 million of their $45 million of gross sales.

28. Although the ABL Lenders were initially projected to be paid in full from the inventory liquidations by December 24, 2019, as of January 10, 2020, the ABL Lenders are still owed approximately $5.8 million.

C.  The Going-Concern Asset Sale

29. On November 8, 2019, the Court entered an order approving bid procedures to govern the sale of substantially all of the Debtors' assets.[24] The bid procedures included the following sale timeline: (i) December 12 bid deadline; (ii) December 18 auction; (iii) December 19 sale hearing; and (iv) December 31 sale closing deadline.

30. The Debtors received 13 bids for some or all of their assets by the December 12 bid deadline. At the conclusion of the auction, the Debtors, in consultation with the Committee and the ABL Lenders, selected Liberty's $28 million bid as the highest or otherwise best bid for the Debtors' assets.

---

[24] *See Order (I) Approving Bid Procedures in Connection With the Potential Sale of Substantially All of the Debtors' Assets, (II) Scheduling an Auction and a Sale Hearing, (III) Approving the Form and Manner of Notice Thereof, (IV) Authorizing the Debtors to Enter Into a Stalking Horse Agreement, (V) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief.* Docket No. 224.

31. The Court approved the sale to Liberty on December 23 and entered an order (the "Sale Order") approving the sale on December 26.[25]  The Liberty sale is scheduled to close on or about January 31, 2020.

32. Pursuant to the Sale Order, to the extent the ABL Lenders are not otherwise paid in full from the inventory liquidations as of the sale closing, the sale proceeds shall be used to indefeasibly pay the ABL Lenders in full.[26]

D. The Debtors' Administrative Expenses

33. Although the Cash Collateral Order was initially set to terminate on December 20, 2019, the ABL Lenders were still owed $8.3 million as of that date.  The ABL Lenders, therefore, agreed to extend the Debtors' use of cash collateral through and including January 31, 2020 pursuant to an extended budget (the "Extended Budget").[27]

34. Pursuant to the Extended Budget, the ABL Lenders are proposed to be paid in full from the proceeds of the inventory liquidations by January 24, 2020.  Unlike the Approved Budget, however, the Extended Budget does not provide for the payment of 503(b)(9) claims or set aside a wind down reserve.

35. Further, consistent with its position at the cash collateral hearing, Black Diamond does not consent to the use of its cash collateral for anything other than the professional fee carve-out.[28]

---

[25] *See Order (I) Approving the Sale of Substantially All of the Debtors Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests Under the Asset Purchase Agreement, (II) Authorizing the Assumption and Assignment of Contracts and Leases, And (III) Granting Related Relief.*  Docket No. 371.

[26] Sale Order, ¶ 10.

[27] *See Notice of Agreed Extension of Expiration Date Under Final Cash Collateral Order.*  Docket No. 350.

[28] *See In re Bayou Steel BD Holdings, L.L.C., et al.,* Case No. 19-12153 (Bankr. D. Del. December 23, 2019); Hr'g Tr. at 26:9-26:15 ("And Black Diamond does not consent to all these admin claims being paid ahead of them … and we are not willing to allow sale proceeds to be used to fund those claims, period, and full stop") [hereinafter "Sale Hearing Transcript"].

36. Based upon testimony at the December 23 sale hearing, the Debtors' estates are administratively insolvent by more than $4 million, which includes: (i) $1.2 million of real estate taxes; (ii) $220,000 of KEIP payments; (iii) $1.7 million of 503(b)(9) claims; (iv) Candlewood's $810,000 transaction fee; and (v) $40,000 of U.S. Trustee fees.[29]

## ARGUMENT

37. Section 1112(b)(1) provides that a court should either convert a chapter 11 case to chapter 7 or dismiss the case when cause is demonstrated, whichever is in the best interests of creditors and the estate.[30] The Third Circuit has held that section 1112(b) "requires a two-step process in which the court first determines whether there is 'cause' to convert or dismiss, and next chooses between conversion and dismissal based on the best interests of creditors and the estate."[31] The purpose of section 1112(b)(1) is to prevent the debtor "from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation."[32]

38. Although section 1112(b) does not define "cause," section 1112(b)(4) provides sixteen factors that constitute "cause" to convert or dismiss a case.[33] The factors, however, are "not exhaustive" and courts are free to consider other factors.[34] The application of the factors is partly dependent on where the debtor is in the bankruptcy reorganization process.[35]

---

[29] *See id.* at 42:25-43:1 ("Mr. Pollack would testify he believes that the administrative shortfall right now is about $4,400,000").

[30] 11 U.S.C. § 1112(b)(1).

[31] *In re Am. Capital Equip., LLC*, 688 F.3d 145, 161 (3d Cir. 2012) (internal citations omitted).

[32] *In re Reserves Resort, Spa & Country Club LLC*, 2013 WL 3523289, at *2 (Bankr. D. Del. July 12, 2013).

[33] *See* 11 U.S.C. § 1112(b)(4).

[34] *Gateway Access Solutions*, 374 B.R. 556, 561 (Bankr. M.D. Pa. 2007) ("such lists are viewed as illustrative rather than exhaustive, and the Court should 'consider other factors as they arise'") (*citing In re Brown*, 951 F.2d 564, 572 (3d Cir. 1991)); *Quarles v. U.S. Trustee*, 194 B.R. 95, 96 (W.D. Va. 1996) (courts may consider additional grounds in determining cause).

[35] *Gateway Access Solutions*, 374 B.R. at 561.

39. The movant initially bears the burden of establishing cause under section 1112(b) of the Bankruptcy Code.[36] If the movant establishes cause, the burden shifts to the debtor to prove it falls within the "unusual circumstances" exception.[37] Congress has explained that the exception only applies if: (1) the debtor or a party in interest establishes that there is a reasonable likelihood that a plan will be confirmed within a reasonable time period; (2) the grounds for granting such relief include an act or omission for which there exists a reasonable justification; or (3) such act or omission will be cured within a reasonable time period.[38]

### A. Continuing Losses Have Occurred Since the Inception of These Cases and There is No Prospect for Rehabilitation

40. Section 1112(b)(4)(A) provides that "cause" exists if there are substantial or continuing losses or diminution of the estate and there is the absence of a reasonable likelihood of rehabilitation.[39] Although section 1112(b)(4)(A) is often analyzed in the context of a debtor attempting to reorganize, courts have found section 1112(b)(4)(A) applicable to debtors liquidating their assets in chapter 11 as well.[40]

---

[36] *See* 11 U.S.C. § 1112(b)(2); *Reserves Resort*, 2013 WL 3523289, at *2 ("The burden is on the moving party to prove cause by a preponderance of the evidence."); *Gateway Access Solutions*, 374 B.R. at 561.

[37] 11 U.S.C. § 1112(b)(1); *Gateway Access Solutions*, 374 B.R. at 567 (in order to deny conversion, the court must be able to specifically identify factors to establish conversion is not in the best interests of the creditors and the estate).

[38] *See* H.R. Rep. No. 109-31(I) at 94 (April 8, 2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 2005 WL 832198.

[39] 11 U.S.C. § 1112(b)(4)(A).

[40] *See e.g., In re Wen-Kev Mgmt.*, No. 13-36463, 2014 U.S. Dist. LEXIS 177650 (D. N.J. Dec. 29, 2014); *Loop Corp. v. United States Trustee*, 379 F.3d 511 (8th Cir. 2004); *In re BH S & B Holdings, LLC*, 439 B.R. 342 (Bankr. S.D.N.Y. 2010); *Canpartners Realty Holding Co. IV, L.L.C. v. Vallambrosa Holdings, L.L.C. (In re Vallambrosa Holdings, L.L.C.)*, 419 B.R. 81, 89 (Bankr. S.D. Ga. 2009).

41. In *Loop Corp.,* the Eight Circuit affirmed the conversion of a chapter 11 bankruptcy case to chapter 7 on facts similar to those here — the debtor's assets were liquidated, the secured lender was paid off, and all that remained was cash and potential causes of action.[41] The U.S. Trustee moved to convert the case because despite ongoing negotiations between the debtor and the committee on the terms of a consensual plan, an agreement could not be reached.[42] The bankruptcy court found that the "ongoing expenses associated with the estate and attempting to negotiate a confirmable plan constituted 'continuing loss to or diminution of the estate.'"[43] In affirming conversion of the case to chapter 7, the Eight Circuit noted the following:

> In the context of a debtor who has ceased business operations and liquidated virtually all of its assets, any negative cash flow — including that resulting only from administrative expenses — effectively comes straight from the pockets of the creditors. This is enough to satisfy the first element of § 1112(b)(1). … Courts have consistently understood "rehabilitation" to refer to the debtor's ability to restore the viability of its business. Because the debtors here intended to liquidate their assets rather than restore their business operations, they had no reasonable likelihood of rehabilitation.[44]

42. The Debtors' continued presence in chapter 11 will increase the administrative costs associated with these cases and further erode value for the Debtors' creditors. As of January 31, 2020, the Liberty sale will have closed, the Debtors will have liquidated all of their inventory, and only $4.4 million of accounts receivable are projected to remain. After payment of the ABL Lenders, however, proceeds from the inventory liquidations and the Liberty sale are insufficient to satisfy Black Diamond's $36.5 million of subordinated debt, let alone the administrative costs associated with these cases. The Debtors readily admit

---

[41]   *See generally, Loop Corp.,* 379 F.3d 511.

[42]   *Id.*

[43]   *Id.* at 514-15.

[44]   *Loop Corp.*, 379 F.3d at 516 (internal citations omitted);

that as of the December 23 sale hearing, the estates are administratively insolvent by more than $4 million.  Black Diamond, however, has repeatedly stated its unwillingness to fund these or any other administrative expenses.[45]  The Debtors' administrative deficit will continue to increase the longer that these cases remain in chapter 11.  Accordingly, the ongoing administrative expense associated with remaining in chapter 11 will diminish the value of the Debtors' estates for all creditors and the first requirement of section 1112(b)(4)(A) is easily satisfied.[46]

        43.     The Debtors similarly do not have any prospect for reorganization.  The Debtors have sold substantially all of their assets to Liberty and are not attempting to reorganize their businesses.  As of the filing of this Motion, the Debtors have liquidated substantially all of their remaining inventory, entered into the Liberty sale, and are merely continuing to collect outstanding receivables.  Accordingly, the second requirement of section 1112(b)(4)(A) is also easily satisfied because "the Debtors' intention to liquidate (rather than rehabilitate) demonstrates that there is no likelihood of rehabilitation."[47]

---

[45] *See* Sale Hearing Transcript at 26:9-26:15 ("And Black Diamond does not consent to all these admin claims being paid ahead of them … and we are not willing to allow sale proceeds to be used to fund those claims, period, and full stop").

[46] *See Wen-Kev Mgmt.*, 2014 U.S. Dist. LEXIS 177650 at *12 (*citing Loop Corp.,* 379 F.3d at 516) ("the ongoing expenses associated with administering the estate and attempting to negotiate confirmable plans … can be deemed to be continued loss to … the estate") (internal citations omitted); *BH S & B*, 439 B.R. at 348 (cause exists to convert the case where "the Debtors' financial statements reflecting continuing losses and the Debtors' intention to liquidate establish that there is no likelihood of rehabilitation"); *In re Citi-Toledo Partners*, 170 B.R. 602, 606 (Bankr. N.D. Ohio 1994) ("first requirement of § 1112(b)(1) satisfied because administrative expenses eroded the position of the estate's creditors and diminished the value of the estate"); *Vallambrosa Holdings*, 419 B.R. at 89 ("accumulating administrative expenses are eroding the position of the estate's creditors and further diminishing the value of the estate").

[47] *BH S & B,* 439 B.R. at 347; *Loop Corp.,* 379 F.3d at 516 ("Because the debtors here intended to liquidate their assets rather than restore their business operations, they had no reasonable likelihood of rehabilitation"); *Wen-Kev Mgmt.,* 2014 U.S. Dist. LEXIS 177650 at *12-13 (no likelihood of rehabilitation where the final act to be achieved was the distribution of the liquidated estate).

B.     <u>The Debtors' Estates Are Administratively Insolvent</u>

44. Although not specifically set forth in section 1112(b), courts have considered whether an estate is administratively insolvent in determining whether "cause" exists to convert or dismiss a case.[48] As set forth above, notwithstanding the fact that these cases were run for their benefit, neither the ABL Lenders nor Black Diamond is willing to fund the administrative costs associated with these cases. In particular, neither the ABL Lenders nor Black Diamond has made any provision for the payment of more than $4 million of administrative expenses, including $1.2 million of real estate taxes, $220,000 of KEIP payments, $1.7 million of section 503(b)(9) claims, Candlewood's $810,000 transaction fee and $40,000 of U.S. Trustee fees. Additional administrative expenses have and will continue to accrue, including professional fees and U.S. Trustee fees. The Debtors must account for and pay these liabilities, in addition to all other administrative expense claims, in order to remain in chapter 11. Accordingly, cause similarly exists to convert these cases to chapter 7 solely based on the administrative insolvency of these estates.[49]

C.     <u>The Debtors Cannot Confirm a Chapter 11 Plan</u>

45. Section 1112(b)(4)(J) provides that "cause" may include the failure to file a disclosure statement, or the failure to file or confirm a plan, within the time fixed by the Bankruptcy Code or by order of the court.[50] The timely and accurate disclosure of financial

---

[48]   *See BH S & B,* 439 B.R. at 349 ("Although section 1112(b)(4) does not list administrative insolvency as cause to convert or dismiss a chapter 11 case, a court may still consider this factor.").

[49]   *Id.* (converting cases to chapter 7 due to the administrative insolvency of the estates).

[50]   *See* 11 U.S.C. § 1112(b)(4)(J).

information is the "life blood of the chapter 11 process."[51]  Whether the period during which a debtor fails to file a plan or disclosure statement constitutes a reasonable period of time will depend upon the unique circumstances of each case.[52]

46.     As set forth above, the Debtors have an administrative shortfall in excess of $4 million as of December 23.  Neither the ABL Lenders nor Black Diamond is willing to fund these and other costs necessary to remain in chapter 11.  The Debtors, therefore, are unable to confirm a chapter 11 plan.  For this reason as well, the Committee submits that "cause" exists to convert these cases to cases under chapter 7 of the Bankruptcy Code.

### IV.     Conversion Of These Cases Best Serves The Interests Of Creditors And The Debtors' Estates

47.     Having established causes for conversion, a court must examine whether conversion or dismissal is in the best interests of the creditors and the estate.  Here, conversion, rather than dismissal, would best serve the interests of the Debtors' estates.  Although both conversion and dismissal would end the administrative burn in fees and costs associated with chapter 11, conversion to chapter 7 is clearly preferable.  The only remaining assets following the sale closing will consist of outstanding accounts receivable and potential estate causes of action.  Conversion, therefore, would result in a chapter 7 trustee investigating, and if appropriate, pursuing such causes of actions for the benefit of all creditors.

---

[51]   *Id.* (finding that the debtor's failure to file a disclosure statement within the time period set by the court constitutes cause under section 1112(b)); *see also BH S & B,* 439 B.R. at 351 (cause exists to convert because debtor has failed file a plan and disclosure statement by the court-approved deadline).

[52]   *Quarles,* 194 B.R. at 97 (appellant's failure to file a disclosure statement as requested by the bankruptcy court undermines the chapter 11 process); *BH S & B,* 439 B.R. at 351 (while the complexity and nature of the case will dictate its pace, "a debtor cannot wallow in chapter 11").

48. In particular, the Committee believes there are potential estate claims with respect to, among other things, the $30 million equity distribution made to Black Diamond in March 2017. The distribution was made at a time when the Debtors were operating at a loss and there is a question as to whether they were insolvent. Upon information and belief, based upon documentation reviewed by the Committee to date, there was no corporate authorization with respect to such equity distribution, including any documentation or board presentations supporting the basis for such distribution.

49. Accordingly, there may be claims against Black Diamond and/or the Debtors' D&Os (some of whom were Black Diamond appointees) with respect to such distribution. Such claims could recover upwards of $30 million for the benefit of unsecured creditors. However, these claims would be eliminated if the Debtors' cases were dismissed. Further, Black Diamond has itself indicated that it does not oppose conversion of these cases to chapter 7.[53] The appointment of a chapter 7 trustee would allow the Debtors' assets to be orderly liquidated and to distribute such proceeds to the Debtors' creditors in an efficient manner.

50. For the foregoing reasons, conversion of these cases to cases under chapter 7 of the Bankruptcy Code is warranted, necessary, and in the best interests of creditors and the estate.

---

[53] *See* Sale Hearing Transcript at 26:2-27:3 ("…or they can convert the case to a 7 and we're okay with that, Your Honor.").

## NO PRIOR REQUEST

51. The Committee has not made a prior request seeking the relief requested by this Motion to this or any other Court.

## NOTICE

52. Notice of this Motion will be provided to: (a) the Debtors, 138 Highway 3217, LaPlace, Louisiana, 70068, Attn: Alton Davis (alton.davis@bayousteel.com); (b) counsel to the Debtors, Polsinelli PC, 222 Delaware Avenue, Suite 1101, Wilmington, DE 19801, Attn: Christopher Ward (cward@polsinelli.com) and Shanti Katona (skatona@polsinelli.com); (c) the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Linda J. Casey (linda.casey@usdoj.gov); (d) counsel to the Prepetition Agent, Vinson & Elkins LLP, 2001 Ross Avenue, Suite 3900, Dallas, Texas 75201-2975, Attn: William L. Wallander (bwallander@velaw.com) and Bradley R. Foxman (bfoxman@velaw.com), and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, Attn: Mark D. Collins (collins@rlf.com); (e) counsel to Black Diamond Commercial Finance, LLC, Winston & Strawn LLP, 35 Wacker Dr., Chicago, Illinois 60601, Attn: Dan McGuire (dmcguire@winston.com) and Fox Rothschild LLP, Citizens Bank Center, 919 North Market Street, Suite 300, Wilmington, Delaware 19899-2323, Attn: Seth Niederman (sniederman@foxrothschild.com); and (f) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Committee respectfully submits that no further notice of the Motion is necessary or required under the circumstances.

WHEREFORE, the Committee requests that the Court enter an order converting these cases to cases under chapter 7 of the Bankruptcy Code and granting such other and further relief as the Court may deem just and proper.

Dated: January 21, 2020

        COLE SCHOTZ P.C.

        */s/ Katherine M. Devanney*
        G. David Dean (No. 6403)
        Patrick J. Reilley (No. 4451)
        Katherine M. Devanney (No. 6356)
        500 Delaware Avenue, Suite 1410
        Wilmington, DE 19801
        Telephone: (302) 652-3131
        Facsimile: (302) 652-3117
        ddean@coleschotz.com
        preilley@coleschotz.com
        kdevanney@coleschotz.com

        and

        KELLEY DRYE & WARREN LLP
        James S. Carr (admitted *pro hac vice*)
        Jason R. Adams (admitted *pro hac vice*)
        Lauren S. Schlussel (admitted *pro hac vice*)
        101 Park Avenue
        New York, New York 10178
        Telephone: (212) 808-7800
        Facsimile: (212) 808-7897
        Email: jcarr@kelleydrye.com
                jadams@kelleydrye.com
                lschlussel@kelleydrye.com

        *Counsel to the Official Committee of Unsecured Creditors of Bayou Steel BD Holdings, L.L.C., et al.*