**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

---------------------------------------------------------------X

In re:

BAYOU STEEL BD HOLDINGS, L.L.C., *et al.*[1]

                      Debtors.

Chapter 11
(Jointly Administered)

Case No. 19-12153 (KBO)

---------------------------------------------------------------X

**MOTION OF BLACK DIAMOND COMMERCIAL FINANCE, L.L.C. FOR ENTRY OF AN ORDER CONVERTING THE DEBTORS' CHAPTER 11 CASES TO CHAPTER 7 CASES PURSUANT TO 11 U.S.C. 1112(b)**

Black Diamond Commercial Finance, L.L.C. ("BDCF") hereby moves for entry of an order converting the Debtors' Chapter 11 cases to Chapter 7 cases pursuant to 11 U.S.C. section 1112(b) of the Bankruptcy Code. In support of this Motion, BDCF respectfully states as follows:

**INTRODUCTION**

The immediate conversion of these chapter 11 cases to chapter 7 cases will best serve the interests of the Debtors' estates and creditors. The Debtors stated in their first day declaration that the purpose of the bankruptcy filings was to conduct an "orderly liquidation of the remaining inventory and assets." *Declaration of Alton Davis, President and Chief Operating Officer of Bayou Steel BD Holdings, L.L.C., in Support of Debtors' Chapter 11 Petitions and First Day Motions*, ¶ 30 [D.I. 14].[2] On December 21, 2019, Debtors concluded the sale process by selecting a winning bid and on December 23, 2019, the Court held a hearing where it approved the sale. The sale is scheduled to close by January 31, 2020.

---

[1] The Debtors in these chapter 11 cases are: Bayou Steel BD Holdings, L.L.C., BD Bayou Steel Investment, L.L.C., and BD LaPlace, LLC.

[2] Capitalized terms not defined herein shall have the meaning prescribed in the Declaration of Alton Davis, President and Chief Operating Officer of Bayou Steel BD Holdings, L.L.C., in Support of Debtors' Chapter 11 Petitions and First Day Motions [D.I. 14].

AmericasActive:14289568.6

At present, the Debtors' estates appear to be administratively insolvent. The Debtors' authority to use Cash Collateral is coming to an end, all of the Debtors' employees have been terminated, and the Debtors maintain no operations. Once the sale closes at the end of this month, the Debtors will, effectively, be nothing but a pot of cash and avoidance actions and other potential causes of action. There is simply no need to dig a deeper administrative expense hole by continuing the Debtors' cases in chapter 11. In order to avoid unnecessarily incurring additional administrative claims that run a material risk of nonpayment, these cases should be converted to chapter 7.

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b), and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory bases for the relief requested herein are section 1112(b) of the Bankruptcy Code, Bankruptcy Rule 1017(f), and Local Rule 2002-1.

## BACKGROUND

3. As set forth in greater detail in the Term Loan Agreement, BDCF serves as agent under the Debtors Term Loan Facility. The Term Loan Facility is secured by a second priority lien over the ABL Collateral and a first priority lien on the real estate owned by the Debtors. As of the Petition Date, the aggregate principal amount outstanding under the Term Loan Facility was approximately $36.5 million.

4. As part of the section 363 sale process in these cases, on December 21, 2019, the Debtors selected the cash bid of $28 million (subject to certain adjustments) from Liberty BSG

Holdings Inc. ("Liberty") as the highest and best bid over the $33.5 million from a series of credit bids from BDCF, largely based on the fact that the Liberty bid included a potential restart of the Debtors' LaPlace facility.

5. On December 23, 2019, this Court held a hearing to approve the sale. At the hearing, BDCF did not object to the sale itself, only to any distribution of the sale proceeds to anyone other than BDCF, or to any notion that BDCF be required to foot the administrative expense bill as a precondition to approval of the sale. At the conclusion of the sale hearing, the Court approved the sale to Liberty and ordered the sale proceeds be held in abeyance pending further order of this Court.

## RELIEF REQUESTED AND BASIS FOR RELIEF

6. By this motion, BDCF requests entry of an order, pursuant to section 1112(b) of the Bankruptcy Code, converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code.

***There was concern regarding the administrative solvency of the Debtors' estates at the outset***

7. At the very outset of the Debtors' chapter 11 cases, it was clear that the administrative solvency of the Debtors' estates rested largely on the ability to generate a sale price for the Debtors' assets sufficient to satisfy the secured claims of both Bank of America and BDCF. Neither lending group was willing to agree to a budget that would fund the administrative costs of the chapter 11 process in full as a precondition for allowing the Debtors to proceed with a going concern sale process. At the hearing held on November 5, 2019, on the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protecting, (III) Modifying the Automatic Stay, (IV) Setting a Final Hearing, and (V) Granting Related Relief [D.I. 24] ("Final CC Hearing") various parties expressed this concern over

3

the approximately $6 million shortfall for projected administrative claims in the final cash collateral budget:

- Debtors' Counsel: "Some of the issues that were raised by the committee regarding the administrative solvency and the funding, moving that date up provides adequate funding for us to get through a sale process. And that was the parties' goal here, was to fund the administrative claims to get through a sale process, to see where the bids come in…. And we're going to have to talk about what we do from that date forward with what then may be a different fulcrum security." *See* Final CC Hearing, at 43:19–25, 44:1–4;

- Committee Counsel: "There is a lump sum, which you will see in the final order, that there really isn't consent on as to who is actually flipping[sic.] the bill for those….I think today is the stopgap, which is to say, there are concerns that ***neither lender at this point, neither group of lenders at this point has agreed, yes, you can use our collateral to pay those known administrative claims***." *Id.* at 49:4–12 (emphasis added); and

- BDCF Counsel: "there's an arrangement relative to cash collateral, but there's open issues there that have basically been pushed down the road until later." *Id.* at 95:4-7.

8. The parties, with the consent of the Court, agreed to proceed with a cash collateral[3] and sale process in chapter 11 that had a funding "hole" in it that needed to be filled for the Debtors' estates to remain administratively solvent. As the Court noted, the parties' approach of deferring the issue was reasonable under the circumstances, given the perceived favorable odds that the sale process would yield a price that would resolve the issue:

> Like I said, I think the resolutions reached here are reasonable and ensure that the parties are working towards not missing the forest through the trees and it makes a lot of sense to, perhaps, adjourn some of the issues to avoid the cost of a contested hearing today if those issues would never come to fruition.

Final CC Hearing, at 55:9-14. Unfortunately, the sale process did not produce the hoped-for results.

---

[3] The final cash collateral order included no section 506(c) waiver for Bank of America or BDCF in order to ensure that the estates would have the opportunity to seek payment of administrative claims entitled to treatment under section 506(c) in light of the potential for administrative insolvency. Potential surcharge claims have been paid in the ordinary course of business and hence that issue is now largely moot.

4

AmericasActive:14289568.6

9. At the hearing held on December 23, 2019 on Motion of the Debtors for Entry of (I) an Order (A) Approving Bid Procedures in Connection with the Potential Sale of Substantially All of the Debtors' Assets, (B) Scheduling an Auction and a Sale Hearing, (C) Approving the Form and Manner of Notice Thereof, (D) Authorizing the Debtors to Enter into a Stalking Horse Agreement, (E) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (F) Granting Related Relief; and (II) an order (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief [D.I. 73] (the "<u>Sale Hearing</u>"), the parties acknowledged the obvious math: the sale price of $28 million from Liberty would not be sufficient to repay the remaining Bank of America secured claim and the BDCF secured claim, thereby leaving the estate administratively insolvent (absent meaningful recoveries on avoidance actions).

10. At the Sale Hearing, Debtors' counsel opined that a situation could exist where all administrative claims would be paid in full, but that situation is conditioned upon a substantial recovery from speculative preference actions. *See* D.I. 369, at 10:13-16 (Hearing re Debtors' Motions for Entry of an Order Approving the Sale of Substantially All of the Debtors' Assets (December 23, 2019)). Committee counsel similarly observed that "[e]veryone is [in] agreement that Bank of America is going to be paid in full and that there is going to be a shortfall." *See* Sale Hearing, at 14:19–21.

11. Knowing that the administrative solvency of Debtors' cases was uncertain at best, BDCF was prepared for the Court to convert the Debtors cases to chapter 7. BDCF stated at the Sale Hearing that should the cases be converted to chapter 7, BDCF was comfortable with that outcome and its potential recovery therein. *See* Sale Hearing, at 52:6–9.

12. Nothing has occurred since the Sale Hearing to change these facts. The Debtors' estates are almost certainly administratively insolvent, and hence there is no reason to continue these cases in chapter 11.

***Continuing Debtors' cases in chapter 11 is impractical***

13. Continuing Debtors' cases in chapter 11 is impractical given that the sale is set to close on or about January 31, 2020 and the Debtors authority to use cash collateral will expire at that time. As the Court correctly observed, "cash collateral is running out and once Bank of America gets paid in full, [BDCF is] up to determine whether usage of cash collateral happens or not." *See* Sale Hearing, at 54:12–15. Not surprisingly, BDCF will not consent to the Debtors' use of cash collateral at that point, as there is no benefit to BDCF in the Debtors' continued use of cash collateral.

14. At the sale hearing, it was highlighted that when the sale closes on January 31st, the Debtors' estates will be approximately $4.4 million short on administrative claims. *See* Sale Hearing, at 9:14–16, 43:1. It does not make sense to allow a pot of administrative expenses to continue to accumulate that will be junior to BDCF's claim. The only basis to prime BDCF is through a section 506(c) surcharge. Still, surcharges to recover expenses from secured collateral are permitted only under "sharply limited" circumstances. *See In re Towne, Inc.*, 2013 BL 232068 (3d Cir. Aug. 29, 2013) *(quoting In re C.S. Assocs.,* 29 F.3d 903, 906 (3d Cir. 1994)). Furthermore, all or nearly all of the expenses that could qualify for surcharge treatment under section 506(c) have already been paid in the ordinary course of business, and all may in fact be paid by the time the sale closes. Thus, the Debtors' estates have reached end of the line: the sale is set to close, the Debtors' authority to use cash collateral will expire, and the Debtors' estates are administratively insolvent.

***Conversion of Debtors' cases is in the best interests of the Debtors' and their creditors***

15. Since the Debtors' estates are administratively insolvent, it is in the best interests of the Debtors' estates and their creditors to convert these cases to chapter 7. There are no unencumbered assets with which to pay chapter 11 administrative expenses. A liquidation under chapter 7 will halt the rising administrative expenses, of which the estate already cannot afford. Prolonging the Debtors' cases in chapter 11 serves only to continue the incurrence of administrative claims for which there is no likely source of payment. Similarly, prolonging the Debtors' cases in chapter 11 to pursue preference actions is unnecessarily costly. Such actions can be pursued by a chapter 7 trustee.

16. The current posture of being administratively insolvent, the significant diminution in value of the Debtors' estates and no remaining need to stay in chapter 11 to realize a going concern value eliminate any reasonable opportunity for unsecured creditors to receive a distribution in these cases. There is simply no reason these cases should remain in chapter 11. Section 1112(b)(l) of the Bankruptcy Code provides that the court "shall" convert or dismiss the case if the movant establishes cause, unless the court determines that unusual circumstances exist such that conversion or dismissal would not be in the best interests of creditors and the estate. 11 U.S.C. § 1112(b)(l); *In re 3 Ram, Inc.*, 343 B.R. 113, 118 (Bankr. E.D. Pa. 2006). Section 1112(b) does not define "unusual circumstances," but "it clearly contemplates conditions that are not common in most chapter 11 cases." 7 Alan N. Resnick & Henry J. Sommer, COLLIER ON BANKRUPTCY ("Collier") ¶¶ 1112.04[3] (15th ed. rev. 2006).

17. Section 1112(b) of the Bankruptcy Code provides in relevant part that a court shall convert a chapter 11 case, "for cause," upon the request of a party in interest:[4]

---

[4] The Committee is a party-in-interest in the Debtor's chapter 11 proceeding. *See* 11 U.S.C. § 1109(b); *In re Combustion Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2004).

7

AmericasActive:14289568.6

> [O]n request of a party in interest, and after notice and hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, **the court shall convert a case under this chapter to a case under chapter 7** or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause ....

See 11 U.S.C. § 1112(b) (emphasis added)**.**

18. Prior to the 2005 amendments to the Bankruptcy Code, section 1112(b) contained the language "may convert" as opposed to the "shall convert" language, which now appears in section 1112(b). One of the few courts to directly address this change to section 1112(b) of the Bankruptcy Code observed:

> This change diminishes the discretion the bankruptcy courts have in conversions to Chapter 11. If cause for dismissal or conversion to Chapter 7 exists discretion not to dismiss or convert is limited to those instances in which the court makes specific findings that unusual circumstances establish that the requested conversion or dismissal is not in the best interests of creditors and the estate.

*In re Broad Creek Edgewater, LP,* 371 B.R. 752, 759 (Bankr. D.S.C. 2007). Therefore, this Court is authorized and, in fact, mandated to convert the Debtor's chapter 11 case to chapter 7 upon a showing of cause.

19. Section 1112(b)(4) provides a non-exhaustive list of sixteen factors from which the Court may find a showing of "cause" for purposes of paragraph (b)(l). *See* 11 U.S.C. § 1112(b)(4); 7 Collier ¶ 1112.04[5]. One such ground includes where there is a continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation. 11 U.S.C. §1112(b)(4)(A); *In re Timbers of lnwood Forest Assocs., Ltd.*, 808 F.2d 363, 371-72 (5th Cir. 1987), *aff'd*, 484 U.S. 364 (1988); *In re ABEPP Acquisition Corp.*, 191 B.R. 365 (Bankr. N.D. Ohio 1996); *In re Kanterman*, 88 B.R. 26, 30 (Bankr. S.D.N.Y. 1988).

20. The test in determining whether there has been a continuing loss to or diminution of the estate is whether there is "a negative cash flow by the debtor after entry of the Order for Relief in the Chapter 11 case, [or] depreciation in value of the debtors' assets notwithstanding a possible positive cash flow, either condition sufficing to satisfy the first element set forth in § 1112(b)(I)." *Faden v. Faden*, Civ. No. 90-2863 (CSF), 1990 WL 191861 at *3 (D.N.J. Nov. 5,1990). For purposes of a liquidating chapter 11 case, in which there are no ongoing business operations, a negative cash flow exists so long as the estate continues to incur chapter 11 administrative expenses. *Loop Corp v. U.S. Trustee*, 379 F.3d 511, 515-516 (8th Cir. 2004) ("Under the interpretation of § 1112(b)(l) consistently used in bankruptcy courts, this negative cash flow situation alone is sufficient to establish 'continuing loss to or diminution of the estate.'"); *see also In re Lyons Transp. Lines, Inc.*, 123 B.R. 526, 531 (Bankr. W.D. Pa. 1991); *In re Schriock Constr., Inc.*, 167 B.R. 569, 575 (Bankr. D.N.D. 1994); *In re White Plains Road, Inc.*, 28 B.R. 515, 518 (Bankr. S.D.N.Y. 1983); 7 Collier ¶ 1112.04[5][a][i].

21. Here, the Debtors have no possibility of confirming a plan and, as Debtors stated in their First Day Declaration, do not intent to rehabilitate their businesses through a chapter 11 reorganization. Courts have consistently held that liquidation does not equate to the "rehabilitation" of the debtor contemplated by chapter 11. *See, e.g., ABEPP Acquisition*, 191 B.R. at 368 (debtor's intention to liquidate was one of the reasons the court converted the bankruptcy case); *In re Jeanette Corp.*, 85 B.R. 319, 343-44 (W.D. Pa. 1988) (where debtors' assets other than a cause of action were sold during chapter 11 case, proposed plan of liquidation was "not a plan for rehabilitation of the [d]ebtor"), *vacated on other grounds by Moody v. Simmons,* 858 F.2d 137 (3d Cir. 1988); *Matter of E. Paul Kovacs and Co.. Inc.*, 16 B.R. 203, 206 (Bankr. D. Ct. 1981) ("rehabilitation referred to in § 1112(b)(1) means more than liquidation under chapter 11"). The

9

term "rehabilitation" as used in section 1112(b)(l) of the Bankruptcy Code means "to put back in good condition; re-establish on a firm, sound basis." *In re ABEPP Acquisition Corp.*, 191 B.R. at 368 (citation omitted); *In re V Cos.*, 274 B.R. 721, 725 (Bankr. N.D. Ohio 2002).

22. Moreover, "'[r]ehabilitation' is not 'reorganization'; thus, the standard under section 1112(b)(l) is not the technical one of whether the Debtor can confirm a plan but, rather, whether the Debtors' business prospects justify [the] continuance of [a] reorganization effort," 7 Collier ¶ 1112.04[5][a][ii]. Here, no reorganization purpose is served, whatsoever. *See Matter of Woodbrook Assoc.*, 19 F.3d 312, 317 (7th Cir. 1994) (although "reorganization" may include a liquidating plan, rehabilitation does not); *see also In re Ledges Apts.*, 58 B.R. 84, 87 (Bankr. E.D. Va. 1986) ("Rehabilitation is not reorganization. Reorganization encompasses rehabilitation and may contemplate liquidation. Rehabilitation, on the other hand, may not include liquidation.").

23. No reorganizational values remain to be achieved in the chapter 11 process. In contrast to a chapter 7 liquidation, though, continuation of the chapter 11 proceedings will simply increase the expenses of estate administration once the sale closes. In fact, the Debtors are in a holding pattern maintaining operations only to facilitate the sale of substantially all assets.

24. Continuing in chapter 11 will only increase the administrative expense burden on the already administratively insolvent estates. The Debtors have no further sources of financing, their authority to use cash collateral is expiring and they lack the ability to fund ongoing administrative expenses that may be incurred after the closing of the sale. Therefore, BDCF submits that converting the chapter 11 cases to cases under chapter 7 at this time is warranted and necessary. Based on discussions with Committee counsel, BDCF believes the Committee also supports conversion of these cases to chapter 7.

25. Notwithstanding the foregoing, BDCF will continue discussions with the Committee and the Debtors to explore whether a more economically advantageous path exists in chapter 11. If the parties do not agree on such a path by the time the sale closes, the Debtors' cases must be converted.

## CONCLUSION

WHEREFORE, for the foregoing reasons, BDCF respectfully requests that this Court enter an order converting these cases from chapter 11 to chapter 7 and grant such other and further relief as the Court deems proper.

Dated: January 21, 2020

FOX ROTHSCHILD LLP

By: */s/ Seth S. Niederman*
Seth A. Niederman (DE No. 4588)
919 North Market Street, Suite 300
Wilmington, DE 19899-2323
Tel: (302) 654-7444
Email: sniederman@foxrothschild.com

-and-

Daniel J. McGuire (IL No. 06239526)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
Tel: (312) 558-5600
Email: dmcguire@winston.com

*Counsel to Black Diamond Commercial Finance, L.L.C.*